John T. Jasnoch (CA 281605)
Cornelia J. B. Gordon (CA 320207)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile:  619-233-0508
jjasnoch@scott-scott.com

*Attorneys for Lead Plaintiff Ronald J. Solotruk*
*and Lead Counsel for the Class*

[Additional Counsel on Signature Page.]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| DEREK PETERSEN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>TRIPLEPOINT VENTURE GROWTH BDC CORP., JAMES P. LABE, CHRISTOPHER M. MATHIEU, and SAJAL K. SRIVASTAVA,<br><br>Defendants. | Case No. 3:23-cv-02980-TLT<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT AND OBJECTION TO DEFENDANTS' REQUEST FOR JUDICIAL NOTICE**<br><br>Date: February 20, 2024<br>Time: 2:00 p.m.<br>Location: Courtroom 9 – 19th Floor<br>Judge: Hon. Trina L. Thompson, D.J. |

**TABLE OF CONTENTS**

I.      INTRODUCTION .........................................................................................................ii

II.     STATEMENT OF FACTS .......................................................................................... 2

        A.  TPVG's Business and Operations.................................................................... 2

        B.  The Valuation Process and Resulting Conflicts.............................................. 3

        C.  Assignment of Credit Risk Categories............................................................ 4

        D.  Numerous TPVG Portfolio Companies Lapse into Crisis ............................... 5

        E.  The Truth Gradually Begins to Emerge........................................................... 9

III.    ARGUMENT .............................................................................................................. 10

        A.  Plaintiff Adequately Pleads False and Misleading Statements....................... 10

            1.  Defendants' Inadequate Risk Disclosures Do Not Immunize Them .....................10

            2.  Plaintiff Adequately Pleads Inflated Fair Values.......................................12

            3.  Defendants' Characterizations of Loan Quality Are Actionable...........................15

            4.  Defendants' Risk Rating Statements Are Actionable............................................16

        B.  Plaintiff Adequately Alleges a Strong Inference of Scienter......................................... 18

            1.  Plaintiff Alleges More than Access to Unspecified Information...........................18

            2.  Defendants Motive and Opportunity Supports Inferring Scienter........................20

            3.  The Core Operations Doctrine Applies...............................................................22

        C.  Plaintiff Adequately Alleges Loss Causation .................................................. 23

            1.  The Bear Cave Report Qualifies as a Corrective Disclosure...............................23

            2.  Defendants' May 3, 2023 Statements Were Also Corrective ...............................24

            3.  Defendants' "Statistical Significance" Arguments Are Without Merit.................24

IV.     DEFENDANTS' REQUEST FOR JUDICIAL NOTICE SHOULD BE
        LARGELY DENIED ......................................................................................................... 25

V.      CONCLUSION................................................................................................................ 25

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abrams v. Blackburne & Sons Realty Cap. Corp.*,
    2019 WL 8640656 (C.D. Cal. Dec. 2, 2019) ..............................................................................21

*Barnes v. SunPower Corp.*,
    2023 WL 2592371 (N.D. Cal. Mar. 16, 2023).............................................................................25

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008) .....................................................................................................11

*City of Dearborn Heights Act 345 Pol. & Fire Ret. Sys. v. Align Tech.*,
    856 F.3d 605 (9th Cir. 2017) ................................................................................................12, 22

*Durning v. First Bos. Corp.*,
    815 F.2d 1265 (9th Cir. 1987) ...................................................................................................16

*Eng v. Edison Int'l*,
    2018 WL 1367419 (S.D. Cal. Mar. 16, 2018), *aff'd*, 786 F. App'x 685 (9th
    Cir. 2019) ...................................................................................................................................24

*ESG Cap. Partners, LP v. Stratos*,
    828 F.3d 1023 (9th Cir. 2016) ...................................................................................................18

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)........................................................................................15

*Glazer Cap. Mgmt., LP v. Magistri*,
    549 F.3d 736 (9th Cir. 2008) .....................................................................................................21

*Hoang v. ContextLogic, Inc.*,
    2023 WL 6536162 (N.D. Cal. Mar. 10, 2023)............................................................................19

*In re Alphabet, Inc. Sec. Litig.*,
    1 F.4th 687 (9th Cir. 2021) ...........................................................................................11, 18, 21

*In re BioMarin Pharm. Inc. Sec. Litig.*,
    2022 WL 164299 (N.D. Cal. Jan. 6, 2022) ................................................................................18

*In re BofI Holding, Inc. Sec. Litig.*,
    977 F.3d 781 (9th Cir. 2020) .....................................................................................................23

*In re Countrywide Fin. Corp. Sec. Litig.*
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) ................................................................................15, 16

*In re Cutera Sec. Litig.*,
    610 F.3d 1103 (9th Cir. 2010) ...................................................................................................16

ii

*In re Daou Sys., Inc.*,
    411 F.3d 1006 (9th Cir. 2005) ..................................................................................................18

*In re Nektar Therapeutics Sec. Litig.*,
    34 F.4th 828 (9th Cir. 2022) ....................................................................................................23

*In re New Century*,
    588 F. Supp. 2d 1206 (C.D. Cal. 2008) ..............................................................................14, 16

*In re Pivotal Sec. Litig.*,
    2020 WL 4193384 (N.D. Cal. July 21, 2020)..........................................................................12

*In Re Questcor Sec. Litig.*,
    2013 WL 5486762 (C.D. Cal. Oct. 1, 2013).............................................................................11

*In re Security Cap. Assur. Ltd. Sec. Litig.*,
    729 F. Supp. 2d 569 (S.D.N.Y. 2010)......................................................................................24

*In re Signet Jewelers Ltd. Sec. Litig.*,
    2018 WL 6167889 (S.D.N.Y Nov. 26, 2018)...........................................................................16

*In re Sorrento Therapeutics, Inc. Sec. Litig.*,
    2021 WL 6062943 (S.D. Cal. Nov. 18, 2021) ..........................................................................21

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ...................................................................................................25

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
    416 F.3d 940 (9th Cir. 2005) ...................................................................................................11

*Lopez v. Smith*,
    203 F.3d 1122 (9th Cir. 2000) .................................................................................................25

*Mahapatra v. Truecar*,
    2015 WL 12552062 (C.D. Cal. Dec. 9, 2015) .........................................................................19

*Nguyen v. Radient Pharm. Corp.*,
    2011 WL 5041959 (C.D. Cal. Oct. 20, 2011)...........................................................................23

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)..................................................................................................................12

*Prodanova v. H.C. Wainwright & Co. LLC*,
    2019 WL 4143301 (C.D. Cal. July 2, 2019), *aff'd*, 993 F.3d 1097 (9th Cir.
    2021) ........................................................................................................................................19

*Retail Wholessale & Dep't Stores Union v. Hewlett-Packard Co.*,
    845 F.3d 1268 (9th Cir. 2017) .................................................................................................16

*S. Ferry LP, No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ...................................................................................................22

iii

*Seaman v. Cal. Bus. Bank*,
   2014 WL 1339649 (N.D. Cal. Apr. 2, 2014) ........................................................................11

*Shapiro v. UJB Fin. Corp.*,
   964 F.2d 272 (3d Cir. 1992)....................................................................................................16

*Tellabs, Inc. v. Makor Issues & Rts. Ltd.*,
   551 U.S. 308 (2007)................................................................................................................18

**TABLE OF ABBREVIATIONS**

| Abbreviation | Meaning |
|---|---|
| Mot. or Motion | Defendants' Notice of Motion and Motion to Dismiss Plaintiff's First Amended Complaint (ECF No. 48) |
| FAC or ¶___ | Plaintiff's First Amended Complaint for Violations of the Federal Securities Laws, filed December 5, 2023 (ECF No. 39) |
| TPVG | Defendant TriplePoint Venture Growth BDC Corp |
| TPC | TriplePoint Capital LLC |
| Defs.' Ex. or Defs.' Exs. | Exhibit(s) to Declaration of Carl Hudson in Support of Defendants' Notice of Motion and Motion to Dismiss Plaintiff's First Amended Complaint |
| BDC | Business Development Company |
| TCPA | Telephone Consumer Protection Act |
| RJN | Defendants' Request for Judicial Notice Regarding Defendants' Notice of Motion and Motion to Dismiss Plaintiff's First Amended Complaint (ECF No. 49) |
| TPA | TriplePoint Advisers LLC |

Unless otherwise noted, emphasis is added and certain quotation marks, alteration marks, citations, and emphases have been omitted.

## I.    INTRODUCTION

This case involves straightforward securities fraud claims against a lender, TPVG, and its most senior officers.  As detailed in the operative FAC, Defendants routinely assured investors throughout the Class Period that TPVG was investing in the "high[est] quality venture growth stage companies" and maintaining its loan portfolio's "excellent credit quality" through its "highly selective and disciplined" approach of investing in only "exceptional" and "compelling" growth stage companies (*e.g.*, ¶¶179, 181, 187-88, 194, 200, 204) – and further comforted investors by reporting virtually all of its loans at full face value and as meriting one of TPVG's top two credit rankings on its 5-point scale (*i.e.*, as performing at least "at or above expectations").  *See generally* ¶¶180-206.  Unbeknownst to TPVG investors, however, by no later than the start of the Class Period (May 4, 2022), TPVG's portfolio quality was materially declining, and TPVG was lending to increasingly risky borrowers (and even "doubling down" by lending troubled borrowers more even as their problems were becoming more dire).  *Id.*; *see also ¶¶*61-177.

In response, Defendants argue that they adequately warned investors that TPVG's loan business involved risks – but ignore the basic rule that to warn of risks provides no defense to a failure to disclose that such "risks" have ***already*** substantially materialized.  They also argue that Plaintiff fails to adequately allege that Defendants acted with *scienter* (*i.e.*, with conscious or reckless disregard for the truth) – but ignore (*inter alia*) Plaintiff's well-pled allegations as to Defendants' extensive access to non-public information about the "Portfolio Companies" that received TPVG loans.  Defendants' *scienter* and lack of material falsity arguments also ring hollow in the face of Plaintiff's detailed allegations (all pled without any discovery) regarding serious problems that plagued scores of TPVG loans, worth a combined $222.6 million, to over a dozen different entities.  ¶¶205, 225.  And while Defendants are sufficiently desperate to resort to citing materials outside the pleadings to construct their own self-serving counter-narrative, such tactics, to the extent they are not improper under controlling Ninth Circuit precedent, only support the kind of heavily fact-based defense inappropriate for resolution at this early pleading stage.

In sum, accepting Plaintiff's factual allegations as true and drawing the reasonable inferences therefrom in his favor, the FAC pleads the alleged fraud with ample particularity and

1

raises the requisite "strong inference" of Defendants' *scienter*. Defendants' remaining miscellany of arguments for dismissal are also without merit, as set forth below.

## II. STATEMENT OF FACTS

### A. TPVG's Business and Operations

Defendants Labe and Srivastava created the "TriplePoint" brand in 2003 by founding TPC, a private company that provides financing to venture capital-backed entities. ¶4. In 2013 they founded TPVG as a BDC that would also invest in venture-capital stage start-ups, primarily through debt financing (*i.e.*, loans). ¶¶2-3. As a publicly-traded BDC, TPVG enables its investors to participate in its investments, giving TPVG a pool of capital to finance its investments (which are often structured as co-investments with other TriplePoint-affiliated vehicles). ¶¶2-3, 33.

TPVG attracts investors by assuring them that it thoroughly vets its Portfolio Companies before investing in them, and that it thereafter closely monitors such companies' operations. This vetting and monitoring is conducted largely through TPA, which was also founded by Labe and Srivastava (who have a "material pecuniary interest" in it; ¶8) and serves as TPVG's investment advisor in exchange for a 1.75% management fee and incentive fees based on a percentage of net investment income and/or realized capital gains. ¶37. TPA is broadly "responsible for sourcing, reviewing and structuring investment opportunities for [TPVG], underwriting and performing due diligence on [TPVG's] investments and monitoring [TPVG's] investment portfolio on an ongoing basis." ¶37. TPVG's public filings further detail how TPA, on TPVG's behalf, keeps very close tabs on each Portfolio Company. Specifically:

- TPA uses "an ***extensive internal credit tracking and monitoring approach*** to regularly follow a borrower's actual financial performance and achievement of business-related milestones to ensure that the internal risk rating assigned to each borrower is appropriate," a process that has been refined and "validated by Mr. Labe and Mr. Srivastava" (¶16);

- Each Portfolio Company is assigned a dedicated team of TPA employees (¶43), and every month or quarter a member of each such team will review "various financial statements, compliance reports and other documents received from" its assigned Portfolio Company, plus the Company's "publicly filed financing statements, … and press releases" – and the reviewing TPA team member will enter those documents into TPA's "proprietary client-management platform for review by the rest of the Portfolio Company['s] Team" (*id.*);

- At least quarterly, all Portfolio Companies are given an "extensive re-evaluation," which results in the preparation of a "portfolio update" addressing, *inter alia*, the "timing/status of the [subject company's] next equity financing round, cash balance and burn rate, financial and operational progress, and covenant adherence" (¶44);

2

- On a weekly basis, TPA's "Investment Committee" (consisting solely of Labe and Srivastava) and TPA's senior investment team "review material events and information on [TPVG's] borrowers and discuss in detail those borrowers that are performing below expectations" (*id.*);

- Each such Portfolio Company review meeting is "typically attended" by one or more Investment Committee members (*i.e.*, by Labe and/or Srivastava), by TPA's senior investment team, and by the relevant Portfolio Company team (*id.*); and

- Defendants Labe and Srivastava "may be called upon to provide ***and currently do provide*** significant managerial assistance to [P]ortfolio [C]ompanies and other investment vehicles which are managed by [TPA]" (¶46).

That much we know from TPVG's public filings, but a loan agreement filed in one Portfolio Company's bankruptcy provides further details about TPVG's access to information:

- It confirms that each Portfolio Company must provide TPVG with monthly and annual financial statements that describe "any material contingencies" (including litigation contingencies) facing it, as well as "an unaudited income statement," cash flow statements, a GAAP-compliant unaudited balance sheet, and "copies of all board packages delivered" to that Portfolio Company's directors "in connection with board meetings or otherwise" (¶¶47-48); and

- It also confirms that, shortly before the end of each fiscal year, each Portfolio Company must provide TPVG with its budget and business plan, and must, within 180 days of fiscal year end, also provide TPVG with its "audited financial statements accompanied by an audit report" (*id.*).

Per its loan agreement, TPVG is also entitled to additional information from Portfolio Companies, including "tax returns, income statements, balance sheets and names of principal creditors," and (through the lender's collateral agent) audits and inspections "with reasonable notice." *Id.*

## B. The Valuation Process and Resulting Conflicts

Information as to each Portfolio Company's condition is also provided to TPVG's Board as part of TPVG's valuation process. ¶47. But that information is not provided in a vacuum; instead, TPA (led by Labe and Srivastava) gives TPVG's Board "valuation recommendations based upon the most recent and available information, which generally includes industry outlook, capitalization, financial statements and projected financial results of each portfolio company." ¶¶47, 235. Indeed, TPVG's most recent Form 10-K concedes that Labe and Srivastava's influence over valuations creates a potential conflict of interest as "[t]he participation of [TPA]'s senior investment team in our valuation process, ***and the pecuniary interest in [TPA] by certain members of our Board*** [*i.e.*, Labe and Srivastava], could result in a conflict of interest given that the base

3

management fee is based, in part, on the value of our average adjusted gross assets, and [TPA]'s incentive fee is based, in part, on realized gains and realized and unrealized losses." ¶235.

TPVG's investment and management structure created powerful incentives for Labe and Srivastava to exert their control over TPA and TPVG's Board (on which they both serve) to keep the Portfolio Company loans' reported fair values as high as possible for as long as possible. First, the higher the reported fair value of TPVG's investment assets, the higher the management fee that TPA is paid – and, indirectly, the more that Labe and Srivastava benefit. *See* ¶¶232-36. Second, TPVG itself admits that in co-investment scenarios where TPVG has invested with other TriplePoint entities, TPA might cause TPVG to refrain from taking actions (*e.g.*, downgrading a Portfolio Company's credit risk category, or writing down the value of a loan) that would "disadvantage" TPC or its affiliates. *See* ¶¶33, 237-39. Third, TPVG's ability to continue operating is predicated on its compliance with the terms of its secured revolving credit facility and of various notes it has issued (with maturity dates in 2025, 2026, and 2027) – all of which have cross-default provisions such that a default under any would be catastrophic for TPVG. ¶¶240-45. A number of "events of default" are tethered to the quality of TPVG's investment portfolio, further incentivizing Defendants to avoid taking any action that might directly or indirectly cause the value or quality assessment of the portfolio to be lowered. ¶245. Finally, TPVG holds smaller equity positions in a number of Portfolio Companies, and would be similarly incentivized to avoid doing anything that could ultimately hurt its equity stakes. ¶248. In other words, and as discussed further below, Defendants had every incentive to delay disclosing problems at the Portfolio Companies until the eleventh hour – which is exactly what they did, time after time.

### C. Assignment of Credit Risk Categories

The quarterly valuations were one metric by which TPVG investors could try to assess the strength of its loan portfolio. The other key metric was TPVG's categorization of its Portfolio Company loans into one of five credit risk categories. ¶54. New loans were generally assigned to category "White (2)" – "[p]erforming at expectations and/or reasonably close to it." The only higher category was "Clear (1)," with the categories below White (2) being "Yellow (3)," "Orange

(4)," and "Red (5)," with the lower-numbered categories reflecting increasing risks of default.[1] *Id.* Unlike the Portfolio Company valuations, which are (at least in theory) subject to board oversight, it is TPA that determines each Portfolio Company's credit risk category.  ¶¶54-55.  More specifically, it is the judgment of TPA's senior investment team (led by Labe and Srivastava) that determines the credit risk category for each Portfolio Company.  ¶¶15-16, 36, 55.

### D.    Numerous TPVG Portfolio Companies Lapse into Crisis

Knowing all they knew, with access to all that they had, and by their own representations, Defendants closely watched each Portfolio Company and its performance.  But as discussed below, they provided investors with a grossly misleading picture of the Portfolio Companies' health time and again, even as many of them fell into financial crisis or folded entirely.  For example:

**Medly Health, Inc.**, operated an unprofitable digital pharmacy that was losing an average of $12 million-$14 million per month when TPVG made two initial *junior* secured loans totaling $10 million in 2020.  ¶¶64, 66.  As per CW1 (a then-Medly Vice President who stayed with the company through the end of 2022), although Medly had raised $100 million in its most recent round of financing in 2020 to finance its operations, it actually used that money to acquire another pharmacy company (Pharmaca) in a deal that closed in early 2022.  ¶¶67-68.  That acquisition left Medly "very thin on extra money" – a serious problem given Medly's cash needs.  ¶68.

Nonetheless, in March 2022, TPVG loaned Medly a further $20 million, bringing its total loans to Medly to roughly $30 million.  ¶69.  But with the funds that had been diverted to the Pharmaca deal, it was obvious that substantially more funding was needed – and as Defendants knew, during the summer of 2022 a badly-needed $130 million funding round had fallen through. That left TriplePoint and Medley's other existing investors scrambling to find emergency funds for Medly, with TPVG ultimately loaning it another $4 million as part of a $20 million emergency funding round that still left Medly far short of the $130 million it needed to keep going.  ¶¶70-71. By late August 2022, with Medly having been unable to purchase drugs to fill prescriptions for the prior 3½ weeks and sales having plummeted by 80%, Medly was forced to cut more than 50% of its workforce between August and early November 2022.  ¶72.

---

[1]    The details of the various risk ratings are set forth in §III.A.3.

However, in its Form 10-Q for Q3 2022 (filed 11/2/2022), TPVG reported the fair value of its roughly $34 million in loans to Medly at $32 million (*i.e.*, near face value). *Id.* Defendants also decided to defer putting Medly on nonaccrual until the first day *after* Q3 2022 ended – thereby allowing them to avoid reporting this adverse development in TPVG's Q3 2022 disclosures. ¶73. Accordingly, it was only after Medly *filed for bankruptcy* in December 2022 that TPVG downgraded Medly's credit risk rating from Yellow (3) ("performing below expectations") to Red (5) and recognized the full amount of its $34 million in Medly loans as realized losses. ¶¶73-76.

**The Pill Club**, a company that prescribed and sold contraceptive pills, borrowed $20 million from TPVG in August 2022 under a prior funding commitment made in 2021. ¶¶77-80. By the time TPVG funded the loan, The Pill Club was embroiled in the late stages of a civil investigation by California's DOJ and Insurance Commissioner into charges that it was violating (*inter alia*) proper medical procedures and engaging in improper billing practices; by no later than April 2022 it had become aware of a *qui tam* complaint against it, and by June 2022 it had unsuccessfully tried to mediate the charges. ¶¶78-80. Nonetheless, TPVG valued its $20 million loan to The Pill Club at roughly $19.85 million as of the end of both Q3 and Q4 2022.

In late 2022, The Pill Club settled with California, which led to the *qui tam* complaint becoming public in January 2023. ¶82. Predictably, "several key partners" terminated their Pill Club contracts with the public disclosure of the *qui tam* suit and settlement, causing a projected 60% loss in revenue. *Id.* Then, in March 2023, another key partner served a notice of a $50 million breach of contract claim, and Michigan served investigative demands based on the same improper conduct that California had pursued. ¶83. In April 2023, The Pill Club filed for bankruptcy. ¶84.

In the bankruptcy, the Trustee marketed The Pill Club's business and assets to more than 70 companies. Ultimately, the only entity that even bothered to submit a qualified bid was another TPVG Portfolio Company. Absent this inside deal, TPVG would almost certainly have been forced to write off its loan to The Pill Club in full (as it had done with Medly). *See id.*

**Hi.Q, Inc.**, was a life insurance broker when TPVG loaned it $13.25 million in 2018, but it then completely switched to brokering Medicare supplement insurance in 2019. ¶¶87-88. In November 2020, the first of several class actions were filed against it under the TCPA for

6

marketing misconduct, with later suits being filed in December 2020, June 2021, October 2021, and February, March, and May of 2022. ¶¶91-93. By late 2021, Hi.Q had retained a restructuring firm to try to reorganize its business (with the restructuring firm receiving a first priority lien against payment of its $6.5 million fee). ¶94. Those efforts evidently failed, and by late November 2022 Hi.Q's CEO was making statements suggesting that Hi.Q was not going to be in business much longer. ¶96. Hi.Q's situation worsened on December 7, 2022, when its motion for summary judgment in one of the TCPA class actions was denied. ¶97. Hi.Q began mass layoffs the next day, reportedly slashing its workforce from roughly 1,000 employees to just 30. *Id.* Later in December, as the first of at least a dozen creditor suits began to roll in, Hi.Q's CEO wrote to investors that he was "very sorry that I lost your money." ¶¶98-104. Hi.Q filed for bankruptcy under Chapter 7 in August 2023.

Despite the rampant red flags at Hi.Q, including its switch to a completely new business model, a failed restructuring attempt, class actions challenging its marketing practices, the slashing of its workforce, and its CEO's admission to investors that he had "lost [their] money," TPVG did not even downgrade Hi.Q's credit risk category from White (2) (performing at expectations) to Yellow (3) (performing below expectations) until it filed its Form 10-K for FY 2022 on March 1, 2023 – and even then it still reported the fair value of its $25.117 million in Hi.Q loans at roughly 90% of their outstanding principal. ¶¶101-03. And at the end of Q1 2023, TPVG was still valuing the loans at more than 70% of outstanding principal. ¶¶104-06. It was only after Hi.Q filed its no-asset Chapter 7 bankruptcy in August 2023 that TPVG finally wrote off these loans. ¶108.

**VanMoof**, a Dutch maker of e-bikes, saw its net losses grow from €46.9 million in 2020 to €77.8 million in 2021 (with losses estimated to be the same in 2022) despite increased sales. ¶¶109-11. Although it raised enough cash to cover its 2021 losses (helped by a roughly $13 million loan from TPVG), by the fall of 2022 VanMoof was asking its suppliers to agree to defer payments – and TPVG and its affiliates were resorting to pumping in additional millions of emergency funding just to keep VanMoof afloat. ¶113. Indeed, in January 2023 (in its belatedly prepared Annual Report *for 2021*) VanMoof admitted that its ability to continue as a going concern through Q1 2023 was in doubt. ¶112. Nonetheless, as late as 12/31/2022, TPVG was carrying its $18.785

7

million in VanMoof loans at roughly 89% of outstanding principal, and Defendants' only comment on VanMoof in TPVG's March 1, 2023 earnings call was that TPVG was reducing VanMoof's credit risk category from White (2) to Yellow (3).  ¶¶115-16; 205.  It was therefore not until *after* VanMoof actually filed for bankruptcy in July 2023 that, in its Q2 2023 Form 10-Q, TPVG reported the fair value of its VanMoof loans at 24.3% of outstanding principal.  *Id.*

As the FAC details, the Medly, Pill Club, Hi.Q, and VanMoof scenarios are simply examples of the many situations where (1) TPVG made substantial loan(s) to a Portfolio Company, (2) the financial condition of the Portfolio Company deteriorated sharply during the Class Period, and (3) Defendants, despite having extensive access to non-public information about the Portfolio Company, repeatedly failed to disclose the truth about that Company's condition or credit risk.  Although the state of no single Portfolio Company (or associated loan), viewed in isolation, may have been material to a TPGV investor, viewed holistically and in the aggregate, TPVG's conduct materially misled its investors as to the creditworthiness of its loan portfolio as a whole and the *degree* of risk associated with investing in TPVG.  Other examples of TPVG's pattern and practice of failing to adequately disclose the decay in its loan portfolio include:

- **RenoRun**.  After firing nearly 50% of its staff between August and November 2022, and after needed bridge financing fell through as vendors went unpaid, RenoRun went into liquidation in March 2023.  Yet TPVG didn't even downgrade the risk category on its $2.8 million investment notes – and then only from White (2) to Yellow (3) – until its 1Q 2023 earnings call on May 3, 2023.  ¶¶119-30.

- **Capsule**.  After borrowing $15 million in 2020, throughout the Class Period this online pharmacy was facing multiple class actions from a major customer data breach, suffering from a botched automation project and resulting cash crunch, laying off staff and shutting down in two large cities.  Yet TPVG consistently carried these loans at face, and never downgraded Capsule's credit risk.  ¶¶131-35.

- **Good Eggs**.  By 2021 TPVG had invested roughly $14.4 million in loans and preferred stock in this produce delivery company, but during the Class Period its revenue was collapsing at a rate of 18% p.a., its efforts to be acquired failed, and it had to resort to raising new equity that valued it at just $15 million – a staggering 94% devaluation in just two years.  Yet once again, TPVG continued to value its Good Eggs loans – and even its equity, up to a point – at 100% of original cost.  ¶¶136-40.

- **Underground Enterprises**.  TPVG loaned this wine seller $6 million in three loans in May, June, and August of 2022.  But by early 2023 its revenues were crashing and it was failing to deliver paid-for products, leading to its Chapter 7 bankruptcy filing on May 1, 2023.  TPVG would later admit that, rather than Underground being a "high quality" borrower, TPVG viewed its loans to this entity as an "inventory-based financing facility."  Yet even as late as its Q1 2023 Form 10-Q, in which TPVG belatedly announced a token

8

downgrade of the loans from White (2) to Yellow (3), TPVG continued to value them at 97.5.% of face. ¶¶141-47.

- **Demain/Luko**. This insurtech startup received $17.4 million in loans in 2021 and mid-2022 – but by December 2022 it was in dire straits after failing to raise a hoped-for €100 million financing, which triggered a €12 million accelerated payment obligation it could not pay. Luko filed for certain creditor protections under French law in June 2023. Yet in its Q1 2023 Form 10-Q, as with Underground, TPVG only reported a token downgrade from White (2) to Yellow (3), and still valued the loans at 95.7% of face. ¶¶151.

- **Untitled Labs**. This bathroom remodeling company was lent $10 million in mid and late 2022, but its business was defunct by October 2023. And though there is no indication that its demise was due to anything other than systemic and endemic problems at the company, TPVG continued to value these loans at near face value – until it abruptly slashed their value in half as of 6/30/2023. ¶¶154-58.

This same pattern of fundamental and serious declines in the condition of Portfolio Company borrowers – which Defendants then routinely either totally failed to disclose or disclosed only inadequately (*e.g.*, in the form of a modest and belated credit downgrade) until the last minute possible – would also repeat in connection with multiple other loans and related equity investments that TPVG made. ¶¶167-75 (detailing the deterioration at Mind Candy, Modsy, and Roli), ¶¶176-77 (identifying four more Portfolio Companies that were downgraded to as low as Orange (4) by 9/30/2023 (which was just 18 months, or even less, after the loans to these additional "high quality" companies were made)).[2]

### E.    The Truth Gradually Begins to Emerge

The truth about the quality of TPVG's loan portfolio began to emerge in spring of 2023, beginning with its March 1, 2023 disclosures that it had written off all of its $34 million investment in Medley, and had downgraded its $43 million in total loans to VanMoof and Hi.Q from White (2) to Yellow (3). ¶209. Then, on May 2, 2023, a well-read market newsletter

---

[2]    For example, **Mind Candy Ltd.** was forced to renegotiate its TPVG loans multiple times, with earlier renegotiations including a switch to Payment-in-Kind ("PIK") interest that led to ballooning loan balances ($22 million by Q2 2023), despite Mind Candy's unprofitable status and minimal revenue. ¶¶159-64. TPVG listed the fair value of the Mind Candy loans at effectively face value during the Class Period, and even in its Q2 2023 filing, it was reporting the fair value as roughly 85% of the total owed. ¶¶164-66. TPVG reported the fair value of its loans to **Modsy** at *above* their face value until August 2022, shortly after Modsy announced it was winding down its business, when it abruptly downgraded Modsy from White (2) to Red (5) and wrote off 85% of its loans to the company. ¶¶167-71. **Roli, Ltd.** has likewise only managed to survive thanks to TPVG shareholders' generosity: after the company went through an administration proceeding in the U.K., TPVG restructured its loans to Roli so that they were not accruing interest and had no EOT payment. ¶¶172-74. The restructured loans provide no benefit to TPVG's shareholders, but they *do* allow Defendants to keep them on the books and avoid realizing losses.

("*The Bear Cave*") flagged a host of issues, reporting that the credit quality of TPVG's loan portfolio was far worse than previously disclosed and that it was "saddled by portfolio company bankruptcies and upside-down startups" (and which, after discussing the Medly fiasco, also cited serious problems at Pill Club, Capsule, VanMoof, RenoRun, Good Eggs, and Hi.Q). ¶¶211-14. In response, the price of TPGV shares fell over 10%. ¶215.

After the market close on May 3, 2023, TPVG issued its Q1 2023 Form 10-Q, which disclosed $10.9 million in unrealized losses in the quarter and TPVG's belated downgrading of a number of Portfolio Companies, including VanMoof, Hi.Q, Luko, The Pill Club, Underground Enterprises, and RenoRun, and their outstanding loans of nearly $100 million. TPVG also disclosed that the latter three entities had filed for bankruptcy. In response, TPVG shares fell a further 8.57%. ¶¶216-21.

Since May 2023, TPVG has continued to suffer further writedowns and been forced to downgrade additional loans. As of November 1, 2023, what TPVG had repeatedly described as "high quality" loans made to "compelling" venture growth companies and had carried at full face value (or nearly so) over the Class Period were revealed to be anything but: a staggering $226.2 million in principal amount of those loans had either been written off, materially downgraded, or (in the case of The Pill Club) saved from disaster by a timely bailout from another TPVG Portfolio Company. ¶¶222-26. TPVG has also had to mark-down additional millions of "fair value" on its equity stakes in many of those same companies. ¶227.

## III.　ARGUMENT

### A.　Plaintiff Adequately Pleads False and Misleading Statements

Defendants concede that Plaintiff adequately pleads the "who, what, when and where" of each of their alleged fraudulent statements (*see* p. 1, *supra*), but assert that Plaintiff fails to allege "with particularity" the reasons "why" they are actionable. Defendants are wrong.

#### 1.　Defendants' Inadequate Risk Disclosures Do Not Immunize Them

First, Defendants argue that they adequately warned investors that its Portfolio Companies "***could*** experience deterioration or limited growth" that in turn "***could*** ultimately lead to difficulty in meeting their debt service requirements and [increased] defaults." Mot. at 7. However, risk

10

warnings that "speak[] entirely of as-yet-unrealized risks and contingencies" and fail to alert the reader that "some of these risks *may already have come to fruition*," do not insulate Defendants from liability. *See, e.g.*, *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986 (9th Cir. 2008); *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 701 (9th Cir. 2021). Similarly, here Plaintiff has cited numerous examples of *specific* Portfolio Companies that were *already* suffering significant decay. Likewise, generic, boilerplate risk "disclosures" applicable to all lenders (like those here) do not insulate Defendants from liability. *See, e.g.*, *In Re Questcor Sec. Litig.*, 2013 WL 5486762, at *13 (C.D. Cal. Oct. 1, 2013). In such circumstances, Defendants' conduct in continuing to falsely describe the "high quality" of their Portfolio Companies, while also failing to make timely credit and loan value downgrades, is not immunized. And unlike *Seaman v. Cal. Bus. Bank*, 2014 WL 1339649, at *1 (N.D. Cal. Apr. 2, 2014), on which TPVG relies (Mot. at 8), this is *not* a case where a defendant lender "candidly acknowledged [its] precarious financial situation";[3] *see also Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947 (9th Cir. 2005) (dismissal under the bespeaks caution doctrine "requires a stringent showing").

Defendants then argue that they did make "contemporaneous" disclosures, noting that they disclosed Medly's and Pill Club's bankruptcies *after* they had been publicly filed, and downgraded VanMoof *after* a major Dutch paper had reported on its inability to get vital funding. *Id.* But where Defendants, who touted their insider access to Portfolio Company financial information, delayed making disclosures until bankruptcies *had already occurred* or severe problems were otherwise publicly revealed, their delays do nothing to undercut Plaintiff's theory of liability: namely, that Defendants misled investors by failing to *timely* disclose serious problems at the Portfolio Companies until well *after* such problems had already materialized. Simply stated, common sense confirms that "high quality" companies do not "blow up" overnight, and that Plaintiff adequately alleges that Defendants were aware of severe problems at, *e.g.*, Medly, Pill Club, and VanMoof well before they publicly imploded. *See* §II.D.

---

[3]    The plaintiff in *Seaman* also alleged that the defendant bank failed to disclose any information about a tranche of loans whose collectability was "highly questionable," but the discussion and analysis in *Seaman* which Defendants cite involved the alleged reserve adequacy misstatements and not the omissions. *Id.*, at *1-*2, *7.

PLTFF'S OPP. TO DEFS.' MOT. TO DISMISS AND OBJ. TO REQ. FOR JUDICIAL NOTICE – Case No. 3:23-cv-02980-TLT

Alternatively, Defendants argue they had no duty to disclose "more" about any of its troubled Portfolio Companies.  As an initial matter, disclosure of "other" facts is typically not an issue where a statement ***affirmatively misstates*** (*i.e.*, overstates) asset values or credit-ratings.  But with respect to whether Defendants' statements regarding, *e.g.*, the "high quality" of its Portfolio Companies were rendered materially misleading by virtue of their omissions, even Defendants' cases agree that liability arises where a defendant's statements "create an impression of a state of affairs that differs in a material way from the one that actually exists."  Mot. at 9.[4]  And Defendants' argument that they never explicitly told investors that TPVG "did ***not*** face risks intrinsic to investing in venture growth companies" is a red herring, as the issue is Defendants' failure to timely disclose the extent to which relevant risks had already materialized – even as they warned investors of general risks that "might" materialize, but which already had.

### 2.     Plaintiff Adequately Pleads Inflated Fair Values

Defendants, citing *City of Dearborn Heights Act 345 Pol. & Fire Ret. Sys. v. Align Tech.*, 856 F.3d 605, 613-14 (9th Cir. 2017), argue that TPVG's reported loan values involve "management's [subjective] opinion regarding fair value," and that as opinions they must be evaluated under *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015).  However, as *Omnicare* explains, a reasonable investor "expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time[,]" such that liability attaches when a statement "omits material facts about the [defendants'] . . . knowledge" and "those facts conflict with what a reasonable investor would take from the statement itself[.]"  *Id.* at 188-89.  In sum, a plaintiff must "call into question the issuer's basis for offering the opinion" by "identify[ing] particular (and material) facts going to the basis for the issuer's opinion – [*e.g.*,] the knowledge [defendant] did or did not have – whose omission makes the opinion statement at issue misleading to a reasonable person."  *Id.*

---

[4]     Defendants rely on *In re Pivotal Sec. Litig.*, 2020 WL 4193384, at *11 (N.D. Cal. July 21, 2020), which held that plaintiffs failed to allege "specific facts . . . ***inconsistent*** with [defendant's] disclosures" about its competition, and had simply relied on "vague assertions" about pricing and competition, defendant's business strategy, and internal "mixed messages . . . regarding what product to sell."  *Id.*  Here, by contrast, Plaintiff alleges specific omitted facts that were inconsistent with Defendants' positive statements about their portfolio.

Plaintiff meets this standard.  As summarized at §II above, the FAC is replete with specific factual allegations that "call into question" the basis for TPVG's reported valuations.  For example, Plaintiff alleges that TPVG valued its Medly loans at roughly face value in its Q3 2022 financials, even though by the end of Q3 2022 this pharmacy company had run out of money to buy drugs, was experiencing an *80%* loss of sales, was slashing its workforce, and facing a *$110 million* shortfall.  And although Plaintiff does not plead a specific alternate Q3 2022 value for that loan, Defendants cite no authority requiring such granularity, at least where the facts alleged make clear that these under-secured, junior loans were worth *nothing close* to $32 million.  ¶¶64-76.  Plaintiff cites numerous other examples of the same story playing out with other companies.  *See, e.g.*, ¶¶87-108 (Hi.Q); ¶¶109-18 (VanMoof); ¶¶119-30 (RenoRun); *see also* ¶¶77-86 (The Pill Club; disaster averted post-bankruptcy only after TPVG-related party organized bailout in absence of any other interested acquirers); ¶¶159-66 (Mind Candy; outright default averted only due to TPVG's renegotiation of loans, yet loans reported at over 91% of face even though Mind Candy's annual revenue had declined to approximately ¼ of principal owed on its TPVG loans).

In response, Defendants deflect by arguing that TPVG's valuations were "backed by third-party valuations" and reviewed by its auditors.  But, it appears that only 25% of TPVG loans were guaranteed to be "independently reviewed" by outside valuers in any given quarter.  ¶57; *see also* Defs.' Ex. 2 at 17.  Moreover, Defendants cite no evidence that its outside valuers or its auditors had access to the same inside information about each Portfolio Company that Defendants had.  Indeed, TPVG's auditor's report emphasized the difficulties of trying to audit management's stated loan valuations, as they turned heavily on "unobservable inputs." *Id.* at 78.

Next, Defendants argue that Plaintiff relies on excessive inferences to conclude that TPVG would be unable to collect on its loans even if the relevant Portfolio Company was suffering from known serious problems.  That Defendants knew (or recklessly disregarded) the severe problems in their portfolio have been noted above and are further discussed below at §III.B.  And as for collectability, Defendants' own belated write-downs confirm that numerous loans were in fact impaired, either fully or partially, even if "only" two of those loans (Medly and Hi.Q) had to be totally written off.  *See, e.g.*, ¶76 (Medly; $34 million in loans written off); ¶¶105, 108 (Hi.Q; full

$25 million in loans written off); ¶118 (VanMoof; $23 million in loans written down to $5.5 million); ¶147 (Underground Enterprises; $6 million in loans written down to $1.75 million); ¶158 (Untitled Labs; $10 million in loans written down to $4.633 million); ¶171 (Modsy; of $15 million in loans, $12.75 million written off); ¶175 (Roli; $35.5 million in loans written down to $9.3 million).  TPVG's occasional "success" in *temporarily* postponing collapse (as with VanMoof) hardly refutes Plaintiff's allegations of overstated loan values.

Defendants' further argument (Mot. at 12) that Plaintiff does not adequately plead that they had information contradicting their valuation opinions is just another variation on their flawed *scienter* arguments.  *See* §III.B below.  Similarly, Defendants argue that TPGV's "incremental investments" (*i.e.*, their efforts to plug holes in sinking ships) rebut any claim that they knew of the Portfolio Companies' problems.  But the stronger inference here is that they were simply taking a calculated risk that "doubling down" offered the best odds of *mitigating overall losses* in the face of known, serious problems.  In sum, TPVG's emergency loans to Medly, *e.g.*, are *not* "evidence" that Defendants believed that their *prior* loans did not merit writedowns or downgrades.

Defendants' final attack on the actionability of their reported fair values on their loans (and certain equity investments) is that they are protected "forward looking statements."  Mot at 13.  But they cite no cases holding that reported loan values are "forward-looking" under the PSLRA.  Indeed, financial statements are replete with line items – including not only non-cash asset values but also items such as revenue reported on an income statement – whose accuracy depends in some sense on future events (*e.g.*, will payment actually be received on product shipments on which a company has recognized revenue on an accrual basis?).  That does not render statements of *current* asset or revenue values "forward-looking."  *See, e.g.*, *In re New Century*, 588 F. Supp. 2d 1206, 1227 (C.D. Cal. 2008) (no dismissal warranted for forward-looking statements where plaintiff alleged "understatement of the repurchase reserve and an improper valuation of residual interests that were both misrepresentations *when made*").[5]

---

[5]    As for Defendants' further rehashed arguments here that they made sufficient "risk warnings" to neutralize any risk of investors being misled, see §III.A.1 above.

14

### 3.    Defendants' Characterizations of Loan Quality Are Actionable

**"Hindsight."**  Defendants argue (Mot. at 14) that Plaintiff does not adequately allege why their rosy statements were false or misleading when made, and that the FAC alleges falsity "only with the benefit of hindsight" provided by later bankruptcies or defaults.  But Plaintiff's claims do not rest "almost exclusively" on such later developments.  To the contrary, as discussed above and below at §III.B, Plaintiff alleges that Defendants were routinely provided with inside information, prior to making their rosy statements, that belied and was fundamentally inconsistent with such statements and rendered them misleading when made.  Unless Defendants were lying about their access to information and their extensive portfolio monitoring procedures, the overwhelming inference is that the severe problems that infected so many Portfolio Companies not only existed at the time Defendants made their statements, but that Defendants were aware of (or recklessly disregarded) them at the time.  *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 191-92 (S.D.N.Y. 2010) ("It is not 'fraud by hindsight' when statements related to a loan's existing quality and risks were false and misleading when made.").

**"Puffery."**  Alternatively, Defendants argue that their repeated assurances that TPVG was investing in the "high[est] quality venture growth stage companies[,]" maintaining its loan portfolio's "excellent credit quality" through its "highly selective and disciplined" approach, and investing only in "exceptional" and "compelling" growth stage companies (*e.g.*, ¶¶179, 181, 187-88, 194, 200, 204), were mere puffery and inactionable as a matter of law.[6]

Further, case law confirms that statements that characterize a lending business's loan portfolio as "high quality" or its lending as limited to "exceptional" companies are actionable, particularly in the context of a corporation whose ***entire business*** is based on its lending activities. For example, in *In re Countrywide Fin. Corp. Sec. Litig.*, the court held that a mortgage lender's

---

[6]    *See, more particularly*, ¶179 (touting results achieved "while maintaining high credit quality" and demand for its "debt financing solutions from high-quality venture growth stage companies"); ¶181 ("If anything, we're, again, being a little tougher [in our underwriting], given the overall volatility, but we're pleased with what we're seeing from market demand and market quality"); ¶186 (touting TPVG's purported "focus on high quality venture growth stage companies"); ¶194 (citing TPVG's purportedly "high quality portfolio" and policy of "continu[ing] to invest in a highly selective and disciplined manner with compelling growth stage companies").

15

statements – that it was "consistently producing quality mortgages," had "a major focus on ensuring the quality of our mortgage loan production," "manage[d] [its] credit risk by producing high quality loans" and employed procedures "designed to produce high quality loans" – were all actionable.  588 F. Supp. 2d 1132, 1178 (C.D. Cal. 2008) (citing to paragraphs containing the quoted statements).[7]  *See also New Century*, 588 F. Supp. 2d at 1225 (statements that, *e.g.*, defendant's loan portfolio consisted of "higher credit quality" loans was actionable); *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at * (S.D.N.Y Nov. 26, 2018) (statements that defendants' credit portfolio was "strong," "very healthy," "robust," and "very stringently managed" were all actionable); *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 283 (3d Cir. 1992) (statements that loan portfolio quality was "high" were actionable).

In sum, as these cases show, Defendants' statements about loan quality and the strength of TPVG's portfolio are ***not*** so subjective as to be immaterial (and hence inactionable) as a matter of law.  *See also Durning v. First Bos. Corp.*, 815 F.2d 1265, 1268 (9th Cir. 1987) ("Only if the disclosure is so obvious that reasonable minds cannot differ is [issue of whether statement was misleading] appropriately resolved as a matter of law [rather than by] a jury.").[8]

### 4.    Defendants' Risk Rating Statements Are Actionable

Defendants also provided "risk ratings" for each Portfolio Company, as follows:

| Category | Definition |
| --- | --- |
| Clear (1) | Performing above expectation and/or strong financial or enterprise profile, value or coverage. |
| White (2) | Performing at expectations and/or reasonably close to it.  Reasonable financial or enterprise profile, value or coverage. |
| Yellow (3) | Performing generally below expectations and/or some proactive concern.  Adequate financial or enterprise profile, value or coverage. |

---

[7]    For the actual quotes associated with the paragraphs cited in the opinion, *see* Amended Complaint, in *In re Countrywide*, No. 2:07-cv-05295 (C.D. Cal.), ECF No. 186, ¶¶557-58.

[8]    Defendants' two cited cases are readily distinguished, as neither of them involved the quality of a lender's loan portfolio.  Specifically, *In re Cutera Sec. Litig.,* 610 F.3d 1103, 1111 (9th Cir. 2010), simply held that a laser manufacturer's characterization of its labor relations as "good" was too vague to be material to investors.  And *Retail Wholesale & Dep't Stores Union v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017), simply held that statements about H-P's commitment to certain "shared values" outlined in its Ethics Code were inherently aspirational and not sufficiently "capable of objective verification" so as to be actionably misleading in the context of defendants' failure to disclose its CEO's improper sexual harassment.

16

| Category | Definition |
|----------|-----------|
| Orange (4) | Needs close attention due to performance materially below expectations, weak financial and/or enterprise profile, concern regarding additional capital or exit equivalent. |
| Red (5) | Serious concern/trouble due to pending or actual default or equivalent.  May experience partial and/or full loss. |

¶54.  TPVG generally assigns all new loans a rating of 2, then purportedly re-evaluates each Company's rating quarterly, and also reports quarterly on the distribution of Companies in each category (by number and aggregate loan amounts).[9]  Although categories assigned to each Portfolio Company are not regularly reported, they can be deduced by tracing comments made in TPVG's quarterly conference calls, which is when TPVG typically disclosed any changes it made to individual Portfolio Companies since its last call.

As the FAC alleges, Defendants repeatedly failed to downgrade problem borrowers (and their loans) in a timely fashion, *see generally* ¶¶64-177, 183, 190, 196, 206, such that even as late as of the end of Q4 2022 TPVG was reporting that three Companies, representing 6.6% of amounts loaned, were rated Clear (1); 48 Companies representing 81.9% of amounts loaned were rated White (2); five Companies representing 10.4% of amounts loaned were rated Yellow (3); one Company representing 1.1% of loaned amounts was rated Orange (4); and none were rated "Red." ¶201.  TPVG's "risk ratings" thus indicated that the portfolio's quality had experienced virtually no deterioration during 2022.  *Compare with* n.9, *supra*.  But as the FAC makes clear, a significantly larger number of Portfolio Companies (representing a significantly larger percentage of outstanding loan amounts) were experiencing serious deterioration over the course of 2022 (and beyond) that justified ratings of at least Yellow (3) (conditions warrant at least "some proactive concern") or Orange (4) (conditions warrant "close attention due to [sub-par] performance, weak financial[s] . . . [or] concern regarding additional capital or exit equivalent") – if not Red (5) ("Serious concern/trouble due to pending or actual default or equivalent").

---

[9]    *E.g.*, in its Q1 2022 Form 10-Q, TPVG reported that four Companies, reflecting 7% of amounts loaned, were rated Clear (1); 40 Companies reflecting 85.1% of amounts loaned were rated White (2); three Companies reflecting 6.5% of amounts loaned were rated Yellow (3); one Company reflecting 1.4% of loaned amounts was rated Orange (4); and none were rated Red (5). ¶55.

17

Tellingly, Defendants effectively ignore these "risk rating" statements in their discussion of misleading statements, and thereby effectively concede (as they must) that they are also statements on which actionable securities fraud claims may be based.

**B.    Plaintiff Adequately Alleges a Strong Inference of Scienter**

Under the PSLRA, plaintiffs must also allege facts supporting a "strong inference" of defendants' *scienter* (intentional or reckless misconduct).  Such an inference "need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the most plausible of competing inferences", but need only be "as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rts. Ltd.*, 551 U.S. 308, 324 (2007).  In making this determination, a court must draw all reasonable inferences in plaintiffs' favor, *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1035 (9th Cir. 2016), and consider all of plaintiffs' allegations "holistically." *Alphabet*, 1 F.4th at 701.  "Falsity and scienter in [. . .] securities fraud cases are generally inferred from the same set of facts," such that both requirements are often considered as part of a "unitary inquiry." *In re BioMarin Pharm. Inc. Sec. Litig.*, 2022 WL 164299, at \*13 (N.D. Cal. Jan. 6, 2022) (quoting *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005)).

1.    <u>Plaintiff Alleges More than Access to Unspecified Information</u>

As discussed above and at length, Plaintiff alleges that TPVG's Portfolio Companies were *required*, as confirmed by both Defendants' statements and by the terms of its standard loan agreement[10] to provide substantial information to TPA and/or TPVG, ¶¶42-51; that Labe and Srivastava, who control TPVG,[11] are both TPA's co-founders and the sole members of TPA's Investment Committee, ¶¶6-8; that TPA's Investment Committee meets weekly to "review material events and information on [TPVG's] borrowers and [to] discuss in detail those borrowers that are performing below expectations."  ¶44 (quoting TPVG's 2022 Form 10-K); and that TPA

---

[10]    Defendants argue that it is "speculative" to infer TPVG's "standard" loan terms from the one agreement that Plaintiffs, pre-discovery, located in a public bankruptcy filing.  But the cited terms match up with TPVG's own statements (*see* ¶48) about the scope of information it obtained from Portfolio Companies, which strongly confirms that the cited loan agreement *does* represent TPVG's standard terms.  Nor is it plausible that TPVG's borrowers (who needed TPVG's money) would have the leverage to get *weaker* reporting terms than those in the cited agreement.

[11]    Defendants do not dispute Plaintiff's allegations that Labe and Srivastava controlled TPVG under §20(a).  Mot. at 25 n.5 (noting §20(a) claims without denying control at ¶¶268-73).

provides TPVG's Board with "the most recent and available information" on the Portfolio Companies as part of the valuation process, "which generally includes industry outlook, capitalization, financial statements and projected financial results of each portfolio company," ¶47.

Accordingly, this is decidedly not a case where the plaintiff has only alleged mere "access to unspecified information." *Cf. Mahapatra v. Truecar*, Inc., 2015 WL 12552062, at \*2 (C.D. Cal. Dec. 9, 2015) (cited in Mot. at 15). Instead, Plaintiff specifically alleges that TPA (and hence Labe and Srivastava) and/or TPVG received the following *specific* materials from each Portfolio Company: (1) *monthly* financial statements, including income statements, cash flow statements, and GAAP-compliant balance sheets; (2) *monthly* reports of material contingencies (including on pending litigation); and (3) *monthly* copies of all board packages delivered to board members "in connection with board meetings or otherwise" during the prior 30 days. ¶¶42-48. In addition, TPA and/or TPVG not only received and reviewed copies of each Portfolio Company's "budget and business plan" (¶48), but as part of their "active portfolio monitoring process" would also (a) routinely monitor each borrower's "adherence to the[ir] business plan, financial condition, future growth potential and ability to raise additional equity capital" and (b) "maintain[] dialogue and contact with our borrowers' management teams to discuss [*inter alia*] business progress, cash flow, financial condition and capital structure matters." ¶42; *see also* §II.A, *supra*. To the extent this information went to TPA, it was communicated via TPA to TPVG's Board. ¶47.

Defendants' cases are inapt. In *Prodanova v. H.C. Wainwright & Co. LLC*, 2019 WL 4143301, at \*11 (C.D. Cal. July 2, 2019), *aff'd*, 993 F.3d 1097 (9th Cir. 2021), a bank issued a bullish analyst report on a company without disclosing that it would soon underwrite that company's share offering at a less-than-bullish price. But even if the bank's compliance unit should have caught this alleged violation had it followed "industry custom," the court held this *single* error did not evince *scienter*. And in *Hoang v. ContextLogic, Inc.*, 2023 WL 6536162, at \*22 (N.D. Cal. Mar. 10, 2023), plaintiff did not specify the reports that defendants would have actually reviewed, or explain how they contradicted their statements. Here, unlike *Prodanova*, Plaintiff alleges not some isolated "mistake," but a *pattern* of Defendants failing to timely disclose serious adverse developments in over a dozen Portfolio Companies. And unlike *Hoang*, Plaintiff

19

alleges both the types of reports received as well as, citing TPVG's own SEC filings, Labe and/or Srivastava's participation in weekly meetings to review problems identified in those materials.

Alternatively, Defendants argue that the stronger inference is that borrowers hid *from TPVG* adverse information. For example, they posit that The Pill Club would not have "admitted" to TPVG that it actually violated the law. Mot. at 17. But Plaintiff's claim is not that Pill Club admitted guilt to TPVG, but that Defendants were aware of such potentially fatal charges, brought with the credibility of the California AG, which belied treating The Pill Club as a "high quality" borrower when it drew on TPVG's credit facility in August 2022. As for Hi.Q, the TCPA litigation was also just one of many "red flags," which included Hi.Q's retention of restructuring consultants, mass layoffs, and its CEO's public apology to investors for having "lost your money." ¶¶94-99. Defendants also suggest that VanMoof's auditor's refusal to sign its 2022 financials shows that it hid the truth from TPVG. But there was ample other evidence of severe financial distress at VanMoof, and Defendants loaned it more money in late 2022 (to try to keep it afloat) even though it didn't have audited financials *for 2021* until January 2023. ¶¶111-17. In sum, even if the extent of some problems was not fully disclosed to them, Defendants' preferred inference – that they were regularly "kept in the dark" by their troubled borrowers – rings hollow, especially given the number of different borrowers at issue and the size of the problems allegedly hidden.

2.     Defendants Motive and Opportunity Supports Inferring Scienter

Defendants also had motive and opportunity to conceal the deteriorating conditions of TPVG's loan portfolio and the Portfolio Companies. The motives alleged are not the kind of generalized corporate motives that courts have found insufficient to support *scienter*. Rather, Plaintiff alleged highly specific motives unique to Defendants: the inflation of TPA's management fees, which TPVG's own filings confirm were substantial enough that they created a potential conflict of interest for Labe and Srivastava (¶¶233-36); the protection of other TriplePoint vehicles' investment(s) in Portfolio Companies, which TPVG's filings likewise acknowledge was significant enough to cause potential conflicts (¶¶237-39); the avoidance of downgrades or writedowns that might trigger a default under a critical credit facility and tranches of notes, both of which Defendants used to fund the loans TPVG made to Portfolio Companies (¶¶240-45); the

20

elevation and/or maintenance of TPVG's stock price to maximize the proceeds from a second public offering ("SPO") conducted during the Class Period (¶¶246-47); and the insulation of TPVG's equity investments in the Portfolio Companies (¶248).

Even if none of these motives is individually enough to support a strong inference of *scienter*, when considered holistically (as the Court must, *see, e.g.*, *Alphabet*, 1 F.4th at 701), they tell a powerful story about the incentives Defendants had to prop up the Portfolio Companies and TPVG's loans to them. The improper counter-narratives put forth by Defendants (to the extent they can be considered, *see* §IV below) do nothing to change that, and also misrepresent Plaintiff's allegations. Plaintiff has neither alleged nor argued that Defendants were "[w]illfully choosing poor loans" or that they "chose to commit TriplePoint to poor loans" – rather, Plaintiff has alleged that (whatever Defendants' intentions were at the initiation of TriplePoint's lending relationship with the Portfolio Companies) Defendants were highly incentivized to conceal the deterioration of those loans, and the companies to which TPVG made them, ***after*** the loans were already made. ¶¶232-48.

The cases cited by Defendants suggesting that Defendants' motives were just normal business motives are misquoted or inapposite,[12] and other courts have found the kind of motives alleged by Plaintiff here to be compelling indicia of *scienter*. *See, e.g.*, *Abrams v. Blackburne & Sons Realty Cap. Corp.*, 2019 WL 8640656, at *12 (C.D. Cal. Dec. 2, 2019) (scienter alleged where defendants had no exposure to the risks of an overvaluation or default by an uncreditworthy borrower since it passed the associated costs on to its investors, ***while still collecting its management and service fees in semi-regular assessments***.").[13]

---

[12] For example, the quoted text from *Glazer* (Mot. at 20) was an excerpt of the court's holding that "evidence of a personal profit motive on the part of officers and directors ***contemplating a merger*** is insufficient to raise a strong inference of scienter." *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 748 (9th Cir. 2008). And *Sorrento* considered whether the defendants had motive to raise the stock price (a much more banal corporate motive) in order to, among other things, meet "debt repayment requirements," *In re Sorrento Therapeutics, Inc. Sec. Litig.*, 2021 WL 6062943, at *8 (S.D. Cal. Nov. 18, 2021); here, Plaintiff has alleged Defendants were motivated to avoid downgrading or writing down Portfolio Company loans, unrelated to TPVG's stock price, in order to avoid triggering catastrophic defaults in funding agreements, ¶¶240-45.

[13] While Defendants Labe and Srivastava were not fully insulated against the risks of overvaluation as in *Abrams*, the benefits they accrued from the management fees paid to TPA far outweighed the value of their individual ownership in TPVG.

Moreover, Defendants had the opportunity to make the relevant misstatements. First, Defendants certainly had the opportunity with respect to statements in public filings and on earnings calls about the quality of TPVG's loan portfolio and the Portfolio Companies (*see* §III.A.3, *supra*). Second, with respect to the credit risk categorizations, Labe and Srivastava certainly had the opportunity to assign misleading ratings, since it was TPA (helmed by Labe and Srivastava) that assigned them. ¶¶54-55. Third, and with respect to the loan valuations, Defendants have substantially more influence over the valuations than their brief suggests. While some – not all, as Defendants appear to concede – of the loans TPVG makes may be subject to independent review, it is the board that makes the final decision. ¶¶56-60, 233-36. And everything that TPVG's Board (on which Labe and Srivastava serve) receives is filtered through TPA, which is led by Labe and Srivastava. §§II.A-B. In sum, Defendants have substantial influence over the process including, with respect to Labe and Srivastava, a vote on the final valuations.

### 3.     The Core Operations Doctrine Applies

Finally, the core operations doctrine is a relevant factor in assessing *scienter* based on the facts alleged. *See S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784-85 (9th Cir. 2008) ("Allegations that rely on the core-operations inference are among the allegations that may be considered in the complete PSLRA analysis," and "in some unusual circumstances, the core operations inference, without more, may raise the strong inference required by the PSLRA"). Without the Portfolio Companies there would be no loans, and TPVG would cease to exist. The Portfolio Companies' health – specifically, their ability to repay their loans from TPVG on the agreed-upon terms – is the single most important factor in determining TPVG's own performance. ¶249. Each quarter, Defendants report on the fair value of the Portfolio Companies' loans and TPA, helmed by Labe and Srivastava, and assign credit risk categories to each of the Portfolio Companies. §§II.A-C. This is not a situation like that in *City of Dearborn*, 856 F.3d at 620, cited by Defendants. In that case, the alleged channel stuffing occurred at a separate company, before the defendant company acquired it, and the plaintiff could not allege that the individual defendants "personally accessed" the relevant data. *Id.* Here, the issues identified in the FAC occurred after Defendants had entered into loan agreements with the Portfolio Companies, Defendants claimed

to be kept apprised of the Portfolio Companies' operations on a regular basis, and Labe and Srivastava were apparently even involved in the management of certain Portfolio Companies. Defendants cannot, on the one hand, tout the rigor of their monitoring approach (Defendants purport to be routinely apprised of each and every Portfolio Company's performance) while disclaiming any knowledge of the Portfolio Companies' operations on the other.

### C. Plaintiff Adequately Alleges Loss Causation

Loss causation allegations need only be "plausible," and suffice "so long as they give defendant notice of plaintiffs' … theory and provide … some assurance that the theory has a basis in fact." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020).

#### 1. The Bear Cave Report Qualifies as a Corrective Disclosure[14]

Defendants first assert that *The Bear Cave* report must be disregarded as a matter of law as a potential corrective disclosure because it was authored by a short seller. However, per its website, Edwin Dorsey, its "sole" author, ***does not take positions against companies profiled in The Bear Cave*.**  https://thebearcave.substack.com/about (last visited Feb. 7, 2024).

Moreover, even if *The Bear Cave* were a short seller (which it is not), its May 2023 report would still qualify as a corrective disclosure. As the Ninth Circuit recently affirmed, if a short seller report "required extensive and tedious research involving the analysis of far-flung bits and pieces of data," then "[t]he time and effort it took to compile this information make it plausible that the posts provided new information to the market, even though all of the underlying data was publicly available." *See In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 839 (9th Cir. 2022). Here, *The Bear Cave* compiled information about over a dozen privately-held Portfolio Companies, not previously disclosed by TPVG, in one place.  ¶¶211-15.  Even assuming, *arguendo*, that all these "bits of data" were "publicly available" if one knew where to look, *The Bear Cave*'s collection of it (and its analysis as it related to TPVG) in one place, as well as the market's reaction after its report came out, suffices to allege that it "provided new information to the market." *Nektar*, 34 F.4th at 839; *see also Nguyen v. Radient Pharm. Corp.*, 2011 WL

---

[14]    Plaintiff reserves all his rights to argue that the disclosures at issue also suffice to allege loss causation under a "materialization of the risk" theory.

5041959, at *7 (C.D. Cal. Oct. 20, 2011) (argument that information was already made known to markets is highly fact intensive and only "rarely" justifies dismissal).

### 2. Defendants' May 3, 2023 Statements Were Also Corrective

Defendants do not dispute that their Q1 2023 statements of May 3, 2023, made on the heels of *The Bear Cave* report and that disclosed more information about net unrealized losses and Portfolio Company downgrades and bankruptcies, constitute corrective disclosures.  ¶¶217-19.

### 3. Defendants' "Statistical Significance" Arguments Are Without Merit

Plaintiff alleges a two-day drop of ***over 10%*** in response to *The Bear Cave* report, plus a ***further*** 8.6% drop (on May 4) in response to TPVG's post-close disclosures of May 3.  ¶¶215, 221.  Defendants cite no cases remotely suggesting that declines of this size (totaling ***nearly 20%*** over a three-day window in response to two sets of corrective disclosures) are insufficient to support the requisite plausible inference of loss causation.  *In re Security Cap. Assur. Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 599 (S.D.N.Y. 2010), cited by Defendants, involved loss causation allegations based on a "slow, steady decline in [defendant]'s securities, not a 'sharp drop' resulting from the announcement of concealed facts."  *Id.*  Similarly, *Eng v. Edison Int'l*, 2018 WL 1367419, at *5 (S.D. Cal. Mar. 16, 2018), *aff'd*, 786 F. App'x 685 (9th Cir. 2019), involved four ***entirely separate*** one day drops of only ***1%, .79%, 2.71% and 2.41%***, (none of which were outside the range of the stock's normal daily trading fluctuations).  Defendants offer no similar analysis here, and given the very large 10%+ and 8.57% drops alleged, they also have no authority for requiring Plaintiffs to "prove" statistical significance through expert reports at the pleading stage.[15]

Lastly, Defendants argue (Mot. at 25) that a plaintiff must plausibly allege that investor losses were causally connected to defendants' alleged misstatements, "as opposed to some other fact."  This is precisely what plaintiffs adequately allege here – and Defendants' protestations of good intentions and good faith are matters for discovery, not resolution on a motion to dismiss.

---

[15]    At most, even if the Court were to accept it as "judicially noticeable," Defendants offer evidence (Ex. 19) that the "S&P BDC Index" (***unadjusted*** to exclude the impact of TPVG's own massive declines) fell from only 55.13 to 52.94 (***or less than 4%***) between the close on May 1and May 4 – compared to TPVG's ***20%*** drop over the same period.

24

## IV. DEFENDANTS' REQUEST FOR JUDICIAL NOTICE SHOULD BE LARGELY DENIED

Defendants' Motion cites numerous non-judicially noticeable articles or reports that are neither cited nor alluded to in the FAC. *See* Defs.' Exs. 1, 4-5, 7-8, 12-13, 17-19, 21-23, 26-27, & 29. The RJN as to those documents should be denied in full. Indeed, the Ninth Circuit has condemned this type of maneuver as "a concerning pattern in securities cases," and noting that "[i]f defendants are permitted to present their own version of the facts at the pleading stage – and district courts accept those facts as uncontroverted and true – it becomes near impossible for even the most aggrieved plaintiff to demonstrate a sufficiently 'plausible' claim for relief." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018). And certain other exhibits, notably TPVG's SEC filings and earnings call comments (Defs.' Exs. 2-3, 6, 10, 14-16, 20, 28, 30-31), can only be noticed for their contents, and not for the truth of the matters asserted therein under *Khoja*, 899 F.3d at 999-1000. The RJN should also be denied to that extent as to those exhibits.

## V. CONCLUSION

For the foregoing reasons, Plaintiff requests Defendants' Motion be denied.[16]

Dated: February 7, 2024

SCOTT+SCOTT ATTORNEYS AT LAW LLP

*s/ John T. Jasnoch*
John T. Jasnoch (CA Bar No. 281605)
Cornelia J. B. Gordon (CA Bar No. 320207
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile: 619-233-0508
jjasnoch@scott-scott.com
cgordon@scott-scott.com

SCOTT+SCOTT ATTORNEYS AT LAW LLP
William C. Fredericks (admitted *pro hac vice*)
Thomas L. Laughlin, IV (admitted *pro hac vice*)
The Helmsley Building
230 Park Avenue, 17th Floor

---

[16] If the Court grants dismissal, Plaintiff requests leave to amend to remedy any deficiencies. *Barnes v. SunPower Corp.*, 2023 WL 2592371, at \*4 (N.D. Cal. Mar. 16, 2023) (Thompson, J.) ("leave to amend 'shall be freely given when justice so requires,' bearing in mind 'the underlying purpose of Rule 15 is to facilitate decisions on the merits, rather than on the pleadings or technicalities'"), citing *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).

25

New York, NY 10169
Telephone: 212-233-6444
Facsimile:  212-233-6334
tlaughlin@scott-scott.com
wfredericks@scott-scott.com

*Counsel for Lead Plaintiff Ronald J. Solotruk and Lead Counsel for the Class*

**THE SCHALL LAW FIRM**
Brian J. Schall (CA Bar No. 290685)
Ivy T. Ngo (CA Bar No. 249860)
Rina Restaino (CA Bar No. 285415)
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: 310-301-3335
Facsimile:  310-388-0192
brian@schallfirm.com
ivy@schallfirm.com
rina@schallfirm.com

*Additional Counsel for Lead Plaintiff Ronald J. Solotruk*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 7, 2024, I caused the foregoing document to be filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

Executed on February 7, 2024, at San Diego, California.

 s/ *John T. Jasnoch*
John T. Jasnoch (CA 281605)

PLTFF'S OPP. TO DEFS.' MOT. TO DISMISS AND OBJ. TO REQ. FOR JUDICIAL NOTICE – Case No. 3:23-cv-02980-TLT