# SUPPLEMENTAL EXHIBIT 2

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## Form 10-K

**(Mark One)**

x **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

### FOR THE FISCAL YEAR ENDED DECEMBER 31 , 2022

**OR**

¨ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

FOR THE TRANSITION PERIOD FROM            TO
COMMISSION FILE NUMBER:  814-01044

# TriplePoint Venture Growth BDC Corp.

**(Exact name of registrant as specified in its charter)**

| **Maryland** | **46-3082016** |
|---|---|
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |

**2755 Sand Hill Road , Suite 150 , Menlo Park , California 94025**
**(Address of principal executive office)**
**( 650 ) 854-2090**
**(Registrant's telephone number, including area code)**
Securities registered pursuant to Section 12(b) of the Act:

| **Title of Each Class** | **Trading Symbol(s)** | **Name of Each Exchange on Which Registered** |
|---|---|---|
| **Common Stock, par value $0.01 per share** | **TPVG** | **The New York Stock Exchange** |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes  ¨     No   x

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes  ¨     No   x

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes   x  No  ¨

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).    Yes   x  No  ¨

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ¨ | Accelerated filer | ¨ |
| Non-accelerated filer | x | Smaller reporting company | ¨ |
| Emerging growth company | ¨ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ¨

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act by the registered public accounting firm that prepared or issued its audit report. ¨

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ¨

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to § 240.10D-1(b). ¨

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes  ¨   No   x

The aggregate market value of common stock held by non-affiliates of the Registrant on June 30, 2022 based on the closing price on that date of $12.74 on the New York Stock Exchange was $ 390.1  million. Solely for purposes of this disclosure, shares of common stock held by executive officers and directors of the Registrant as of such date have been excluded because such persons may be deemed to be affiliates. This determination of executive officers and directors as affiliates is not necessarily a conclusive determination for any other purposes.

There were 35,348,049 shares of the Registrant's common stock outstanding as of March 1, 2023.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the Registrant's definitive proxy statement relating to the Registrant's 2023 annual meeting of stockholders (the "2023 Proxy Statement"), to be filed with the Securities and Exchange Commission not later than 120 days after the end of the fiscal year covered by this Annual Report on Form 10-K, are incorporated by reference into Part III of this Annual Report on Form 10-K, as indicated herein.

**TRIPLEPOINT VENTURE GROWTH BDC CORP.**

**FORM 10-K**
**FOR THE YEAR ENDED DECEMBER 31, 2022**

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---:|
| **PART I** | | |
| Item 1. | Business | 1 |
| Item 1A. | Risk Factors | 24 |
| Item 1B. | Unresolved Staff Comments | 53 |
| Item 2. | Properties | 53 |
| Item 3. | Legal Proceedings | 53 |
| Item 4. | Mine Safety Disclosures | 53 |
| | | |
| **PART II** | | |
| Item 5. | Market For Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 54 |
| Item 6. | [ *Reserved* .] | 56 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 57 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 74 |
| Item 8. | Consolidated Financial Statements and Supplementary Data | 76 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 136 |
| Item 9A. | Controls and Procedures | 136 |
| Item 9B. | Other Information | 137 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 140 |
| | | |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 141 |
| Item 11. | Executive Compensation | 141 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 141 |
| Item 13. | Certain Relationships and Related Transactions and Director Independence | 141 |
| Item 14. | Principal Accountant Fees and Services | 141 |
| | | |
| **PART IV** | | |
| Item 15. | Exhibits and Financial Statement Schedules | 142 |
| | Signatures | 145 |

**PART I**

*Except as otherwise indicated in this Annual Report on Form 10-K, the terms:*

- *"we," "us" and "our" refer to TriplePoint Venture Growth BDC Corp., a Maryland corporation, and its wholly owned subsidiaries;*

- *"Adviser" refers to TriplePoint Advisers LLC, a Delaware limited liability company, our investment adviser and a subsidiary of TPC;*

- *"Administrator" refers to TriplePoint Administrator LLC, a Delaware limited liability company, our administrator and a subsidiary of our Adviser;*

- *"Credit Facility" refers to our and our Financing Subsidiary's secured revolving credit facility with the lenders and agents party thereto from time to time and Deutsche Bank AG, New York Branch, as facility agent, as amended or otherwise modified from time to time;*

- *"TPC" and "TriplePoint Capital" refers to TriplePoint Capital LLC, a Delaware limited liability company; and*

- *"Financing Subsidiary" refers to TPVG Variable Funding Company LLC, a Delaware limited liability company and our wholly owned, bankruptcy remote special purpose subsidiary established for utilizing the Credit Facility.*

## Item 1.   Business

### Overview

We are an externally managed, closed-end, non-diversified management investment company that has elected to be treated as a business development company, or "BDC," under the Investment Company Act of 1940, as amended, or the "1940 Act." We have also elected to be treated, and intend to qualify annually, as a regulated investment company, or "RIC," under Subchapter M of the Internal Revenue Code of 1986, as amended, or the "Code," for U.S. federal income tax purposes.

We were formed as a Maryland corporation on June 28, 2013 to expand the venture growth stage business segment of TPC's investment platform. Our investment objective is to maximize our total return to stockholders primarily in the form of current income and, to a lesser extent, capital appreciation by lending primarily with warrants to venture growth stage companies focused in technology and other high growth industries backed by TPC's select group of leading venture capital investors. We commenced investment activities in March 2014, at which time we acquired our initial portfolio in order to expedite the ramp-up of our investment activities and further our ability to meet our investment objectives. On March 11, 2014, we completed our initial public offering and concurrent private placement.

We originate and invest primarily in loans that have a secured collateral position and are generally used by venture growth stage companies to finance their continued expansion and growth, equipment financings and, on a select basis, revolving loans, together with, in many cases, attached equity "kickers" in the form of warrant investments, and direct equity investments. We underwrite our investments seeking an unlevered yield-to-maturity on our growth capital loans and equipment financings generally ranging from 10% to 18% and on our revolving loans generally ranging from 1% above the applicable prime rate to 10%, in each case, with potential for higher returns in the event we are able to exercise warrant investments and realize gains or sell our related equity investments at a profit. We also generally underwrite our secured loans seeking a loan-to-enterprise value of less than 25%.

We make investments that our Adviser's senior investment team believes have a low probability of loss due to their expertise and the revenue profile, product validation, customer commitments, intellectual property, financial condition and enterprise value of the potential opportunity. We believe these investments provide us with a stable, fixed-income revenue stream along with the potential for equity-related gains on a risk-adjusted basis. We believe that the venture growth stage debt market presents a compelling growth channel for us because it has high barriers to entry and is underserved by both traditional lenders and existing debt financing providers to venture capital-backed companies given the brand, reputation and market acceptance, industry relationships, venture lending and leasing expertise, specialized skills, track record, and other factors required to lend to companies backed by leading venture capital investors. Additionally, we believe our investments are distinct compared with the investments made by more traditional lenders because our investments provide us the ability to invest alongside leading venture capital investors in companies focused in technology and other high growth industries. We also believe that our investments are distinct compared to the investments made by existing debt financing providers to venture capital backed companies given our primary focus on venture growth stage companies backed by TPC's select group of leading venture capital investors.

We believe we are able to successfully structure these investments as a result of the strong value proposition our secured loans offer to both borrowers and their venture capital investors. Our secured loans provide venture growth stage companies with an opportunity to:

- diversify their funding sources;

- augment their existing capital base and extend operating capital;

- scale business operations and accelerate growth;

- fund expenses ahead of anticipated corresponding revenue;

- expand product offerings through internal development or acquisitions;

- lower the upfront costs of capital expenditures;

- build and/or expand their leadership positions within their respective markets;

- accelerate and/or reduce volatility in the timing of cash collections; and

- delay and/or postpone the need for their next round of equity financing, in each case, extending their cash available to fund operations without incurring substantial equity dilution during a critical time in their lifecycle when they are meaningfully building enterprise value.

**TriplePoint Capital, the Adviser, and the Administrator**

*TriplePoint Capital*

TPC is widely recognized as a leading global financing provider devoted to serving venture capital-backed companies with creative, flexible and customized debt financing, equity capital and complementary services throughout their lifespan. TPC is headquartered on Sand Hill Road in Silicon Valley with regional offices currently located in San Francisco, New York City and Boston, and has a primary focus in technology and other high growth industries. TPC's portfolio of venture capital-backed companies has included and/or includes widely recognized and industry-leading companies around the world.

TPC's global investment platform serves venture capital-backed companies backed by its select group of leading venture capital investors across all stages of development of a venture capital-backed company's lifecycle with dedicated business segments focused on providing creative, flexible and customized debt financings and complementary services at each stage. TPC currently categorizes venture capital-backed companies into the following five lifecycle stages of development: seed, early, later, venture growth and public. TPC has other business segments, in addition to the Company, that target investments in these lifecycle stages.

TPC utilizes a unique, relationship-based lending strategy that primarily targets companies funded by a select group of leading venture capital investors, which TPC refers to as the "TriplePoint Lifespan Approach." Key elements of the TriplePoint Lifespan Approach include:

- establishing debt financing relationships with select venture capital-backed companies primarily across all five lifecycle stages of development;

- working with TPC's select group of leading venture capital investors to identify debt financing opportunities within their portfolio companies that TPC believes have established management teams, strong investor support, large market opportunities, innovative technology or intellectual property and sufficient cash on hand and equity backing to support a potential debt financing opportunity on attractive risk-adjusted terms;

- developing debt financing relationships as early as possible in a venture capital-backed company's lifecycle in order to have a real-time understanding of the company's capital needs and be in a strategic position to evaluate and capitalize on additional investment opportunities as the company matures;

- diligently monitoring the progress and ongoing creditworthiness of a borrower; and

- serving as a creative, flexible and dependable financing partner with a focus on efficiency, responsiveness and customer service.

*Our Adviser*

Our investment activities are managed by our Adviser, which is registered as an investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act"), and is a wholly owned subsidiary of TPC. Our Adviser is responsible for sourcing, reviewing and structuring investment opportunities for us, underwriting and performing due diligence on our investments and monitoring our investment portfolio on an ongoing basis. Our Adviser was organized in August 2013 and, pursuant to an investment advisory agreement (the "Investment Advisory Agreement"), we pay our Adviser a base management fee and an incentive fee for its services. For information regarding our Adviser and the fees payable under the Investment Advisory Agreement, see "-Management Agreements-Investment Advisory Agreement" below.

The Adviser's senior investment team is led by the Adviser's co-founders, James P. Labe and Sajal K. Srivastava, who are highly experienced and disciplined in providing debt financing across all stages of a venture capital-backed company's lifecycle and have developed long-standing relationships with, and have an established history of investing alongside, premier venture capital investors as a creative, flexible and dependable financing partner. Our Adviser's co-founders have worked together for more than 23 years and its senior investment team includes professionals with extensive experience and backgrounds in technology and other high growth industries as well as in venture capital, private equity and credit. The Adviser's senior investment team has an average of more than 20 years of relevant experience and an extensive network of industry contacts and venture capital relationships.

2

*Our Administrator*

Our administrative functions are provided by our Administrator. Our Administrator is responsible for furnishing us with office facilities and equipment and provides us with clerical, bookkeeping, recordkeeping and other administrative services at such facilities. Under an administration agreement with our Administrator (the "Administration Agreement"), we pay our Administrator an amount equal to our allocable portion (subject to the review of our board of directors (the "Board")) of our Administrator's overhead resulting from its obligations under the Administration Agreement, including rent and the allocable portion of the cost of our Chief Compliance Officer and Chief Financial Officer and their respective staffs. For information regarding our Administrator and expenses payable under the Administration Agreement, see "-Management Agreements-Administration Agreement" below.

## Investment Strategy

*Overview*

Our investment objective is to maximize our total return to stockholders primarily in the form of current income and, to a lesser extent, capital appreciation. We pursue our investment objective by relying on a core investment philosophy described as the "Four Rs." The Four Rs stand for:

- *Relationships* — We seek to develop and maintain deep, longstanding and mutually beneficial relationships with TPC's select group of leading venture capital investors, borrowers and entrepreneurs.

- *Reputation* — We seek to preserve and extend the strong reputation of TPC's brand and franchise as a creative, flexible and dependable financing partner with a focus on efficiency, responsiveness and customer service when interacting with venture capital investors, borrowers and entrepreneurs and when originating, structuring, underwriting and monitoring our investments.

- *References* — We seek to make every venture capital investor, borrower and entrepreneur with whom we work a reference so that they not only work with us again but also encourage others to work with us. We believe that receiving referrals from TPC's select group of leading venture capital investors, borrowers and entrepreneurs is a critical part of our investment origination process and differentiates us from other lenders.

- *Returns* — We believe that by focusing on relationships, reputation and references, in addition to utilizing our specialized and established credit and monitoring process, we will generate attractive risk-adjusted returns over the long-term.

We invest primarily in (i) growth capital loans that have a secured collateral position and that are generally used by venture growth stage companies to finance their continued expansion and growth, (ii) equipment financings, which may be structured as loans or leases, that have a secured collateral position on specified mission-critical equipment or the entire company, (iii) on a select basis, revolving loans that have a secured collateral position and that are typically used by venture growth stage companies to advance against inventory, components, accounts receivable, contractual or future billings, bookings, revenues, sales or cash payments and collections including proceeds from a sale, financing or the equivalent and (iv) direct equity investments in venture growth stage companies. In connection with our growth capital loans, equipment financings and revolving loans, we generally receive warrant investments that allow us to participate in any equity appreciation of our borrowers and enhance our overall investment returns.

*Target Venture Growth Stage Companies*

We primarily target investment opportunities in venture growth stage companies backed by venture capital investors. However, having backing from a venture capital investor does not guarantee financing from us. Prospective borrowers must further qualify based on our Adviser's rigorous and established investment selection and underwriting criteria and generally have many of the following characteristics:

- financing from a member of TPC's select group of leading venture capital investors with whom TPC has an established history of providing secured loans alongside equity investments made by these venture capital investors;

- focused in technology or other high growth industries and targeting an industry segment or sub-sector with a large and/or growing market opportunity;

- completion of their primary technology and product development;

- meaningful customer sales, commitments or orders and have generated or we believe are reasonably expected to generate within the current fiscal year or on an annualized run rate at least $20 million in revenues and a strong outlook for continued and/or potentially rapid revenue growth;

- a leadership position in its market (or the potential to establish a leadership position) with potential and/or defensible barriers to entry;

- an experienced and relatively complete senior management team with a successful track record;

- support from existing venture capital investors in the form of meaningful invested equity capital relative to our investment amount and/or reserved capital or willingness to invest additional capital as needed;

- strong likelihood of raising additional equity capital or achieving an exit in the form of an initial public offering or sale based on the determination of our Adviser and its investment experience and history of investing in venture growth stage companies;

3

- differentiated products, unique technology, proprietary intellectual property, and/or positive clinical results that may have intrinsic value on a stand-alone and/or liquidation basis;

- meaningful enterprise value or the potential for meaningful growth in enterprise value relative to the size of our investment as indicated by a recent equity round valuation or in the opinion of our Adviser's senior investment team;

- a balanced current financial condition typically with 12 months or more of operating cash runway based on its projected cash burn and/or a path to profitability typically over a three- to five-year period from the date of our investment; and

- upcoming strategic and potential enterprise valuation-accreting business milestones that our investment can help provide operating cash runway for the company to achieve.

As a matter of practice, the evaluation of these criteria and characteristics, including the meaningful nature thereof, will involve subjective judgments and determinations by our Adviser, drawing upon its prior investment experience.

For many venture capital-backed companies, we believe that the venture growth stage is generally the point in their lifecycle at which they begin operational and financial preparations for a liquidity event, such as an initial public offering or private sale. We believe these investments provide us with a stable, fixed-income revenue stream along with the potential for equity-related gains on a risk-adjusted basis. We invest opportunistically in venture capital-backed companies at other lifecycle stages of development when our Adviser's senior investment team believes that they present an attractive investment opportunity for us.

### *Invest with TPC's Select Group of Leading Venture Capital Investors*

We generally expect to (i) benefit from the relationships developed by TPC as part of its TriplePoint Lifespan Approach and (ii) target investment opportunities backed by a select group of leading venture capital investors. We believe these well-recognized firms have consistently generated strong returns through superior selection processes and access to experienced entrepreneurs and quality investment opportunities based upon their strong reputations and track records, specialized knowledge and experienced investment professionals. As a result of this strategy, we focus and narrow our investment sourcing efforts to those investment opportunities backed by these leading venture capital investors with established track records targeting investments in Silicon Valley, Boston, Chicago, Los Angeles, New York City, Northern Virginia, San Diego, Seattle, the United Kingdom, Israel and other geographic areas of venture capital investments. We believe these relationships serve as an important source of investment opportunity referrals for us. We work with our select group of leading venture capital investors to identify debt financing opportunities within their portfolio companies that we believe have established management teams, strong venture capital investor support, large market opportunities, innovative technology or intellectual property, potential for meaningful warrant and/or equity investment returns and sufficient cash reserves to complement a potential debt financing opportunity.

### *Focus in Technology and other High Growth Industries*

We generally target technology and other high growth industries and further specialize in subsectors within each of these industries including:

- *Technology* —areas of focus include: big data, cloud computing, communications, consumer, data storage, electronics, energy efficiency, hardware, information services, internet and media, networking, semiconductors, software, software-as-a-service, wireless communications and other technology-related subsectors; and

- *Other High Growth Industries* —areas of focus vary depending upon our Adviser's investment strategy.

Our Adviser seeks to invest in those subsectors where our Adviser sees opportunities for innovation, globalization, demand and other drivers of change which create significant business opportunities for venture growth stage companies with cutting edge or disruptive technology, differentiated value propositions and sustainable competitive advantages. As a result, we believe that companies in these subsectors are more likely to attract significant investment from venture capital investors, private equity firms or strategic partners and are a more attractive candidate for a liquidity event than a company in a non-high growth industry.

We generally view high growth industries as industries which experience a higher than average growth rate as compared to others as a result of demand for new products or services offered by companies in these industries. These companies also generally have a global business strategy and products or services that appeal to customers and consumers worldwide. It is this demand and the potential global addressable market for their products or services that makes these industries and companies attractive to venture capital investment and therefore attractive lending candidates for us.

4

***Offer Creative Financing Solutions with Attractive Risk-Adjusted Pricing***

Debt financings for venture growth stage companies are extremely diverse with use of proceeds, repayment structures and value propositions varying considerably among different company types. Our debt financings are customized based on a host of factors, including our review, assessment and analysis of each company's management team, business outlook, underlying technology, support from its venture capital investors, products or services, current and future financial profile, intended use of our proceeds and anticipated payback structure, timing of a liquidity event and return potential. The diversity of debt financing possibilities requires prospective lenders to demonstrate a high degree of venture lending and leasing expertise, technology and other high growth industries knowledge and specialization, and willingness to provide customized products and flexibility. We believe the members of our Adviser's senior investment team are uniquely situated given their extensive industry background, track record, knowledge and lending experience in the technology and other high growth industries, as well as venture capital, private equity and credit, to analyze, structure and underwrite such debt financings. We believe that we have the ability to appropriately price the investment opportunities we originate based upon the debt structures we employ and the individual risk profiles of our borrowers to generate attractive risk-adjusted returns for us and our stockholders.

***Generate Equity Upside over Time through Warrant and Equity Investments***

In connection with our secured loans, we generally receive warrant investments to acquire preferred or common stock in a venture growth stage company with an exercise price typically equal to the same price per share paid by the company's venture capital investors in its last round of equity financing or a recent valuation of the venture growth stage company as determined by a third party or in its next round of equity financing. Our warrant investment coverage generally ranges from 2% to 10% of the committed loan amount. The warrant investments we obtain typically include a "cashless exercise" provision to allow us to exercise these rights without any additional cash investment. We also generally receive the opportunity to invest equity directly in our venture growth stage companies. We believe that making equity investments and receiving warrant investments in venture growth stage companies with exit events on the horizon, such as an initial public offering or private sale, increases the likelihood of equity appreciation and enhanced investment returns. As a venture growth stage company's enterprise value changes, we may recognize unrealized gains or losses from the fair value changes in our warrant and equity investments, and in conjunction with either a sale of the company or in connection with or following an initial public offering, we expect to achieve additional investment returns and realized gains from the exercise of these warrant investments and the sale of the underlying stock.

***Utilize a Disciplined Investment Process***

Our Adviser's senior investment team leverages the more than 50 years of combined experience and expertise of James P. Labe and Sajal K. Srivastava, TPC's co-founders, and the track record developed by them at TPC since its inception for reviewing prospective borrowers and potential financings, structuring those financings and subsequently monitoring those that are pursued and made, through which our Adviser's senior investment team has succeeded in making profitable investments and minimizing credit losses. Additionally, we believe that the credit performance of our venture growth stage companies and the returns associated with lending to these companies are enhanced through our Adviser's focus on originating investments primarily backed by TPC's select group of leading venture capital investors and having an understanding of their outlook and/or support of our prospective and existing borrowers.

***Employ Active Portfolio Management Processes***

Our Adviser utilizes an extensive internal credit tracking and monitoring approach to regularly follow a borrower's actual financial performance and achievement of business-related milestones to ensure that the internal risk rating assigned to each borrower is appropriate. This process has been refined and validated by Messrs. Labe and Srivastava, and the track record developed by TPC since its inception and is based, in part, on its expertise, familiarity and deep understanding of the risk associated with investing in various stages of a venture capital-backed company's lifespan. The analysis focuses on both quantitative metrics, such as cash balance and cash burn, and our Adviser's qualitative assessment in various areas, such as the outlook for the borrower's industry segment, progress of product development, overall adherence to the business plan, financial condition, future growth potential and ability to raise additional equity capital. Our Adviser maintains dialogue and contact with our borrowers' management teams to discuss, among other topics, business progress, cash flow, financial condition and capital structure matters. Our Adviser also typically engages in dialogue with the venture capital investors in our borrowers to understand and assess the borrower's progress and development and the venture capital investor's outlook and/or level of support for our borrower and in conjunction with the Four Rs, our core investment philosophy, determines the appropriate course of action with respect to investments in borrowers on our Credit Watch List (as described further below).

5

**Investment Structure**

We offer a full range of creative, flexible and customized secured financing products which may include a combination of an initial facility fee, interest and principal payments, end-of-term payments and warrant and/or equity investment rights. Although the general components for each type of our debt financing products are substantially the same, we select and customize the specific debt financing product on a case-by-case basis based on our Adviser's senior investment team's experience and their analysis of a prospective borrower, its financing needs and its intended use of the proceeds from our debt financing product. For example, the type of debt financing transaction, the total repayment period, the interest-only period, the amortization period, the collateral position, the warrant investment coverage and the overall yield-to-maturity may vary. We make investments that our Adviser's senior investment team believes have a low probability of loss due to their expertise and the revenue profile, product validation, customer commitments, intellectual property, financial condition and enterprise value of the potential opportunity. Our debt financing products are typically structured as lines of credit, whereby a prospective borrower may be required to draw some of the commitment amount at close but may have up to 24 months from document execution to access the remaining available commitment amount of debt financing capital and, in many cases future advances may be subject to certain predetermined performance milestones and other conditions.

*Growth Capital Loans*

Key typical attributes of our growth capital loans include:

- Size ranges from $5 million to $50 million. We generally target and balance our growth capital loan size to the total equity capital base, the current or near-term enterprise value, value of intellectual property, revenue run rate and current or near-term cash and liquidity profile of a prospective borrower;

- Short total repayment periods typically ranging from 36 to 60 months or less that provide for interest-only or moderate loan amortization in the early period of the loan, with the majority of the amortization deferred until 24 to 48 months after the loan's funding date or a large lump sum payment on its maturity;

- Unlevered yield-to-maturity generally ranging from 10% to 18%, which may include current interest payments at fixed or floating rates, upfront and facility fees, an end-of-term payment and/or a payment-in-kind ("PIK") interest payment. Our end-of-term payments are contractual and fixed interest payments due at the maturity date of the loan, including upon prepayment, and are generally a fixed percentage of the original principal balance of the loan. A meaningful portion of the difference between our yield-to-maturity and the stated interest rate on the loan is recognized as non-cash income until it is paid;

- Equity "kickers" in the form of warrant investments to acquire preferred or common stock in the prospective borrower that allow us to participate in any potential equity appreciation and enhance our overall returns;

- Secured by a senior secured lien on all of the prospective borrower's assets including a pledge or negative pledge on its intellectual property. For certain prospective borrowers we are the only form of secured debt (other than potentially specific equipment financing). Other prospective borrowers may also have a revolving loan, typically from a bank, to finance receivables, cash, billings, bookings, inventory, or working capital and the collateral for such financing may be the underlying financed asset, bank accounts and/or a senior lien having priority over our senior lien. In addition, there may be prospective borrowers that have a term loan facility, with or without an accompanying revolving loan, typically from a bank, that may have priority over our senior lien; and

- Limited and/or flexible covenant structures and with certain affirmative and negative covenants, default penalties, lien protection, investor abandonment provisions, material adverse change provisions, change-of-control provisions, restrictions on additional use of leverage and reimbursement for upfront and regular internal and third-party expenses, as well as prepayment penalties.

*Equipment Financings*

Key typical attributes of our equipment financings include:

- Size ranges from $5 million to $50 million. We generally target the size of our equipment financing to anticipate the capital equipment needs for a prospective borrower over a twelve month period balanced by the total equity capital base, the current or near-term enterprise value, value of intellectual property, revenue run rate and current or near-term cash and liquidity profile of a prospective borrower;

- Short total repayment periods typically ranging from 36 to 48 months or less that provide for short interest-only periods followed by full amortization;

- Structured as full payout loans or leases with either buyout provisions based on the fair market value of the financed equipment or a fixed end-of term payment;

- Unlevered yield-to-maturity generally ranging from 10% to 15%, which may include current interest payments at fixed or floating rates, upfront and facility fees, an end-of-term payment and/or a PIK interest payment. Our end-of-term payments are contractual and fixed interest payments due at the maturity date of the loan, including upon prepayment, and are generally a fixed percentage of the original principal balance of the loan. The portion of our end-of-term payments that equal the difference between our yield-to-maturity and the stated interest rate on the loan are recognized as non-cash income until they are paid;

6

- Equity "kickers" in the form of warrant investments to acquire preferred or common stock in the prospective borrower that allow us to participate in any potential equity appreciation and enhance our overall returns;

- Secured primarily by the underlying equipment being financed and/or a secured lien on all assets. We expect that much of the equipment financed by us will consist of standard, off-the-shelf equipment, such as computers, electronic test and measurement, telecommunications, laboratory equipment, manufacturing or production equipment. In certain cases, a portion of an equipment financing may finance customized equipment, software and/or expenses or soft-costs which may not have any substantial resale value; and

- Limited and/or flexible covenant structures with certain affirmative and negative covenants, default penalties, lien protection, investor abandonment provisions, material adverse change provisions, change-of-control provisions and reimbursement for upfront and regular internal and third-party expenses, as well as prepayment penalties.

### *Revolving Loans*

On a select basis, we offer revolving loans. Key typical attributes of our revolving loans include the following:

- Size ranges from $1 million to $50 million. We generally structure our revolving loans subject to an advance rate against the company's inventory, supply-chain components, accounts receivable, contractual or future billings, bookings, revenues, marketing spend, sales or cash payments and collections including proceeds from a sale, financing or the equivalent, that serve as our sole or primary collateral in support of the repayment of such loans;

- Short total repayment periods typically ranging from 12 to 36 months or less that typically provide for interest-only periods and/or moderate loan amortization in the early period of the loan, with the majority of the amortization deferred until 12 to 24 months after the loan's funding date or on its maturity date;

- Unlevered yield-to-maturity generally ranging from 1% above the applicable prime rate to 10%, which may include current interest payments at fixed or floating rates, upfront and facility fees, an end-of-term payment and/or a PIK interest payment. Our end-of-term payments are contractual and fixed interest payments due at the maturity date of the loan, including upon prepayment, and are generally a fixed percentage of the original principal balance of the loan. The portion of our end-of-term payments that equal the difference between our yield-to-maturity and the stated interest rate on the loan are recognized as non-cash income until they are paid;

- Equity "kickers" in the form of warrant investments to acquire preferred or common stock in the prospective borrower that allow us to participate in any equity appreciation and enhance our overall returns;

- Secured by a senior secured lien on all of the prospective borrower's assets including a pledge or negative pledge on its intellectual property or on all of the specific assets financed specifically by the revolving loan such as the company's inventory, components, accounts receivable, contractual or future billings, bookings, revenues, sales or cash payments and collections, including proceeds from a sale, financing or the equivalent; and

- Some financial covenants which may include advance rates, borrowing formulas, excess concentrations, cash requirements, business contracts or milestones along with certain affirmative and negative covenants, default penalties, lien protection, investor abandonment provisions, material adverse change provisions, change-of-control provisions, restrictions on additional use of leverage and reimbursement for upfront and regular internal and third-party expenses, as well as prepayment penalties.

### *Warrant Investments*

In connection with our secured loans, we generally receive warrant investments to acquire preferred or common stock in a venture growth stage company with an exercise price typically equal to the same price per share paid by the company's venture capital investors in its last round of equity financing or a recent valuation of the venture growth stage company as determined by a third party or in its next round of equity financing. As a venture growth stage company's enterprise value changes we expect to recognize unrealized gains or losses from the fair value changes in our warrant investments, and in conjunction with either a sale of the company or in connection with or following an initial public offering, we may achieve additional investment returns and realized gains from the exercise of these warrant investments and the sale of the underlying stock. Warrant investments granted in connection with our secured loans are typically based on a percentage of the committed loan amount, are treated as original issue discount ("OID") and may be earned at document execution and/or as the loan is funded. Warrant coverage generally ranges from 2% to 10% of the committed loan amount.

7

*Direct Equity Investments*

In connection with our secured loans, we may obtain equity investment rights that allow us to invest in a venture growth stage company's current or next round of private equity financing on the same terms and conditions as the company's venture capital investors and/or other equity investors in the round. In some cases, we may make a direct equity investment in a prospective portfolio company prior to transacting a potential secured loan with the company. As a venture growth stage company's enterprise value changes we recognize unrealized gains or losses from the fair value changes in our direct equity investments, and in conjunction with either a sale of the company or in connection with or following an initial public offering, we may achieve additional investment returns and realized gains from the sale of the underlying stock. These equity investment rights typically range from $100,000 to $5.0 million in size (generally not exceeding 5% of the company's total equity), although we are under no obligation to make any such investment. Typically, these are passive investments (we do not take a board of directors seat in the company) but can be strategically valuable and beneficial as an enhancement to our relationship with the venture growth stage company and to our economic return by generating meaningful return on capital committed.

## Brokerage Allocation and Other Practices

Since we acquire and dispose of many of our investments in privately negotiated transactions, many of the transactions that we engage in do not require the use of brokers or the payment of brokerage commissions. Subject to policies established by our Board, our Adviser is primarily responsible for selecting brokers and dealers to execute transactions with respect to the publicly traded securities portion of our portfolio transactions and the allocation of brokerage commissions. Our Adviser does not execute transactions through any particular broker or dealer but seeks to obtain the best net results for us under the circumstances, taking into account such factors as price (including the applicable brokerage commission or dealer spread), size of order, difficulty of execution and operational facilities of the firm and the firm's risk and skill in positioning blocks of securities. Our Adviser generally seeks reasonably competitive trade execution costs but does not necessarily pay the lowest spread or commission available. Subject to applicable legal requirements, our Adviser may select a broker based upon brokerage or research services provided to our Adviser and us and any other clients. In return for such services, we may pay a higher commission than other brokers would charge if our Adviser determines in good faith that such commission is reasonable in relation to the services provided. We also pay brokerage commissions incurred in connection with open-market purchases pursuant to our dividend reinvestment plan. The aggregate amount of brokerage commissions paid by us during the three most recent fiscal years is $39,000.

## Investment Criteria

Our Adviser (i) benefits from the relationships developed by TPC as part of its TriplePoint Lifespan Approach and (ii) typically sources investment opportunities with TPC's select group of leading venture capital investors or directly from prospective borrowers who are seeking debt financing. Many of these prospective borrowers are attracted to TPC's reputation, extensive track record in the venture growth stage debt market, the Four Rs' core investment philosophy, and/or may have previously had a lending relationship with TPC. Additional origination sources for our Adviser include an extensive network of strategic industry contacts, including former and current venture growth stage companies, financial advisers, commercial banks and accounting and law firms. Our Adviser also identifies companies with strong management teams and innovative technology to proactively generate debt financing opportunities.

We primarily target investment opportunities in venture growth stage companies that have received equity investments from venture capital investors. However, having backing from a venture capital investor does not guarantee financing from us. Prospective borrowers must further qualify based on our Adviser's rigorous and established investment selection and underwriting criteria and generally have many of the characteristics discussed above under "-Investment Strategy-Target Venture Growth Stage Companies." As a matter of practice, the evaluation of these criteria and characteristics, including the meaningful nature thereof, will involve subjective judgments and determinations by our Adviser, drawing upon its prior investment experience.

We underwrite our transactions to ensure that our portfolio companies have a strategic and balanced intended use of our investment proceeds without us taking excessive risk and with a low likelihood of default. We believe that the profiles of the venture growth stage companies that we target mitigate our risk because we expect these companies have several options to repay our debt financing through:

- cash flow either from achieving the strong and rapid revenue and profitability plans targeted at the time of our underwriting or in a downside risk scenario from reducing growth and associated operating expenses;

- receiving additional cash from new equity investors based on the progress and development made by the company and their outlook for growth or in a downside risk scenario from existing equity investors to avoid them from otherwise losing all of their invested capital given our ability to foreclose on our collateral;

- receiving acquisition offers from strategic or other financial investors or undertaking an initial public offering, given their large and growing market opportunities, the stage of development of their underlying technology and products and their financial profile; or

- in a worst-case scenario, liquidating underlying assets including any proceeds from the sale of equipment, inventory, accounts receivable and/or intellectual property.

8

Upon referral or contact, a prospective borrower is added to our Adviser's client management system and assigned to one of our Adviser's originations professionals (each, an "Origination Professional") who becomes the prospective borrower's primary contact with us. The Originations Professional evaluates the prospective borrower in more depth to understand its debt financing needs and to determine whether or not it is qualified under our criteria. Upon initial screening, the Originations Professional generally meets with the prospective borrower and performs a preliminary investigation of the prospective borrower's management, operations and business outlook. The Originations Professional generally consults with, and gathers information from, a wide variety of industry sources to assess the prospective borrower and its industry. In addition, the Originations Professional may reach out to the prospective borrower's venture capital investors to understand the background of their investment in the company, their outlook for the company, the company's market and products, the company's goals and objectives associated with the proposed debt financing and the venture capital investor's level of support for the company. If the Originations Professional is satisfied with the preliminary assessment of the prospective borrower's management, operations and business prospects, the Originations Professional submits an internal pre-screen memorandum of the proposed debt transaction to our Adviser's senior investment team for discussion and review, as well as for pricing and structuring guidance. Each potential investment opportunity that our Adviser's Originations Professionals determine merits investment consideration is presented and evaluated at a weekly meeting in which our Adviser's senior investment team discusses the merits and risks of a potential investment opportunity, as well as the due diligence process and the pricing and structure. If our Adviser's senior investment team believes an investment opportunity fits our investment profile, the Originations Professional submits a non-binding term sheet to the prospective borrower.

*Diligence Process*

Assuming the non-binding term sheet submitted to the prospective borrower is subsequently executed, the investment opportunity is then subject to our Adviser's rigorous diligence and credit analysis process, which is based on its senior investment team's extensive experience and tailored specifically for venture growth stage companies. This process differs notably from traditional lending analysis, combining both qualitative and quantitative analysis and assessment, versus traditional, purely quantitative credit analyses. There is a heavy orientation towards a qualitative and subjective investment-oriented review, taking into account such factors as:

- venture capital investor quality, track record and expected level of participation in future financing events;

- management team experience, completeness, performance to date, and ability to perform;

- industry segment/market attractiveness and outlook, competitive dynamics, and growth potential;

- detailed assessment and analysis of the venture growth stage company's current products or technology and future products or technology, including value proposition and return on investment to its customers and its ability to expand and grow its customer base;

- current and future financial position, including financial projections and sensitivity analyses, historical performance, cash balance and burn analysis, capitalization structure, feasibility of financial plan and underlying assumptions, break-even/profitability timing, future cash needs and future financing plans;

- stage of development and execution timeline and milestones and the likelihood and feasibility of achieving such milestones; and

- transaction risk/return profile—assessing the strengths, weaknesses, risks, loan-to-value, liquidation values and outlook of the borrower compared to the structure, pricing, potential returns, likelihood of repayment and collateral structure of the proposed debt financing.

Our Adviser's diligence and credit analysis process typically includes visits by one of our Adviser's Investment and Credit Analysis professionals (each, an "Investment and Credit Analysis Professional") to a prospective borrower's headquarters and other facilities, interviews with key management and board members and reference checks on senior management. In addition, the diligence process may include discussions with key industry research analysts, other industry participants, customers and suppliers, where appropriate. One of our Adviser's professionals also typically reviews the prospective borrower's organizational documents and structure, capital structure, assets, liabilities, employee plans, key customer or supplier contracts, legal and tax matters and other relevant legal documentation. The Investment and Credit Analysis Professional submits a detailed credit and due diligence memorandum describing and analyzing the proposed transaction, as well as the outcome of the diligence and credit analysis activities. This memorandum is circulated to members of our Adviser's Investment Committee (the "Investment Committee") and senior investment team in advance of its meetings.

*Investment Committee*

The objective of the Adviser's Investment Committee and senior investment team is to leverage its members' broad historical experience, including significant entrepreneurial, credit, venture capital, venture lending and venture leasing expertise and technology and other high growth industries knowledge assessing the risk and needs of venture growth stage companies and appropriateness of prospective transactions, assessing the risk/return profile of proposed transactions, assessing the independent diligence and credit analysis and providing a forum for independent and unbiased thought, discussion, and assessment.

9

The Investment Committee, comprised of Mr. Labe and Mr. Srivastava, who are also members of the Adviser's senior investment team, holds votes to approve any proposed investment transaction, including follow-on investments. Additionally, members of the Adviser's senior investment team meet on at least a weekly basis to consider new and follow-on investment opportunities, with the non-Investment Committee members participating in voting on an advisory basis on all investments, which serves as an input to the Investment Committee's decisions. During these meetings, the applicable Originations and Investment and Credit Analysis Professional presents the transaction, results of the professional's diligence review and credit analysis and the professional's recommendations to the senior investment team. During the presentation, the investment team members in attendance typically ask questions, ask for clarifications, state opinions and assessments and make other comments. When there are no further questions and the discussions have concluded, the investment team holds an advisory vote to consider approval of the proposed transaction. In certain situations, the Investment Committee and members of the Adviser's senior investment team may ask the Originations and Investment and Credit Analysis Professional to perform additional analysis and resubmit the transaction at a later meeting. No single criterion determines a decision to invest. The members weigh a variety of factors, both qualitative and quantitative, when making an investment decision. Our Adviser has the discretion to modify the members of the Investment Committee and its approval process at any time without our consent.

**Investment Monitoring and Portfolio Management**

Our Adviser utilizes an extensive internal credit tracking and monitoring approach to regularly follow a borrower's actual financial performance and achievement of business-related milestones to ensure that the internal risk rating assigned to each borrower is appropriate. This process has been refined and validated by Mr. Labe and Mr. Srivastava, and the track record developed by TPC since its inception and is based in part on its expertise and deep understanding of the risk associated with investing in various stages of a venture capital-backed company's lifespan. The analysis focuses on both quantitative metrics, such as cash balance and cash burn, and our Adviser's qualitative assessment in various areas, such as the outlook for the borrower's industry segment, progress of product development, overall adherence to the business plan, financial condition, future growth potential and ability to raise additional equity capital. Our Adviser maintains dialogue and contact with our borrowers' management teams to discuss, among other topics, business progress, cash flow, financial condition and capital structure matters. Our Adviser also typically engages in dialogue with the venture capital investors in our borrowers to understand and assess the borrower's progress and development and the venture capital investor's outlook and/or level of support for our borrower and in conjunction with the Four Rs, our core investment philosophy, determines the appropriate course of action with respect to investments in borrowers on our Credit Watch List.

Each of our borrowers is assigned a "Portfolio Company Team" consisting of staff from our Adviser's Originations, Investment and Credit Analysis, Portfolio Monitoring and Legal teams. We believe having a dedicated Portfolio Company Team for each borrower further strengthens the relationship we have with the borrower, which is a key component of our Adviser's strategy and affords our Adviser consistent and continuous interaction with our borrowers. A Portfolio Monitoring professional is assigned to all borrowers to ensure compliance with financial statement and compliance reporting, insurance filing and timely payment requirements. These professionals review the various financial statements, compliance reports and other documents received from our borrowers on a monthly or quarterly basis, as well as any publicly filed financing statements, such as UCC financing statements and press releases, and enter them into our Adviser's proprietary client-management platform for review by the rest of the Portfolio Company Team. In the event of a missed payment or if other credit issues arise, the Portfolio Company Team initiates escalation procedures.

On a weekly basis, our Adviser's Investment Committee and senior investment team review material events and information on our borrowers and discuss in detail those borrowers that are performing below expectations. On a quarterly basis, or more frequently as needed, our Originations and Investment and Credit Analysis Professionals undertake an extensive re-evaluation of each borrower and prepare a portfolio update. Key topics that are reviewed include timing/status of the next equity financing round, cash balance and burn rate, financial and operational progress, and covenant adherence. All of these meetings are typically attended by one or more members of our Adviser's Investment Committee, senior investment team and the Portfolio Company Team for the specific borrower being reviewed.

If the outlook for a borrower, its industry or a borrower's available cash balance or credit rating is materially deteriorating, or there is material downturn in the borrower's standing since our last review, we change the standing of the borrower on our Credit Watch List (as discussed below) and our Originations and Investment and Credit Analysis Professionals contact the borrower and its venture capital investors to discuss and understand any changes. Our Originations and Investment and Credit Analysis Professionals generally actively work to maintain an open dialogue with borrowers on the Credit Watch List to work to limit the likelihood of a default. Utilizing the Four Rs, our core investment philosophy, our Adviser assesses each borrower on our Credit Watch List and, based on the recommendations from our Originations and Investment and Credit Analysis Professionals and potentially from our discussions with and representations made from the borrower's venture capital investors, determines the appropriate course of action, including decisions to enforce our rights and remedies, modify or waive a provision of our investments, declare a default, request early pay-off, or wait for an external event, such as an acquisition or financing, to restructure a secured loan or receive additional consideration in the form of fees or warrant investments. In a worst-case scenario, a member of our Portfolio Company Team sells collateral with the help of management, repossesses and auctions assets or negotiates and structures other potential outcomes. If bankruptcy is a possibility, a member of our Portfolio Company Team may utilize outside counsel to provide advice on avoiding this outcome or to minimize the adverse effects on us.

Consistent with TPC's existing policies, our Adviser maintains a Credit Watch List, which places borrowers into five risk categories based upon our Adviser's senior investment team's judgment, where 1 is the highest rating and all new loans are generally assigned a rating of 2.

| Category | Category Definition | Action Item |
|---|---|---|
| Clear (1) | Performing above expectations and/or strong financial or enterprise profile, value or coverage. | Review quarterly. |
| White (2) | Performing at expectations and/or reasonably close to it. Reasonable financial or enterprise profile, value or coverage. Generally, all new loans are initially graded White (2). | Contact portfolio company periodically; in no event less than quarterly. |
| Yellow (3) | Performing generally below expectations and/or some proactive concern due to industry, business, financial and/or related factors. Adequate financial or enterprise profile, value or coverage. | Contact portfolio company monthly or more frequently as determined by our Adviser's Investment Committee; contact venture capital investors. |
| Orange (4) | Needs close attention due to performance materially below expectations, weak financial and/or enterprise profile, concern regarding additional capital or exit equivalent. | Contact portfolio company weekly or more frequently as determined by our Adviser's Investment Committee; contact venture capital investors regularly; our Adviser forms a workout group to minimize risk of loss. |
| Red (5) | Serious concern/trouble due to pending or actual default or equivalent. May experience partial and/or full loss. | Maximize value from assets. |

**Competition**

Debt financing for venture capital-backed companies is particularly heterogeneous—the type, structures and sizes of debt financings often vary significantly depending on a particular company's industry and its current or near-term stage of development. The profile and underwriting characteristics of an early stage venture capital-backed company are very different from those of a later stage venture capital-backed company and/or those of a venture growth stage company. Furthermore, within venture growth stage companies, the uses, structures and value propositions of debt financing vary considerably among companies and industries and require a high degree of venture lending and venture leasing expertise and technology and other high growth industries knowledge, specialization and flexibility from a lender. The availability of debt financing for venture growth stage companies is further limited by factors such as the brand, reputation and market acceptance, industry relationships, track record, and other factors required to lend to companies backed by leading venture capital investors. In addition, a lender must understand the distinct credit profiles of these companies and have the deep experience and specialized set of skills required to (i) source deal flow and receive investment referrals; (ii) evaluate high growth industries and sectors, business prospects, operating characteristics and collateral; (iii) analyze potential transactions; and (iv) customize unconventional transaction structures for these companies.

We believe that venture-oriented banks tend to be the primary form of traditional lenders participating in the market for venture growth stage companies and that they generally focus on providing lower risk and lower return financings, which tend to require and impose many restrictive covenants and conditions on borrowers, such as minimum cash balances, financial covenants, limitations on outflows and borrowing formulas and require a significant depository relationship to facilitate rapid liquidation. In addition, we believe that most existing non-traditional debt providers do not regularly or actively participate in venture growth stage lending due to their reluctance to underwrite the large financings required by venture growth stage companies, as well as the desire of these providers to structure deals with lower current return but with the potential for significantly higher equity upside through warrant investments by lending to companies with lower valuations than would be possible in the venture growth stage lending market. As a result, most existing providers of debt financing tend to focus on seed, early and late-stage venture capital-backed companies instead of venture growth stage companies.

Our competitors include both existing and newly formed equity and debt focused public and private funds, other BDCs, investment banks, venture-oriented banks, commercial financing companies and, to the extent they provide an alternative form of financing, private equity and hedge funds. Many of our competitors are substantially larger and have considerably greater financial, technical and marketing resources than us. For example, we believe some of our competitors may have access to funding sources that are not available to us. In addition, some of our competitors may have higher risk tolerances or different risk assessments, which expose them to a wider variety of investments. Furthermore, many of our competitors are not subject to the regulatory restrictions that the 1940 Act imposes on us as a BDC or to the distribution and other requirements we must satisfy to maintain our qualification as a RIC.

We believe we compete effectively with these entities primarily on the basis of TPC's reputation, track record, experience, industry knowledge and relationships and our Adviser's senior investment team's contacts, efficient investment analysis, decision-making processes, creative financing products and highly customized investment terms. We believe that the Four Rs, our core investment philosophy, enable us to continue to grow our brand name, reputation and differentiate us from our competitors. We do not compete primarily on the financing terms we offer and believe that some competitors make loans with rates that are comparable or lower than our rates. We also believe that our relationship-based approach to investing, which leverages our Adviser's senior investment team's expertise in developing strong relationships with venture capital investors and venture capital-backed companies, understanding the capital needs of venture growth stage companies, and structuring and customizing attractive financing solutions to meet the financing needs throughout a company's growth stage, enables us to identify, attract and proactively capitalize on venture growth stage companies' debt needs as they grow and become successful enterprises.

11

**Employees**

We do not currently have any employees and do not expect to have any employees. Services necessary for our business are provided by individuals who are employees of the Adviser or its affiliates, and the Administrator, pursuant to the terms of the Investment Advisory Agreement and/or the Administration Agreement, each as described below. Our day-to-day investment operations are managed by the Adviser, and we reimburse our Administrator for our allocable portion of expenses incurred pursuant to the Administration Agreement, as described below.

**Management Agreements**

*Investment Advisory Agreement*

Subject to the overall supervision of our Board and in accordance with the 1940 Act, our Adviser manages our day-to-day operations and provides investment advisory services to us. Under the terms of the Investment Advisory Agreement, our Adviser:

- determines the composition of our portfolio, the nature and timing of the changes to our portfolio and the manner of implementing such changes;

- identifies, evaluates and negotiates the structure of the investments we make;

- executes, closes, services and monitors the investments we make;

- determines the securities and other assets that we will purchase, retain or sell;

- performs due diligence on prospective investments; and

- provides us with such other investment advisory, research and related services as we may, from time to time, reasonably require for the investment of our funds.

Pursuant to the Investment Advisory Agreement, we pay our Adviser a fee for its investment advisory and management services consisting of two components—a base management fee and an incentive fee. The cost of both the base management fee and the incentive fee is ultimately borne by our stockholders.

**Base Management Fee**

The base management fee is calculated at an annual rate of 1.75% of our average adjusted gross assets, including assets purchased with borrowed funds. For services rendered under the Investment Advisory Agreement, the base management fee is payable quarterly in arrears. The base management fee is calculated based on the average value of our gross assets at the end of our two most recently completed calendar quarters. Such amount is appropriately adjusted (based on the actual number of days elapsed relative to the total number of days in such calendar quarter) for any share issuances or repurchases during a calendar quarter. Base management fees for any partial month or quarter are appropriately pro-rated.

**Incentive Fee**

The incentive fee, which provides our Adviser with a share of the income that it generates for us, consists of two components—investment income and capital gains—which are largely independent of each other, with the result that one component may be payable even if the other is not payable.

Under the investment income component, we pay our Adviser each quarter 20.0% of the amount by which our pre-incentive fee net investment income for the quarter exceeds a hurdle rate of 2.0% (which is 8.0% annualized) of our net assets at the end of the immediately preceding calendar quarter, subject to a "catch-up" provision pursuant to which our Adviser receives all of such income in excess of the 2.0% level but less than 2.5% and subject to a total return requirement. The effect of the "catch-up" provision is that, subject to the total return provision discussed below, if pre-incentive fee net investment income exceeds 2.5% in any calendar quarter, our Adviser receives 20.0% of our pre-incentive fee net investment income as if the 2.0% hurdle rate did not apply. The foregoing incentive fee is subject to a total return requirement, which provides that no incentive fee in respect of our pre-incentive fee net investment income is payable except to the extent that 20.0% of the cumulative net increase in net assets resulting from operations since the effective date of our election to be regulated as a BDC (March 5, 2014) exceeds the cumulative incentive fees accrued and/or paid since March 5, 2014. In other words, any investment income incentive fee that is payable in a calendar quarter is limited to the lesser of (i) 20.0% of the amount by which our pre-incentive fee net investment income for such calendar quarter exceeds the 2.0% hurdle rate, subject to the "catch-up" provision and (ii) (x) 20.0% of the cumulative net increase in net assets resulting from operations since March 5, 2014 minus (y) the cumulative incentive fees accrued and/or paid since March 5, 2014. For the foregoing purpose, the "cumulative net increase in net assets resulting from operations" is the sum of our pre-incentive fee net investment income, realized gains and losses and unrealized gains and losses since March 5, 2014.

12

Pre-incentive fee net investment income, expressed as a rate of return on the value of our net assets at the end of the immediately preceding calendar quarter, does not include any realized capital gains, realized capital losses or unrealized capital gains or losses. Because of the structure of the incentive fee, it is possible that we may pay an incentive fee in a quarter where we incur a loss, subject to the total return requirement described in the preceding paragraph. For example, if we receive pre-incentive fee net investment income in excess of the quarterly minimum hurdle rate, we will pay the applicable income incentive fee even if we have incurred a loss in that quarter due to realized and unrealized capital losses. Our net investment income used to calculate this component of the incentive fee is also included in the amount of our assets used to calculate the 1.75% base management fee. These calculations are appropriately adjusted for any share issuances or repurchases during the relevant quarter.

The following is a graphical representation of the calculation of the income-related portion of the incentive fee.



*Quarterly Incentive Fee Based on Net Investment Income*
**Pre-incentive fee net investment income (expressed as a percentage of the value of net assets)**

**Percentage of pre-incentive fee net investment income allocated to first component of incentive fee**

Under the capital gains component of the incentive fee, we pay our Adviser at the end of each calendar year (or upon termination of the Investment Advisory Agreement) 20.0% of our aggregate cumulative realized capital gains from inception through the end of that year, computed net of our aggregate cumulative realized capital losses and our aggregate cumulative unrealized losses through the end of such year, less the aggregate amount of any previously paid capital gain incentive fees. For the foregoing purpose, our "aggregate cumulative realized capital gains" does not include any unrealized gains. It should be noted that we accrue an incentive fee for accounting purposes taking into account any unrealized gains in accordance with GAAP. The capital gains component of the incentive fee is not subject to any minimum return to stockholders. If such amount is negative, then no capital gains incentive fee is payable for such year. Additionally, if the Investment Advisory Agreement is terminated as of a date that is not a calendar year end, the termination date will be treated as though it were a calendar year end for purposes of calculating and paying the capital gains incentive fee.

## Payment of Our Expenses

All professionals of our Adviser, when and to the extent engaged in providing investment advisory and management services to us, and the compensation and routine overhead expenses of personnel allocable to these services to us, are provided and paid for by our Adviser and not by us. We bear all other out-of-pocket costs and expenses of our operations and transactions, including, without limitation, those relating to:

- organization;
- calculating our net asset value (including the cost and expenses of any independent valuation firm);
- indemnification payments;
- providing managerial assistance to those portfolio companies that request it;
- marketing expenses;
- expenses relating to the development and maintenance of our website;
- fees and expenses payable to third parties, including agents, consultants or other advisors, in connection with monitoring financial and legal affairs for us and in monitoring our investments and performing due diligence on our prospective portfolio companies or otherwise relating to, or associated with, evaluating and making investments;
- fees and expenses incurred in connection with obtaining debt financing;
- interest payable on debt, if any, incurred to finance our investments and expenses related to unsuccessful portfolio acquisition efforts;
- offerings of our common stock and other securities;
- investment advisory and management fees;
- administration fees, expenses and/or payments payable under the Administration Agreement;
- fees payable to third parties, including agents, consultants and other advisors, relating to, or associated with, evaluating and making investments, including costs associated with meeting potential financial sponsors;

13

- any existing and potential sources of indirect income to the Adviser from its relationships with us and the profitability of those relationships;

- information about the services performed and the personnel performing such services under the Investment Advisory Agreement;

- economies of scale realized by the Adviser (or that possibly might be realized by the Adviser in the future) in connection with the Adviser's provision of services to us; and

- the organizational capability and financial condition of the Adviser.

Based on the information reviewed and the discussions detailed above, the Board, including all of the directors who are not "interested persons" as defined in the 1940 Act, concluded that the investment advisory fee rates and terms are reasonable in relation to the services provided and re-approved the Investment Advisory Agreement as being in the best interests of our stockholders. The Board did not assign relative weights to the above factors or the other factors considered by it. Individual members of the Board may have given different weights to different factors.

*Administration Agreement*

The Administration Agreement provides that our Administrator is responsible for furnishing us with office facilities and equipment and providing us with clerical, bookkeeping, recordkeeping and other administrative services at such facilities. Under the Administration Agreement, our Administrator performs, or oversees, or arranges for, the performance of, our required administrative services, which includes being responsible for the financial and other records that we are required to maintain and preparing reports to our stockholders and reports and other materials filed with the SEC or any other regulatory authority. In addition, our Administrator assists us in determining and publishing our net asset value, oversees the preparation and filing of our tax returns and the printing and dissemination of reports and other materials to our stockholders, and generally oversees the payment of our expenses and the performance of administrative and professional services rendered to us by others. Under the Administration Agreement, our Administrator also provides managerial assistance on our behalf to those companies that have accepted our offer to provide such assistance.

In consideration of the provision of the services of our Administrator, we reimburse our Administrator for the costs and expenses incurred by our Administrator in performing its obligations and providing personnel and facilities under the Administration Agreement. Payments under the Administration Agreement are equal to our allocable portion (subject to the review of our Board) of our Administrator's overhead resulting from its obligations under the Administration Agreement, including rent and the allocable portion of the cost of our Chief Compliance Officer and Chief Financial Officer and their respective staffs. In addition, if requested to provide significant managerial assistance to our portfolio companies, our Administrator is paid an additional amount based on the services provided, which shall not exceed the amount we receive from such companies for providing this assistance. The Administration Agreement between us and the Administrator was initially approved by our Board at an in-person meeting in November 2013 and was entered into in February 2014.

Our Board most recently determined to re-approve the Administration Agreement at a meeting held on October 28, 2022. In connection with such approval, the Board, including a majority of independent directors, reviewed the payments made by us to the Administrator to determine that the provisions of the Administration Agreement are carried out satisfactorily and to determine, among other things, whether the payments made by us under the Administration Agreement are reasonable in light of the services provided. The Board also reviewed the methodology employed in determining how the expenses are allocated to us and the proposed allocation of administrative expenses among us and the affiliates of TPC. The Board then assessed the reasonableness of such reimbursements for expenses allocated to us based on the nature and quality of the administrative services provided to us by the Administrator, our projected operating expenses and expense ratio compared to BDCs with similar investment objectives, any existing and potential sources of indirect income to the Administrator from its relationship with us, information about the administrative services to be performed and the personnel performing such administrative services, the organizational capability of the Administrator, and the possibility of obtaining similar services from other third-party service providers.

The Administration Agreement will continue in effect from year to year if approved annually by the Board. The Administration Agreement may be terminated by either party without penalty upon 60 days' written notice to the other party. Stockholder approval is not required to amend the Administration Agreement.

The Administration Agreement provides that, absent criminal conduct, willful misfeasance, bad faith or gross negligence in the performance of its duties or by reason of the reckless disregard of its duties and obligations, our Administrator and any person or entity affiliated with it are entitled to indemnification from us for any damages, liabilities, costs and expenses (including reasonable attorneys' fees and amounts reasonably paid in settlement) arising from the rendering of our Administrator's services under the Administration Agreement or otherwise as our administrator.

*Staffing Agreement*

Our Adviser has entered into the Staffing Agreement with TPC (the "Staffing Agreement"). Pursuant to the Staffing Agreement, TPC has made and will continue to make, subject to the terms of the Staffing Agreement, its investment and portfolio management and monitoring teams available to our Adviser. We believe that the Staffing Agreement (i) provides us with access to deal flow generated by TPC in the ordinary course of its business; (ii) provides us with access to TPC's investment professionals, including its senior investment team led by Mr. Labe and Mr. Srivastava, and TPC's non-investment employees; and (iii) commits certain key senior members of TPC's Investment Committee to serve as members of our Adviser's Investment Committee. Our Adviser is responsible for determining if we will participate in deal flow generated by TPC. Our Adviser takes advantage of the significant deal origination channels, rigorous due diligence process, disciplined underwriting methods, creative investment structuring and comprehensive portfolio management and investment monitoring capabilities of TPC's senior investment team. The Staffing Agreement may be terminated by either party with 60 days' prior written notice.

*License Agreement*

We have entered into the License Agreement with TPC under which TPC granted us a non-exclusive, royalty-free license to use the name "TriplePoint" and the TriplePoint logo. Under the License Agreement, we have a right to use the "TriplePoint" name for so long as our Adviser or one of its affiliates remains our investment adviser. Other than with respect to this limited license, we have no legal right to the "TriplePoint" name.

**Determination of Net Asset Value**

*Quarterly Determinations*

We determine the net asset value per share of our common stock on at least a quarterly basis. The net asset value per share is equal to the value of our total assets minus liabilities and any preferred stock outstanding divided by the total number of shares of common stock outstanding. As of the date of this Annual Report on Form 10-K, we do not have any preferred stock outstanding.

Our investment assets are carried at fair value in accordance with the 1940 Act and Accounting Standards Codification Topic 820, Fair Value Measurements and Disclosure, or ASC Topic 820. Value, as defined in Section 2(a)(41) of the 1940 Act, is (i) the market price for those securities for which a market quotation is readily available and (ii) for all other securities and assets, fair value is as determined in good faith by our Board. Our investments are primarily made to venture growth stage companies in technology and other high growth industries. Given the nature of lending to these types of companies, our investments are generally considered Level 3 assets under ASC Topic 820 because there is no known or accessible market or market indexes for these investments to be traded or exchanged. As such, we value substantially all of our investments at fair value as determined in good faith by our Board pursuant to a consistent valuation policy in accordance with the provisions of ASC Topic 820 and the 1940 Act. Due to the inherent uncertainty in determining the fair value of investments that do not have a readily available market value, the fair value of our investments determined in good faith by our Board may differ significantly from the value that would have been used had a readily available market existed for such investments, and the differences could be material.

The valuation committee of the Board (the "Valuation Committee") is responsible for assisting the Board in valuing investments that are not publicly traded or for which current market values are not readily available. Investments for which market quotations are readily available are valued using market quotations, which are generally obtained from independent pricing services, broker-dealers or market makers. We value our portfolio investments for which market quotations are not readily available at fair value, as determined in good faith by the Board, with the assistance of the Adviser and independent valuation agents, in accordance with Rule 2a-5 of the 1940 Act and GAAP, and in accordance with our valuation policy approved by the Board. If more than one valuation method is used to measure fair value, the results are evaluated and weighted, as appropriate, considering the reasonableness of the range indicated by those results. The Adviser considers a range of fair values based upon the valuation techniques utilized and selects a value within that range that most accurately represents fair value based on current market conditions as well as other factors the Adviser's valuation committee considers relevant.

The Board determines fair value of its investments on at least a quarterly basis or at such other times when it feels it would be appropriate to do so given the circumstances. A determination of fair value involves subjective judgments and estimates and depends on the facts and circumstances present at each valuation date. Due to the inherent uncertainty of determining fair value of portfolio investments that do not have a readily available market value, fair value of investments may differ significantly from the values that would have been used had a readily available market value existed for such investments, and the differences could be material.

The fair value of our investments is measured in accordance with Accounting Standards Codification Topic 820, Fair Value Measurements and Disclosure, or "ASC Topic 820," issued by the FASB. ASC Topic 820 defines fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. ASC Topic 820 specifies a hierarchy of valuation techniques based on whether the inputs to those valuation techniques are observable or unobservable. ASC Topic 820 also provides guidance regarding a fair value hierarchy, which prioritizes information used to measure fair value and the effect of fair value measurements on earnings and provides for enhanced disclosures determined by the level of information used in the valuation. In accordance with ASC Topic 820, these inputs are summarized in the three levels listed below:

- *Level 1* — Valuations are based on quoted prices in active markets for identical assets or liabilities that are accessible at the measurement date.

- *Level 2* — Valuations are based on quoted prices in markets that are not active or for which all significant inputs are observable, either directly or indirectly, and model-based valuation techniques for which all significant inputs are observable.

16

- *Level 3* — Valuations are based on inputs that are unobservable and significant to the overall fair value measurement. Level 3 assets and liabilities include financial instruments whose value is determined using pricing models incorporating significant unobservable inputs, such as discounted cash flow models and other similar valuations techniques. The valuation of Level 3 assets and liabilities generally requires significant management judgment due to the inability to observe inputs to valuation.

In certain cases, the inputs used to measure fair value may fall into different levels of the fair value hierarchy. In such cases, an investment's level within the fair value hierarchy is based on the lowest level of observable input that is significant to the fair value measurement. The assessment of the significance of a particular input to the fair value measurement in its entirety requires judgment and consideration of factors specific to the investment.

Under ASC Topic 820, the fair value measurement also assumes that the transaction to sell an asset occurs in the principal market for the asset or, in the absence of a principal market, the most advantageous market for the asset, which may be a hypothetical market, and excludes transaction costs. The principal market for any asset is the market with the greatest volume and level of activity for such asset in which the reporting entity would or could sell or transfer the asset. In determining the principal market for an asset or liability under ASC Topic 820, it is assumed that the reporting entity has access to such market as of the measurement date. Market participants are defined as buyers and sellers in the principal or most advantageous market that are independent, knowledgeable and willing and able to transact. See "Note 4. Investments" in the notes to our consolidated financial statements for a further discussion of our valuation process.

For purposes of Section 2(a)(41) and Rule 2a-5 under the 1940 Act, a market quotation is readily available only when that quotation is a quoted price (unadjusted) in active markets for identical investments that we can access at the measurement date, provided that a quotation will not be readily available if it is not reliable. Any portfolio investment that is not priced using a Level 1 input shall be subject to the fair value determination requirements under Rule 2a-5 and subject to our valuation procedures.

With respect to investments for which market quotations are not readily available, the Board undertakes a multi-step valuation process each quarter, as described below:

- The quarterly valuation process begins with each portfolio company or investment receiving a proposed valuation by the Adviser. The Adviser's internal valuation committee (the "Adviser Valuation Committee") is responsible for the valuation process, including making preliminary valuation conclusions and recommendations to the Valuation Committee and Board. The Adviser Valuation Committee does not include any voting members who are portfolio managers or investment professionals.

- The Adviser's Portfolio Valuation, Monitoring and Analytics ("VMA") group is responsible for aiding and supporting the Adviser Valuation Committee in the Adviser Valuation Committee's role of overseeing the valuation process, including for calculating and overseeing the valuation process and valuation conclusions, and including making recommendations with respect to discount rates, liquidity adjustments and other key inputs into the valuation process.

- Proposed valuations are then documented and discussed with the Adviser Valuation Committee and other members of the Adviser's senior management, including members of the VMA and the Adviser's Finance, Operations, Legal and Compliance groups.

- At least 25% of the Company's investment portfolio will receive valuation recommendations from an independent third-party valuation firm each quarter, as selected in accordance with the Company's valuation policy. Each new portfolio investment will be reviewed by an independent third-party valuation firm within 12 months of the date of investment, and thereafter will be reviewed by an independent third-party valuation firm no later than the fourth quarter following its most recent inclusion in such review process. However, a valuation review by an independent third-party valuation firm is not required for holdings whose value is less than 1% of the Company's gross assets (up to an aggregate of 10% of the Company's gross assets) or those assets that the Board and/or Valuation Committee has agreed to waive from such requirement.

- The Adviser and the independent third-party valuation firms, if applicable, then present their proposed valuations to the Valuation Committee and Board, and the Board makes a fair valuation determination for each portfolio investment that is to be fair valued.

**Material U.S. Federal Income Tax Considerations**

*Taxation of the Company*

We have elected to be treated, and intend to qualify annually, as a RIC under Subchapter M of the Code. As a RIC, we generally do not pay corporate-level U.S. federal income taxes on any ordinary income or capital gains that we timely distribute (or are deemed to timely distribute) to our stockholders as dividends.

To qualify as a RIC, we must, among other things:

- derive in each taxable year at least 90% of our gross income from dividends, interest, payments with respect to certain securities loans, gains from the sale or other disposition of stock, securities or foreign currencies, other income derived with respect to our business of investing in stock, securities or currencies, or net income derived from an interest in a "qualified publicly traded partnership," or "QPTP," hereinafter the "90% Gross Income Test;" and

- diversify our holdings so that, at the end of each quarter of each taxable year:

17

**Debt Instruments**

In certain circumstances, we may be required to recognize taxable income prior to which we receive cash. For example, if we hold debt instruments that are treated under applicable tax rules as having OID (such as debt instruments with an end-of-term payment and/or PIK interest payment or, in certain cases, increasing interest rates or issued with warrant investments), we must include in taxable income each year a portion of the OID that accrues over the life of the obligation, regardless of whether cash representing such income is received by us in the same taxable year. We may also have to include in income other amounts that we have not yet received in cash, such as PIK interest, deferred loan origination fees that are paid after origination of the loan or are paid in non-cash compensation such as warrant investments or stock, or certain income with respect to equity investments in foreign corporations. Because any OID or other amounts accrued will be included in our investment company taxable income for the year of accrual, we may be required to make a distribution to our stockholders in order to satisfy the Annual Distribution Requirement and to avoid the 4% U.S. federal excise tax, even though we will not have received any corresponding cash amount.

**Warrant Investments**

Gain or loss realized by us from the sale or exchange of warrant investments acquired by us as well as any loss attributable to the lapse of such warrant investments generally are treated as capital gain or loss. The treatment of such gain or loss as long-term or short-term generally depends on how long we held a particular warrant.

**Foreign Investments**

In the event we invest in foreign securities, we may be subject to withholding and other foreign taxes with respect to those securities. We do not expect to satisfy the requirement to pass through to our stockholders their share of the foreign taxes paid by us.

**Passive Foreign Investment Companies**

We may invest in the stock of a foreign corporation which is classified as a "passive foreign investment company" (within the meaning of Section 1297 of the Code), or "PFIC." In general, unless a special tax election has been made, we are required to pay tax at ordinary income rates on any gains and "excess distributions" with respect to PFIC stock as if such items had been realized ratably over the period during which we held the PFIC stock, plus an interest charge. Certain adverse tax consequences of a PFIC investment may be limited if we are eligible to elect alternative tax treatment with respect to such investment. No assurances can be given that any such election will be available or that, if available, we will make such an election.

**Foreign Currency Transactions**

Under the Code, gains or losses attributable to fluctuations in exchange rates which occur between the time we accrue income or other receivables or accrue expenses or other liabilities denominated in a foreign currency and the time we actually collect such receivables or pay such liabilities generally are treated as ordinary income or loss. Similarly, on disposition of debt instruments and certain other instruments denominated in a foreign currency, gains or losses attributable to fluctuations if the value of the foreign currency between the date of acquisition of the instrument and the date of disposition also are treated as ordinary income or loss. These currency fluctuations related gains and losses may increase or decrease the amount of our investment company taxable income to be distributed to our stockholders as ordinary income.

*Failure to Qualify as a RIC*

If we were unable to qualify for treatment as a RIC, and if certain cure provisions described below are not available, we would be subject to tax on all of our taxable income (including our net capital gains) at regular corporate rates. We would not be able to deduct distributions to stockholders, nor would they be required to be made. Distributions, including distributions of net long-term capital gain, would generally be taxable to our stockholders as ordinary dividend income to the extent of our current and accumulated earnings and profits. Subject to certain limitations under the Code, corporate stockholders would be eligible to claim a dividend received deduction with respect to such dividend; non-corporate stockholders would generally be able to treat such dividends as "qualified dividend income," which is subject to reduced rates of U.S. federal income tax. Distributions in excess of our current and accumulated earnings and profits would be treated first as a return of capital to the extent of the stockholder's tax basis, and any remaining distributions would be treated as a capital gain. If we fail to qualify as a RIC for a period greater than two taxable years, to qualify as a RIC in a subsequent year we may be subject to regular corporate tax on any net built-in gains with respect to certain of our assets (i.e., the excess of the aggregate gains, including items of income, over aggregate losses that would have been realized with respect to such assets if we had been liquidated) that we elect to recognize on requalification or when recognized over the next five years.

**Regulation**

We are regulated as a BDC under the 1940 Act. The 1940 Act contains prohibitions and restrictions relating to transactions between BDCs and their affiliates (including any investment advisers), principal underwriters and affiliates of those affiliates and requires that a majority of the directors of a BDC be persons other than "interested persons," as that term is defined in the 1940 Act. In addition, the 1940 Act provides that we may not change the nature of our business so as to cease to be, or withdraw our election as, a BDC without the approval of a majority of our outstanding voting securities.

We do not intend to acquire securities issued by any investment company in excess of the limits imposed by the 1940 Act. Under these current limits, we generally cannot acquire more than 3% of the voting stock of any registered investment company or BDC, invest more than 5% of the value of our total assets in the securities of one registered investment company or BDC, or invest more than 10% of the value of our total assets in the securities of registered investment companies and BDCs, subject to compliance with certain exceptions.

We are not generally able to issue and sell our common stock at a price below net asset value per share. We may, however, sell our common stock at a price below then-current net asset value per share of our common stock if our Board determines that such sale is in our best interests, and if our stockholders approve such sale. In any such case, the price at which our securities are to be issued and sold may not be less than a price that, in the determination of our Board, closely approximates the market value of such securities (less any distributing commission or discount). If we raise additional funds by issuing common stock or senior securities convertible into, or exchangeable for, our common stock, then the percentage ownership of our stockholders at that time will decrease and you may experience dilution.

At our 2018 Annual Stockholders Meeting, our stockholders authorized our ability to issue options, warrants or rights to subscribe to, convert to, or purchase shares of our common stock, which may include convertible preferred stock and convertible debentures, under appropriate circumstances in connection with our capital raising and financing activities, subject to applicable restrictions under the 1940 Act (including, without limitation, that at the date of issuance of the options, warrants or rights, (i) the number of shares that would result from the exercise or conversion of all of the Company's options, warrants or rights to subscribe to, convert to, or purchase our common stock does not exceed 25% of our then-outstanding shares, and (2) the exercise or conversion price thereof is not less than the market value per share of our common stock). Such authorization has no expiration.

*Qualifying Assets*

Under the 1940 Act, a BDC may not acquire any asset other than assets of the type listed in Section 55(a) of the 1940 Act, which are referred to as "qualifying assets," unless, at the time the acquisition is made, qualifying assets represent at least 70% of the BDC's total assets. The principal categories of qualifying assets that are applicable to us are the following:

(1)   securities purchased in transactions not involving any public offering from the issuer of such securities, which issuer (subject to certain limited exceptions) is an eligible portfolio company, or from any person who is, or has been during the preceding 13 months, an affiliated person of an eligible portfolio company, or from any other person, subject to such rules as may be prescribed by the SEC. An "eligible portfolio company" is defined in the 1940 Act as any issuer that:

•     is organized under the laws of, and has its principal place of business in, the United States;

•     is not an investment company (other than a small business investment company wholly owned by the BDC) or a company that would be an investment company but for certain exclusions under the 1940 Act; and

•     satisfies either of the following:

    i.    does not have any class of securities listed on a national securities exchange or has any class of securities listed on a national securities exchange subject to a $250 million market capitalization maximum; or

    ii.   is controlled by a BDC or a group of companies including a BDC, the BDC actually exercises a controlling influence over the management or policies of the eligible portfolio company, and, as a result, the BDC has an affiliated person who is a director of the eligible portfolio company.

(2)   securities purchased in a private transaction from a U.S. issuer that is not an investment company or from an affiliated person of the issuer, or in transactions incident to such a private transaction, if the issuer is in bankruptcy and subject to reorganization or if the issuer, immediately prior to the purchase of its securities, was unable to meet its obligations as they came due without material assistance other than conventional lending or financing arrangements.

(3)   securities received in exchange for or distributed on or with respect to securities described above, or pursuant to the exercise of warrant investments or rights relating to such securities.

(4)   cash, cash equivalents, U.S. government securities or high-quality debt securities that mature in one year or less from the date of investment.

The regulations defining and interpreting qualifying assets may change over time. We may adjust our investment focus as needed to comply with and/or take advantage of any regulatory, legislative, administrative or judicial actions in this area.

We generally look through our subsidiaries to the underlying holdings (considered together with portfolio assets held outside of our subsidiaries) for purposes of determining compliance with the 70% qualifying assets requirement of the 1940 Act. On a consolidated basis, we expect that at least 70% of our assets will be eligible assets.

20

Under Section 55(b) of the 1940 Act, the value of a BDC's assets shall be determined as of the date of the most recent financial statements filed by such company with the SEC pursuant to Section 13 of the 1934 Act, and shall be determined no less frequently than annually.

### Managerial Assistance to Portfolio Companies

BDCs generally must offer, and must provide upon request, significant managerial assistance to certain of their portfolio companies, except in circumstances where either (i) the BDC controls such issuer of securities or (ii) the BDC purchases such securities in conjunction with one or more other persons acting together and one of the other persons in the group makes available such managerial assistance. Making available managerial assistance means any arrangement whereby the BDC, through its directors, officers or employees, offers to provide, and, if accepted, does so provide, significant guidance and counsel concerning the management, operations or business objectives and policies of a portfolio company. The Administrator may provide all or a portion of this assistance pursuant to the Administration Agreement, the costs of which will be reimbursed by us at cost. We may receive fees for these services.

### Temporary Investments

Pending investment in other types of qualifying assets, as described above, our investments may consist of cash, cash equivalents, U.S. government securities, repurchase agreements and high-quality debt investments that mature in one year or less from the date of investment, which we refer to, collectively, as "temporary investments," so that 70% of our assets are qualifying assets or temporary investments. Typically, we invest in U.S. Treasury bills or in repurchase agreements, so long as the agreements are fully collateralized by cash or securities issued by the U.S. government or its agencies. A repurchase agreement involves the purchase by an investor, such as us, of a specified security and the simultaneous agreement by the seller to repurchase it at an agreed-upon future date and at a price that is greater than the purchase price by an amount that reflects an agreed-upon interest rate. If more than 25% of our total assets constitute repurchase agreements from a single counterparty, we would not meet the "Diversification Tests," in order to qualify as a RIC for U.S. federal income tax purposes. Accordingly, we do not intend to enter into repurchase agreements with a single counterparty in excess of this limit. Our Adviser monitors the creditworthiness of any counterparties with which we enter into repurchase agreement transactions.

### Senior Securities

On April 24, 2018, the Board unanimously approved the application of the modified asset coverage requirements set forth in Section 61(a) of 1940 Act. In addition, at a special meeting of stockholders held on June 21, 2018, our stockholders approved the application of the 150% minimum asset coverage requirements under the 1940 Act, and we became subject to the 150% minimum asset coverage ratio effective June 22, 2018. Thus, we are permitted, under specified conditions, to issue multiple classes of debt and one class of stock senior to our common stock if our asset coverage, as defined in the 1940 Act, is at least equal to 150% immediately after each such issuance. As of December 31, 2022, the Company's asset coverage for borrowed amounts was 174 %.

In addition, while any senior securities remain outstanding, we generally must make provisions to prohibit any cash distribution to our stockholders or the repurchase of such securities or shares unless we meet the applicable asset coverage ratios after deducting the amount of the distribution or repurchase. We may also borrow amounts up to 5% of the value of our total assets for temporary purposes without regard to asset coverage. We consolidate our financial results with all of our wholly owned subsidiaries for financial reporting purposes and measure our compliance with the leverage test applicable to BDCs under the 1940 Act on a consolidated basis. For a discussion of the risks associated with leverage, see "Risk Factors-Risks Relating to our Business and Structure-Regulations governing our operation as a BDC affect our ability to, and the way in which we, raise additional capital. As a BDC, the necessity of raising additional capital may expose us to risks, including the typical risks associated with leverage. The net asset value per share of our common stock may be diluted if we issue or sell securities to subscribe for or convertible into shares of our common stock."

### Codes of Ethics

We and our Adviser have adopted a joint code of ethics pursuant to Rule 17j-1 under the 1940 Act and Rule 204A-1 under the Advisers Act that establishes procedures for personal investments and restricts certain personal securities transactions. Personnel subject to the code may invest in securities for their personal investment accounts, including securities that may be purchased or held by us, so long as such investments are made in accordance with the code's requirements. The joint code of ethics is available free of charge on our website at www.tpvg.com and on the EDGAR Database on the SEC's website at http://www.sec.gov.

We have also adopted a Code of Business Conduct and Ethics under the Sarbanes-Oxley Act of 2002 (the "SOX Code of Ethics"), which applies to, among others, our Chief Executive Officer and Chief Financial Officer.

21

*Proxy Voting Policies and Procedures*

We have delegated our proxy voting responsibility to the Adviser. A summary of the Proxy Voting Policies and Procedures of the Adviser are set forth below. These policies and procedures will be reviewed periodically by the Adviser and our directors who are not "interested persons," as defined under the 1940 Act, of the Company, and, accordingly, are subject to change.

## Introduction

As an investment adviser registered under the Advisers Act, our Adviser has a fiduciary duty to act solely in the best interests of its clients. As part of this duty, our Adviser recognizes that it must vote our securities in a timely manner free of conflicts of interest and in our best interests.

Our Adviser's policies and procedures for voting proxies for its investment advisory clients are intended to comply with Section 206 of, and Rule 206(4)-6 under, the Advisers Act.

## Proxy Policies

Our Adviser votes proxies relating to any of our portfolio equity securities in what it perceives to be the best interest of our stockholders. Our Adviser reviews on a case-by-case basis each proposal submitted to a stockholder vote to determine its effect on any of the portfolio equity securities we hold. In most cases our Adviser will vote in favor of proposals that our Adviser believes are likely to increase the value of any of the portfolio equity securities we hold. Although our Adviser generally votes against proposals that may have a negative effect on any of our portfolio equity securities, our Adviser may vote for such a proposal if there exist compelling long-term reasons to do so.

Our proxy voting decisions are made by our Adviser's senior investment team. To ensure that our Adviser's vote is not the product of a conflict of interest, our Adviser requires that (1) anyone involved in the decision-making process disclose to our Chief Compliance Officer any potential conflict that he or she is aware of and any contact that he or she has had with any interested party regarding a proxy vote and (2) employees involved in the decision-making process or vote administration are prohibited from revealing how our Adviser intends to vote on a proposal in order to reduce any attempted influence from interested parties. Where conflicts of interest may be present, our Adviser discloses such conflicts to us, including our independent directors and may request guidance from us on how to vote such proxies.

## Proxy Voting Records

You may obtain information without charge about how our Adviser voted proxies by making a written request for proxy voting information to: 2755 Sand Hill Road, Suite 150, Menlo Park, California 94025, Attention: Investor Relations.

*Privacy Principles*

We are committed to maintaining the privacy of our stockholders and to safeguarding their nonpublic personal information. The following information is provided to help you understand what personal information we collect, how we protect that information and why, in certain cases, we may share information with select other parties.

Generally, we do not receive any nonpublic personal information relating to our stockholders, although certain nonpublic personal information of our stockholders may become available to us. We do not disclose any nonpublic personal information about our stockholders or former stockholders to anyone, except as permitted by law or as are necessary in order to service stockholder accounts (for example, to a transfer agent or third-party administrator).

We restrict access to nonpublic personal information about our stockholders to employees of our Adviser and its affiliates with a legitimate business need for the information. We maintain physical, electronic and procedural safeguards designed to protect the nonpublic personal information of our stockholders.

*Other*

Under the 1940 Act, we are required to provide and maintain a bond issued by a reputable fidelity insurance company to protect us against larceny and embezzlement. Furthermore, as a BDC, we are prohibited from protecting any director or officer against any liability to us or our stockholders arising from willful misfeasance, bad faith, gross negligence or reckless disregard of the duties involved in the conduct of such person's office.

We and our Adviser are each required to adopt and implement written policies and procedures reasonably designed to prevent violation of relevant federal securities laws, review these policies and procedures annually for their adequacy and the effectiveness of their implementation, and designate a Chief Compliance Officer to be responsible for administering these policies and procedures.

We are prohibited under the 1940 Act from participating in certain transactions with our affiliates without the prior approval of our independent directors and, in some cases, the SEC. Any person that owns, directly or indirectly, 5% or more of our outstanding voting securities will be our affiliate for purposes of the 1940 Act and we are generally prohibited from buying or selling any security from or to such affiliate without the prior approval of our independent directors. The 1940 Act also prohibits certain "joint" transactions with certain of our affiliates, which could include concurrent investments in the same company, without prior approval of our independent directors and, in some cases, the SEC. We are prohibited from buying or selling any security from or to any person that controls us or who owns more than 25% of our voting securities and certain of that person's affiliates, or entering into prohibited joint transactions with such persons, absent the prior approval of the SEC. As a result of these restrictions, we may be prohibited from buying or selling any security (other than any security of which we are the issuer) from or to any company that is advised or managed by TPC, our Adviser or their affiliates without the prior approval of the SEC, which may limit the scope of investment opportunities that would otherwise be available to us.

We co-invest from time to time, and intend to continue making co-investments, with TPC and/or investment funds, accounts and vehicles managed by TPC or its affiliates where doing so is consistent with our investment strategy as well as applicable law and SEC staff interpretations. We generally are only permitted to co-invest with TPC and/or such investment funds, accounts and vehicles managed by TPC or its affiliates where the only term that is negotiated is price. However, on March 28, 2018, we, TPC and our Adviser received an exemptive order (the "Exemptive Order") from the SEC, which permits greater flexibility to negotiate the terms of co-investments with TPC and/or investment funds, accounts and investment vehicles managed by TPC or its affiliates in a manner consistent with our investment objective, positions, policies, strategies and restrictions as well as regulatory requirements and other pertinent factors. Pursuant to the Exemptive Order, we are permitted to co-invest with our affiliates if, among other things, a "required majority" (as defined in Section 57(o) of the 1940 Act) of our independent directors make certain conclusions in connection with a co-investment transaction, including, but not limited to, that (1) the terms of the potential co-investment transaction, including the consideration to be paid, are reasonable and fair to us and our stockholders and do not involve overreaching in respect of us or our stockholders on the part of any person concerned, and (2) the potential co-investment transaction is consistent with the interests of our stockholders and is consistent with our then-current investment objective and strategies.

### Sarbanes-Oxley Act

The Sarbanes-Oxley Act of 2002, as amended, or the "Sarbanes-Oxley Act," imposes a wide variety of regulatory requirements on SEC-registered companies and their insiders. Many of these requirements affect us. For example:

(1)  pursuant to Rule 13a-14 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), our principal executive officer and principal financial officer must certify the accuracy of the financial statements contained in our periodic reports;

(2)  pursuant to Item 307 under Regulation S-K, our periodic reports must disclose our conclusions about the effectiveness of our disclosure controls and procedures;

(3)  pursuant to Rule 13a-15 under the Exchange Act, our management must prepare an annual report regarding its assessment of our internal control over financial reporting and, to the extent that we are a "large accelerated filer" or an "accelerated filer" under Rule 12b-2 under the Exchange Act, must obtain an audit of the effectiveness of internal control over financial reporting performed by our independent registered public accounting firm; and

(4)  pursuant to Item 308 of Regulation S-K and Rule 13a-15 under the Exchange Act, our periodic reports must disclose whether there were significant changes in our internal control over financial reporting or in other factors that could significantly affect these controls subsequent to the date of their evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

### Corporate Governance Regulations

The NYSE has adopted corporate governance regulations that listed companies must comply with. We believe we are in compliance with these corporate governance listing standards. We monitor our compliance with all future listing standards and take all necessary actions to ensure that we are in compliance therewith.

**Available Information**

Our address is 2755 Sand Hill Road, Suite 150, Menlo Park, CA 94025. Our phone number is (650) 854-2090 and our internet website is at www.tpvg.com . We make available free of charge on our website our proxy statement, annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendments to those reports as soon as reasonably practical after we electronically file such material with, or furnish it to, the SEC. Information contained on our website is not incorporated by reference into this Annual Report on Form 10-K and you should not consider information contained on our website to be part of this Annual Report on Form 10-K or any other report we file with the SEC.

Our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and all amendments to those reports and other public filings are also available free of charge on the EDGAR Database on the SEC's Web site at http://www.sec.gov.

23

**Item 1A.    Risk Factors**

*You should carefully consider these risk factors, together with all of the other information included in this Annual Report on Form 10-K and other reports and documents filed by us with the SEC. The risks set out below are not the only risks we face. Additional risks and uncertainties not presently known to us or not presently deemed material by us may also impair our operations and performance. If any of the following events occur, our financial condition, results of operations and cash flows could be materially and adversely affected. In such case, our net asset value and the trading price of our common stock could decline and you may lose all or part of your investment. The risk factors presented below are those we believe to be the principal risk factors associated with our Company given our investment objectives, investment policies and capital structure.*

The following is a summary of the principal risk factors associated with an investment in the Company. Further details regarding each risk included in the below summary list can be found further below.

- We are dependent upon our executive officers, our Adviser's senior investment team and, in particular, Messrs. Labe and Srivastava, for our success and upon our Adviser's access to such individuals pursuant to the Staffing Agreement. If our Adviser were to lose such access, our ability to achieve our investment objective could be significantly harmed.

- Our business model depends, in part, upon TPC's relationships with a select group of leading venture capital investors. Any inability of TPC to maintain or develop these relationships, or the failure of these relationships to result in referrals of investment opportunities for us, could have a material adverse effect on our business.

- We operate in a highly competitive market for investment opportunities, and we may not be able to compete effectively.

- We may need to raise additional capital to grow. If additional capital is not available or not available on favorable terms, our ability to grow will be impaired.

- You may not receive distributions or our distributions may not grow over time.

- Regulations governing our operation as a BDC affect our ability to, and the way in which we, raise additional capital. As a BDC, the necessity of raising additional capital may expose us to risks, including the typical risks associated with leverage. The net asset value per share of our common stock may be diluted if we issue or sell securities to subscribe for or convertible into shares of our common stock.

- We finance certain of our investments with borrowed money, which magnifies the potential for gain or loss on amounts invested and increases the risk of investing in us.

- We may default under the Credit Facility, the agreements governing our outstanding unsecured notes or any future indebtedness or be unable to amend, repay or refinance any such facility or financing arrangement on commercially reasonable terms, or at all, which could have a material adverse effect on our financial condition, results of operations and cash flows.

- Changes in interest rates, changes in the method for determining LIBOR and the potential replacement of LIBOR may affect our cost of capital and net investment income. In addition, if the Credit Facility or similar financing arrangement were to become unavailable, it could have a material adverse effect on our business, financial condition and results of operations.

- Our investment portfolio is recorded at fair value, with our Board having final responsibility for overseeing, reviewing and approving, in good faith, such fair value and, as a result, there is uncertainty as to the value of our portfolio investments, which may impact our net asset value.

- Our ability to enter into transactions with our affiliates and to make investments in venture growth stage companies along with our affiliates is restricted by the 1940 Act which may limit the scope of investment opportunities available to us.

- Our Adviser may be subject to conflicts of interest with respect to taking actions regarding investments in which TPC or its affiliates may also have an interest.

- Our investments are concentrated in technology and other high growth industries, including clean technology, some of which are subject to extensive government regulation, which exposes us to the risk of significant loss if any of these industry sectors experiences a downturn.

- Our investment strategy includes a primary focus on venture growth stage companies, which are subject to many risks, including dependence on the need to raise additional capital, volatility, intense competition, shortened product life cycles, changes in regulatory and governmental programs, periodic downturns, and below investment grade ratings, which could cause you to lose all or part of your investment in us.

- Our existing and/or future portfolio companies may not draw on any of our unfunded obligations or may draw our outstanding unfunded obligations at a time when our capital is not readily available.

- If the assets securing the loans that we make decrease in value, then we may lack sufficient collateral to cover losses.

- Our portfolio companies may have limited operating histories and financial resources.

- The lack of liquidity in our investments may materially and adversely affect our ability to meet our investment objectives.

24

- Prepayments of our loans could have a material adverse impact on our results of operations and our ability to make stockholder distributions, increase the risk of violating 1940 Act provisions applicable to BDCs and breaching covenants under our borrowing arrangements, and could result in a decline in the market price of our shares.

- Our common stock may trade below our net asset value per share, which limits our ability to raise additional equity capital.

- The market price of our common stock may fluctuate significantly.

- Global capital markets could enter a period of severe disruption and instability or an economic recession. These conditions have historically affected and could again materially and adversely affect debt and equity capital markets in the United States and around the world and could impair our portfolio companies and harm our operating results.

- Events outside of our control, including relating to public health crises, supply-chain disruptions, geopolitical conflicts, including acts of war, and inflation, could negatively affect our portfolio companies' and our results of operations and financial condition, as well as the amount or frequency of our distributions to stockholders.

**Risks Relating to our Business and Structure**

***Deterioration in the economy and financial markets increases the likelihood of adverse effects on our financial position and results of operations. Such economic adversity could impair our portfolio companies' financial positions and operating results and affect the industries in which we invest, which could, in turn, harm our operating results.***

The broader fundamentals of the United States and global economies remain mixed. In the event that the United States economy, or economies in Europe or Latin America, contract, it is likely that the financial results of venture growth stage companies, like those in which we invest, could experience deterioration or limited growth from current levels, which could ultimately lead to difficulty in meeting their debt service requirements and an increase in defaults. Consequently, we can provide no assurance that the performance of certain portfolio companies will not be negatively impacted by economic cycles, industry cycles or other conditions, which could also have a negative impact on our future results.

Although we have been able to secure access to additional liquidity, including through the Credit Facility, public and private debt issuances and equity offerings, the potential for volatility in the debt and equity capital markets provides no assurance that debt or equity capital will be available to us in the future on favorable terms, or at all. Further, if the price of our common stock falls below our net asset value per share, we will be limited in our ability to sell new shares if we do not have stockholder authorization to sell shares at a price below net asset value per share. We did not seek stockholder authorization to sell shares of our common stock below the then-current net asset value per share of our common stock at our 2022 annual meeting of stockholders and do not intend to seek such authorization at our 2023 annual meeting of stockholders.

***A failure on our part to maintain our status as a BDC may significantly reduce our operating flexibility.***

If we fail to maintain our status as a BDC, we might be regulated as a closed-end investment company that is required to register under the 1940 Act, which would subject us to additional regulatory restrictions and significantly decrease our operating flexibility. In addition, any such failure could cause an event of default under our outstanding indebtedness, which could have a material adverse effect on our business, financial condition or results of operations.

***We are dependent upon our executive officers, our Adviser's senior investment team and, in particular, Messrs. Labe and Srivastava, for our success and upon our Adviser's access to such individuals pursuant to the Staffing Agreement. If our Adviser were to lose such access, our ability to achieve our investment objective could be significantly harmed.***

Our Adviser has entered into the Staffing Agreement with TPC. Pursuant to the Staffing Agreement, TPC makes, subject to the terms of the Staffing Agreement, its investment and portfolio management and monitoring teams available to our Adviser. We believe that the Staffing Agreement (i) provides us with access to deal flow generated by TPC in the ordinary course of its business; (ii) provides us with access to TPC's investment professionals, including its senior investment team led by Messrs. Labe and Srivastava, and TPC's non-investment employees; and (iii) commits certain key senior members of TPC's Investment Committee to serve as members of our Adviser's Investment Committee. Under the Staffing Agreement, TPC is required to make the Adviser aware of any financings that TPC evaluates, originates, or in which TPC participates, and the Adviser is responsible for allocating the investment opportunities amongst its affiliates fairly and equitably over time in accordance with its allocation policy. We depend on the diligence, skill and network of business contacts of our Adviser's senior investment team and our executive officers to achieve our investment objective. We cannot assure you that TPC will fulfill its obligations under the Staffing Agreement or its allocation policy. Further, the Staffing Agreement may be terminated with 60 days' prior written notice, and we cannot assure you that the Staffing Agreement will not be terminated by TPC or that our Adviser will continue to have access to the professionals and Investment Committee of TPC or its information and deal flow. The loss of any such access would limit our ability to achieve our investment objective and operate as we anticipate. This could have a material adverse effect on our financial condition, results of operations and cash flows.

***Our business model depends, in part, upon TPC's relationships with a select group of leading venture capital investors. Any inability of TPC to maintain or develop these relationships, or the failure of these relationships to result in referrals of investment opportunities for us, could have a material adverse effect on our business.***

We depend, in part, upon TPC to maintain industry relationships, including with a select group of leading venture capital investors, and we utilize these relationships to source and identify potential investment opportunities, although this group of leading venture capital investors, which may be modified from time to time, is not obligated to provide us with referrals for investment opportunities. If TPC fails to maintain or develop such relationships, or if we fall out of favor with such venture capital investors, it could decrease our access to these investors or their support and we may not be able to grow our investment portfolio. We can offer no assurance that these relationships will result in any investment opportunities for us in the future. In addition, any harm to the reputation of TPC and/or its select group of leading venture capital investors or their relationships could decrease our deal flow and the outlook of our investments which could have a material adverse effect on our financial condition, results of operations and cash flows.

***Our success depends on the ability of TPC and our Adviser to attract and retain qualified personnel in a competitive environment.***

Our growth requires that TPC and our Adviser retain and attract new investment and administrative personnel in a competitive market. Their ability to attract and retain personnel with the requisite credentials, experience and skills depends on several factors including, but not limited to, their and our reputations and their ability to offer competitive wages, benefits and professional growth opportunities. Many of the entities with whom TPC and our Adviser compete for experienced personnel, including investment funds, have greater resources than they have.

***We may not replicate the historical results achieved by TPC or members of its senior investment team.***

Our focus in making investments differs from that of TPC. For example, while TPC's portfolio consists primarily of providing financing to venture capital-backed companies across all stages of their development, including the venture growth stage, we pursue an investment strategy that is focused primarily on the venture growth stage. The profile and underwriting characteristics of an early stage venture capital-backed company are very different from those of a later stage venture capital-backed company and/or those of a venture growth stage company. Furthermore, within venture growth stage companies, the uses, structures and value propositions of debt financing vary considerably among companies and industries and require a high degree of venture lending and venture leasing expertise and technology and other high growth industries knowledge, specialization and flexibility from a lender. As a result, we cannot assure you that we will replicate the historical results achieved by TPC or members of its senior investment team and we caution you that our investment returns could be substantially lower than the returns achieved by them in prior periods, or in connection with other investment vehicles.

***The nature of our approach to our business may lead to volatility and variability from period to period with respect to new originations. Our financial condition and results of operations depend upon our ability to effectively manage credit, deploy capital and grow our business.***

Our ability to achieve our investment objective depends on our Adviser's ability to manage our business and to grow our investments and earnings. This depends on our Adviser's ability to identify, invest in and monitor companies that meet our underwriting criteria. Furthermore, our Adviser may choose to slow or accelerate new business originations depending on market conditions, rate of investment of TPC's select group of leading venture capital investors, our Adviser's knowledge, expertise and experience, and other market dynamics. The achievement of our investment objective on a cost-effective basis depends upon our Adviser's execution of our investment process, its ability to provide competent, attentive and efficient services to us and, to a lesser extent, our access to financing on acceptable terms. Accomplishing this result on a cost-effective basis is largely a function of our Adviser's origination capabilities, management of the investment process, ability to provide efficient services and access to financing sources on acceptable terms. Our Adviser's senior investment team also has substantial responsibilities in connection with the management of TPC's investment vehicles and business segments. We caution you that the principals of our Adviser may be called upon to provide and currently do provide significant managerial assistance to portfolio companies and other investment vehicles which are managed by the Adviser. These activities may distract them from servicing new investment opportunities for us or slow our rate of investment. Any failure to manage our business and our future growth effectively could have a material adverse effect on our financial condition, results of operations and cash flows.

***We operate in a highly competitive market for investment opportunities, and we may not be able to compete effectively.***

Our competitors include both existing and newly formed equity and debt focused public and private funds, other BDCs, investment banks, venture-oriented banks, commercial financing companies and, to the extent they provide an alternative form of financing, private equity and hedge funds. One or more of our competitors may have or develop relationships with TPC's select group of leading venture capital investors. We may also be limited in our ability to make an investment pursuant to the restrictions under the 1940 Act to the extent one or more of our affiliates has an existing investment with such obligor. Additionally, many of our competitors are substantially larger and have considerably greater financial, technical and marketing resources than us. For example, we believe some of our competitors may have access to funding sources that are not available to us. In addition, some of our competitors may have higher risk tolerances or different risk assessments, which could allow them to consider a wider variety of investments and establish more relationships than we do. Furthermore, many of our competitors are not subject to the regulatory restrictions that the 1940 Act imposes on us as a BDC or to the distribution and other requirements we must satisfy to maintain our ability to be subject to tax as a RIC.

26

The competitive pressures we face may have a material adverse effect on our financial condition, results of operations and cash flows. We do not compete primarily on the financing terms we offer and believe that some competitors make loans with rates that are comparable or lower than our rates. We may lose some investment opportunities if we do not match our competitors' pricing, terms and structure. However, if we match our competitors' pricing, terms and structure, we may experience decreased net interest income, lower yields and increased risk of credit loss. As a result of this competition, we may not be able to take advantage of attractive investment opportunities from time to time, and we may not be able to identify and make investments that are consistent with our investment objective.

***We will be subject to U.S. federal corporate-level income tax and may default under our current or future borrowing arrangements if we are unable to maintain our qualification and tax treatment as a RIC under Subchapter M of the Code.***

To qualify for tax treatment as a RIC under Subchapter M of the Code, we must meet certain source-of-income, asset diversification and distribution requirements. The distribution requirement for a RIC generally is satisfied if we distribute at least 90% of our net ordinary income and net realized short-term capital gains in excess of net realized long-term capital losses, if any, to our stockholders on an annual basis. Because we incur debt, we are subject to certain asset coverage ratio requirements under the 1940 Act and financial covenants under loan and credit agreements that could, under certain circumstances, restrict us from making distributions necessary to qualify for tax treatment as a RIC. If we are unable to obtain cash from other sources, we may fail to qualify for tax treatment as a RIC and, thus, may be subject to U.S. federal corporate-level income tax and default under applicable covenants under any financing arrangements. To qualify as a RIC, we must also meet certain asset diversification requirements at the end of each calendar quarter. Failure to meet these tests may result in our having to dispose of certain investments quickly in order to prevent the loss of our qualification as a RIC. Because most of our investments are in private companies, any such dispositions may be made at disadvantageous prices and may result in substantial losses. If we fail to qualify as a RIC for any reason and become subject to corporate-level U.S. federal income tax, the resulting corporate taxes could substantially reduce our net assets, the amount of income available for distributions to our stockholders and the amount of funds available for new investments.

***We may need to raise additional capital to grow. If additional capital is not available or not available on favorable terms, our ability to grow will be impaired.***

We may need additional capital to fund new investments or unfunded commitments and grow our portfolio of investments. We intend to access the capital markets periodically to issue debt or equity securities or borrow from financial institutions in order to obtain such additional capital. Unfavorable economic conditions could increase our funding costs, limit our access to the capital markets or result in a decision by lenders not to extend credit to us. In addition, there may be fewer lenders familiar with, or willing to provide credit to, firms in our industry. The availability of debt from lenders may be more limited than it is for firms that are not in our industry due to the credit profile of our targeted borrowers or the structure and risk profile of our unrated loans. As a result, we may have difficulty raising additional capital in order to fund our loans and grow our business.

In order to maintain our ability to be subject to tax as a RIC, we will be required to distribute at least 90% of our net ordinary income and net realized short-term capital gains in excess of net realized long-term capital losses, if any, to our stockholders. As a result, these earnings generally will not be available to fund new investments. Under the 1940 Act, we generally are required to meet a coverage ratio of total assets less all liabilities and indebtedness not represented by senior securities to total senior securities, which generally includes all of our borrowings and any preferred stock that we have outstanding (or that we may issue in the future), of at least 150%. This requirement limits the amount that we may borrow. If the value of our assets declines, we may be unable to satisfy this test. If that happens, we may be required to sell a portion of our investments or issue additional common stock and, depending on the nature of our leverage, to repay a portion of our indebtedness at a time when such sales and repayments may be disadvantageous. In addition, the issuance of additional securities could dilute the percentage ownership of our current stockholders. We cannot assure you that debt and equity financing will be available to us on favorable terms, or at all, and debt financings may be restricted by the terms of any of our outstanding borrowings.

In addition, shares of closed-end investment companies have recently traded at discounts to their net asset values. If our common stock trades below its net asset value, we will not be able to issue additional shares of our common stock at its market price without first obtaining the approval for such issuance from our stockholders and our independent directors. If additional funds are not available to us, we could be forced to curtail or cease new lending and investment activities and our net asset value could decline.

A reduction in the availability of new capital or an inability on our part to access the capital markets successfully could limit our ability to grow our business and execute our business strategy fully and could decrease our earnings, if any, which would have a material adverse effect on our financial condition, results of operations and cash flows.

***We may have difficulty paying our required distributions if we recognize income before, or without, receiving cash representing such income.***

For U.S. federal income tax purposes, in certain circumstances, we may be required to recognize taxable income prior to when we receive cash, such as the accrual of end-of-term payments, PIK, and/or OID, including in connection with the receipt of "equity kickers" in the form of warrants in conjunction with our debt investments. Our end-of-term payments are contractual and fixed interest payments due at the maturity date of the loan, including upon prepayment, and are generally a fixed percentage of the original principal balance of the loan. OID decreases our loan balance by an amount equal to the cost basis of the upfront warrant investment received and certain capitalized fees we receive in connection with our loan and is recognized by us as non-cash income over the life of the secured loan. Our secured loans generally include an end-of-term payment and/or PIK interest payment. Such payments, which could be significant relative to our overall investment activities are included in income before we receive any corresponding cash payment. We are also required to include in income certain other amounts that we will not receive in cash, including OID.

27

To the extent OID instruments, such as zero coupon bonds, and PIK loans, constitute a significant portion of our income, investors will be exposed to typical risks associated with such income that are required to be included in taxable and accounting income prior to receipt of cash, including the following: (a) the higher interest rates of PIK loans reflect the payment deferral and increased credit risk associated with these instruments, and PIK instruments generally represent a significantly higher credit risk than coupon loans; (b) PIK loans may have unreliable valuations because their accruals require continuing judgments about the collectability of the deferred payments and the value of any associated collateral; (c) PIK interest payments add to loan principal thereby increasing our gross assets, thus increasing our Adviser's future base management fees, and increases future investment income, thus increasing the Adviser's future income incentive fees at a compounding rate; (d) market prices of zero-coupon or PIK securities are affected to a greater extent by interest rate changes and may be more volatile than securities that pay interest periodically and in cash; (e) because OID income is accrued without any cash being received by us, required cash distributions may have to be paid from offering proceeds or the sale of our assets without investors being given any notice of this fact; (f) the deferral of PIK interest increases the loan-to-value ratio, which is a measure of the riskiness of a loan; (g) even if the accounting conditions for income accrual are met, the borrower could still default when our actual payment is due at the maturity of the loan; (h) OID creates risk of non-refundable cash payments to our Adviser on-cash accruals that may never be realized; and (i) because OID will be included in our "investment company taxable income" for the year of the accrual, we may be required to make distributions to stockholders on such accruals to satisfy the Annual Distribution Requirement applicable to RICs, even where we have not received any corresponding cash amount.

Since, in these cases we may recognize income before or without receiving cash representing such income, we may have difficulty meeting the requirement to distribute at least 90% of our net ordinary income and net realized short-term capital gains in excess of net realized long-term capital losses, if any, to maintain our tax treatment as a RIC and to avoid a 4% U.S. federal excise tax on certain of our undistributed income. In such a case, we may have to sell some of our investments at times we would not consider advantageous, raise additional debt or equity capital or reduce new investment originations to meet these distribution requirements. If we are not able to obtain sufficient cash from other sources, we may fail to qualify for tax treatment as a RIC and thus be subject to corporate-level income tax.

***You may not receive distributions or our distributions may not grow over time.***

We intend to make distributions on a quarterly basis to our stockholders out of assets legally available for distribution. We cannot assure you that we will achieve investment results that will allow us to make a specified level of cash distributions or year-to-year increases in cash distributions. Our ability to pay distributions might be materially and adversely affected by the impact of one or more of the risks described herein. Due to the asset coverage test applicable to us under the 1940 Act as a BDC, we may be limited in our ability to make distributions. All distributions will be made at the discretion of our Board and will depend on our earnings, financial condition, maintenance of RIC status and covenants under our borrowing arrangements, compliance with applicable BDC, SBA regulations (when and if applicable) and such other factors as our Board may deem relevant from time to time. We cannot assure you that we will make distributions to our stockholders in the future.

***Regulations governing our operation as a BDC affect our ability to, and the way in which we, raise additional capital. As a BDC, the necessity of raising additional capital may expose us to risks, including the typical risks associated with leverage. The net asset value per share of our common stock may be diluted if we issue or sell securities to subscribe for or convertible into shares of our common stock.***

We may issue debt securities or preferred stock and/or borrow money from banks or other financial institutions, which we refer to collectively as "senior securities," up to the maximum amount permitted by the 1940 Act. Under the provisions of the 1940 Act, we are permitted as a BDC to issue senior securities in amounts such that our asset coverage ratio, as defined in the 1940 Act, equals at least 150% (i.e., the amount of debt may not exceed $66 \frac{2}{3}$ % of the value of our assets) after each issuance of senior securities. If the value of our assets declines, we may be unable to satisfy this test. If that happens, we may be required to sell a portion of our investments at a time when such sales may be disadvantageous to us in order to repay a portion of our indebtedness. Also, any amounts that we use to service our indebtedness would not be available for distributions to our common stockholders. To the extent we have senior securities outstanding, we will be exposed to typical risks associated with leverage, including an increased risk of loss.

We are not generally able to issue and sell our common stock at a price below net asset value per share. We may, however, sell our common stock at a price below then-current net asset value per share of our common stock if our Board determines that such sale is in our best interests, and if our stockholders approve such sale. In any such case, the price at which our securities are to be issued and sold may not be less than a price that, in the determination of our Board, closely approximates the market value of such securities (less any distributing commission or discount). If we raise additional funds by issuing common stock or senior securities convertible into, or exchangeable for, our common stock, then the percentage ownership of our stockholders at that time will decrease and you may experience dilution.

28

In addition, at our 2018 Annual Stockholders Meeting, our stockholders authorized our ability to issue options, warrants or rights to subscribe to, convert to, or purchase shares of our common stock, which may include convertible preferred stock and convertible debentures, under appropriate circumstances in connection with our capital raising and financing activities, subject to applicable restrictions under the 1940 Act (including, without limitation, that at the date of issuance of the options, warrants or rights, (i) the number of shares that would result from the exercise or conversion of all of the Company's options, warrants or rights to subscribe to, convert to, or purchase our common stock does not exceed 25% of our then-outstanding shares, and (2) the exercise or conversion price thereof is not less than the market value per share of our common stock). Such authorization has no expiration. We may also use newly issued shares to implement our dividend reinvestment plan, whether our shares are trading at a premium or at a discount to our then-current net asset value per share. Any decision to issue or sell securities to subscribe for or convertible into shares of our common stock would be subject to the determination by our board of directors that such issuance or sale is in our and our stockholders' best interests. If we issue warrants or securities to subscribe for or convertible into shares of our common stock, subject to certain limitations, the exercise or conversion price per share at the time of exercise or conversion could be less than the net asset value per share of our common stock at the time of exercise or conversion, and because we would incur expenses in connection with any such issuance of options, warrants or convertible debt, such exercise or conversion could result in a dilution of net asset value per share of our common stock at the time of such exercise. Any exercise of options, warrants or securities to subscribe for or convertible into shares of our common stock at an exercise or conversion price that is below net asset value at the time of such exercise or conversion, would result in an immediate dilution to our then-existing common stockholders. This dilution would include reduction in net asset value as a result of the proportionately greater decrease in a stockholder's interest in our earnings and assets and voting interests in us than the increase in our assets resulting from such issuance.

*Previously enacted legislation allows us to incur additional leverage.*

The 1940 Act generally prohibits us from incurring indebtedness unless immediately after such borrowing we have an asset coverage for total borrowings of at least 200% (i.e., the amount of debt may not exceed 50% of the value of our assets). However, the SBCAA, signed into law in March 2018, modified the 1940 Act by allowing a BDC to increase the maximum amount of leverage it may incur by lowering the required asset coverage ratio of 200% to an asset coverage ratio of 150% (i.e., the amount of debt may not exceed $66\,^2/_3$ % of the value of our assets), if certain requirements are met. On April 24, 2018, the Board unanimously approved the application of the modified asset coverage requirements set forth in Section 61(a) of 1940 Act. In addition, at a special meeting of stockholders held on June 21, 2018, our stockholders approved the application of the 150% minimum asset coverage requirements under the 1940 Act, and we became subject to the 150% minimum asset coverage ratio effective June 22, 2018. Thus, we are permitted, under specified conditions, to issue multiple classes of debt and one class of stock senior to our common stock if our asset coverage, as defined in the 1940 Act, is at least equal to 150% immediately after each such issuance. As of December 31, 2022, the Company's asset coverage for borrowed amounts was 174 %.

*Incurring additional leverage could increase the risk of investing in the Company. The use of leverage may increase the likelihood of our defaulting on our obligations.*

Leverage magnifies the potential for loss on investments in our indebtedness and on invested equity capital. As we use leverage to partially finance our investments, you will experience increased risks of investing in our securities. If the value of our assets increases, then leveraging would cause the net asset value attributable to our common stock to increase more sharply than it would have had we not leveraged. Conversely, if the value of our assets decreases, leveraging would cause net asset value to decline more sharply than it otherwise would have had we not leveraged our business. Similarly, any increase in our income in excess of interest payable on the borrowed funds would cause our net investment income to increase more than it would without the leverage, while any decrease in our income would cause net investment income to decline more sharply than it would have had we not borrowed. Such a decline could negatively affect our ability to pay common stock dividends, scheduled debt payments or other payments related to our securities. The effects of leverage would cause any decrease in net asset value for any losses to be greater than any increase in net asset value for any corresponding gains. We are permitted, as a BDC, to issue senior securities only in amounts such that our asset coverage, as defined in the 1940 Act, equals at least 150% after each issuance of senior securities. If we incur additional leverage, you will experience increased risks of investing in our common stock. Under certain circumstances, the use of leverage may increase the likelihood of default, which would disfavor the holders of our common stock or of securities convertible into our common stock or warrant investments representing rights to purchase our common stock or securities convertible into our common stock.

29

***We finance certain of our investments with borrowed money, which magnifies the potential for gain or loss on amounts invested and increases the risk of investing in us.***

We finance certain of our investments with borrowed money when we expect the return on our investment to exceed the cost of borrowing. As of December 31, 2022, we had $175.0 million of principal outstanding under the Credit Facility, $70.0 million of principal outstanding on our 4.50% notes due 2025 (the "2025 Notes"), $200.0 million of principal outstanding on our 4.50% notes due 2026 (the "2026 Notes") and $125.0 million of principal outstanding on our 5.00% notes due 2027 (the "2027 Notes") before reducing the unamortized debt issuance costs. The use of leverage magnifies the potential for gain or loss on amounts invested. The use of leverage is generally considered a speculative investment technique and increases the risks associated with investing in shares of our common stock. Lenders will have fixed dollar claims on our assets that are superior to the claims of our common stockholders and we would expect such lenders to seek recovery against our assets in the event of a default. We may pledge up to 100% of our assets or the assets of a subsidiary under the terms of any debt instruments we may enter into with lenders. In addition, under the terms of the Credit Facility and any borrowing facility or other debt instrument we may enter into in the future, we are or will likely be required to use the net proceeds of any investments that we sell to repay a portion of the amount borrowed under such facility or instrument before applying such net proceeds to any other uses. If the value of our assets decreases, leveraging would cause our net asset value to decline more sharply than it otherwise would have had we not leveraged, thereby magnifying losses, potentially triggering mandatory debt payments or asset contributions under the Credit Facility or eliminating our stake in a leveraged investment. Similarly, any decrease in our revenue or income will cause our net income to decline more sharply than it would have had we not borrowed. Such a decline would also negatively affect our ability to make distributions with respect to our common stock. Our ability to service any debt depends largely on our financial performance and is subject to prevailing economic conditions and competitive pressures.

As a BDC, we generally are required to meet a coverage ratio of total assets less all liabilities and indebtedness not represented by senior securities to total senior securities, which generally includes all of our borrowings (other than potential leverage in future Small Business Investment Company, or "SBIC," subsidiaries, should we receive an SBIC license(s), subject to exemptive relief) and any preferred stock that we may issue in the future, of at least 150%. If our asset coverage ratio declines below 150%, we will not be able to incur additional debt and could be required to sell a portion of our investments to repay some debt when it is otherwise disadvantageous for us to do so. This could have a material adverse effect on our operations, and we may not be able to make distributions. The amount of leverage that we employ depends on our Adviser's and the Board's assessment of market and other factors at the time of any proposed borrowing. We cannot assure you that we will be able to obtain credit at all or on terms acceptable to us.

The following table illustrates the effect of leverage on returns from an investment in our common stock as of December 31, 2022, assuming various annual returns, net of expenses. The calculations in the table below are hypothetical and actual returns may be higher or lower than those appearing in the table below.

| | Assumed Return on our Portfolio (Net of Expenses) | | | | |
|---|---|---|---|---|---|
| | **(10.0)%** | **(5.0)%** | **0.0%** | **5.0%** | **10.0%** |
| Corresponding return to common stockholder assuming actual asset coverage as of December 31, 2022 [1] | ( 31.4 )% | ( 19.4 )% | ( 7.3 )% | 4.8 % | 16.9 % |

_____

(1)     The hypothetical return to common stockholders is calculated by multiplying our total assets as of December 31, 2022 by the assumed rates of return and subtracting all interest accrued on our debt for the year ended December 31, 2022, and then dividing the resulting difference by our total assets attributable to common stock. The calculation assumes the Company had (i) $1,014.5 million in total assets, (ii) $570.0 million in total debt outstanding, (iii) $419.9 million in net assets, (v) and a weighted average cost of borrowings of 5.4 %.

Based on our outstanding indebtedness of $570.0 million as of December 31, 2022, our investment portfolio would have been required to experience an annual return of at least 3.0% to cover annual interest payments on the outstanding debt.

As required by Section 18(a) and 61(a) of the 1940 Act, in connection with the issuance of certain senior securities, a provision must be made by us to prohibit the declaration of any dividend or distribution on the Company's stock, other than a dividend payable in our common stock, or the repurchase of any stock unless at the time of the dividend or distribution declaration or repurchase there is asset coverage (computed in accordance with Section 18(h) of the 1940 Act) of at least 150% on our senior securities after deducting the amount of the dividend, distribution or repurchase.

In addition, each of the Credit Facility and the agreements governing the 2025 Notes, 2026 Notes and 2027 Notes imposes, and any debt facilities or other borrowing arrangements we may enter into in the future may impose, financial and operating covenants that restrict our business activities, including limitations that hinder our ability to finance additional loans and investments or to make the distributions required to maintain our ability to be subject to tax treatment as a RIC under Subchapter M of the Code.

***We may default under the Credit Facility, the agreements governing our outstanding unsecured notes or any future indebtedness or be unable to amend, repay or refinance any such facility or financing arrangement on commercially reasonable terms, or at all, which could have a material adverse effect on our financial condition, results of operations and cash flows.***

In the event we default under the Credit Facility, the agreements governing the 2025 Notes, 2026 Notes or the 2027 Notes or any future indebtedness or are unable to amend, repay or refinance any such indebtedness on commercially reasonable terms, or at all, our business could be materially and adversely affected as we may be forced to sell all or a portion of our investments quickly and prematurely at what may be disadvantageous prices to us in order to meet our outstanding payment obligations and/or support working capital requirements under the Credit Facility, the 2025 Notes, the 2026 Notes and the 2027 Notes or any future indebtedness, any of which would have a material adverse effect on our financial condition, results of operations and cash flows.

Events of default under the Credit Facility include, among other things, (i) a payment default; (ii) a change of control; (iii) bankruptcy; (iv) a covenant default; and (v) breach of a key man clause relating to our Chief Executive Officer, James P. Labe, and our President and Chief Investment Officer, Sajal K. Srivastava; and (vi) our failure to maintain our qualification as a BDC. Following any such default, the administrative agent under the Credit Facility could assume control of the disposition of any or all of our assets or restrict our utilization of any indebtedness, including the selection of such assets to be disposed and the timing of such disposition, including decisions with respect to our warrant investments, which would have a material adverse effect on our business, financial condition, results of operations and cash flows.

The Master Note Purchase Agreement (the "Note Purchase Agreement") under which the 2025 Notes were issued contains customary terms and conditions for unsecured notes issued in a private placement, including, without limitation, affirmative and negative covenants such as information reporting, maintenance of our status as a BDC within the meaning of the 1940 Act, a minimum asset coverage ratio of 1.50 to 1.00, a minimum interest coverage ratio of 1.25 to 1.00, and a minimum stockholders' equity requirement. The Note Purchase Agreement also contains customary events of default with customary cure and notice periods, including, without limitation, nonpayment, incorrect representation in any material respect, breach of covenant, cross-default under other indebtedness we have incurred or of our subsidiary guarantors (if any), certain judgments and orders, certain events of bankruptcy, and breach of a key man clause relating to Messrs. Labe and Srivastava. The terms and conditions applicable to the 2026 Notes under the Note Purchase Agreement, as modified by the terms of the First Supplement, dated as of March 1, 2021 (the "First Supplement"), to the Note Purchase Agreement, including events of default and affirmative and negative covenants, are substantially similar to the terms and conditions applicable to the 2025 Notes. The terms and conditions applicable to the 2027 Notes under the Note Purchase Agreement, as modified by the terms of the Second Supplement, dated as of February 28, 2022 (the "Second Supplement"), to the Note Purchase Agreement, including events of default and affirmative and negative covenants, are substantially similar to the terms and conditions applicable to the 2025 Notes and the 2026 Notes.

Our continued compliance with the covenants under the Credit Facility and the Note Purchase Agreement (as modified by any supplements thereto) depends on many factors, some of which are beyond our control, and there can be no assurance that we will continue to comply with such covenants. Our failure to satisfy the respective covenants could result in foreclosure by the lenders under the applicable credit facility or governing instrument or acceleration by the applicable lenders or noteholders, which would accelerate our repayment obligations under the relevant agreement and thereby have a material adverse effect on our business, liquidity, financial condition, results of operations and ability to pay distributions to our stockholders. Because the Credit Facility and the agreements governing the 2025 Notes, the 2026 Notes and the 2027 Notes have, and any future credit facilities will likely have, customary cross-default provisions, if the indebtedness under the Credit Facility or represented by the 2025 Notes, the 2026 Notes or the 2027 Notes, or under any future credit facility, is accelerated, we may be unable to repay or finance the amounts due.

***Changes in interest rates, changes in the method for determining LIBOR and the potential replacement of LIBOR may affect our cost of capital and net investment income. In addition, if the Credit Facility or similar financing arrangement were to become unavailable, it could have a material adverse effect on our business, financial condition and results of operations.***

General interest rate fluctuations and changes in credit spreads on floating rate loans may have a substantial negative impact on our investments and investment opportunities and, accordingly, may have a material adverse effect on our rate of return on invested capital, our net investment income, our net asset value and the market value of our common stock. The majority of our debt investments have, and are expected to have, floating interest rates, which generally are Prime-based and all of which have interest rate floors. Increases in interest rates tend to make it more difficult for our portfolio companies to service their obligations under the debt investments that we will hold and increase defaults even where our investment income increases. Rising interest rates could also cause borrowers to shift cash from other productive uses to the payment of interest, which may have a material adverse effect on their business and operations and could, over time, lead to increased defaults. Additionally, as interest rates increase and the corresponding risk of a default by borrowers increases, the liquidity of higher interest rate loans may decrease as fewer investors may be willing to purchase such loans in the secondary market in light of the increased risk of a default by the borrower and the heightened risk of a loss of an investment in such loans. All of these risks may be exacerbated when interest rates rise rapidly and/or significantly. Decreases in credit spreads on debt that pays a floating rate of return would have an impact on the income generation of our floating rate assets. Conversely, if interest rates were to decline, borrowers may refinance their loans at lower interest rates, which could shorten the average life of the loans and reduce the associated returns on the investment, as well as require our Adviser to incur management time and expense to re-deploy such proceeds, including on terms that may not be as favorable as our existing loans.

31

In addition, because we borrow money to finance certain of our investments, our net income will depend, in part, upon the difference between the rate at which we borrow funds and the rate at which we invest those funds. Portions of our investment portfolio and our borrowings under the Credit Facility have floating rate components. As a result, the recent significant changes in market interest rates have increased our interest expense. In periods of rising interest rates, such as in the current market, our cost of funds increases, which tends to reduce our net investment income. We may hedge against interest rate fluctuations by using standard hedging instruments such as interest rate swap agreements, futures, options and forward contracts, subject to applicable legal requirements, including all necessary registrations (or exemptions from registration) with the Commodity Futures Trading Commission. These activities may limit our ability to participate in the benefits of lower interest rates with respect to the hedged borrowings. Adverse developments resulting from changes in interest rates or hedging transactions could have a material adverse effect on our business, financial condition and results of operations. In addition, if the Credit Facility or any other financing arrangement were to become unavailable to us and attractive alternative financing sources were not available, it could have a material adverse effect on our business, financial condition and results of operations.

Although most U.S. dollar LIBOR rates will continue to be published through June 30, 2023, the U.K.'s Financial Conduct Authority no longer compels panel banks to continue to contribute to LIBOR and the Federal Reserve Board, the Office of the Comptroller of the Currency, and the Federal Deposit Insurance Corporation have encouraged banks to cease entering into new contracts that use U.S. dollar LIBOR as a reference rate. The U.S. Federal Reserve, in conjunction with the Alternative Reference Rates Committee, a steering committee comprised of large U.S. financial institutions, supports replacing U.S.-dollar LIBOR with the Secured Overnight Financing Rate, or SOFR, a new index calculated by short-term repurchase agreements, backed by Treasury securities. Although there are an increasing number of issuances utilizing SOFR or the Sterling Over Night Index Average, or SONIA, an alternative reference rate that is based on transactions, these alternative reference rates may not attain market acceptance as replacements for LIBOR. The transition away from LIBOR to alternative reference rates is complex and could have a material adverse effect on our business, financial condition and results of operations, including as a result of any changes in the pricing of our investments, changes to the documentation for certain of our investments and borrowings and the pace of such changes, disputes and other actions regarding the interpretation of current and prospective loan documentation or modifications to processes and systems.

In anticipation of the cessation of LIBOR, we amended our Credit Facility in July 2022 to, among other things, replace the LIBOR benchmark with a SOFR benchmark and may need to renegotiate any credit agreements extending beyond June 30, 2023 with our portfolio companies that utilize LIBOR as a factor in determining the interest rate or rely on certain fallback provisions that could cause interest rates to shift to a base rate plus a margin. Any such renegotiations may have a material adverse effect on our business, financial condition and results of operations, including as a result of changes in interest rates payable to us by our portfolio companies.

Alteration of the terms of a debt instrument or a modification of the terms of other types of contracts to replace an interbank offered rate with a new reference rate could result in a taxable exchange and the realization of income and gain/loss for U.S. federal income tax purposes. The IRS has issued regulations regarding the tax consequences of the transition from LIBOR or another interbank offered rate ("IBOR") to a new reference rate in debt instruments and non-debt contracts. Under the regulations, alteration or modification of the terms of a debt instrument to replace an operative rate that uses a discontinued IBOR with a qualified rate (as defined in the regulations) including true up payments equalizing the fair market value of contracts before and after such IBOR transition, to add a qualified rate as a fallback rate to a contract whose operative rate uses a discontinued IBOR or to replace a fallback rate that uses a discontinued IBOR with a qualified rate would not be taxable. The IRS may provide additional guidance, with potential retroactive effect.

***Provisions in our current debt obligations or any future indebtedness may limit our discretion in operating our business.***

The Credit Facility is, and any future indebtedness may be, backed by all or a portion of our assets on which the lenders may have a security interest. We may pledge up to 100% of our assets or the assets of our Financing Subsidiary and may grant a security interest in all of our assets under the terms of any debt instrument we enter into with lenders. Any security interests that we grant will be set forth in a security agreement and evidenced by the filing of financing statements by the agent for the lenders. Any restrictive provision or negative covenant in the agreements governing our indebtedness, including the Credit Facility and the Note Purchase Agreement, First Supplement and Second Supplement, including applicable diversification and eligibility requirements, or any of our future indebtedness limits or may limit our operating discretion, which could have a material adverse effect on our financial condition, results of operations and cash flows. A failure to comply with the restrictive provisions or negative covenants in the Credit Facility or the Note Purchase Agreement, the First Supplement and the Second Supplement, or any of our future indebtedness may result in an event of default and/or restrict our ability to control the disposition of our assets and our utilization of any indebtedness. See "Management's Discussion and Analysis of Financial Condition and Results of Operations-Contractual Obligations."

***Adverse developments in the credit markets may impair our ability to enter into any other future borrowing facility.***

During past U.S. and global economic downturns, many commercial banks and other financial institutions stopped lending or significantly curtailed their lending activity. In addition, in an effort to stem losses and reduce their exposure to segments of the economy deemed to be high risk, some financial institutions limited refinancing and loan modification transactions and reviewed the terms of existing facilities to identify bases for accelerating the maturity of existing lending facilities. If these conditions recur, it may be difficult for us to enter into a new borrowing facility, obtain other financing to finance the growth of our investments or refinance any outstanding indebtedness on acceptable economic terms or at all.

32

***If we do not invest a sufficient portion of our assets in qualifying assets, we could fail to qualify as a BDC or be precluded from investing according to our current business strategy.***

As a BDC, we may not acquire any assets other than "qualifying assets" unless, at the time of and after giving effect to such acquisition, at least 70% of our total assets are qualifying assets. See "Business-Regulation."

We believe that most of the investments that we may acquire in the future will constitute qualifying assets. However, we may be precluded from investing in what we believe to be attractive investments if such investments are not qualifying assets for purposes of the 1940 Act. If we do not invest a sufficient portion of our assets in qualifying assets, we could violate the 1940 Act provisions applicable to BDCs. As a result of such violation, specific rules under the 1940 Act could require us to dispose of investments at inappropriate times in order to come into compliance with the 1940 Act prior to making additional investments. If we need to dispose of such investments quickly, it could be difficult to dispose of such investments on favorable terms or at all. We may not be able to find a buyer for such investments and, even if we do find a buyer, we may have to sell the investments at a substantial loss. Any such outcomes would have a material adverse effect on our financial condition, results of operations and cash flows.

If we do not maintain our status as a BDC, we would be subject to regulation as a registered closed-end investment company under the 1940 Act. As a registered closed-end investment company, we would be subject to substantially more regulatory restrictions under the 1940 Act, which would significantly decrease our operating flexibility. For these reasons, loss of our status as a BDC likely would have a material adverse effect on our business, financial condition and results of operations. Similarly, these rules could prevent us from making follow-on investments in existing portfolio companies (which could result in the dilution of our position).

***Our investment portfolio is recorded at fair value, with our Board having final responsibility for overseeing, reviewing and approving, in good faith, such fair value and, as a result, there is uncertainty as to the value of our portfolio investments, which may impact our net asset value.***

Most of our investments take the form of secured loans, warrants and direct equity investments that are not publicly traded. The fair value of loans and other investments that are not publicly traded may not be readily determinable, and we value these investments at fair value as determined in good faith by our Board. Most of our investments are classified as Level 3 under ASC Topic 820. This means that our valuations are based on unobservable inputs and our own assumptions about how market participants would price the asset or liability in question. Inputs into the determination of the fair value of our investments require significant management judgment or estimation. We retain the services of one or more independent third-party valuation firms to review the valuation of these loans and other investments. The valuation for each portfolio investment, including our Level 3 investments, is generally reviewed annually by an independent third-party valuation firm in accordance with our valuation policy. However, the Board does not intend to have de minimis investments of less than 1.0% of our gross assets (up to an aggregate of 10.0% of our gross assets) reviewed by an independent third-party valuation firm. The Board discusses valuations on a quarterly basis and determines, in good faith, the fair value of each investment in our portfolio based on the input of our Adviser, the independent third-party valuation firm and the Valuation Committee. The types of factors that our Board takes into account in determining the fair value of our investments generally include, as appropriate, such factors as yield, maturity and measures of credit quality, the enterprise value of the company, the nature and realizable value of any collateral, the company's ability to make payments and its earnings and discounted cash flow, our assessment of the support of their venture capital investors, the markets in which the company does business, comparisons to similar publicly traded companies and other relevant factors. Because such valuations, and particularly valuations of private companies, are inherently uncertain, may fluctuate over short periods of time and may be based on estimates, our determinations of fair value may differ materially from the values that would have been used if a ready market for these loans and other investments existed. Our net asset value could be materially and adversely affected if our determinations regarding the fair value of our loans and other investments were materially higher than the values that we ultimately realize upon the disposal of such loans and other investments.

***We are obligated to maintain proper and effective internal control over financial reporting. We may not complete our analysis of our internal control over financial reporting in a timely manner, or our internal controls may not be determined to be effective, which may adversely affect investor confidence in our company and, as a result, the value of our securities.***

Complying with Section 404 requires a rigorous compliance program as well as adequate time and resources. We may not be able to complete our internal control evaluation, testing and any required remediation in a timely fashion. If we are not able to implement the applicable requirements of Section 404 in a timely manner or with adequate compliance, our operations, financial reporting or financial results could be adversely affected. Matters impacting our internal controls may cause us to be unable to report our financial information on a timely basis and thereby subject us to adverse regulatory consequences, including sanctions by the SEC or violations of applicable stock exchange listing rules, and result in a breach of the covenants under the agreements governing any of our financing arrangements. There could also be a negative reaction in the financial markets due to a loss of investor confidence in us and the reliability of our financial statements. Additionally, if we identify one or more material weaknesses in our internal control over financial reporting, we will be unable to assert that our internal controls are effective. If we are unable to assert that our internal control over financial reporting is effective, we could lose investor confidence in the accuracy and completeness of our financial reports. This could have a material adverse effect on us and lead to a decline in the price of our securities.

Our internal control over financial reporting may not prevent or detect misstatements because of its inherent limitations. Even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements. If we fail to maintain the adequacy of our internal controls, including any failure to implement required new or improved controls, or if we experience difficulties in their implementation, our business and operating results could be harmed and we could fail to meet our financial reporting obligations.

33

***Our Board may change our investment objective, operating policies and strategies without prior notice or stockholder approval, the effects of which may be adverse.***

Our Board has the authority, except as otherwise provided in the 1940 Act, to modify or waive our investment objective, current operating policies, investment criteria and strategies without prior notice and without stockholder approval. However, absent stockholder approval, we may not change the nature of our business so as to cease to be, or withdraw our election as, a BDC. We cannot predict the effect any changes to our current operating policies, investment criteria and strategies would have on our business, net asset value, operating results and market price of our common stock. Nevertheless, any such changes could materially and adversely affect our business and impair our ability to make distributions to our stockholders.

***Provisions of the Maryland General Corporation Law and of our charter and bylaws could deter takeover attempts and have an adverse impact on the price of our common stock.***

The Maryland General Corporation Law, our charter and our bylaws contain provisions that may discourage, delay or make more difficult a change in control or the removal of our directors. We are subject to the Maryland Business Combination Act, or the "Business Combination Act," the application of which is subject to and may not conflict with any applicable requirements of the 1940 Act. Our Board has adopted a resolution exempting from the Business Combination Act any business combination between us and any other person, subject to prior approval of such business combination by our Board, including approval by a majority of our directors who are not "interested persons" as such term is defined in the 1940 Act. If the resolution exempting business combinations is repealed or our Board does not approve a business combination, the Business Combination Act may discourage third parties from trying to acquire control of us and increase the difficulty of consummating such an offer. Our bylaws exempt from the Maryland Control Share Acquisition Act, or the "Control Share Acquisition Act," acquisitions of our common stock by any person. If we amend our bylaws to repeal the exemption from the Control Share Acquisition Act, the Control Share Acquisition Act also may make it more difficult for a third party to obtain control of us and increase the difficulty of consummating such an offer. However, we will not amend our bylaws to repeal the current exemption from the Control Share Acquisition Act without our Board determining that doing so would be in the best interests of our stockholders and it does not conflict with the 1940 Act.

Our charter and bylaws contain other provisions that may make it difficult for a third party to obtain control of us, including supermajority vote requirements for business transactions that are not approved by a majority of our "continuing directors," provisions of our charter classifying our Board in three classes serving staggered three-year terms, and provisions of our charter authorizing our Board to classify or reclassify shares of our stock in one or more classes or series and to cause the issuance of additional shares of our stock, and to amend our charter, without stockholder approval, to increase or decrease the number of shares of stock of any class or series that we have authority to issue. These provisions, as well as other provisions of our charter and bylaws, may delay, defer or prevent a transaction or a change in control that might otherwise be in the best interests of our stockholders.

***Our Adviser or our Administrator can resign upon 60 days' notice and we may not be able to find a suitable replacement within that time, or at all, resulting in a disruption in our operations that could materially and adversely affect our financial condition, results of operations and cash flows.***

Our Adviser has the right under the Investment Advisory Agreement to resign at any time upon 60 days' written notice, whether we have found a replacement or not. Similarly, our Administrator has the right under the Administration Agreement to resign at any time upon 60 days' written notice, whether we have found a replacement or not. If our Adviser or our Administrator were to resign, we may not be able to find a new investment adviser, administrator or hire internal management with similar expertise and ability to provide the same or equivalent services on acceptable terms within 60 days, or at all. If we are unable to do so quickly, our operations are likely to experience a disruption, our financial condition, results of operations and cash flows as well as our ability to pay distributions to our stockholders are likely to be materially and adversely affected and the market price of our shares may decline. In addition, the coordination of our internal management and investment or administrative activities, as applicable, is likely to suffer if we are unable to identify and reach an agreement with a single institution or group of executives having the expertise possessed by our Adviser and our Administrator. Even if we are able to retain comparable management, whether internal or external, the integration of such management and their lack of familiarity with our investment objective may result in additional costs and time delays that may materially and adversely affect our financial condition, results of operations and cash flows.

***The failure in cyber security systems, as well as the occurrence of events unanticipated in our Adviser's disaster recovery systems and management continuity planning or a support failure from external providers during a disaster could impair our ability to conduct business effectively.***

The occurrence of a disaster, such as a cyber-attack against us or against a third-party that has access to our data or networks, a natural catastrophe, an industrial accident, failure of our disaster recovery systems, or consequential employee error, could have an adverse effect on our ability to communicate or conduct business, negatively impacting our operations and financial condition. This adverse effect can become particularly acute if those events affect our electronic data processing, transmission, storage, and retrieval systems, or impact the availability, integrity, or confidentiality of our data.

We depend heavily upon computer systems to perform necessary business functions. Despite our implementation of a variety of security measures, our computer systems, networks, and data, like those of other companies, could be subject to cyber-attacks and unauthorized access, use, alteration, or destruction, such as from physical and electronic break-ins or unauthorized tampering. If one or more of these events occurs, it could potentially jeopardize the confidential, proprietary, and other information processed, stored in, and transmitted through our computer systems and networks. Such an attack could involve gaining unauthorized access to our information systems for purposes of misappropriating assets, stealing confidential information, corrupting data or causing operational disruption and result in disrupted operations, misstated or unreliable financial data, regulatory penalties, liability for stolen assets or information, increased cybersecurity protection and insurance costs, litigation and damage to our business relationships, any of which could have a material adverse effect on our business, financial condition and results of operations.

Third parties with which we do business may also be sources of cybersecurity or other technological risk. We outsource certain functions and these relationships allow for the storage and processing of our information, as well as client, counterparty, employee, and borrower information. While we engage in actions to reduce our exposure resulting from outsourcing, ongoing threats may result in unauthorized access, loss, exposure, destruction, or other cybersecurity incidents that affects our data, resulting in increased costs and other consequences as described above.

*If we are unable to manage our growth, our results of operations could suffer.*

Rapid growth of our portfolio would require expanded portfolio monitoring, increased personnel, expanded operational and financial systems and new and expanded control procedures. Our Adviser may be unable to attract sufficient qualified personnel or successfully manage expanded operations. As our portfolio expands, we may periodically experience constraints that would adversely affect our Adviser's ability to identify and capitalize on investment opportunities, conduct a thorough and efficient diligence and credit analysis, close financing transactions in a timely fashion and/or effectively monitor our portfolio companies. Failure to manage growth effectively could materially and adversely affect our financial condition, results of operations and cash flows.

**Risks Relating to our Conflicts of Interest**

*Our ability to enter into transactions with our affiliates and to make investments in venture growth stage companies along with our affiliates is restricted by the 1940 Act which may limit the scope of investment opportunities available to us.*

We are prohibited under the 1940 Act from participating in certain transactions with our affiliates without the prior approval of our independent directors and, in some cases, the SEC. Any person that owns, directly or indirectly, 5% or more of our outstanding voting securities will be our affiliate for purposes of the 1940 Act. In addition, any venture growth stage company in which TPC or its affiliates own 5% or more of its outstanding voting securities will be our affiliate for purposes of the 1940 Act. We are generally prohibited from buying or selling any security from or to such affiliate without the prior approval of our independent directors and, in certain cases, the SEC. The 1940 Act also prohibits certain "joint" transactions with certain of our affiliates, which could include concurrent investments in the same company, without prior approval of our independent directors and, in some cases, the SEC. We are prohibited from buying or selling any security from or to any person that controls us or who owns more than 25% of our voting securities and certain of that person's affiliates, or entering into prohibited joint transactions with such persons, absent the prior approval of the SEC. As a result of these restrictions, we may be prohibited from (i) buying or selling any security (other than any security of which we are the issuer) from or to any company that is advised or managed by TPC or our Adviser or any of their affiliates or in which TPC or our Adviser or any of their affiliates hold an interest or (ii) modifying any security that we hold in a company in which TPC or our Adviser or any of their affiliates also hold an interest without the prior approval of the SEC, which may limit our ability to take any action with respect to an existing investment or potential investment regardless of whether we conclude that the action may be in the best interest of our stockholders.

35

Our investment strategy includes investments in secured loans to companies, together with, in many cases, attached equity "kickers" in the form of warrant investments, and direct equity investments. TPC and the Adviser also manage, and in the future may manage, other investment funds, accounts or vehicles that invest or may invest in companies and investments similar to those in our investment portfolio. Although we were formed to expand the venture growth stage business segment of TPC's investment platform, subject to its allocation policy and applicable law, other vehicles sponsored or managed by our Adviser's senior investment team also invest in venture growth stage companies or may have prior investments outstanding to potential borrowers. As a result, members of our Adviser's senior investment team and the Investment Committee, in their roles at TPC, may face conflicts in the allocation of investment opportunities among us and other investment vehicles managed by TPC with similar or overlapping investment objectives. Generally, when a particular investment would be appropriate for us as well as one or more other investment funds, accounts or vehicles managed by our Adviser's senior investment team, such investment will be apportioned by our Adviser's senior investment team in accordance with (1) our Adviser's internal conflict of interest and allocation policies, (2) the requirements of the Advisers Act and (3) certain restrictions under the 1940 Act regarding co-investments with affiliates. Co-investment opportunities will be allocated amongst us, TPC and/or investment funds, accounts and vehicles managed by the Adviser or its affiliates: (1) consistent with both the Adviser's allocation policies and procedures and the conditions of the Exemptive Order, as applicable; and (2) in a manner reasonably designed to ensure that investment opportunities are allocated fairly and equitably over time. Such apportionment may not be strictly pro rata, depending on the good faith determination of all relevant factors, including, without limitation, differing investment objectives, amount of capital available for each potential investing entity, diversification considerations, covenants under applicable borrowing arrangements, regulatory restrictions and the terms of our or the respective governing documents of such investment funds, accounts or investment vehicles. These procedures could, in certain circumstances, limit whether or not a co-investment opportunity is available to us, the timing of acquisitions and dispositions of investments, the price paid or received by us for investments or the size of the investment purchased or sold by us.

We may co-invest with TPC and/or investment funds, accounts and vehicles managed by TPC or its affiliates where doing so is consistent with our investment strategy as well as applicable law and SEC staff interpretations. We generally are only permitted to co-invest with TPC and/or such investment funds, accounts and vehicles where the only term that is negotiated is price. However, on March 28, 2018 we, TPC and our Adviser received the Exemptive Order from the SEC, which permits greater flexibility to negotiate the terms of co-investments with TPC and/or investment funds, accounts and investment vehicles managed by TPC or its affiliates in a manner consistent with our investment objective, positions, policies, strategies and restrictions as well as regulatory requirements and other pertinent factors. Pursuant to the Exemptive Order, we are permitted to co-invest with our affiliates if, among other things, a "required majority" (as defined in Section 57(o) of the 1940 Act) of our independent directors make certain conclusions in connection with a co-investment transaction, including, but not limited to, that (1) the terms of the potential co-investment transaction, including the consideration to be paid, are reasonable and fair to us and our stockholders and do not involve overreaching in respect of us or our stockholders on the part of any person concerned, and (2) the potential co-investment transaction is consistent with the interests of our stockholders and is consistent with our then-current investment objective and strategies.

***Our Adviser may be subject to conflicts of interest with respect to taking actions regarding investments in which TPC or its affiliates may also have an interest.***

Although our Adviser has adopted a compliance program that includes conflicts of interest policies and procedures, as well as allocation policies and procedures, that are designed to mitigate the potential actual or perceived conflicts between us, on the one hand, and TPC and its affiliates, on the other hand, it may not eliminate all potential conflicts. TPC and its affiliates may have previously made investments in secured loans, together with, in many cases, attached equity "kickers" in the form of warrant investments, and direct equity investments in some of the same venture growth stage companies in which we expect to invest. In certain of these circumstances, we may have rights and privileges that give us priority over others associated with the issuer, such as TPC or its affiliates. These rights, if exercised, could have a detrimental impact on the value of the investment made by TPC or its affiliates in the issuer, and as a result and subject to the applicable provisions of the Advisers Act and the 1940 Act, our Adviser may not exercise the Company's rights if the Adviser believes TPC or its affiliates would be disadvantaged by the Company taking such action, even if it is in the best interests of our stockholders. In addition, our Adviser may be subject to a conflict in seeking to make an investment in an issuer in which TPC or its affiliates have already invested, and we may still choose to make such investment, where permissible, subject to the approval of a majority of our directors who have no financial interest in the investment and a majority of our independent directors. In such a scenario, our Adviser may be influenced to make an investment or take actions in order to protect the interests of TPC or its affiliates in the issuer.

***The advisory fee structure we have with our Adviser may create incentives that are not fully aligned with the interests of our stockholders.***

In the course of our investing activities, we pay a base management fee and an incentive fee to our Adviser. The Investment Advisory Agreement that we entered into with our Adviser provides that these fees are based on the value of our adjusted gross assets. As a result, investors in our common stock will invest on a "gross" basis and receive distributions on a "net" basis after expenses, resulting in a lower rate of return than one might achieve through direct investments. Because these fees are based on the value of our total assets, our Adviser benefits when we incur debt or use leverage. This fee structure may encourage our Adviser to cause us to borrow money to finance additional investments. Our Board is charged with protecting our interests by monitoring how our Adviser addresses these and other conflicts of interest associated with its management services and compensation. While our Board does not review or approve each investment decision, borrowing or incurrence of leverage, our independent directors periodically review our Adviser's services and fees as well as its portfolio management decisions and portfolio performance. In connection with these reviews, our independent directors consider whether our fees and expenses (including those related to leverage) remain appropriate. As a result of this arrangement, our Adviser may from time to time have interests that differ from those of our stockholders, giving rise to a conflict.

***Our incentive fee may induce our Adviser to pursue speculative investments and to use leverage when it may be unwise to do so.***

The incentive fee payable by us to our Adviser may create an incentive for our Adviser to make investments on our behalf that are risky or more speculative than would be the case in the absence of such compensation arrangement. The way in which the incentive fee payable to our Adviser is determined, which is calculated separately in two components as a percentage of the interest and other investment income in excess of a quarterly minimum hurdle rate and as a percentage of the realized gain on invested capital, may encourage our Adviser to use leverage or take additional risk to increase the return on our investments. Under certain circumstances, the use of leverage may increase the likelihood of default, which would disfavor the holders of our common stock or of securities convertible into our common stock or warrant investments representing rights to purchase our common stock or securities convertible into our common stock. In addition, our Adviser receives the incentive fee based, in part, upon net capital gains realized on our investments. Unlike the portion of the incentive fee based on investment income, there is no minimum level of gain applicable to the portion of the incentive fee based on net capital gains. As a result, our Adviser may have an incentive to invest more in investments that are likely to result in capital gains as compared to income producing securities or to advance or delay realizing a gain in order to enhance its incentive fee. This practice could result in our investing in more speculative securities than would otherwise be the case, which could result in higher investment losses, particularly during economic downturns. A rise in the general level of interest rates can be expected to lead to higher interest rates applicable to certain of our debt investments and may accordingly result in a substantial increase of the amount of incentive fees payable to our Adviser with respect to our pre-incentive fee net investment income.

***We may pay our Adviser an incentive fee on certain investments that include a deferred interest feature.***

We underwrite our loans to generally include an end-of-term payment, a PIK interest payment and/or OID. Our end-of-term payments are contractual and fixed interest payments due at the maturity date of the loan, including upon prepayment, and are generally a fixed percentage of the original principal balance of the loan. The portion of our end-of-term payments which equal the difference between our yield-to-maturity and the stated interest rate on the loan are recognized as non-cash income or OID until they are paid. In addition, in connection with our equity related investments, we may be required to accrue OID which decreases the balance on our secured loans by an amount equal to the value of the warrant investments we receive in connection with the applicable secured loan over its lifetime. Under these types of investments, we accrue interest during the life of the loan on the end-of-term payment, PIK interest payment and/or OID but do not receive the cash income from the investment until the end of the term. However, our pre-incentive fee net investment income, which is used to calculate the income portion of our incentive fee, includes accrued interest. Thus, a portion of this incentive fee is based on income that we have not yet received in cash, such as an end-of-term payment, a PIK interest payment and/or OID.

***The valuation process for certain of our investments may create a conflict of interest.***

For many of our investments, no market-based price quotation is available. As a result, our Board determines the fair value of these secured loans, warrant and equity investments in good faith as described above in "- Risks Relating to our Business and Structure-Our investment portfolio is recorded at fair value, with our Board having final responsibility for overseeing, reviewing and approving, in good faith, such fair value and, as a result, there is uncertainty as to the value of our portfolio investments, which may impact our net asset value." In connection with that determination, our Adviser provides our Board with valuation recommendations based upon the most recent and available information, which generally includes industry outlook, capitalization, financial statements and projected financial results of each portfolio company. Other than *de minimis* investments of less than 1% of our gross assets (up to an aggregate of 10% of our gross assets), the valuation for each investment is generally reviewed by an independent valuation firm annually, in accordance with our valuation policy, and the ultimate determination of fair value is made by our Board, including our interested directors, and not by such independent valuation firm. The Board, however, may request at its discretion to have such *de minimis* investments valued by an independent valuation firm. In addition, Messrs. Labe and Srivastava, each an interested member of our Board, have a material pecuniary interest in our Adviser and serve on its Investment Committee. The participation of our Adviser's senior investment team in our valuation process, and the pecuniary interest in our Adviser by certain members of our Board, could result in a conflict of interest given that the base management fee is based, in part, on the value of our average adjusted gross assets, and our Adviser's incentive fee is based, in part, on realized gains and realized and unrealized losses.

37

*There are conflicts related to our other arrangements with TPC and our Administrator.*

We have entered into the License Agreement with TPC under which TPC granted us a non-exclusive, royalty-free license to use the name "TriplePoint" and the TriplePoint logo. We have also entered into the Administration Agreement with our Administrator pursuant to which we are required to pay our Administrator an amount equal to the allocable portion of our Administrator's overhead resulting from its obligations under the Administration Agreement, including rent and the allocable portion of the cost of our Chief Compliance Officer and Chief Financial Officer and their respective staffs. This creates conflicts of interest that our Board will monitor. For example, under the terms of the License Agreement, we are unable to preclude TPC from licensing or transferring the ownership of the "TriplePoint" name to third parties, some of which may compete against us. Consequently, we are unable to prevent any damage to goodwill that may occur as a result of the activities of TPC, its affiliates or others. Furthermore, in the event the License Agreement is terminated, we will be required to change our name and cease using "TriplePoint" as part of our name. Any of these events could disrupt our recognition in the market place, damage any goodwill we may have generated and otherwise harm our business.

*The Investment Advisory Agreement was not negotiated at arm's length and may not be as favorable to us as if it had been negotiated with an unaffiliated third party.*

Pursuant to the terms of the Investment Advisory Agreement, our Adviser is responsible for sourcing, reviewing and structuring investment opportunities for us, underwriting and performing diligence of our investments and monitoring our investment portfolio on an ongoing basis. The Investment Advisory Agreement was negotiated between related parties. Consequently, its terms, including fees payable to our Adviser, may not be as favorable to us as if it had been negotiated with an unaffiliated third party. In addition, we may choose not to enforce, or to enforce less vigorously, our rights and remedies under the Investment Advisory Agreement because of our desire to maintain our ongoing relationship with our Adviser.

*Our Adviser's liability is limited under the Investment Advisory Agreement and we have agreed to indemnify our Adviser against certain liabilities, which may lead our Adviser to act in a riskier manner on our behalf than it would when acting for its own account.*

Under the Investment Advisory Agreement, our Adviser has not assumed any responsibility to us other than to render the services called for under that agreement. It is not responsible for any action of our Board in following or declining to follow our Adviser's advice or recommendations. Under the Investment Advisory Agreement, our Adviser and its professionals and any person controlling or controlled by our Adviser are not liable to us, any subsidiary of ours, our directors, our stockholders or any subsidiary's stockholders or partners for acts or omissions performed in accordance with and pursuant to the Investment Advisory Agreement, except those resulting from acts constituting criminal conduct, gross negligence, willful misfeasance, bad faith or reckless disregard of the duties that our Adviser owes to us under the Investment Advisory Agreement. In addition, as part of the Investment Advisory Agreement, we have agreed to indemnify our Adviser and its professionals from and against any claims or liabilities, including reasonable legal fees and other expenses reasonably incurred, arising out of or in connection with our business and operations or any action taken or omitted on our behalf pursuant to authority granted by the Investment Advisory Agreement, except where attributable to criminal conduct, willful misfeasance, bad faith or gross negligence in the performance of the Adviser's or such person's duties or by reason of the reckless disregard of the Adviser's duties and obligations under the Investment Advisory Agreement. These protections may lead our Adviser to act in a riskier manner when acting on our behalf than it would when acting for its own account.

**Risks Relating to our Investments**

*Our investments are concentrated in technology and other high growth industries, including clean technology, some of which are subject to extensive government regulation, which exposes us to the risk of significant loss if any of these industry sectors experiences a downturn.*

A consequence of our investment strategy is that our investment returns will be materially and adversely affected if the companies or the industries we target perform poorly. Beyond the asset diversification requirements to which we will be subject as a RIC and any concentration limitations we have agreed or may agree to as part of the Credit Facility or any future financing arrangement or other indebtedness, we do not have fixed guidelines for diversification or limitations on the size of our investments in any one company and our investments could be concentrated in relatively few industries.

Our investments may be subject to extensive regulation by U.S. and foreign federal, state and/or local agencies. Changes in existing laws, rules or regulations, or judicial or administrative interpretations thereof, or new laws, rules or regulations could have an adverse impact on the business and industries of our portfolio companies. In addition, changes in government priorities or limitations on government resources could also adversely impact our portfolio companies. We are unable to predict whether any such changes in laws, rules or regulations will occur and, if they do occur, the impact of these changes on our portfolio companies and our investment returns. Furthermore, if any of our portfolio companies fail to comply with applicable regulations, they could be subject to significant penalties and claims that could materially and adversely affect their operations. Our portfolio companies may be subject to the expense, delay and uncertainty of the regulatory approval process for their products and, even if approved, these products may not be accepted in the marketplace.

Our portfolio investments are concentrated the technology and other high growth industries, including clean technology. As a result, a downturn in any of these industries and particularly those in which we are heavily concentrated could materially and adversely affect our financial condition, results of operations and cash flows.

***Our portfolio may lack diversification among portfolio companies which may subject us to a risk of significant loss if one or more of these companies default on their obligations under any of their debt instruments.***

Our portfolio consists of a limited number of portfolio companies. Beyond the asset diversification requirements associated with our qualification as a RIC under the Code and any concentration limitations we have agreed or may agree to as part of the Credit Facility or any future financing arrangement or other indebtedness, we do not have fixed guidelines for diversification, and our investments may be concentrated in relatively few industries or companies. As our portfolio may be less diversified than the portfolios of other investment vehicles, we may be more susceptible to failure if a single loan fails. Similarly, the aggregate returns we realize may be significantly adversely affected if a small number of investments perform poorly or if we need to write down the value of any one investment.

***Our financial condition, results of operations and cash flows would be negatively affected if a significant portfolio investment fails to perform as expected.***

Our total investment in an individual company may be significant. As a result, if a significant investment fails to perform as expected, it may be subject to multiple credit rating downgrades on our internal rating scale within a short period of time. As a result of such deterioration in the performance of a significant investment, our financial condition, results of operations and cash flows could be more negatively affected and the magnitude of the loss could be more significant than if we had made smaller investments in more companies.

***Our investment strategy includes a primary focus on venture growth stage companies, which are subject to many risks, including dependence on the need to raise additional capital, volatility, intense competition, shortened product life cycles, changes in regulatory and governmental programs, periodic downturns, and below investment grade ratings, which could cause you to lose all or part of your investment in us.***

We invest primarily in venture growth stage companies, many of which may have narrow product lines and small market shares, which tend to render them more vulnerable to competitors' actions and market conditions, as well as to general economic downturns, compared to more mature companies. The revenues, income (or losses), and projected financial performance and valuations of venture growth stage companies can and often do fluctuate suddenly and dramatically. For these reasons, investments in our portfolio companies, if rated by one or more ratings agency, would typically be rated below "investment grade," which refers to securities rated by ratings agencies below the four highest rating categories. Our target venture growth stage companies may be geographically concentrated and are therefore highly susceptible to materially negative local, political, natural and economic events. In addition, high growth industries are generally characterized by abrupt business cycles and intense competition. Overcapacity in high growth industries, together with cyclical economic downturns, may result in substantial decreases in the value of many venture growth stage companies and/or their ability to meet their current and projected financial performance to service our debt. Furthermore, venture growth stage companies also typically rely on venture capital and private equity investors, or initial public offerings, or sales for additional capital.

Venture capital firms in turn rely on their limited partners to pay in capital over time in order to fund their ongoing and future investment activities. To the extent that venture capital firms' limited partners are unable or choose not to fulfill their ongoing funding obligations, the venture capital firms may be unable to continue operationally and/or financially supporting the ongoing operations of our portfolio companies, which could have a material adverse impact on our financing arrangement with the portfolio company.

These companies, their industries, their products and customer demand and the outlook and competitive landscape for their industries are all subject to change, which could have a material adverse impact on their ability to execute their business plans and generate cash flow or raise additional capital that would serve as the basis for repayment of our loans. Therefore, the venture growth stage companies in which we invest may face considerably more risk of loss than do companies at other stages of development.

***Our investments in the technology industry involve significant risks, including highly volatile markets.***

We make investments in technology companies, which are generally subject to more volatile markets than companies in other industries. The technology industry can be significantly affected by intense competitive pricing pressures, changing global demand, research and development costs, the ability to attract and maintain skilled employees, component prices, short product cycles and rapid obsolescence of technology. Thus, the ultimate success of a technology company may depend on its ability to continually innovate in increasingly competitive markets. In addition, some technology companies may also be negatively affected by failure to obtain timely regulatory approvals, and may be subject to large capital expenditures. It is possible that certain technology companies will not be able to raise additional financing to meet capital-expenditure requirements or may be able to do so only at a price or on terms which are unfavorable to us. These risks generate substantial volatility in the fair value of the securities of technology companies that are inherently difficult to predict and, accordingly, investments in the technology industry may lead to substantial losses.

*Some of our portfolio companies may need additional capital, which may not be readily available.*

Venture growth stage companies may require additional equity financing if their cash flow from operating activities is insufficient to satisfy their continuing growth, working capital and other requirements. Each round of venture financing is typically intended to provide a venture capital-backed company with only enough capital to reach the next stage of development. We cannot predict the circumstances or market conditions under which our venture growth stage companies will seek additional capital. It is possible that one or more of our venture growth stage companies will not be able to raise additional financing or may be able to do so only at a price or on terms unfavorable to us, either of which would negatively impact our investment returns, the fair value of our portfolio and our ability to restructure our investments. Some of these companies may be unable to obtain sufficient financing from private investors, public or private capital markets or traditional lenders. This may have a significant impact if the companies are unable to obtain certain federal, state or foreign agency approval for their products or the marketing thereof, if regulatory review processes extend longer than anticipated and the companies need continued funding for their operations during these times. Accordingly, financing these types of companies may entail a higher risk of loss than would financing companies that are able to utilize traditional credit sources.

*Our existing and/or future portfolio companies may not draw on any of our unfunded obligations or may draw our outstanding unfunded obligations at a time when our capital is not readily available.*

A commitment to extend credit is a formal agreement to lend funds to our portfolio companies as long as there is no violation of any condition established under the agreement. The actual borrowing needs of our portfolio companies under these commitments have historically been lower than the contractual amount of the commitments. A portion of these commitments expire without being drawn upon, and as such, the total amount of unfunded commitments does not reflect our expected future cash funding requirements.

As of December 31, 2022, our unfunded commitments totaled $ 324.0  million to 37 portfolio companies. Our credit agreements generally contain customary lending provisions that allow us relief from funding obligations for previously made commitments in instances where the underlying company experiences material adverse events that affect the financial condition or business outlook for the company. We cannot assure you that any of these unfunded commitments or any future obligations will be drawn by the venture growth stage companies. We have also entered into commitments with certain portfolio companies that permit an increase in the commitment amount in the future in the event that conditions to such increases are met. If such conditions to increase are met, these amounts may become unfunded commitments if not drawn prior to expiration. As of December 31, 2022, we did not have any backlog of potential future commitments.

The actual borrowing needs of our portfolio companies may exceed our expected funding requirements, especially during a challenging economic environment when our portfolio companies may be more dependent on our credit commitments due to the lack of available credit elsewhere, an increasing cost of credit or the limited availability of financing from venture capital firms. In addition, investors in some of our portfolio companies may fail to meet their underlying investment commitments due to liquidity or other financing issues, which may increase our portfolio companies' borrowing needs. Any failure to meet our unfunded credit commitments in accordance with the actual borrowing needs of our portfolio companies may have a material adverse effect on our business, financial condition and results of operations. We intend to use cash flow from normal and early principal repayments, indebtedness, any proceeds from any subsequent equity or debt offerings, and available cash to fund our outstanding unfunded obligations. However, there can be no assurance that we will have sufficient capital available to fund these commitments as they come due. We may rely on assumptions, estimates, assurances and other information related to potential non-utilization of unfunded commitments by our portfolio companies as well as related to potential exit events, principal prepayments, and fee payments. To the extent these assumptions, estimates, assurances and other information are incorrect or events are delayed, we may not be able to fund commitments as they come due. To the extent we are not able to fund commitments as they come due, we may be forced to sell assets, modify the terms of our commitments or default on our commitments, and as a result, our business could be materially and adversely affected.

*Unlike traditional lenders, we offer a flexible payment and covenant structure to our portfolio companies and may choose not to take advantage of certain opportunities due to our long-term investment philosophy to develop and maintain deep and longstanding relationships with TPC's select group of leading venture capital investors, borrowers and entrepreneurs and to preserve our reputation.*

As part of the Four Rs, our core investment philosophy, we seek to develop and maintain deep and longstanding relationships with TPC's select group of leading venture capital investors, borrowers and entrepreneurs and to preserve our reputation. Accordingly, our debt-financing products generally offer borrowers a flexible payment and covenant structure that may not provide us with the same level of protection as more restrictive conditions that traditional lenders typically impose on borrowers. Furthermore, there may be situations with borrowers on our Credit Watch List where we believe that a member of TPC's select group of venture capital investors intends to, expresses their intent to, or provides subject to milestones or contingencies, continued support, assistance and/or financial commitment to the borrower and our Adviser, based on such representation, may determine to modify or waive a provision or term of our existing loan which we would otherwise be entitled to enforce. The terms of any such modification or waiver may not be as favorable to us as we could have required, or had the right to require, and we may choose to enforce less vigorously our rights and remedies under our loans than traditional lenders due to our investment philosophy to preserve our reputation and maintain a strong relationship with the applicable venture capital investor or borrower based on their representations made to us.

***If our portfolio companies are unable to protect their intellectual property rights, our business and prospects could be harmed. If our portfolio companies are required to devote significant resources to protecting their intellectual property rights, then the value of our investment could be reduced.***

Our future success and competitive position depend in part upon the ability of our venture growth stage companies to obtain and maintain proprietary technology used in their products and services, which will often represent a significant portion of the collateral securing our loans. Venture growth stage companies will rely, in part, on patent, trade secret and trademark law to protect that technology, but competitors may misappropriate their intellectual property, and disputes as to ownership of intellectual property may arise. Venture growth stage companies may have also failed to properly obtain intellectual property ownership that, under intellectual property laws, by default resides with the personnel who created the intellectual property. Consequently, venture growth stage companies may, from time to time, be required to institute litigation in order to enforce their patents, copyrights or other intellectual property rights, to protect their trade secrets, to determine the validity and scope of the proprietary rights of others or to defend against claims of infringement. Such litigation could result in substantial costs and diversion of resources. Similarly, if a venture growth stage company is found to infringe upon or misappropriate a third party's patent or other proprietary rights, that company could be required to pay damages to such third party, alter its own products or processes, obtain a license from the third party and/or cease activities utilizing such proprietary rights, including making or selling products utilizing such proprietary rights. Any of the foregoing events could negatively affect both the company's ability to service our debt obligation and the value of any equity securities that we own, as well as any collateral securing our obligation.

***Our relationship with certain portfolio companies may expose us to our portfolio companies' trade secrets and confidential information which may require us to be parties to non-disclosure agreements and restrict us from engaging in certain transactions.***

Our relationship with some of our portfolio companies may expose us to our portfolio companies' trade secrets and confidential information (including transactional data and personal data about their employees and clients) that may require us to be parties to non-disclosure agreements and restrict us from engaging in certain transactions. Unauthorized access or disclosure of such information may occur, resulting in theft, loss or other misappropriation. Any theft, loss, improper use, such as insider trading or other misappropriation of confidential information could have a material adverse impact on our competitive positions, our relationship with our portfolio companies and our reputation and could subject us to regulatory inquiries, enforcement and fines, civil litigation and possible financial liability or costs.

***Our financial condition, results of operations and cash flows could be negatively affected if we are unable to recover our principal investment as a result of a negative pledge or lack of a security interest on the intellectual property of our venture growth stage companies.***

In some cases, we collateralize our loans with a secured collateral position in a venture growth stage company's assets, which may include a negative pledge or, to a lesser extent, no security on their intellectual property. In the case of a negative pledge, the venture growth stage company cannot encumber or pledge their intellectual property without our permission. In the event of a default on a loan, the intellectual property of the venture growth stage company will most likely be liquidated to provide proceeds to pay the creditors of the company. There can be no assurance that our security interest, if any, in the proceeds of the intellectual property will be enforceable in a court of law or bankruptcy court or that there will not be others with senior or *pari passu* credit interests.

***If the assets securing the loans that we make decrease in value, then we may lack sufficient collateral to cover losses.***

We believe that our borrowers generally are able to repay our loans from their available capital, future capital-raising transactions or current and/or future cash flow from operations. However, to attempt to mitigate credit risks, we typically take a secured collateral position. There is a risk that the collateral securing our secured loans may decrease in value over time, may be difficult to sell in a timely manner, may be difficult to appraise, may be liquidated at a price lower than what we consider to be fair value and may fluctuate in value based upon the success of the business and market conditions, including as a result of the inability of a borrower to raise additional capital.

In some circumstances, other creditors have claims having priority over our senior lien. Although for certain borrowers, we may be the only form of secured debt (other than potentially specific equipment financing), other borrowers may also have other senior secured debt, such as revolving loans and/or term loans, having priority over our senior lien. At the time of underwriting our loans, we generally only consider growth capital loans for prospective borrowers with sufficient collateral that covers the value of our loan as well as the revolving and/or term loans that may have priority over our senior lien; however, there may be instances in which we have incorrectly estimated the current or future potential value of the underlying collateral or the underlying collateral value has decreased, in which case our ability to recover our investment may be materially and adversely affected.

In addition, a substantial portion of the assets securing our investment may be in the form of intellectual property, inventory and equipment and, to a lesser extent, cash and accounts receivable. Intellectual property, if any, that is securing our loan could lose value if, among other things, the borrower's rights to the intellectual property are challenged or if the borrower's license to the intellectual property is revoked or expires. Inventory may not be adequate to secure our loan if our valuation of the inventory at the time that we made the loan was not accurate or if there is a reduction in the demand for the inventory.

Similarly, any equipment securing our loan may not provide us with the anticipated security if there are changes in technology or advances in new equipment that render the particular equipment obsolete or of limited value, or if the borrower fails to adequately maintain or repair the equipment. The residual value of the equipment at the time we would take possession may not be sufficient to satisfy the outstanding debt and we could experience a loss on the disposition of the equipment. Any one or more of the preceding factors could materially impair our ability to recover our investment in a foreclosure.

41

***Our portfolio companies may have limited operating histories and financial resources.***

Our portfolio consists of investments in companies that have relatively limited operating histories. Generally, very little public information exists about these companies, and we are required to rely on the ability of our Adviser to obtain adequate information to evaluate the potential returns from investing in these companies. If we are unable to uncover all material information about these companies, we may not make a fully informed investment decision, and we may lose money on our investments. These companies may be particularly vulnerable to U.S. and foreign economic downturns and may have limited access to capital. These businesses also frequently have less diverse product lines and a smaller market presence than larger competitors and may experience substantial variations in operating results. They may face intense competition, including from companies with greater financial, technical, operational and marketing resources, and typically depend upon the expertise and experience of a single individual executive or a small management team. Our success depends, in large part, upon the abilities of the key management personnel of our portfolio companies, who are responsible for the day-to-day operations of our portfolio companies. Competition for qualified personnel is intense at any stage of a company's development. The loss of one or more key managers can hinder or delay a company's implementation of its business plan and harm its financial condition. Our portfolio companies may not be able to attract and retain qualified managers and personnel. Any inability to do so may negatively affect our investment returns.

In addition, our existing and future portfolio companies may compete with each other for investment or business opportunities and the success of one could negatively impact the other. Furthermore, some of our portfolio companies do business in regulated industries and could be affected by changes in government regulation. Accordingly, these factors could impair their cash flow or result in other events, such as bankruptcy, which could limit their ability to repay their obligations to us, and may materially and adversely affect the return on, or the recovery of, our investment. As a result, we may lose our entire investment in any or all of our portfolio companies.

***We make debt investments in venture growth stage companies that generally do not have sufficient cash resources to repay our loan in full at the time of its origination.***

We invest primarily in venture growth stage companies that generally do not have sufficient cash-on-hand to satisfy our loan in full at the time we originate the loan. Following our investment, these companies may be unable to successfully scale operations and increase revenue as we had anticipated at the time we made the investment. In certain circumstances, these companies may not be able to generate meaningful customer sales, commitments or orders due to unfavorable market conditions. As a result, the company may not generate sufficient cash flow to service our loan and/or the company's venture capital investors may no longer provide the company with meaningful invested equity capital to provide a debt financing cushion to our loan. As a consequence, the company may (i) request us to restructure our loan resulting in the delay of principal repayment, the reduction of fees and/or future interest rates and/or the possible loss of principal or (ii) experience bankruptcy, liquidation or similar financial distress. We may be unable to accommodate any such restructuring request due to the eligibility requirements under the Credit Facility or otherwise. The bankruptcy, liquidation and/or recovery process has a number of significant inherent risks for us as a creditor. Many events in a bankruptcy proceeding are the product of contested matters and adversarial proceedings and are beyond the control of the creditors. A bankruptcy filing by one of our portfolio companies may adversely and permanently affect our investment in that company. If the proceeding is converted to liquidation, the liquidation value of the company may not equal the fair value that was believed to exist at the time of our investment. The duration of a bankruptcy, liquidation and/or recovery proceeding is also difficult to predict, and a creditor's return on investment can be materially and adversely affected by delays until the plan of reorganization or liquidation ultimately becomes effective. The administrative costs in connection with a bankruptcy proceeding are frequently high and would be paid out of the debtor's estate prior to any return to creditors. Because the standards for classification of claims under bankruptcy law are vague, our influence with respect to the obligations we own may be lost by increases in the number and amount of claims or by different treatment. In the early stages of the bankruptcy process, it is often difficult to estimate the extent of, or even to identify, any contingent claims that might be made. In addition, certain claims that have priority by law (for example, claims for taxes) may be substantial.

***There may be circumstances when our debt investments could be subordinated to claims of other creditors or we could be subject to lender liability claims.***

Even though we structure many investments as secured loans, if one of our portfolio companies were to go bankrupt, depending on the facts and circumstances, and based upon principles of equitable subordination as defined by existing case law, a bankruptcy court could subordinate all or a portion of our claim to that of other creditors and transfer any lien securing such subordinated claim to the bankruptcy estate. The principles of equitable subordination defined by case law have generally indicated that a claim may be subordinated only if its holder is guilty of misconduct or where the senior loan is re-characterized as an equity investment and the senior lender has actually provided significant managerial assistance to the bankrupt debtor. We may also be subject to lender liability claims for actions taken by us with respect to a borrower's business or instances where we exercise control over the borrower. It is possible that we could become subject to a lender's liability claim, including as a result of actions taken in rendering significant managerial assistance or actions to compel and collect payments from the borrower outside the ordinary course of business. Such risk of equitable subordination may be potentially heightened with respect to various portfolio investments that we may be deemed to control.

***The lack of liquidity in our investments may materially and adversely affect our ability to meet our investment objectives.***

The majority of our assets are invested in illiquid loans and a substantial portion of our investments in leveraged companies are subject to legal and other restrictions on resale or are otherwise less liquid than more broadly traded public securities. The illiquidity of these investments may make it difficult for us to sell such investments if the need arises. In addition, if we are required to liquidate all or a portion of our portfolio quickly, we may realize significantly less than the value at which we have previously recorded our investments.

To the extent that we invest in equity or equity-linked securities of privately-held companies, there can be no assurances that a trading market will develop for the securities that we wish to liquidate, or that the subject companies will permit their shares to be sold through such marketplaces. A lack of initial public offering opportunities for venture capital-backed companies could lead to companies staying longer in our portfolio as private entities that continue to require private funding. This situation may adversely affect the amount of available funding for venture growth stage companies. A lack of initial public offering opportunities for venture capital-backed companies can also cause some venture capital firms to change their strategies, leading some of them to reduce funding of their portfolio companies and making it more difficult for such companies to access capital and to fulfill their potential, which can result in unrealized depreciation and realized losses in such companies by other companies such as ourselves who are co-investors in such companies.

Even if a subject portfolio company completes an initial public offering, we are typically subject to lock-up provisions that prohibit us from selling our investments into the public market for specified periods of time after the initial public offering. As a result, the market price of securities that we hold may decline substantially before we are able to sell these securities following an initial public offering.

### *Publicly traded securities involve significant risks that differ from those associated with non-traded securities.*

Certain of the companies in which we have invested have in the past conducted initial public offerings and become publicly traded, and other current and future portfolio companies may seek to do the same. In the event that a portfolio company completes an initial public offering, we will hold publicly traded securities in such company. Publicly traded securities involve significant risks that differ in type and degree from the risks associated with investments in private companies. These risks include greater volatility in the valuation of such companies, increased likelihood of shareholder litigation against such companies, and increased costs associated with each of the aforementioned risks. As a result, the market value of the publicly traded securities we hold may fluctuate significantly.

In addition, we are typically subject to lock-up provisions that prevent us from disposing of our investments for specified periods of time after a portfolio company's initial public offering. In the event that we dispose of any such securities, such securities may be sold at a price less than they otherwise would have been absent restrictions on transfer and/or for less than their initial cost.

### *Any unrealized losses we experience on our investment portfolio may be an indication of future realized losses, which could reduce our funds available for distribution and could have a material adverse effect on our ability to service our outstanding borrowings.*

As a BDC, we are required to carry our investments at fair value as determined in good faith by or under the direction of our Board. Decreases in the market values or fair values of our investments are recorded as unrealized losses. Any unrealized losses in our investment portfolio could be an indication of a portfolio company's inability to meet its repayment obligations to us with respect to the affected investments. This could result in realized losses in the future and ultimately in reductions of our funds available for distribution in future periods and could materially and adversely affect our ability to service our outstanding borrowings.

### *Our stockholders do not have any input in our Adviser's investment decisions.*

Our investments are selected by our Adviser, subject to the approval of its Investment Committee. Our stockholders do not have input into our Adviser's investment decisions. As a result, our stockholders are unable to evaluate any of our potential portfolio investments. These factors increase the uncertainty, and thus the risk, of investing in shares of our common stock.

### *Because we generally do not hold controlling equity interests in our portfolio companies, we are not able to exercise control over our portfolio companies or prevent decisions by management that could decrease the value of our investment.*

We generally do not hold controlling equity positions in any of our portfolio companies. As a result, we are subject to the risk that a portfolio company may make business decisions with which we disagree and that the management and/or stockholders of a portfolio company may take risks or otherwise act in ways that have a material adverse effect on our interests. Due to the lack of liquidity of the debt and equity investments that we hold in our portfolio, we may not be able to dispose of our investments in the event we disagree with the actions of a portfolio company and may therefore suffer a decrease in the value of our investment.

### *We may suffer a loss if a portfolio company defaults on a loan, including the entire or partial loss of the accrued PIK interest, the end-of-term payment and/or OID, such as warrant investments and facility fees due to us. To the extent we invest in OID instruments, including PIK loans, zero coupon bonds, and debt securities with attached warrants, you will be exposed to certain risks associated with such investments.*

Our debt-financing products generally offer a flexible payment and covenant structure to our portfolio companies that may not provide the same level of protection to us as more restrictive conditions that traditional lenders typically impose on borrowers. For example, our secured loans generally include an end-of-term payment, PIK interest payment and/or OID, such as warrant investments and facility fees. If a portfolio company fails to satisfy financial or operating covenants imposed by us or other lenders, the company may default on our loan which could potentially lead to termination of its loans and foreclosure on its assets. If a portfolio company defaults under our loan, this could trigger cross-defaults under other agreements and jeopardize such portfolio company's ability to meet its obligations under the loans or equity securities that we hold, including payment to us of the end-of-term payment, PIK interest payment and/or OID, such as warrant investments and facility fees. We may incur expenses to the extent necessary to seek recovery upon default or to negotiate new terms, which may include the waiver of certain financial covenants, with a defaulting portfolio company.

43

To the extent that we invest in OID instruments, including PIK loans, zero coupon bonds, and debt securities with attached warrants, investors will be exposed to the risks associated with the inclusion of such non-cash income in taxable and accounting income prior to receipt of cash, including the following risks:

- the interest payments deferred on a PIK loan are subject to the risk that the borrower may default when the deferred payments are due in cash at the maturity of the loan;

- the interest rates on PIK loans are higher to reflect the time-value of money on deferred interest payments and the higher credit risk of borrowers who may need to defer interest payments;

- PIK instruments may have unreliable valuations because the accruals require judgments about ultimate collectability of the deferred payments and the value of the associated collateral;

- an election to defer PIK interest payments by adding them to principal increases our gross assets and, thus, may increase future base management fees to the Adviser and, because interest payments will then be payable on a larger principal amount, the PIK election also increases the Adviser's future income incentive fees at a compounding rate;

- market prices of OID instruments are more volatile because they are affected to a greater extent by interest rate changes than instruments that pay interest periodically in cash;

- the deferral of interest on a PIK loan increases its loan-to-value ratio, which is a measure of the riskiness of a loan;

- OID creates the risk of non-refundable cash payments to the Adviser based on non-cash accruals that may never be realized;

- for U.S. federal income tax purposes, we will be required to make distributions of OID income to shareholders without receiving any cash and such distributions have to be paid from offering proceeds or the sale of assets without investors being given any notice of this fact; and

- the required recognition of OID, including PIK, interest for U.S. federal income tax purposes may have a negative impact on liquidity, because it represents a non-cash component of our taxable income that must, nevertheless, be distributed in cash to investors to avoid it being subject to U.S. federal corporate-level taxation.

***Prepayments of our loans could have a material adverse impact on our results of operations and our ability to make stockholder distributions, increase the risk of violating 1940 Act provisions applicable to BDCs and breaching covenants under our borrowing arrangements, and could result in a decline in the market price of our shares.***

We are subject to the risk that the loans we make to our portfolio companies may be repaid prior to maturity. We expect that our investments will generally allow for prepayment at any time subject to penalties in certain limited circumstances. When this occurs, we generally reinvest these proceeds in temporary investments, pending their future investment in accordance with our investment strategy. These temporary investments typically have substantially lower yields than the loan being prepaid and we could experience significant delays in reinvesting these amounts. Any future investment may also be at lower yields than the loan that was repaid. As a result, our financial condition, results of operations and cash flows could be materially and adversely affected if one or more of our portfolio companies elect to prepay amounts owed to us or if multiple obligors make prepayments in close proximity to each other. Prepayments could also negatively impact our ability to make, or the amount of, stockholder distributions with respect to our common stock, which could result in a decline in the market price of our shares. In addition, any such prepayments could materially increase the risk of failing to meet 1940 Act provisions applicable to BDCs, including the qualifying asset test, and increases the risk of breaching covenants under the Credit Facility and under the agreements governing our outstanding unsecured notes, or otherwise triggering an event of default under the relevant borrowing arrangement. These risks are increased to the extent that prepayment levels during a period increase unexpectedly.

***Our portfolio companies may incur debt that ranks equally with, or senior to, our investments in such companies.***

We invest a portion of our capital in loans that have a secured collateral position. Our portfolio companies may have, or may be permitted to incur, other debt that is secured by and ranks equally with, or senior to, all or a portion of the collateral secured by the loans in which we invest. By their terms, such debt instruments may provide that the holders are entitled to receive payment of interest or principal on or before the dates on which we are entitled to receive payments in respect of the loans in which we invest or are entitled to receive payment from the disposition of certain collateral or all collateral senior to us. Also, in the event of insolvency, liquidation, dissolution, reorganization or bankruptcy of a portfolio company, holders of debt instruments ranking senior to our investment in that portfolio company would typically be entitled to receive payment in full before we receive any distribution in respect of our investment. After repaying senior creditors, a portfolio company may not have any remaining assets to use for repaying its obligation to us. In the case of debt ranking equally with loans in which we invest, we would have to share any distributions on an equal and ratable basis with other creditors holding such debt in the event of an insolvency, liquidation, dissolution, reorganization or bankruptcy of the portfolio company.

44

The senior liens on the collateral secure the portfolio company's obligations under any outstanding senior debt and may secure certain other future debt that may be permitted to be incurred by the portfolio company under the agreements governing the loans. The holders of obligations secured by senior liens on the collateral generally control the liquidation of, and are entitled to receive proceeds from, any realization of the collateral to repay their obligations in full before us. In addition, the value of the collateral in the event of liquidation depends on market and economic conditions, the availability of buyers and other factors. There can be no assurance that the proceeds, if any, from sales of all of the collateral would be sufficient to satisfy the loan obligations secured by the senior liens after payment in full of all obligations secured by other liens on the collateral. If such proceeds were not sufficient to repay amounts outstanding under the loan obligations secured by other liens, then we, to the extent not repaid from the proceeds of the sale of the collateral, will only have an unsecured claim against the portfolio company's remaining assets, if any.

The rights we may have with respect to the collateral securing the loans we make to our portfolio companies with senior debt outstanding may also be limited pursuant to the terms of one or more intercreditor agreements that we enter into with the holders of such senior debt. Under a typical intercreditor agreement, at any time that obligations that have the benefit of the senior liens are outstanding, any of the following actions that may be taken in respect of the collateral will be at the direction of the holders of the obligations secured by the senior liens:

- the ability to cause the commencement of enforcement proceedings against the collateral;
- the ability to control the conduct of such proceedings;
- the approval of amendments to collateral documents;
- releases of liens on the collateral;
- waivers of past defaults under collateral documents; and
- we may not have the ability to control or direct such actions, even if our rights, including our security interest in the collateral, are materially and adversely affected.

***The disposition of our investments may result in contingent liabilities.***

A substantial majority of our investments are loans. In connection with the disposition of an investment in loans, we may be required to make representations about the business and financial affairs of the portfolio company typical of those made in connection with the sale of a business. We may also be required to indemnify the purchasers of such investment to the extent that any such representations turn out to be inaccurate or with respect to potential liabilities. These arrangements may result in contingent liabilities that ultimately result in funding obligations that we must satisfy through our return of distributions previously made to us.

***Our equity related investments are highly speculative, and we may not realize gains from these investments.***

When we make a secured loan, we generally acquire warrant investments in the portfolio company. From time to time we may also acquire equity participation rights in connection with an investment which will allow us, at our option, to participate in current or future rounds of equity financing through direct capital investments in our portfolio companies. In addition, we may be required to accrue OID which decreases the balance on our secured loans by an amount equal to the value of the warrant investments we receive in connection with the applicable secured loan over its lifetime. To the extent we hold these equity related investments, we attempt to dispose of them and realize gains upon our disposition of them. However, the equity related investments we receive and make may not appreciate in value or may decline in value. We also may be unable to realize any value if a portfolio company does not have a liquidity event, such as a sale of the business or public offering, or if the portfolio company defaults under its outstanding indebtedness, which could materially decrease the value of, or prevent us from being able to sell, the underlying equity related investment. As a result, we may not be able to realize gains from our equity related investments and any gains that we do realize on the disposition of any equity related investment may not be sufficient to offset any other losses or OID we experience or accrue.

***Investments in secured loans to companies with foreign operations and/or investments in foreign securities may involve significant risks in addition to the risks inherent in U.S. investments.***

Our investment strategy contemplates making secured loans to companies with foreign operations. As of December 31, 2022, 32.1% of our portfolio at fair value consisted of companies not domiciled in the United States as they did not have their principal place of business in the United States, including investments in European companies. Investing in such companies may expose us to additional risks not typically associated with investing in U.S. companies or U.S. companies with no foreign operations or exposure. These risks include changes in exchange control regulations, intellectual property laws, political and social instability, limitations in our ability to perfect our security interests, expropriation, imposition of foreign taxes, less liquid markets and less available information than is generally the case in the United States, higher transaction costs, less government supervision of exchanges, matters relating to non-U.S. brokers and issuers, less developed bankruptcy laws, difficulty in enforcing contractual obligations, lack of uniform accounting and auditing standards and greater price volatility. In addition, we expect that investing in such companies will expose us to higher administrative, legal and monitoring costs and expenses not typically associated with investing in U.S. companies or U.S. companies with no foreign operations.

45

Although we expect that our investments will be primarily U.S. dollar denominated, any investments denominated in a foreign currency will be subject to the risk that the value of a particular currency will change in relation to one or more other currencies. Among the factors that may affect currency values are trade balances, the level of short-term interest rates, differences in relative values of similar assets in different currencies, long-term opportunities for investment and capital appreciation and political developments. As discussed below, we may employ hedging techniques to minimize these risks, but we cannot assure you that such strategies will be effective or without risk to us.

*We may expose ourselves to risks resulting from our use of hedging transactions.*

As of December 31, 2022, 61.2% of our portfolio (at principal balance) had a floating interest rate indexed to the U.S. Prime rate ("Prime Rate"). The remaining 38.8% of our portfolio had a fixed interest rate. Our Credit Facility bears interest at a floating rate indexed to certain indices, including SOFR and commercial paper rates. We may utilize instruments such as forward contracts, currency options and interest rate swaps, caps, collars and floors to seek to hedge against fluctuations in the relative values of its portfolio positions from changes in currency exchange rates and market interest rates. Use of these hedging instruments may expose us to counter-party credit risk. Hedging against a decline in the values of its portfolio positions does not eliminate the possibility of fluctuations in the values of such positions or prevent losses if the values of such positions decline. However, such hedging can establish other positions designed to gain from those same developments, thereby offsetting the decline in the value of such portfolio positions. Such hedging transactions may also limit the opportunity for gain if the values of the portfolio positions should increase. Moreover, it may not be possible to hedge against an exchange rate or interest rate fluctuation that is generally anticipated at an acceptable price. Engaging in hedging transactions may reduce cash available to pay distributions to our stockholders.

We believe that any hedging transactions that we enter into in the future will not be considered "qualifying assets" under the 1940 Act, which may limit our hedging strategy more than other companies that are not subject to the 1940 Act. Our ability to engage in hedging transactions may also be adversely affected by rules adopted by the U.S. Commodity Futures Trading Commission ("CFTC"), unless our Adviser registers with CFTC as a commodity pool operator or obtains an exemption from such requirement. On February 18, 2020, our Adviser claimed an exclusion from the definition of the term "commodity pool operator" under the Commodity Exchange Act and therefore, is not subject to registration or regulation as a commodity pool operator under such Act. In addition, Rule 18f-4 of the 1940 Act limits a fund's derivatives exposure through a value-at-risk test and requires the adoption and implementation of a derivatives risk management program for certain derivatives users. We intend to operate in a manner that will permit us to be a "limited derivatives user" under Rule 18f-4. Subject to certain conditions, limited derivatives users are not subject to the full requirements of Rule 18f-4.

While we may enter into such transactions to seek to reduce currency exchange rate and interest rate risks, unanticipated changes in currency exchange rates or interest rates could result in poorer overall investment performance than if we had not engaged in any such hedging transactions. In addition, the degree of correlation between price movements of the instruments used in a hedging strategy and price movements in the portfolio positions being hedged could vary. Moreover, for a variety of reasons, we may not seek to establish a perfect correlation between such hedging instruments and the portfolio holdings being hedged. Any such imperfect correlation may prevent us from achieving the intended hedge and expose us to risk of loss.

*Our failure to make protective or follow-on investments in our portfolio companies could impair the value of our portfolio.*

Following an initial investment in a portfolio company, we may make additional investments in that portfolio company as "protective" and/or "follow-on" investments, in order to attempt to preserve or enhance the value of our initial investment. We may elect not to make follow-on investments or otherwise lack sufficient funds to make those investments. We have the discretion to make any follow-on investments, subject to the availability of capital resources. The failure to make follow-on investments may, in some circumstances, jeopardize the continued viability of a portfolio company, result in a diminished current value or impair the ability or likelihood for a full recovery of the value of our initial investment, or may result in a missed opportunity for us to increase our participation in a successful operation. Even if we have sufficient capital to make a desired follow-on investment, we may elect not to make a follow-on investment because we do not want to increase our concentration of risk, we prefer other opportunities, we are subject to BDC requirements that would prevent such follow-on investments or the follow-on investment would affect our qualification as a RIC.

*The effect of global climate change may impact the operations of our portfolio companies.*

Climate change creates physical and financial risk, and some of our portfolio companies may be adversely affected by climate change. Extreme weather conditions in general require more system backup, adding to costs, and can contribute to increased system stresses, including service interruptions. In addition, as a result of the potential governmental response to climate change, some of our portfolio companies may become subject to new or strengthened regulations or legislation that could increase their operating costs and/or decrease their revenues.

*Inflation may adversely affect the business, results of operations and financial condition of our portfolio companies.*

Certain of our portfolio companies are in industries that may be impacted by inflation. If such portfolio companies are unable to pass any increases in their costs of operations along to their customers, it could adversely affect their operating results and impact their ability to pay interest and principal on our loans, particularly if interest rates rise in response to inflation. In addition, any projected future decreases in our portfolio companies' operating results due to inflation could adversely impact the fair value of those investments. Any decreases in the fair value of our investments could result in future realized or unrealized losses and therefore reduce our net assets resulting from operations.

**Risks Relating to our Common Stock and Securities**

*Our common stock may trade below our net asset value per share, which limits our ability to raise additional equity capital.*

If our common stock is trading below our net asset value per share, we are not able to issue additional shares of our common stock at the market price without first obtaining the approval for such issuance from our stockholders and our independent directors. If our common stock trades below our net asset value per share, the higher cost of equity capital may result in it being unattractive to raise new equity, which may limit our ability to grow. The risk of our common stock trading below our net asset value per share is separate and distinct from the risk that our net asset value per share may decline. We cannot predict whether shares of our common stock will trade above, at or below our net asset value per share.

*Our stockholders will experience dilution in their ownership percentage if they opt out of our dividend reinvestment plan and participating stockholders can experience dilution in the value of their shares if we distribute shares through our dividend reinvestment plan at a price below the then-current NAV.*

All dividends declared in cash payable to stockholders that are participants in our dividend reinvestment plan may be reinvested in newly-issued shares of our common stock. As a result, our stockholders that opt out of our dividend reinvestment plan will experience dilution in their ownership percentage of our common stock over time. In addition, we may distribute shares through our dividend reinvestment plan at a price that is below our then-current NAV per share, which would result in dilution of the value of the shares held by stockholders who participate in our dividend reinvestment plan.

*You may receive shares of our common stock through our dividend reinvestment plan, and we may otherwise choose to pay dividends in our common stock, in which case you may be required to pay tax in excess of the cash you receive.*

Our cash distributions to stockholders will be automatically reinvested in additional shares of our common stock unless such stockholder has specifically "opted out" of our dividend reinvestment plan so as to receive cash distributions. In addition, we may in the future distribute taxable dividends that are payable in part in shares of our common stock. In accordance with certain applicable U.S. Treasury regulations and published guidance issued by the IRS, a RIC may treat a distribution of its own common stock as fulfilling the RIC distribution requirements if each stockholder may elect to receive his or her entire distribution in either cash or common stock of the RIC, subject to a limitation that the aggregate amount of cash to be distributed to all stockholders must be at least 20% of the aggregate declared distribution. If too many stockholders elect to receive cash, the cash available for distribution must be allocated among the stockholders electing to receive cash (with the balance of the distribution paid in stock). In no event will any stockholder electing to receive cash, receive less than the lesser of (a) the portion of the distribution such stockholder has elected to receive in cash or (b) an amount equal to his or her entire distribution times the percentage limitation on cash available for distribution. If these and certain other requirements are met, for U.S. federal income tax purposes, the amount of the dividend paid in common stock will be equal to the amount of cash that could have been received instead of common stock. Taxable stockholders receiving such dividends will be required to include the full amount of the dividend as ordinary income (or as long-term capital gain to the extent such distribution is properly reported as a capital gain dividend) to the extent of our current and accumulated earnings and profits for U.S. federal income tax purposes. As a result, a U.S. stockholder may be required to pay tax with respect to such dividends in excess of any cash received. If a U.S. stockholder sells the stock it receives as a dividend in order to pay this tax, the sales proceeds may be less than the amount included in income with respect to the dividend, depending on the market price of our common stock at the time of the sale. Furthermore, with respect to Non-U.S. stockholders, we may be required to withhold U.S. tax with respect to such dividends including in respect of all or a portion of such dividend that is payable in common stock. In addition, if a significant number of our stockholders determine to sell shares of our common stock in order to pay taxes owed on dividends, it may put downward pressure on the trading price of our common stock.

*Investing in our common stock may involve an above average degree of risk.*

The investments we make in accordance with our investment strategy may result in a higher amount of risk and higher volatility or loss of principal than alternative investment options. Our investments in venture growth stage companies with secured loans, warrant investments and direct equity investments may be speculative and, therefore, an investment in our common stock may not be suitable for someone with lower risk tolerance.

*The market price of our common stock may fluctuate significantly.*

The market price and liquidity of the market for shares of our common stock may be significantly affected by numerous factors, some of which are beyond our control and may not be directly related to our operating performance. These factors include:

- price and volume fluctuations in the overall stock market from time to time;
- significant volatility in the market price and trading volume of securities of BDCs or other companies in our sector, which is not necessarily related to the operating performance of these companies;
- any inability to deploy or invest our capital;
- fluctuations in interest rates;
- any inability to access the capital markets;

47

- realized and unrealized losses in investments in our portfolio companies;

- the financial performance of the industries in which we invest;

- announcement of strategic developments, acquisitions, and other material events by us or our competitors or operating performance of companies comparable to us;

- changes in regulatory policies or tax guidelines, particularly with respect to RICs or BDCs;

- perception or reputation of TPC;

- loss of our qualification as a RIC or BDC;

- changes in earnings or variations in operating results;

- changes in accounting guidelines governing valuation of our investments;

- any shortfall in revenue or net income or any increase in losses from levels expected by investors or securities analysts;

- departure of, or loss of access to, members of our Adviser's senior investment team;

- operating performance of companies comparable to us; and

- general economic trends and other external factors.

***Our business and operation could be negatively affected if we become subject to any securities litigation or shareholder activism, which could cause us to incur significant expense, hinder execution of investment strategy and impact our stock price.***

In the past, following periods of volatility in the market price of a company's securities, securities class action litigation has often been brought against that company. Shareholder activism, which could take many forms or arise in a variety of situations, has increased in the BDC space in recent years. While we are currently not subject to any securities litigation or shareholder activism, due to the potential volatility of our stock price and for a variety of other reasons, we may in the future become the target of securities litigation or shareholder activism. Securities litigation and shareholder activism, including potential proxy contests, could result in substantial costs and divert management's and our board of directors' attention and resources from our business. Additionally, such securities litigation and shareholder activism could give rise to perceived uncertainties as to our future, adversely affect our relationships with service providers and make it more difficult to attract and retain qualified personnel. Also, we may be required to incur significant legal fees and other expenses related to any securities litigation and activist shareholder matters. Further, our stock price could be subject to significant fluctuation or otherwise be adversely affected by the events, risks and uncertainties of any securities litigation and shareholder activism.

***Sales of substantial amounts of our common stock in the public market may have an adverse effect on the market price of our common stock.***

Sales of substantial amounts of our common stock, or the availability of such common stock for sale, could have an adverse effect on the prevailing market prices for our common stock. If this occurs and continues, it could impair our ability to raise additional capital through the sale of securities should we desire to do so.

***Terms relating to redemption may have a material adverse effect on the return on any debt securities that we may issue.***

If debt securities are redeemable at our option, such as the 2025 Notes, the 2026 Notes and the 2027 Notes, we may choose to redeem debt securities at times when prevailing interest rates are lower than the interest rate paid on debt securities. In addition, if debt securities are subject to mandatory redemption, we may be required to redeem debt securities also at times when prevailing interest rates are lower than the interest rate paid on debt securities. In this circumstance, an investor may not be able to reinvest the redemption proceeds in a comparable security at an effective interest rate as high as the debt securities being redeemed.

Subject to the terms of the governing agreements, we may redeem the 2025 Notes, the 2026 Notes and/or the 2027 Notes in whole or in part at any time or from time to time at our option at par plus accrued interest to the prepayment date and, if applicable, a make-whole premium. In addition, we are obligated to offer to prepay the 2025 Notes, the 2026 Notes and the 2027 Notes at par plus accrued and unpaid interest up to, but excluding, the date of prepayment, if certain change in control events occur.

***We may not be able to prepay the 2025 Notes, the 2026 Notes or the 2027 Notes upon a change in control.***

The agreements governing the 2025 Notes, the 2026 and the 2027 Notes require us to offer to prepay all of the issued and outstanding notes upon the occurrence of certain change in control events, which could have a material adverse effect on our business, financial condition and results of operations. Upon a change in control event, holders of the 2025 Notes, the 2026 Notes, the 2027 Notes and any additional notes issued under the terms of the Note Purchase Agreement may require us to prepay for cash some or all of the notes at a prepayment price equal to 100% of the aggregate principal amount of the notes being prepaid, plus accrued and unpaid interest to, but not including, the date of prepayment. If a change in control were to occur, we may not have sufficient funds to prepay any such accelerated indebtedness.

48

***The 2025 Notes, the 2026 Notes and the 2027 Notes are unsecured and therefore are effectively subordinated to any secured indebtedness we have currently incurred or may incur in the future.***

The 2025 Notes, the 2026 Notes and the 2027 Notes are not secured by any of our assets or any of the assets of our subsidiaries and rank equally in right of payment with all of our existing and future unsubordinated, unsecured indebtedness. As a result, the 2025 Notes, the 2026 Notes and the 2027 Notes are effectively subordinated to any secured indebtedness we or our subsidiaries have currently incurred and may incur in the future (or any indebtedness that is initially unsecured to which we subsequently grant security) to the extent of the value of the assets securing such indebtedness. In any liquidation, dissolution, bankruptcy or other similar proceeding, the holders of any of our existing or future secured indebtedness and the secured indebtedness of our subsidiaries may assert rights against the assets pledged to secure that indebtedness in order to receive full payment of their indebtedness before the assets may be used to pay other creditors, including the holders of the 2025 Notes, the 2026 Notes and the 2027 Notes.

***The 2025 Notes, the 2026 Notes and the 2027 Notes are structurally subordinated to the indebtedness and other liabilities of our subsidiaries.***

The 2025 Notes, the 2026 Notes and the 2027 Notes are obligations exclusively of TriplePoint Venture Growth BDC Corp. and not of any of our subsidiaries. None of our current subsidiaries is a guarantor of the 2025 Notes, the 2026 Notes or the 2027 Notes, and the 2025 Notes, the 2026 Notes and the 2027 Notes are generally not required to be guaranteed by any subsidiaries we may acquire or create in the future. Except to the extent we are a creditor with recognized claims against our subsidiaries, all claims of other creditors of our subsidiaries, including claims under the Credit Facility, have priority over our equity interests in such subsidiaries (and therefore over the claims of our creditors, including holders of the 2025 Notes, the 2026 Notes and the 2027 Notes) with respect to the assets of such subsidiaries. Even if we are recognized as a creditor of one or more of our subsidiaries, our claims would still be effectively subordinated to any security interests in the assets of any such subsidiary and to any indebtedness or other liabilities of any such subsidiary senior to our claims, including under the Credit Facility. Consequently, the 2025 Notes, the 2026 Notes and the 2027 Notes, as well as any additional notes issued under the terms of the Note Purchase Agreement, are or will be structurally subordinated to all indebtedness and other liabilities of any of our subsidiaries and any subsidiaries that we may in the future acquire or establish. In addition, our subsidiaries may incur substantial additional indebtedness in the future, including under the Credit Facility or otherwise, all of which would be structurally senior to the 2025 Notes, the 2026 Notes and the 2027 Notes.

***A downgrade, suspension or withdrawal of the credit rating, if any, assigned by a rating agency to us or any of our outstanding unsecured notes, including the 2025 Notes, the 2026 Notes and the 2027 Notes, or change in the debt markets could cause the liquidity or market value of our securities to decline significantly.***

Our credit ratings are an assessment by rating agencies of our ability to pay our debts when due. Consequently, real or anticipated changes in our credit ratings will generally affect the value and trading prices, if any, of our outstanding unsecured notes, including the 2025, the 2026 Notes and the 2027 Notes. These credit ratings may not reflect the potential impact of risks relating to the structure or marketing of the notes. Credit ratings are not a recommendation to buy, sell or hold any security, and may be revised or withdrawn at any time by the issuing organization in its sole discretion. We undertake no obligation to maintain our credit ratings or to advise any holders of our unsecured notes of any changes in our credit ratings, except as may be required under the terms of any applicable indenture or other governing document, including the Note Purchase Agreement. There can be no assurance that our credit ratings will remain for any given period of time or that such credit ratings will not be lowered or withdrawn entirely by the rating agency if in their judgment future circumstances relating to the basis of the credit ratings, such as adverse changes in our business or operations, so warrant. Any downgrades to us or our securities could increase our cost of capital or otherwise have a negative effect on our results of operations and financial condition. In this regard, the fixed rate of the 2025 Notes, the 2026 Notes, the 2027 Notes and any additional notes that may be issued under the Note Purchase Agreement is subject to a 1.00% increase in the event that a Below Investment Grade Event (as defined in the Note Purchase Agreement, including as modified by the First Supplement and Second Supplement) occurs. The conditions of the financial markets and prevailing interest rates have fluctuated in the past and are likely to fluctuate in the future, which could have an adverse effect on the market prices and value of our unsecured notes.

**General Risk Factors**

***Global capital markets could enter a period of severe disruption and instability or an economic recession. These conditions have historically affected and could again materially and adversely affect debt and equity capital markets in the United States and around the world and could impair our portfolio companies and harm our operating results.***

The U.S. and global capital markets have, from time to time, experienced periods of disruption characterized by the freezing of available credit, a lack of liquidity in the debt capital markets, significant losses in the principal value of investments, the re-pricing of credit risk in the broadly syndicated credit market, the failure of major financial institutions and general volatility in the financial markets. During these periods of disruption, general economic conditions deteriorated with material adverse consequences for the broader financial and credit markets, and the availability of debt and equity capital for the market as a whole, and financial services firms in particular, was reduced significantly. These conditions may reoccur for a prolonged period of time or materially worsen in the future.

The current global financial market situation, global supply-chain disruptions and various social and political tensions in the United States and around the world (including Russia's invasion of Ukraine, other wars forms of conflict, terrorist acts, security operations and catastrophic events such as fires, floods, earthquakes, tornadoes, hurricanes and global health epidemics) may contribute to increased market volatility, may have long-term effects on the United States and worldwide financial markets and may cause economic uncertainties or deterioration in the U.S. and worldwide. The impact of downgrades by rating agencies to the U.S. government's sovereign credit rating or its perceived creditworthiness as well as potential government shutdowns and uncertainty surrounding transfers of power could adversely affect the U.S. and global financial markets and economic conditions. Increases to budget deficits or direct and contingent sovereign debt may create concerns about the ability of certain nations to service their sovereign debt obligations, and risks resulting from any current or future debt crisis in Europe, the United States or elsewhere could have a detrimental impact on the global economy and the financial condition of financial institutions generally.

Since 2010, several European Union countries have faced budget issues, some of which may have negative long-term effects for the economies of those countries and other European Union countries. There is concern about national-level support for the Euro and the accompanying coordination of fiscal and wage policy among European Economic and Monetary Union member countries. In addition, the fiscal policy of foreign nations, such as Russia and China, may have a severe impact on the worldwide and U.S. financial markets.

In addition, while recent government stimulus measures worldwide have reduced volatility in the financial markets, volatility may return as such measures are phased out, and the long-term impacts of such stimulus on fiscal policy and inflation remain unknown. We cannot predict the effects of these or similar events in the future on the U.S. and global economies and securities markets or on our investments. We monitor developments in economic, political and market conditions and seek to manage our investments in a manner consistent with achieving our investment objective, but there can be no assurance that we will be successful in doing so.

Market conditions may in the future make it difficult to extend the maturity of or refinance our existing indebtedness, including the Credit Facility, the 2025 Notes, the 2026 Note and the 2027 Notes, and any failure to do so could have a material adverse effect on our business. If we are unable to raise or refinance debt, then our equity investors may not benefit from the potential for increased returns on equity resulting from leverage and we may be limited in our ability to make new commitments or to fund existing commitments to our portfolio companies. In addition, the illiquidity of our investments may make it difficult for us to sell such investments if required. As a result, we may realize significantly less than the value at which we have recorded our investments.

***Events outside of our control, including relating to public health crises, supply-chain disruptions, geopolitical conflicts, including acts of war, and inflation, could negatively affect our portfolio companies' and our results of operations and financial condition, as well as the amount or frequency of our distributions to stockholders.***

Periods of market volatility have occurred and could continue to occur in response to pandemics or other events outside of our control. These types of events may adversely affect operating results for us and for our portfolio companies. For example, the COVID-19 pandemic has led to, and for an unknown period of time will continue to lead to, disruptions in local, regional, national and global markets and economies affected thereby, including the United States. With respect to U.S. and global credit markets and the economy in general, this outbreak has resulted in, and until fully resolved is likely to continue to result in, the following (among other things): (i) restrictions on travel and the temporary closure of many corporate offices, retail stores, and manufacturing facilities and factories, resulting in significant disruption to the business of many companies, including supply chains and demand, as well as layoffs of employees; (ii) increased draws by borrowers on lines of credit; (iii) increased requests by borrowers for amendments or waivers of their credit agreements to avoid default, increased defaults by borrowers and/or increased difficulty in obtaining refinancing; (iv) volatility in credit markets, including greater volatility in pricing and spreads; and (v) evolving proposals and actions by state and federal governments to address the problems being experienced by markets, businesses and the economy in general, which may not adequately address the problems being facing such persons. While many countries, including the United States, have relaxed or eliminated the early public health restrictions adopted in response to the COVID-19 pandemic, the outbreak of new, worsening strains of COVID-19 may result in a resurgence in the number of reported cases and hospitalizations. Such increases in cases could lead to the reintroduction of restrictions and business shutdowns in certain states, counties and cities in the United States and globally. In addition to these developments having adverse consequences for us and our portfolio companies, the operations of the Advisor have been, and could continue to be, adversely impacted, including through quarantine measures and travel restrictions imposed on its personnel or service providers based or temporarily located in affected countries, or any related health issues of such personnel or service providers.

As the future impact of COVID-19 and its variants is difficult to predict, the extent to which they could negatively affect our and our portfolio companies' operating results or the duration of any potential business or supply-chain disruption is uncertain. Any potential impact to our results of operations will depend to a large extent on future developments and new information that could emerge regarding the duration and severity of the COVID-19 pandemic and the actions taken by authorities and other entities to contain the spread of COVID-19 and its variants or treat its impact, all of which are beyond our control. These potential impacts, while uncertain, could adversely affect our and our portfolio companies' operating results and financial condition.

The COVID-19 pandemic and the uncertainty regarding the extent and duration of its impact has had a material adverse impact on the venture capital fundraising environment, including with respect to the venture capital-backed companies in which we invest. Our portfolio companies generally require additional equity financing every twelve to twenty-four months. Due to the potential effects of the COVID-19 pandemic, there is an increased risk that one or more of our venture capital-backed companies will not be able to raise additional financing or may be able to do so only at a price or on terms unfavorable to us, which risk may be amplified with respect to portfolio companies that have already taken steps to reduce or modify business operations or are operating in industries that are, or are perceived to be, more adversely affected by the COVID-19 pandemic. Such events would likely have a negative impact our investment returns, the fair value of our investment and our ability to restructure such investment on favorable terms if such portfolio company's cash flow from operating activities is insufficient to satisfy its continuing growth, working capital and other requirements. In addition, as a result of the financial stress caused by any effects of the COVID-19 pandemic, other investors in our portfolio companies may be unable to, or may choose not to, fulfill their ongoing funding obligations with respect to certain of our portfolio companies, may be unable to continue supporting the ongoing operations of our portfolio companies operationally and/or financially, or may seek to restructure or otherwise modify their existing investments in our portfolio companies in a manner that is detrimental to our investment, which could have a material adverse impact on our financing arrangement with the portfolio company and on our results of operations and financial condition. In addition, we intend to use cash and cash equivalents on hand, our available borrowing capacity under the Credit Facility or other future financing arrangement, our anticipated cash flows from operations, including from contractual monthly portfolio company payments and cash flows and prepayments, and any proceeds from drawdowns in connection with the private offering of our common stock or any debt offerings, to fund our outstanding unfunded obligations. Depending on the severity and duration of any future impact of the COVID-19 pandemic on our results of operations and financial condition, there can be no assurance that we will have sufficient capital available to fund these commitments as they come due, which could harm the reputation of the Company and TPC among its select group of venture capital investors and in the venture capital market generally. Any such occurrence could decrease our deal flow and the outlook of our investments, resulting in a material adverse effect on our financial condition, results of operations and cash flows.

This pandemic has also caused, and may continue to cause, disruption to our portfolio companies' global supply chain and business operations. In particular, shortages in commodities and materials, including shortages and reductions in allocations of electronic and other components from key suppliers, labor shortages and elevated levels of employee absenteeism, freight delays and other supply chain constraints and disruptions have significantly delayed or disrupted, and may continue to adversely impact, both our portfolio companies' suppliers' and third party vendors' and our portfolio companies' ability to manufacture and deliver products and/or services to their end-users and customers. Our portfolio companies have also experienced a significant increase in commodity, parts and material component inflation from pre-pandemic levels, as well as inflation in other costs, such as labor, packaging, freight, and energy prices. Continued supply chain disruptions and delays, as well as continued heightened inflation, could lead to continued periodic production interruptions and other inefficiencies that could negatively impact our portfolio companies' productivity, margin performance and results of operations, which could result in a material adverse effect on our financial condition, results of operations and cash flows.

Developments related to the COVID-19 pandemic may contribute to a decrease in the fair value of certain of our portfolio investments. In addition, the COVID-19 pandemic and the related disruption and financial distress experienced by our portfolio companies may have a material adverse effect on our investment income received from portfolio investments, particularly our interest income. Any decreases in our net investment income would increase the portion of our cash flows dedicated to servicing any then-existing borrowings, including under the Credit Facility, the 2025 Notes, the 2026 Notes, the 2027 Notes, and distribution payments to stockholders.

Depending on the extent of continuing impact of the COVID-19 pandemic on our portfolio companies' operations and our net investment income, any future distributions to our stockholders may be for amounts less than expected, may be made less frequently than expected, and may be made in part cash and part stock (as per each stockholder's election), subject to a limitation that the aggregate amount of cash to be distributed to all stockholders must be at least 20% of the aggregate declared distribution.

In addition, particularly because our investment strategy contemplates making secured loans to companies with foreign operations, including in Europe, the warfare, political turmoil or terrorist attacks relating to the conflict between Russia and Ukraine, and any escalation thereof, could materially and adversely impact our and our portfolio companies' financial condition, result of operations and cash flows and may magnify the impact of other risks described in this Annual Report on Form 10-K. Although the severity and duration of the ongoing military action are highly unpredictable, the conflict in Ukraine has already resulted in significant volatility in certain equity, debt and currency markets, material increases in certain commodity prices, and economic uncertainty. The U.S. government and other governments have imposed severe sanctions against Russia and Russian interests and threatened additional sanctions and controls. Sanctions and export control laws and regulations are complex, frequently changing, and increasing in number, and they may impose additional legal compliance costs or create business risks associated with our operations and the operations of our portfolio companies.

51

*A lack of IPO or merger and acquisition opportunities may cause companies to stay in our portfolio longer, leading to lower returns, unrealized depreciation, or realized losses.*

A lack of IPO or merger and acquisition, or M&A, opportunities for private companies, including venture capital-backed companies could lead to companies staying longer in our portfolio as private entities still requiring funding. This situation may adversely affect the amount of available funding for early-stage companies in particular as, in general, venture-capital and other sponsor firms are being forced to provide additional financing to late-stage companies that cannot complete an IPO or M&A transaction. In the best case, such stagnation would dampen returns, and in the worst case, could lead to unrealized depreciation and realized losses as some companies run short of cash and have to accept lower valuations in private fundings or are not able to access additional capital at all. A lack of IPO or M&A opportunities for private companies can also cause some venture capital and other sponsor firms to change their strategies, leading some of them to reduce funding of their portfolio companies and making it more difficult for such companies to access capital and to fulfill their potential, which can result in unrealized depreciation and realized losses in such companies by other companies, such as ourselves, who are co-investors in such companies.

*We are currently operating in a period of capital markets disruption and economic uncertainty.*

The U.S. capital markets are currently experiencing extreme volatility and disruption following the global outbreak of COVID-19 and other global events discussed above. Disruptions in the capital markets in the past have increased the spread between the yields realized on risk-free and higher risk securities, resulting in illiquidity in parts of the capital markets. These and future market disruptions and/or illiquidity would be expected to have an adverse effect on our business, financial condition, results of operations and cash flows. Unfavorable economic conditions also would be expected to increase our funding costs, limit our access to the capital markets or result in a decision by lenders, including existing lenders, not to extend credit to us or renew or expand existing credit facilities. These events have limited and could continue to limit our investment originations, limit our ability to grow and have a material negative impact on our operating results and the fair values of our debt and equity investments.

*We may experience fluctuations in our quarterly operating results.*

We could experience fluctuations in our quarterly operating results due to a number of factors, including our originations and underwriting processes, the interest rate payable on the secured loans we acquire, any prepayments or repayments made on our secured loans, the timing and amount of any warrant or equity investment returns, the timing of any drawdowns requested by our borrowers, the level of our expenses, variations in and the timing of the recognition of realized and unrealized gains or losses, the degree to which we encounter competition in our markets and general economic conditions. In light of these factors, results for any period should not be relied upon as being indicative of performance in future periods.

*Changes in laws or regulations governing our operations may adversely affect our business or cause us to alter our business strategy.*

We and our portfolio companies are subject to regulation by laws and regulations at the local, state, federal and, in some cases, foreign levels. These laws and regulations, as well as their interpretation, may be changed from time to time, and new laws and regulations may be enacted. Accordingly, any change in these laws or regulations, changes in their interpretation, or newly enacted laws or regulations could require changes to certain business practices of us or our portfolio companies, negatively impact the operations, cash flows or financial condition of us or our portfolio companies, impose additional costs on us or our portfolio companies or otherwise adversely affect our business or the business of our portfolio companies.

Additionally, changes to the laws and regulations governing our operations related to permitted investments may cause us to alter our investment strategy in order to avail ourselves of new or different opportunities. Such changes could result in material differences to the strategies and plans set forth herein and may shift our investment focus to other types of investments in which our Adviser's senior investment team may have little or no expertise or experience. Any such changes, if they occur, could have a material adverse effect on our financial condition, results of operations and cash flows.

*Worldwide economic conditions, economic recessions or downturns, as well as political and economic conditions, could impair our venture growth stage companies and harm our operating results.*

The business and operating results of our venture growth stage companies may be impacted by worldwide economic conditions. Any conflict or uncertainty, including due to regulatory changes, natural disasters, public health concerns, political unrest or safety concerns, could harm their financial condition and results of operations and cash flows. In addition, if the government of any country in which products are developed, manufactured or sold sets technical or regulatory standards for products developed or manufactured in or imported into their country that are not widely shared, it may lead some of their customers to suspend imports of their products into that country, require manufacturers or developers in that country to manufacture or develop products with different technical or regulatory standards and disrupt cross-border manufacturing, marketing or business relationships which, in each case, could harm the business of our venture growth stage company investments.

Many of the venture growth stage companies in which we make investments are susceptible to economic slowdowns or recessions and may be unable to repay our secured loans during such periods. Adverse economic conditions may decrease the value of collateral securing some of our secured loans. Economic slowdowns or recessions could lead to financial losses in our portfolio and a decrease in revenues, net income and assets. Unfavorable economic conditions also could increase our funding costs, limit our access to the capital markets or result in a decision by lenders not to extend credit to us. These events could prevent us from increasing our investments and materially and adversely impact our financial condition, result of operations and cash flows.

***Changes to U.S. tariff and import/export regulations may have a negative effect on our portfolio companies and, in turn, harm us.***

There have been significant changes, and continues to be ongoing discussion and commentary regarding potential significant changes to U.S. trade policies, treaties and tariffs, creating significant uncertainty about the future relationship between the United States and other countries with respect to trade policies, treaties and tariffs. These developments, or the perception that any of them could occur, may have a material adverse effect on global economic conditions and the stability of global financial markets, and may significantly reduce global trade and, in particular, trade between the impacted nations and the United States. Any of these factors could depress economic activity and restrict our portfolio companies' access to suppliers or customers and have a material adverse effect on their business, financial condition and results of operations, which in turn would negatively impact us.

***Inflation has adversely affected and may continue to adversely affect the business, results of operations and financial condition of our portfolio companies.***

Certain of our portfolio companies are in industries that have been impacted by inflation. Recent inflationary pressures have increased the costs of labor, energy and raw materials and have adversely affected consumer spending, economic growth and our portfolio companies' operations. If such portfolio companies are unable to pass any increases in their costs of operations along to their customers, it could adversely affect their operating results and impact their ability to pay interest and principal on our loans, particularly if interest rates rise in response to inflation. In addition, any projected future decreases in our portfolio companies' operating results due to inflation could adversely impact the fair value of those investments. Any decreases in the fair value of our investments could result in future realized or unrealized losses and therefore reduce our net assets resulting from operations. Additionally, the Federal Reserve has raised, and has indicated its intent to continue raising, certain benchmark interest rates in an effort to combat inflation.

**Item 1B.   Unresolved Staff Comments**

None.

**Item 2.   Properties**

We do not own any real estate or other physical properties materially important to our operations. Our executive offices are located at 2755 Sand Hill Road, Suite 150, Menlo Park, California 94025. These offices are provided by our Administrator pursuant to the Administration Agreement. We believe that our facilities are suitable and adequate for our business.

**Item 3.   Legal Proceedings**

Neither we, the Adviser, nor our subsidiaries are currently subject to any material pending legal proceedings, other than ordinary routine litigation incidental to our businesses. We, the Adviser, and our subsidiaries may from time to time, however, be involved in litigation arising out of our operations in the normal course of business or otherwise. Furthermore, third parties may seek to impose liability on us in connection with the activities of our portfolio companies. While the outcome of any current legal proceedings cannot at this time be predicted with certainty, we do not expect any current matters will materially affect our financial condition or results of operations; however, there can be no assurance whether any pending legal proceedings will have a material adverse effect on our financial condition or results of operations in any future reporting period.

**Item 4.   Mine Safety Disclosures**

Not applicable.

**COMPARISON OF CUMULATIVE TOTAL RETURNS**
For the Period from March 5, 2014 (TPVG's IPO) to December 31, 2022



Our IPO was priced at $15.00 per share and the chart is based on what our stock price was at the end of the first trading day, which was $15.65 per share.

**Sales of Unregistered Securities**

During the year ended December 31, 2022, we issued a total of 175,389 shares of common stock under our dividend reinvestment plan. These issuances were not subject to the registration requirements under the Securities Act of 1933, as amended (the "Securities Act"). The cash paid for shares of common stock issued under our dividend reinvestment plan during the year ended December 31, 2022 was $2.0 million.

**Issuer Purchases of Equity Securities**

We did not repurchase any of our equity securities during the fiscal year ended December 31, 2022.

**Item 6.   [ *Reserved* ]**

**Item 7.    Management's Discussion and Analysis of Financial Condition and Results of Operations**

**Forward-Looking Statements**

The information contained in this section should be read in conjunction with our consolidated financial statements and related notes and schedules thereto appearing elsewhere in this Annual Report on Form 10-K. Except as otherwise specified, references to "the Company", "we", "us", and "our" refer to TriplePoint Venture Growth BDC Corp. and its subsidiaries.

This Annual Report on Form 10-K contains forward-looking statements that involve substantial risks and uncertainties. These forward-looking statements are not historical facts, but rather are based on current expectations, estimates and projections about us, our current and prospective portfolio investments, our industry, our beliefs, and our assumptions. Words such as "anticipates," "expects," "intends," "plans," "will," "may," "continue," "believes," "seeks," "estimates," "would," "could," "should," "targets," "projects," and variations of these words and similar expressions are intended to identify forward-looking statements. The forward-looking statements contained in this Annual Report on Form 10-K include statements as to:

- our and our portfolio companies' future operating results and financial condition, including our and our portfolio companies' ability to achieve our respective objectives;

- our business prospects and the prospects of our portfolio companies;

- our relationships with third parties, including but not limited to lenders and venture capital investors, including other investors in our portfolio companies;

- the impact and timing of our unfunded commitments;

- the expected market for venture capital investments;

- the performance of our existing portfolio and other investments we may make in the future;

- the impact of investments that we expect to make;

- actual and potential conflicts of interest with TPC, the Adviser and its senior investment team and Investment Committee;

- our contractual arrangements and relationships with third parties;

- the dependence of our future success on the U.S. and global economies, including with respect to the industries in which we invest;

- our expected financings and investments;

- the ability of the Adviser to locate suitable investments for us and to monitor and administer our investments;

- the ability of our Adviser to attract, retain and have access to highly talented professionals, including our Adviser's senior management team;

- our ability to maintain our qualification as a RIC and as a BDC;

- the adequacy of our available liquidity, cash resources and working capital and compliance with covenants under our borrowing arrangements; and

- the timing of cash flows, if any, from the operations of our portfolio companies.

These statements are not guarantees of future performance and are subject to risks, uncertainties, and other factors, some of which are beyond our control and difficult to predict and could cause actual results to differ materially from those expressed or forecasted in the forward-looking statements, including without limitation:

- changes in laws and regulations, changes in political, economic or industry conditions, and changes in the interest rate environment or other conditions affecting the financial and capital markets;

- the potential widespread re-emergence of COVID-19 or its variants, or a similar health pandemic, and the length and duration thereof in the United States as well as worldwide, and the magnitude of its impact and time required for economic recovery;

- the potential for an economic downturn and the time period required for robust economic recovery therefrom;

- a contraction of available credit, an inability or unwillingness of our lenders to fund their commitments to us and/or an inability to access capital markets or additional sources of liquidity, which could have a material adverse effect on our results of operations and financial condition and impair our lending and investment activities;

- interest rate volatility could adversely affect our results, particularly given that we use leverage as part of our investment strategy;

- currency fluctuations could adversely affect the results of our investments in foreign companies, particularly to the extent that we receive payments denominated in foreign currency rather than U.S. dollars;

57

- risks associated with possible disruption in our or our portfolio companies' operations due to wars and other forms of conflict, terrorist acts, security operations and catastrophic events such as fires, floods, earthquakes, tornadoes, hurricanes and global health epidemics; and

- the risks, uncertainties and other factors we identify in "Risk Factors" in this Annual Report on Form 10-K under Part I, Item 1A, and in our other filings with the SEC that we make from time to time.

Although we believe that the assumptions on which these forward-looking statements are based are reasonable, any of those assumptions could prove to be inaccurate, and as a result, the forward-looking statements based on those assumptions also could be inaccurate. Important assumptions include, without limitation, our ability to originate new loans and investments, borrowing costs and levels of profitability and the availability of additional capital. In light of these and other uncertainties, the inclusion of a projection or forward-looking statement in this Annual Report on Form 10-K should not be regarded as a representation by us that our plans and objectives will be achieved. You should not place undue reliance on these forward-looking statements, which apply only as of the date of this Annual Report on Form 10-K.

## Overview

We are an externally managed, closed-end management investment company that has elected to be regulated as a BDC under the 1940 Act. We have elected to be treated, and intend to qualify annually, as a RIC under Subchapter M of the Code for U.S. federal income tax purposes. Our shares are currently listed on the New York Stock Exchange (the "NYSE") under the symbol "TPVG".

We were formed to expand the venture growth stage business segment of TPC's investment platform. TPC is widely recognized as a leading global financing provider devoted to serving venture capital-backed companies with creative, flexible and customized debt financing, equity capital and complementary services throughout their lifespan. TPC is located on Sand Hill Road in Silicon Valley and has a primary focus in technology and other high growth industries.

Our investment objective is to maximize our total return to stockholders primarily in the form of current income and, to a lesser extent, capital appreciation by lending primarily with warrants to venture growth stage companies focused in technology and other high growth industries backed by TPC's select group of leading venture capital investors.

## COVID-19 Developments

The COVID-19 pandemic, and the related effect on the U.S. and global economies, including the recent economic downturn and the uncertainty associated with the timing and likelihood of robust economic recovery, has had adverse consequences for the business operations of some of our portfolio companies and has adversely affected, and threatens to continue to adversely affect, our operations and the operations of the Adviser.

Any significant increase in aggregate unrealized depreciation of our investment portfolio or significant reductions in our net asset value as a result of the effects of the COVID-19 pandemic or otherwise increases the risk of failing to meet the 1940 Act asset coverage requirements and breaching covenants under the Credit Facility, under the governing agreements for the 2025 Notes, the 2026 Notes and the 2027 Notes, or otherwise triggering an event of default under our borrowing arrangements. Any such breach of covenant or event of default, if we are not able to obtain a waiver from the required lenders or debt holders, would have a material adverse effect on our business, liquidity, financial condition, results of operations and ability to pay distributions to our stockholders. See "Risk Factors" in this Annual Report on Form 10-K under Part I, Item 1A for more information. As of December 31, 2022, we were in compliance with the asset coverage requirements under the 1940 Act and with our covenants under the Credit Facility and under the governing agreements for the 2025 Notes, the 2026 Notes and the 2027 Notes.

We will continue to monitor the evolving situation relating to the COVID-19 pandemic and related guidance from U.S. and international authorities, including federal, state and local public health authorities. Given the dynamic nature of this situation and the fact that there may be developments outside of our control that require us or our portfolio companies to adjust plans of operation, we cannot reasonably estimate the full impact of COVID-19 or its variants on our financial condition, results of operations or cash flows in the future. However, it could have a material adverse impact for a prolonged period of time on our future net investment income, the fair value of our portfolio investments, and the respective results of operations and financial condition of us and our portfolio companies. See "Risk Factors" in this Annual Report on Form 10-K under Part I, Item 1A, and in our other filings with the SEC that we make from time to time, for more information.

**Portfolio Composition, Investment Activity and Asset Quality**

*Portfolio Composition*

We originate and invest primarily in venture growth stage companies. Companies at the venture growth stage have distinct characteristics differentiating them from venture capital-backed companies at other stages in their development lifecycle. We invest primarily in (i) growth capital loans that have a secured collateral position and that are generally used by venture growth stage companies to finance their continued expansion and growth, (ii) equipment financings, which may be structured as loans or leases, that have a secured collateral position on specified mission-critical equipment, (iii) on a select basis, revolving loans that have a secured collateral position and that are typically used by venture growth stage companies to advance against inventory, components, accounts receivable, contractual or future billings, bookings, revenues, sales or cash payments and collections including proceeds from a sale, financing or the equivalent and (iv) direct equity investments in venture growth stage companies. In connection with our growth capital loans, equipment financings and revolving loans, we generally receive warrant investments as part of the transaction that allow us to participate in any equity appreciation of our borrowers and enhance our overall investment returns.

As of December 31, 2022, we had 327 investments in 121 companies. Our investments included 144 debt investments, 124 warrant investments, and 59 direct equity and related investments. As of December 31, 2022, the aggregate cost and fair value of these investments were $959.4 million and $949.3 million, respectively. As of December 31, 2022, 11 of our portfolio companies were publicly traded. As of December 31, 2022, the 144 debt investments had an aggregate fair value of $853.0 million and a weighted average loan to enterprise value ratio at the time of underwriting of 7.8%. Enterprise value of a portfolio company is estimated based on information available, including any information regarding the most recent rounds of equity funding, at the time of origination.

As of December 31, 2021, we had 246 investments in 91 companies. Our investments included 107 debt investments, 92 warrant investments, and 47 direct equity and related investments. As of December 31, 2021, the aggregate cost and fair value of these investments were $837.8 million and $865.3 million, respectively. As of December 31, 2021, 10 of our portfolio companies were publicly traded. As of December 31, 2021, the 107 debt investments had an aggregate fair value of $757.2 million and a weighted average loan to enterprise value ratio at the time of underwriting of 7.7%. Enterprise value of a portfolio company is estimated based on information available, including any information regarding the most recent rounds of equity funding, at the time of origination.

The following tables show information on the cost and fair value of our investments in companies along with the number of companies in our portfolio as of December 31, 2022 and 2021:

| Investments by Type (dollars in thousands) | December 31, 2022 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Cost | Fair Value | Net Unrealized Gains (losses) | Number of Investments | Number of Companies |
| Debt investments | $    888,586 | $    852,951 | $    (35,635) | 144 | 57 |
| Warrant investments | 29,427 | 48,414 | 18,987 | 124 | 107 |
| Equity investments | 41,394 | 47,911 | 6,517 | 59 | 48 |
| Total Investments in Portfolio Companies | $    959,407 | $    949,276 | $    (10,131) | 327 | 121 [1] |

[1]    Represents non-duplicative number of companies.

| Investments by Type (dollars in thousands) | December 31, 2021 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Cost | Fair Value | Net Unrealized Gains (losses) | Number of Investments | Number of Companies |
| Debt investments | $    774,652 | $    757,222 | $    (17,430) | 107 | 49 |
| Warrant investments | 25,597 | 51,756 | 26,159 | 92 | 81 |
| Equity investments | 37,600 | 56,362 | 18,762 | 47 | 40 |
| Total Investments in Portfolio Companies | $    837,849 | $    865,340 | $    27,491 | 246 | 91 [1] |

[1]    Represents non-duplicative number of companies.

The following tables show the fair value of the portfolio of investments, by industry and the percentage of the total investment portfolio, as of December 31, 2022 and 2021:

| Investments in Portfolio Companies by Industry (dollars in thousands) | December 31, 2022 | |
| --- | --- | --- |
| | At Fair Value | Percentage of Total Investments |
| Consumer Products and Services | $ 166,626 | 17.6 % |
| E-Commerce - Clothing and Accessories | 131,855 | 13.9 |
| Business Applications Software | 95,772 | 10.1 |
| Financial Institution and Services | 70,083 | 7.4 |
| Real Estate Services | 63,961 | 6.7 |
| Business/Productivity Software | 56,070 | 5.9 |
| Business Products and Services | 49,447 | 5.2 |
| Travel & Leisure | 32,362 | 3.4 |
| Security Services | 31,657 | 3.3 |
| Entertainment | 28,657 | 3.0 |
| Shopping Facilitators | 28,406 | 3.0 |
| Other Financial Services | 24,029 | 2.5 |
| Healthcare Technology Systems | 23,347 | 2.5 |
| Application Software | 22,802 | 2.4 |
| Multimedia and Design Software | 20,174 | 2.1 |
| Healthcare Services | 20,074 | 2.1 |
| Food & Drug | 18,053 | 1.9 |
| Consumer Finance | 17,750 | 1.9 |
| Database Software | 13,702 | 1.4 |
| E-Commerce - Personal Goods | 13,161 | 1.4 |
| Consumer Non-Durables | 11,935 | 1.3 |
| Consumer Retail | 2,169 | 0.2 |
| General Media and Content | 2,162 | 0.2 |
| Network Systems Management Software | 1,925 | 0.2 |
| Commercial Services | 1,310 | 0.1 |
| Financial Software | 997 | 0.1 |
| Aerospace and Defense | 192 | * |
| Business to Business Marketplace | 178 | * |
| Social/Platform Software | 151 | * |
| Educational/Training Software | 140 | * |
| Computer Hardware | 116 | * |
| Advertising / Marketing | 13 | * |
| Transportation | — | * |
| Building Materials/Construction Machinery | — | * |
| Medical Software and Information Services | — | * |
| Total portfolio company investments | $ 949,276 | 100.0 % |

_____

\*    Amount represents less than 0.05% of the total portfolio investments at fair value.

60

| | December 31, 2021 | |
|---|---|---|
| **Investments in Portfolio Companies by Industry**<br>**(dollars in thousands)** | **At Fair Value** | **Percentage of Total Investments** |
| Business Applications Software | $ 114,109 | 13.2 % |
| E-Commerce - Clothing and Accessories | 111,941 | 12.9 |
| Consumer Products and Services | 78,826 | 9.1 |
| Financial Institution and Services | 71,673 | 8.3 |
| Household & Office Goods | 42,470 | 4.9 |
| Other Financial Services | 40,474 | 4.7 |
| Real Estate Services | 38,651 | 4.5 |
| Security Services | 38,282 | 4.4 |
| Healthcare Technology Systems | 37,418 | 4.3 |
| Network Systems Management Software | 37,283 | 4.3 |
| Travel & Leisure | 31,686 | 3.7 |
| Entertainment | 30,881 | 3.6 |
| Consumer Non-Durables | 30,531 | 3.5 |
| Shopping Facilitators | 27,642 | 3.2 |
| Business Products and Services | 22,940 | 2.7 |
| Business/Productivity Software | 17,393 | 2.0 |
| Consumer Finance | 17,345 | 2.0 |
| Food & Drug | 17,316 | 2.0 |
| Multimedia and Design Software | 15,619 | 1.8 |
| E-Commerce - Personal Goods | 15,091 | 1.7 |
| Database Software | 12,876 | 1.5 |
| Computer Hardware | 7,944 | 0.9 |
| Consumer Retail | 2,680 | 0.3 |
| Communications Software | 2,000 | 0.2 |
| General Media and Content | 1,092 | 0.1 |
| Educational/Training Software | 252 | * |
| Commercial Services | 238 | * |
| Conferencing Equipment / Services | 205 | * |
| Social/Platform Software | 151 | * |
| Business to Business Marketplace | 144 | * |
| Transportation | 111 | * |
| Healthcare Services | 61 | * |
| Advertising / Marketing | 13 | * |
| Building Materials/Construction Machinery | 2 | * |
| Medical Software and Information Services | — | * |
| Total portfolio company investments | $ 865,340 | 100.0 % |

---

\*      Amount represents less than 0.05% of the total portfolio investments at fair value.

The following table shows the financing product type of our debt investments as of December 31, 2022 and 2021:

| | December 31, 2022 | | December 31, 2021 | |
|---|---|---|---|---|
| **Debt Investments By Financing Product**<br>**(dollars in thousands)** | **Fair Value** | **Percentage of Total Debt Investments** | **Fair Value** | **Percentage of Total Debt Investments** |
| Growth capital loans | $ 822,438 | 96.4 % | $ 752,268 | 99.4 % |
| Revolver loans | 29,888 | 3.5 | 4,029 | 0.5 |
| Convertible notes | 625 | 0.1 | 925 | 0.1 |
| Total debt investments | $ 852,951 | 100.0 % | $ 757,222 | 100.0 % |

Growth capital loans in which the borrower held a term loan facility, with or without an accompanying revolving loan, in priority to our senior lien represent 21.4% and 26.2% of our debt investments at fair value as of December 31, 2022 and 2021, respectively.

*Investment Activity*

During the year ended December 31, 2022, we entered into debt commitments with 34 new portfolio companies and 14 existing portfolio companies totaling $593.7 million, funded debt investments to 40 portfolio companies for $416.6 million in principal value, acquired warrant investments representing $5.9 million of value, and made equity investments of $6.1 million. Debt investments funded during the year ended December 31, 2022 carried a weighted average annualized portfolio yield of 14.2% at origination.

During the year ended December 31, 2021, we entered into debt commitments with 27 new portfolio companies and seven existing portfolio companies totaling $541.5 million, funded debt investments to 39 portfolio companies for $411.0 million in principal value, acquired warrant investments representing $8.5 million of value, and made equity investments of $5.2 million. Debt investments funded during the year ended December 31, 2021 carried a weighted average annualized portfolio yield of 13.5% at origination.

During the year ended December 31, 2022, we received $200.1 million of principal prepayments, $40.6 million of early repayments (including refinancings) and $22.9 million of scheduled principal amortization.

During the year ended December 31, 2021, we received $160.9 million of principal prepayments and $61.9 million of scheduled principal amortization.

The following table shows the total portfolio investment activity for the years ended December 31, 2022 and 2021:

| (in thousands) | For the Year Ended December 31, | |
| --- | --- | --- |
| | 2022 | 2021 |
| Beginning portfolio at fair value | $ 865,340 | $ 633,779 |
| New debt investments, net [1] | 407,587 | 401,095 |
| Scheduled principal amortization | (22,910) | (61,892) |
| Principal prepayments and early repayments | (240,727) | (160,939) |
| Net amortization and accretion of premiums and discounts and end-of-term payments | 13,903 | 8,050 |
| Payment-in-kind coupon | 6,320 | 7,977 |
| New warrant investments | 5,942 | 8,534 |
| New equity investments | 7,471 | 7,737 |
| Proceeds from dispositions of investments | (12,542) | (15,511) |
| Net realized gains (losses) on investments | (43,483) | (19,626) |
| Net change in unrealized gains (losses) on investments | (37,625) | 56,136 |
| Ending portfolio at fair value | $ 949,276 | $ 865,340 |

_____

(1)    Debt balance is net of fees and discounts applied to the loan at origination.

Our level of investment activity can vary substantially from period to period as our Adviser chooses to slow or accelerate new business originations depending on market conditions, rate of investment of TPC's select group of leading venture capital investors, our Adviser's knowledge, expertise and experience, our funding capacity (including availability under the Credit Facility and our ability or inability to raise equity or debt capital), the amount of our outstanding unfunded commitments and other market dynamics.

The following table shows the debt commitments, fundings of debt investments (principal balance) and equity investments, and non-binding term sheet activity for the years ended December 31, 2022 and 2021:

| Commitments and Fundings (in thousands) | For the Year Ended December 31, | |
| --- | --- | --- |
| | 2022 | 2021 |
| **Debt Commitments** | | |
| New portfolio companies | $ 455,173 | $ 442,145 |
| Existing portfolio companies | 138,524 | 99,366 |
| Total [1] | $ 593,697 | $ 541,511 |
| | | |
| **Funded Debt Investments** | $ 416,562 | $ 411,007 |
| | | |
| **Equity Investments** | $ 6,050 | $ 5,151 |
| | | |
| **Non-Binding Term Sheets** | $ 1,950,218 | $ 1,471,406 |

_____

(1)    Includes backlog of potential future commitments.

We may enter into commitments with certain portfolio companies that permit an increase in the commitment amount in the future in the event that conditions to such increases are met ("backlog of potential future commitments"). If such conditions to increase are met, these amounts may become unfunded commitments if not drawn prior to expiration. As of December 31, 2022 and 2021, we did not have any backlog of potential future commitments.

*Asset Quality*

Consistent with TPC's existing policies, our Adviser maintains a credit watch list which places borrowers into five risk categories based on our Adviser's senior investment team's judgment, where 1 is the highest rating and all new loans are generally assigned a rating of 2.

| Category | Category Definition | Action Item |
|---|---|---|
| Clear (1) | Performing above expectations and/or strong financial or enterprise profile, value or coverage. | Review quarterly. |
| White (2) | Performing at expectations and/or reasonably close to it. Reasonable financial or enterprise profile, value or coverage. Generally, all new loans are initially graded White (2). | Contact portfolio company periodically; in no event less than quarterly. |
| Yellow (3) | Performing generally below expectations and/or some proactive concern due to industry, business, financial and/or related factors. Adequate financial or enterprise profile, value or coverage. | Contact portfolio company monthly or more frequently as determined by our Adviser's Investment Committee; contact venture capital investors. |
| Orange (4) | Needs close attention due to performance materially below expectations, weak financial and/or enterprise profile, concern regarding additional capital or exit equivalent. | Contact portfolio company weekly or more frequently as determined by our Adviser's Investment Committee; contact venture capital investors regularly; our Adviser forms a workout group to minimize risk of loss. |
| Red (5) | Serious concern/trouble due to pending or actual default or equivalent. May experience partial and/or full loss. | Maximize value from assets. |

The following table shows the credit rankings for the portfolio companies that had outstanding debt obligations to us as of December 31, 2022 and 2021:

| | December 31, 2022 | | | December 31, 2021 | | |
|---|---|---|---|---|---|---|
| Credit Category (dollars in thousands) | Fair Value | Percentage of Total Debt Investments | Number of Portfolio Companies | Fair Value | Percentage of Total Debt Investments | Number of Portfolio Companies |
| Clear (1) | $ 55,921 | 6.6 % | 3 | $ 166,091 | 21.9 % | 8 |
| White (2) | 699,008 | 81.9 | 48 | 538,167 | 71.1 | 38 |
| Yellow (3) | 88,912 | 10.4 | 5 | 41,628 | 5.5 | 2 |
| Orange (4) | 9,110 | 1.1 | 1 | 11,336 | 1.5 | 1 |
| Red (5) | — | — | — | — | — | — |
| | $ 852,951 | 100.0 % | 57 | $ 757,222 | 100.0 % | 49 |

As of December 31, 2022 and 2021, the weighted average investment ranking of our debt investment portfolio was 2.06 and 1.87, respectively. During the three months ended December 31, 2022, portfolio company credit category changes, excluding fundings and repayments, consisted of the following: two portfolio companies with an aggregate principal balance of $43.9 million were downgraded from White (2) to Yellow (3). During the three months ended December 31, 2021, portfolio company credit category changes, excluding fundings and repayments, consisted of the following: five portfolio companies with an aggregate principal balance of $122.5 million were upgraded from White (2) to Clear (1); and two portfolio companies with an aggregate principal balance of $41.7 million were downgraded from White (2) to Yellow (3).

As of December 31, 2022, we had an investment in one portfolio company which was on non-accrual status, with an aggregate cost and fair value of $29.5 million and $9.1 million, respectively. As of December 31, 2021, we had an investment in one portfolio company which was on non-accrual status, with an aggregate cost and fair value of $29.5 million and $11.3 million, respectively.

**Results of Operations**

Set forth below is a comparison of the results of operations for the years ended December 31, 2022 and 2021. The comparison of the fiscal years ended December 31, 2021 and 2020 can be found within "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations" included in Part II of our annual report on Form 10-K for the fiscal year ended December 31, 2021, which is incorporated herein by reference.

*Comparison of operating results for the years ended December 31, 2022 and 2021*

An important measure of our financial performance is net increase (decrease) in net assets resulting from operations, which includes net investment income (loss), net realized gains (losses) and net unrealized gains (losses). Net investment income (loss) is the difference between our income from interest, dividends, fees and other investment income and our operating expenses including interest on borrowed funds. Net realized gains (losses) on investments is the difference between the proceeds received from dispositions of portfolio investments and their amortized cost. Net unrealized gains (losses) on investments is the net change in the fair value of our investment portfolio.

63

For the year ended December 31, 2022, our net decrease in net assets resulting from operations was $20.1 million, which was comprised of $63.6 million of net investment income and $83.6 million of net realized and unrealized losses. For the year ended December 31, 2021, our net increase in net assets resulting from operations was $76.6 million, which was comprised of $41.1 million of net investment income and $35.5 million of net realized and unrealized gains. On a per share basis for the year ended December 31, 2022, net investment income was $1.94 per share and the net decrease in net assets from operations was $0.61 per share, as compared to net investment income of $1.33 per share and a net increase in net assets from operations of $2.47 per share for the year ended December 31, 2021.

*Investment Income*

For the year ended December 31, 2022, total investment and other income was $119.4 million as compared to $87.4 million for the year ended December 31, 2021. The increase in total investment and other income for the year ended December 31, 2022, compared to the 2021 period, is primarily due to a greater weighted average principal amount outstanding on our income-bearing debt investment portfolio, higher investment yields and increased prepayment activity.

For the year ended December 31, 2022, we recognized $2.9 million in other income consisting of $0.2 million due to the termination or expiration of unfunded commitments and $2.7 million from the realization of certain fees paid and accrued from portfolio companies and other income related to prepayment activity. For the year ended December 31, 2021, we recognized $4.6 million in other income consisting of $1.0 million due to the termination or expiration of unfunded commitments and $3.6 million from the realization of certain fees paid and accrued from portfolio companies and other income related to prepayment activity.

*Operating Expenses*

Total operating expenses consist of our base management fee, income incentive fee, capital gains incentive fee, interest expense and amortization of fees, administration agreement expenses, and general and administrative expenses. We anticipate operating expenses will increase over time as our portfolio continues to grow. However, we anticipate operating expenses, as a percentage of totals assets and net assets, will generally decrease over time as our portfolio and capital base expand. We expect base management and income incentive fees will increase as we grow our asset base and our earnings. The capital gains incentive fee will depend on realized gains and losses and unrealized losses. Interest expenses will generally increase as we borrow greater amounts under the Credit Facility, issue additional debt securities, and as interest rates increase. We generally expect expenses under the administration agreement and general and administrative expenses to increase over time to meet the additional requirements associated with servicing a larger portfolio.

For the year ended December 31, 2022, total operating expenses were $55.9 million as compared to $46.3 million for the year ended December 31, 2021.

Base management fees for the years ended December 31, 2022 and 2021 totaled $15.8 million and $12.5 million, respectively. Base management fees increased during the year ended December 31, 2022, as compared to the year ended December 31, 2021, due to an increase in the average size of our portfolio during the applicable periods used in the calculation.

Income incentive fees totaled $6.7 million and $10.3 million for the years ended December 31, 2022 and 2021, respectively. For the year ended December 31, 2022, our income incentive fee was reduced by $7.4 million due to the total return requirement under the income component of our incentive fee structure, which resulted in a corresponding increase of $7.4 million in net investment income.

There was no capital gains incentive fee expense for the years ended December 31, 2022 and 2021.

Interest expense and amortization of fees totaled $26.8 million and $17.4 million for the years ended December 31, 2022 and 2021, respectively. The increase during the year ended December 31, 2022, as compared to the year ended December 31, 2021, is primarily due to the issuance of the 2027 Notes, a greater weighted-average outstanding principal balance under the Credit Facility and, to a lesser extent, an increase in interest rates.

Administration agreement and general and administrative expenses totaled $6.7 million and $6.1 million for the years ended December 31, 2022 and 2021, respectively. The increase for the year ended December 31, 2022, as compared to the year ended December 31, 2021, was primarily due to higher administration expenses under the Administration Agreement as well as increased third-party expenses.

*Net Realized Gains and Losses and Net Unrealized Gains and Losses*

Realized gains and losses are included in "net realized gains (losses) on investments" in the consolidated statements of operations.

During the year ended December 31, 2022, we recognized net realized losses on investments of $46.0 million, primarily resulting from the disposition of investments in Medly Health Inc. and Pencil and Pixel, Inc.

During the year ended December 31, 2021, we recognized net realized losses on investments of $20.0 million, consisting primarily of $15.6 million of realized losses from the sale of our investment in Knotel, Inc., which was rated Red (5) on our credit watch list, and its removal from our investment portfolio, a $2.1 million realized loss from the write-off of an equity investment, $2.2 million of realized losses from the termination of warrants, and $0.1 million of other net realized losses.

Unrealized gains and losses are included in "net change in unrealized gains (losses) on investments" in the consolidated statements of operations.

As of December 31, 2022, approximately 61.2%, or $545.1 million in principal balance, of the debt investments in our portfolio bore interest at floating rates, which generally are Prime-based, and all of which have interest rate floors of 3.25% or higher. Substantially all of our unfunded commitments float with changes in the Prime Rate from the date we enter into the commitment to the date of the actual draw. In addition, our interest expense will be affected by changes in the interest rate in connection with our Credit Facility to the extent it goes above the interest rate floor; however, our 2025 Notes, 2026 Notes and 2027 Notes bear interest at a fixed rate (subject to a 1.00% increase in the fixed rate in the event that a Below Investment Grade Event (as defined in the Note Purchase Agreement (as modified by the First Supplement with respect to the 2026 Notes and the Second Supplement with respect to the 2027 Notes)) occurs).

As of December 31, 2022, our floating rate borrowings totaled $175.0 million, which represented 30.7% of our outstanding debt. As of December 31, 2022, all of our floating rate debt investments were subject to interest-rate floors set at 3.25% or higher. Because the Prime Rate as of December 31, 2022 was 7.50%, which is at or above the interest-rate floors applicable to our floating rate debt investments, decreases in interest rates will impact our interest income to a limited extent until Prime Rate reaches 3.25%, while increases in interest rates will increase our interest income to the extent that such rates exceed the applicable interest-rate floor. In addition, with respect to interest expense on our floating rate borrowings under the Credit Facility, we will benefit from any decreases in interest rates up to the point that the SOFR rate decreases to 0.50%, which is the SOFR interest-rate floor under our Credit Facility as of December 31, 2022. However, because current interest rates exceed the SOFR interest-rate floor under our Credit Facility as of December 31, 2022, our interest expense on floating rate borrowings will increase as rates rise. The following table illustrates the annual impact on our net investment income of base rate changes in interest rates (considering interest rate floors for variable rate instruments) assuming no changes in our investment and borrowing structure from the December 31, 2022 consolidated statements of assets and liabilities:

| Change in Interest Rates (in thousands) | Increase (decrease) in interest income | (Increase) decrease in interest expense | Net increase (decrease) in net investment income |
|---|---|---|---|
| Up 300 basis points | $ 16,353 | $ (5,250) | $ 11,103 |
| Up 200 basis points | $ 10,902 | $ (3,500) | $ 7,402 |
| Up 100 basis points | $ 5,451 | $ (1,750) | $ 3,701 |
| Up 50 basis points | $ 2,726 | $ (875) | $ 1,851 |
| Down 50 basis points | $ (2,611) | $ 875 | $ (1,736) |
| Down 100 basis points | $ (5,214) | $ 1,750 | $ (3,464) |
| Down 200 basis points | $ (10,271) | $ 3,500 | $ (6,771) |
| Down 300 basis points | $ (15,011) | $ 5,250 | $ (9,761) |

This analysis is indicative of the potential impact on our investment income as of December 31, 2022, assuming an immediate and sustained change in interest rates as noted. It should be noted that we anticipate growth in our portfolio funded in part with additional borrowings and such additional borrowings, all else being equal, will increase our investment income sensitivity to interest rates to the extent such borrowings have floating interest rates, and such changes could be material. In addition, this analysis does not adjust for potential changes in our portfolio or our borrowing facilities after December 31, 2022 nor does it take into account any changes in the credit performance of our loans that might occur should interest rates change.

Because it is our intention to hold loans to maturity, the fluctuating relative value of these loans that may occur due to changes in interest rates may have an impact on unrealized gains and losses during quarterly reporting periods. Based on our assessment of the interest rate risk, as of December 31, 2022, we had no hedging transactions in place as we deemed the risk acceptable, and we did not believe it was necessary to mitigate this risk at that time.

*Foreign Currency Exchange Rate Risk*

We may also have exposure to foreign currencies related to certain investments. Such investments are translated into U.S. dollars based on the spot rate at the relevant balance sheet date, exposing us to movements in the exchange rate. Based on our assessment of the foreign currency exchange rate risk, as of December 31, 2022, we had no hedging transactions in place as we deemed the risk acceptable, and we did not believe it was necessary to mitigate this risk at that time.

While hedging activities may mitigate our exposure to adverse fluctuations in interest rates or foreign currency exchange rates, certain hedging transactions that we may enter into in the future, such as interest rate swap agreements or foreign currency forward contracts, may also limit our ability to participate in the benefits of higher interest rates or beneficial movements in foreign currency exchange rates with respect to our portfolio investments. In addition, there can be no assurance that we will be able to effectively hedge our interest rate risk or foreign currency exchange rate risk.

Substantially all of our assets and liabilities are financial in nature. As a result, changes in interest rates, foreign currency exchange rates and other factors drive our performance more directly than does inflation. Changes in interest rates and foreign currency exchange rates do not necessarily correlate with inflation rates or changes in inflation rates.

**Item 8.    Consolidated Financial Statements and Supplementary Data**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

| | |
|---|---:|
| Report of Independent Registered Public Accounting Firm (PCAOB ID No. 34 ) | 77 |
| Consolidated Statements of Assets and Liabilities as of December 31, 2022 and December 31, 2021 | 79 |
| Consolidated Statements of Operations for the Years Ended December 31, 2022, December 31, 2021 and December 31, 2020 | 80 |
| Consolidated Statements of Changes in Net Assets for the Years Ended December 31, 2022, December 31, 2021 and December 31, 2020 | 81 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2022, December 31, 2021 and December 31, 2020 | 82 |
| Consolidated Schedules of Investments as of December 31, 2022 and December 31, 2021 | 83 |
| Notes to Consolidated Financial Statements | 112 |

76

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Shareholders of
TriplePoint Venture Growth BDC Corp.

**Opinion on the Financial Statements and Financial Highlights**

We have audited the accompanying consolidated statements of assets and liabilities of TriplePoint Venture Growth BDC Corp. and subsidiaries (the "Company"), including the consolidated schedules of investments, as of December 31, 2022 and 2021, the related consolidated statements of operations, changes in net assets, and cash flows for each of the three years in the period ended December 31, 2022, the consolidated financial highlights for each of the five years in the period ended December 31, 2022, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2022 and 2021, and the results of its operations, changes in net assets, and cash flows for each of the three years in the period ended December 31, 2022, and the financial highlights for each of the five years in the period ended December 31, 2022, in conformity with accounting principles generally accepted in the United States of America.

**Basis for Opinion**

These financial statements and financial highlights are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements and financial highlights based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements and financial highlights, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements and financial highlights. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements and financial highlights. Our procedures included confirmation of investments owned as of December 31, 2022 and 2021, by correspondence with the custodian, loan agents, and borrowers; when replies were not received, we performed other auditing procedures. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matter**

The critical audit matter communicated below is a matter arising from the current-period audit of the financial statements that was communicated or required to be communicated to the audit committee and that (1) relates to an account or disclosure that is material to the financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of the critical audit matter does not alter in any way our opinion on the financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosures to which it relates.

**Fair Value — Level 3 Investments Valuation — Refer to Note 2 and Note 4 to the financial statements**

*Critical Audit Matter Description*

The Company held investments classified as Level 3 investments under accounting principles generally accepted in the United States of America. These investments include growth capital loans, revolving loans, and not publicly traded investments in venture growth stage companies. The valuation techniques which are used by management and approved by the valuation committee in estimating the fair value of these investments vary and certain significant inputs used were unobservable. Unobservable inputs are those for which market data are not available and that are developed using the most relevant information about the assumptions market participants would use when pricing an investment. The fair value of the Company's Level 3 investments was $946.0 million as of December 31, 2022.

We identified the valuation of Level 3 investments as a critical audit matter because of the judgments necessary for management and the valuation committee to select valuation techniques and to use significant unobservable inputs to estimate the fair value. This required a high degree of auditor judgement and extensive audit effort, including the need to involve fair value specialists who possess significant valuation experience, to evaluate the appropriateness of the valuation techniques and the significant unobservable inputs, when performing audit procedures to audit management's estimate of fair value of Level 3 investments.

77

*How the Critical Audit Matter Was Addressed in the Audit*

Our audit procedures related to valuation techniques and unobservable inputs used by management to estimate the fair value of Level 3 investments included the following, among others:

- We evaluated the appropriateness of the valuation techniques used by management to estimate fair value and tested the related significant unobservable inputs by comparing these inputs to external sources. For a sample of Level 3 investments, we performed these procedures with the assistance of our fair value specialists.

- In instances where the selection of valuation techniques or significant unobservable inputs involves more subjective judgments and estimates, with the assistance of our fair value specialists, we developed an independent estimate of the fair value and compared our estimates to management's estimates.

- We evaluated management's ability to reasonably estimate fair value by comparing management's historical estimates to subsequent transactions, taking into account changes in market or investment specific conditions, where applicable.

/s/ Deloitte & Touche LLP

San Francisco, California
March 1, 2023

We have served as the Company's auditor since 2013.

**TRIPLEPOINT VENTURE GROWTH BDC CORP. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF ASSETS AND LIABILITIES**
**(in thousands, except per share data)**

| | | December 31, 2022 | | December 31, 2021 |
|---|---|---|---|---|
| **Assets** | | | | |
| Investments at fair value (amortized cost of $ 959,407 and $ 837,849 , respectively) | $ | 949,276 | $ | 865,340 |
| Cash and cash equivalents | | 51,489 | | 51,272 |
| Restricted cash | | 7,771 | | 7,875 |
| Deferred credit facility costs | | 4,128 | | 2,170 |
| Prepaid expenses and other assets | | 1,869 | | 1,013 |
| **Total assets** | $ | 1,014,533 | $ | 927,670 |
| | | | | |
| **Liabilities** | | | | |
| Revolving Credit Facility | $ | 175,000 | $ | 200,000 |
| 2025 Notes, net | | 69,543 | | 69,348 |
| 2026 Notes, net | | 198,598 | | 198,155 |
| 2027 Notes, net | | 123,839 | | — |
| Base management fee payable | | 4,203 | | 3,265 |
| Income incentive fee payable | | — | | 3,227 |
| Other accrued expenses and liabilities | | 23,410 | | 19,184 |
| **Total liabilities** | $ | 594,593 | $ | 493,179 |
| Commitments and Contingencies (Note 7) | | | | |
| | | | | |
| **Net assets** | | | | |
| Preferred stock, par value $ 0.01 per share ( 50,000 shares authorized; no shares issued and outstanding, respectively) | $ | — | $ | — |
| Common stock, par value $ 0.01 per share | | 353 | | 310 |
| Paid-in capital in excess of par value | | 470,572 | | 414,218 |
| Total distributable earnings (loss) | | ( 50,985 ) | | 19,963 |
| **Total net assets** | $ | 419,940 | $ | 434,491 |
| **Total liabilities and net assets** | $ | 1,014,533 | $ | 927,670 |
| | | | | |
| Shares of common stock outstanding (par value $ 0.01 per share and 450,000 authorized) | | 35,348 | | 31,011 |
| Net asset value per share | $ | 11.88 | $ | 14.01 |

*See accompanying notes to consolidated financial statements.*

79

**TRIPLEPOINT VENTURE GROWTH BDC CORP. AND SUBSIDIARIES**
**CONSOLIDATED SCHEDULE OF INVESTMENTS**
**(dollars in thousands)**
**As of December 31, 2022**

| Portfolio Company | Type of Investment | Acquisition Date [12] | Outstanding Principal | Cost [6] | Fair Value | Maturity Date |
|---|---|---|---|---|---|---|
| **Debt Investments** | | | | | | |
| **Application Software** | | | | | | |
| Flo Health UK Limited [1][3] | Growth Capital Loan (Prime + 5.75 % interest rate, 9.00 % floor, 3.00 % EOT payment) [2] | 5/17/2022 | $ 8,333 | $ 8,312 | $ 8,312 | 5/31/2024 |
| | Growth Capital Loan (Prime + 5.75 % interest rate, 9.00 % floor, 3.00 % EOT payment) [2] | 7/21/2022 | 8,750 | 8,689 | 8,689 | 7/31/2024 |
| | Growth Capital Loan (Prime + 5.75 % interest rate, 9.00 % floor, 3.00 % EOT payment) [2] | 9/30/2022 | 5,750 | 5,687 | 5,687 | 9/30/2024 |
| **Total Application Software - 5.40 %*** | | | 22,833 | 22,688 | 22,688 | |
| **Business Applications Software** | | | | | | |
| Arcadia Power, Inc. | Growth Capital Loan ( 8.75 % interest rate, 3.25 % EOT payment) | 12/16/2021 | 7,000 | 7,049 | 6,962 | 12/31/2024 |
| | Growth Capital Loan ( 9.75 % interest rate, 7.00 % EOT payment) | 5/6/2022 | 11,000 | 10,993 | 10,710 | 11/30/2026 |
| | Growth Capital Loan ( 11.00 % interest rate, 7.00 % EOT payment) | 6/29/2022 | 7,000 | 6,878 | 6,737 | 12/31/2026 |
| | | | 25,000 | 24,920 | 24,409 | |
| FlashParking, Inc. | Growth Capital Loan (Prime + 7.00 % interest rate, 10.25 % floor, 7.00 % EOT payment) | 6/15/2021 | 20,000 | 20,148 | 20,148 | 6/30/2024 |
| | Growth Capital Loan (Prime + 5.00 % interest rate, 8.25 % floor, 4.00 % EOT payment) | 9/24/2021 | 338 | 343 | 343 | 9/30/2023 |
| | Growth Capital Loan (Prime + 5.00 % interest rate, 8.25 % floor, 4.00 % EOT payment) | 9/28/2021 | 547 | 554 | 554 | 9/30/2023 |
| | Growth Capital Loan (Prime + 5.00 % interest rate, 8.25 % floor, 4.00 % EOT payment) | 10/27/2021 | 278 | 281 | 281 | 10/31/2023 |
| | Growth Capital Loan (Prime + 5.00 % interest rate, 8.25 % floor, 4.00 % EOT payment) [2] | 1/21/2022 | 347 | 348 | 348 | 1/31/2024 |
| | | | 21,510 | 21,674 | 21,674 | |
| Hi.Q, Inc. | Growth Capital Loan ( 11.75 % interest rate, 2.00 % EOT payment) | 12/17/2018 | 13,250 | 13,416 | 11,921 | 6/30/2024 |
| | Growth Capital Loan (Prime + 8.50 % interest rate, 11.75 % floor, 1.00 % EOT payment) | 12/31/2020 | 6,867 | 6,881 | 6,179 | 8/31/2025 |
| | Growth Capital Loan (Prime + 8.00 % interest rate, 11.50 % floor, 5.00 % EOT payment) [2] | 5/6/2022 | 5,000 | 4,928 | 4,498 | 5/31/2025 |
| | | | 25,117 | 25,225 | 22,598 | |
| Uniphore Technologies Inc. | Growth Capital Loan ( 11.00 % interest rate, 4.00 % EOT payment) [2] | 12/22/2021 | 7,000 | 7,052 | 6,981 | 12/31/2024 |
| | Growth Capital Loan ( 11.00 % interest rate, 4.00 % EOT payment) [2] | 12/22/2021 | 7,000 | 7,052 | 6,981 | 12/31/2024 |
| | | | 14,000 | 14,104 | 13,962 | |
| **Total Business Applications Software - 19.67 %*** | | | 85,627 | 85,923 | 82,643 | |
| **Business Products and Services** | | | | | | |
| Cart.com, Inc. | Growth Capital Loan (Prime + 5.50 % interest rate, 8.75 % floor, 6.00 % EOT payment) | 12/30/2021 | 20,000 | 19,880 | 19,880 | 12/31/2025 |
| | Growth Capital Loan (Prime + 7.25% interest rate, 10.50% floor, 7.75% EOT payment) [2] | 11/8/2022 | 5,000 | 4,919 | 4,919 | 5/31/2026 |
| | | | 25,000 | 24,799 | 24,799 | |
| Quick Commerce Ltd [1][3] | Growth Capital Loan (Prime + 7.50 % interest rate, 10.75 % floor, 7.50 % EOT payment) [2] | 5/4/2022 | 21,000 | 20,734 | 20,734 | 5/31/2025 |
| RenoRun US Inc. [1][3] | Growth Capital Loan (Prime + 10.50 % interest rate, 13.75 % floor, 8.25 % EOT payment) [2] | 12/30/2021 | 2,250 | 2,218 | 2,218 | 12/31/2025 |
| | Convertible Note ( 4.00 % interest rate) [2] | 12/30/2021 | 625 | 625 | 625 | 12/30/2023 |
| | | | 2,875 | 2,843 | 2,843 | |
| **Total Business Products and Services - 11.51 %*** | | | 48,875 | 48,376 | 48,376 | |

**TRIPLEPOINT VENTURE GROWTH BDC CORP. AND SUBSIDIARIES**
**CONSOLIDATED SCHEDULE OF INVESTMENTS**
**(dollars in thousands)**
**As of December 31, 2022**

| Portfolio Company | Type of Investment | Acquisition Date [12] | Outstanding Principal | Cost [6] | Fair Value | Maturity Date |
|---|---|---|---|---|---|---|
| **Business/Productivity Software** | | | | | | |
| Forum Brands, LLC | Growth Capital Loan ( 10.00 % interest rate, 4.00 % EOT payment) | 7/6/2021 | $ 5,796 | $ 5,891 | $ 5,834 | 7/31/2023 |
| | Growth Capital Loan ( 10.00 % interest rate, 4.00 % EOT payment) | 7/21/2021 | 438 | 445 | 441 | 7/31/2023 |
| | Growth Capital Loan ( 10.00 % interest rate, 4.00 % EOT payment) | 8/10/2021 | 525 | 532 | 526 | 8/31/2023 |
| | Growth Capital Loan ( 10.00 % interest rate, 4.00 % EOT payment) [2] | 10/6/2021 | 2,430 | 2,446 | 2,413 | 10/31/2023 |
| | Growth Capital Loan ( 10.00 % interest rate, 4.00 % EOT payment) [2] | 11/2/2021 | 1,578 | 1,584 | 1,560 | 11/30/2023 |
| | Growth Capital Loan ( 10.00 % interest rate, 4.00 % EOT payment) [2] | 11/2/2021 | 4,233 | 4,249 | 4,186 | 11/30/2023 |
| | Growth Capital Loan ( 10.00 % interest rate, 4.00 % EOT payment) [2] | 12/28/2021 | 1,414 | 1,413 | 1,390 | 12/31/2023 |
| | Growth Capital Loan ( 10.00 % interest rate, 4.00 % EOT payment) [2] | 12/28/2021 | 540 | 540 | 531 | 12/31/2023 |
| | Growth Capital Loan ( 10.00 % interest rate, 4.00 % EOT payment) [2] | 12/28/2021 | 95 | 95 | 93 | 12/31/2023 |
| | Growth Capital Loan ( 10.00 % interest rate, 4.00 % EOT payment) [2] | 1/28/2022 | 3,060 | 3,049 | 2,996 | 1/31/2024 |
| | Growth Capital Loan ( 10.00 % interest rate, 4.00 % EOT payment) [2] | 4/14/2022 | 1,166 | 1,152 | 1,128 | 4/30/2024 |
| | Growth Capital Loan ( 10.00 % interest rate, 4.00 % EOT payment) [2] | 4/14/2022 | 439 | 434 | 425 | 4/30/2024 |
| | Growth Capital Loan ( 10.00 % interest rate, 4.00 % EOT payment) [2] | 9/21/2022 | 2,850 | 2,774 | 2,699 | 9/30/2024 |
| | Growth Capital Loan (10.00% interest rate, 4.00% EOT payment) [2] | 11/1/2022 | 5,130 | 4,975 | 4,834 | 10/31/2024 |
| | Growth Capital Loan (10.00% interest rate, 4.00% EOT payment) [2] | 12/22/2022 | 306 | 296 | 287 | 12/31/2024 |
| | | | 30,000 | 29,875 | 29,343 | |
| Metropolis Technologies, Inc. | Growth Capital Loan (Prime + 4.34 % cash interest rate + 4.16 % PIK interest, 11.75 % floor, 7.00 % EOT payment) [2] | 3/30/2022 | 26,046 | 26,014 | 26,014 | 3/31/2027 |
| **Total Business/Productivity Software - 13.17 %*** | | | 56,046 | 55,889 | 55,357 | |
| | | | | | | |
| **Consumer Finance** | | | | | | |
| Activehours, Inc. (d/b/a Earnin) | Revolver (Prime + 4.25% interest rate, 11.75% floor) [2] | 12/30/2022 | 15,000 | 14,837 | 14,679 | 12/30/2025 |
| The Aligned Company (f/k/a Thingy Thing Inc.) | Growth Capital Loan (Prime + 7.00 % interest rate, 10.25 % floor, 6.25 % EOT payment) | 10/27/2021 | 2,000 | 2,026 | 2,026 | 4/30/2025 |
| **Total Consumer Finance - 3.98 %*** | | | 17,000 | 16,863 | 16,705 | |
| | | | | | | |
| **Consumer Non-Durables** | | | | | | |
| Alyk, Inc. | Growth Capital Loan (Prime + 7.25 % interest rate, 10.50 % floor, 7.25 % EOT payment) | 6/16/2021 | 2,500 | 2,554 | 2,541 | 6/30/2025 |
| Don't Run Out, Inc. | Growth Capital Loan (Prime + 7.75 % interest rate, 11.00 % floor, 10.00 % EOT payment) [2] | 12/30/2021 | 1,000 | 1,006 | 1,006 | 6/30/2025 |
| | Growth Capital Loan (Prime + 5.00% interest rate, 10.50% floor, 9.00% EOT payment) [2] | 10/31/2022 | 1,000 | 991 | 991 | 10/31/2025 |
| | | | 2,000 | 1,997 | 1,997 | |
| Underground Enterprises, Inc. | Growth Capital Loan (Prime + 3.00 % interest rate, 6.50 % floor, 1.00 % EOT payment) | 5/18/2022 | 2,250 | 2,244 | 2,233 | 11/30/2024 |
| | Growth Capital Loan (Prime + 3.75 % interest rate, 7.25 % floor, 5.50 % EOT payment) | 6/9/2022 | 1,500 | 1,510 | 1,501 | 3/31/2025 |
| | Growth Capital Loan (Prime + 3.75 % interest rate, 11.00 % floor, 5.50 % EOT payment) | 8/5/2022 | 2,250 | 2,254 | 2,241 | 5/31/2025 |
| | | | 6,000 | 6,008 | 5,975 | |
| **Total Consumer Non-Durables - 2.50 %*** | | | 10,500 | 10,559 | 10,513 | |

84

**TRIPLEPOINT VENTURE GROWTH BDC CORP. AND SUBSIDIARIES**
**CONSOLIDATED SCHEDULE OF INVESTMENTS**
**(dollars in thousands)**
**As of December 31, 2022**

| Portfolio Company | Type of Investment | Acquisition Date [12] | Outstanding Principal | Cost [6] | Fair Value | Maturity Date |
|---|---|---|---|---|---|---|
| **Consumer Products and Services** | | | | | | |
| Baby Generation, Inc. | Growth Capital Loan (Prime + 7.50 % interest rate, 10.75 % floor, 8.00 % EOT payment) [2] | 1/26/2022 | $ 1,875 | $ 1,898 | $ 1,898 | 1/31/2025 |
| | Growth Capital Loan (Prime + 5.25% interest rate, 8.50% floor, 7.50% EOT payment) [2] | 12/19/2022 | 625 | 616 | 616 | 12/31/2024 |
| | | | 2,500 | 2,514 | 2,514 | |
| Flink SE [1][3] | Growth Capital Loan ( 9.75 % interest rate, 6.75 % EOT payment) [2] | 7/5/2022 | 12,500 | 12,233 | 11,940 | 7/31/2025 |
| | Growth Capital Loan (9.75% interest rate, 6.75% EOT payment) [2] | 10/21/2022 | 12,500 | 12,209 | 11,885 | 10/31/2025 |
| | | | 25,000 | 24,442 | 23,825 | |
| Foodology Inc. [1][3] | Growth Capital Loan (Prime + 5.75 % interest rate, 9.00 % floor, 5.50 % EOT payment) [2] | 4/8/2022 | 249 | 248 | 248 | 4/30/2025 |
| | Growth Capital Loan (Prime + 5.75 % interest rate, 9.00 % floor, 5.50 % EOT payment) [2] | 5/16/2022 | 605 | 602 | 602 | 5/31/2025 |
| | Growth Capital Loan (Prime + 6.25 % interest rate, 9.50 % floor, 6.00 % EOT payment) [2] | 5/24/2022 | 4,000 | 3,977 | 3,977 | 5/31/2025 |
| | | | 4,854 | 4,827 | 4,827 | |
| Good Eggs, Inc. | Growth Capital Loan (Prime + 6.00 % interest rate, 9.25 % floor, 7.75 % EOT payment) [2] | 8/12/2021 | 5,438 | 5,531 | 5,501 | 8/31/2025 |
| | Growth Capital Loan (Prime + 5.25 % interest rate, 8.50 % floor, 6.00 % EOT payment) [2] | 5/26/2022 | 7,000 | 6,846 | 6,809 | 5/31/2025 |
| | | | 12,438 | 12,377 | 12,310 | |
| Hydrow, Inc. | Growth Capital Loan (Prime + 7.75 % interest rate, 11.00 % floor, 10.00 % EOT payment) [2] | 2/9/2021 | 3,350 | 3,474 | 3,449 | 12/31/2024 |
| | Growth Capital Loan (Prime + 7.75 % interest rate, 11.00 % floor, 10.00 % EOT payment) [2] | 2/9/2021 | 6,700 | 6,862 | 6,813 | 12/31/2024 |
| | Growth Capital Loan (Prime + 7.00 % interest rate, 10.25 % floor, 10.00 % EOT payment) [2] | 8/10/2021 | 7,475 | 7,653 | 7,593 | 2/28/2025 |
| | Growth Capital Loan (Prime + 7.00 % interest rate, 10.25 % floor, 10.00 %EOT payment) [2] | 8/31/2021 | 7,475 | 7,645 | 7,585 | 2/28/2025 |
| | | | 25,000 | 25,634 | 25,440 | |
| JOKR S.à r.l. [1][3] | Growth Capital Loan (Prime + 7.75 % interest rate, 11.00 % floor, 6.00 % EOT payment) | 11/3/2021 | 3,000 | 2,886 | 2,846 | 11/30/2025 |
| | Growth Capital Loan (Prime + 7.75 % interest rate, 11.00 % floor, 6.00 % EOT payment) [2] | 8/17/2022 | 1,000 | 986 | 986 | 8/31/2026 |
| | Revolver (Prime + 4.75 % interest rate, 8.00 % floor, 2.45 % EOT payment) [2] | 11/2/2021 | 501 | 504 | 501 | 8/9/2023 |
| | | | 4,501 | 4,376 | 4,333 | |
| Lower Holding Company | Growth Capital Loan (Prime + 3.75% interest rate, 11.25% floor, 5.00% EOT payment) [2] | 12/28/2022 | 8,000 | 7,827 | 7,827 | 12/31/2025 |
| Mystery Tackle Box, Inc. (d/b/a Catch Co.) | Growth Capital Loan (Prime + 6.00 % interest rate, 9.25 % floor, 9.25 % EOT payment) [2] | 4/29/2022 | 5,000 | 5,014 | 5,014 | 1/31/2025 |
| Nakdcom One World AB [1][3] | Growth Capital Loan (Prime + 7.25 % interest rate, 10.50 % floor, 7.00 % EOT payment) [2] | 6/6/2022 | 5,365 | 5,208 | 5,141 | 6/30/2026 |
| | Growth Capital Loan (Prime + 7.25 % interest rate, 10.50 % floor, 7.00 % EOT payment) [2] | 8/29/2022 | 3,009 | 2,903 | 3,064 | 8/31/2026 |
| | | | 13,374 | 13,125 | 13,219 | |
| Outdoor Voices, Inc. | Growth Capital Loan (Prime + 5.75 % interest rate, 11.00 % floor, 11.75 % EOT payment) | 2/26/2019 | 4,000 | 4,363 | 4,347 | 2/29/2024 |
| | Growth Capital Loan (Prime + 5.75 % interest rate, 11.00 % floor, 10.55 % EOT payment) | 4/4/2019 | 2,000 | 2,145 | 2,137 | 2/29/2024 |
| | | | 6,000 | 6,508 | 6,484 | |
| Project 1920, Inc. | Growth Capital Loan (Prime + 6.25 % interest rate, 9.50 % floor, 6.50 % EOT payment) [2] | 3/25/2022 | 2,000 | 2,011 | 1,982 | 3/31/2025 |
| | Revolver (Prime + 5.75 % interest rate, 9.00 % floor, 2.00 % EOT payment) [2] | 3/25/2022 | 2,100 | 2,141 | 2,135 | 3/25/2023 |
| | | | 4,100 | 4,152 | 4,117 | |
| Tempo Interactive Inc. | Growth Capital Loan (Prime + 6.75 % interest rate, 10.00 % floor, 5.00 % EOT payment) [2] | 4/27/2022 | 18,750 | 18,826 | 18,826 | 4/30/2025 |

85

**TRIPLEPOINT VENTURE GROWTH BDC CORP. AND SUBSIDIARIES**
**CONSOLIDATED SCHEDULE OF INVESTMENTS**
**(dollars in thousands)**
**As of December 31, 2022**

| Portfolio Company | Type of Investment | Acquisition Date [(12)] | Outstanding Principal | Cost [(6)] | Fair Value | Maturity Date |
|---|---|---|---|---|---|---|
| The Black Tux, Inc. | Growth Capital Loan (Prime + 8.75 % interest rate, 12.00 % floor, 7.00 % EOT payment) | 11/5/2021 | $ 10,000 | $ 10,002 | $ 10,002 | 5/31/2026 |
| Untitled Labs, Inc. | Growth Capital Loan ( 11.50 % interest rate, 5.00 % EOT payment) | 6/23/2022 | 4,167 | 4,108 | 4,038 | 6/30/2026 |
| | Growth Capital Loan (13.00% interest rate, 5.00% EOT payment) | 10/20/2022 | 5,833 | 5,688 | 5,635 | 10/31/2026 |
| | | | 10,000 | 9,796 | 9,673 | |
| VanMoof Global Holding B.V. [(1)(3)] | Growth Capital Loan ( 9.00 % interest rate, 3.50 % EOT payment) [(2)] | 2/1/2021 | 8,654 | 8,642 | 7,452 | 1/31/2025 |
| | Growth Capital Loan ( 9.00 % interest rate, 3.50 % EOT payment) [(2)] | 5/27/2021 | 4,370 | 4,341 | 3,694 | 5/31/2025 |
| | Growth Capital Loan ( 9.00 % interest rate, 3.50 % EOT payment) [(2)] | 1/31/2022 | 2,011 | 1,972 | 1,812 | 1/31/2026 |
| | Revolver (Prime + 4.75% interest rate, 4.75% floor, 6.00% EOT payment) [(2)] | 11/3/2022 | 1,875 | 1,856 | 1,844 | 10/31/2023 |
| | Revolver (Prime + 4.75% interest rate, 4.75% floor, 6.00% EOT payment) [(2)] | 11/3/2022 | 1,875 | 1,856 | 1,844 | 10/31/2023 |
| | | | 18,785 | 18,667 | 16,646 | |
| **Total Consumer Products and Services - 38.09 %*** | | | 163,302 | 163,073 | 160,043 | |
| **Database Software** | | | | | | |
| Sisense, Inc. | Growth Capital Loan (Prime + 6.50 % interest rate, 9.75 % floor, 9.25 % EOT payment) [(2)] | 12/28/2021 | 13,000 | 13,237 | 13,237 | 6/30/2024 |
| **Total Database Software - 3.15 %*** | | | 13,000 | 13,237 | 13,237 | |
| **E-Commerce - Clothing and Accessories** | | | | | | |
| Dia Styling Co. | Growth Capital Loan (Prime + 4.25 % interest rate, 9.75 % floor, 8.25 % EOT payment) | 6/30/2022 | 5,000 | 5,082 | 5,049 | 6/30/2025 |
| FabFitFun, Inc. | Growth Capital Loan (Prime + 7.75 % interest rate, 11.25 % floor, 6.75 % EOT payment) | 9/29/2021 | 24,167 | 24,031 | 24,031 | 3/31/2025 |
| Minted, Inc. | Growth Capital Loan (Prime + 8.00 % interest rate, 11.50 % floor, 6.00 % EOT payment) | 6/15/2022 | 16,500 | 16,606 | 16,606 | 6/30/2027 |
| | Revolver (Prime + 6.50 % interest rate, 10.00 % floor) [(2)] | 6/15/2022 | 3,400 | 3,337 | 3,337 | 6/15/2025 |
| | | | 19,900 | 19,943 | 19,943 | |
| Outfittery GMBH [(1)(3)] | Growth Capital Loan ( 11.00 % PIK interest, 9.00 % EOT payment) [(2)] | 1/8/2021 | 22,036 | 23,823 | 20,946 | 1/1/2024 |
| | Revolver ( 9.00 % PIK interest, 5.00 % EOT payment) [(2)] | 3/5/2020 | 3,763 | 3,835 | 3,538 | 1/1/2024 |
| | Revolver (9.00% PIK interest, 9.00% EOT payment) [(2)] | 12/28/2022 | 2,131 | 2,113 | 2,010 | 1/1/2025 |
| | | | 27,930 | 29,771 | 26,494 | |
| TFG Holding, Inc. | Growth Capital Loan (Prime + 8.75 % interest rate, 12.00 % floor, 7.50 % EOT payment) | 12/4/2020 | 10,500 | 10,814 | 10,773 | 12/31/2023 |
| | Growth Capital Loan (Prime + 8.75 % interest rate, 12.00 % floor, 7.50 % EOT payment) | 12/21/2021 | 7,000 | 6,927 | 6,879 | 12/31/2024 |
| | Growth Capital Loan (Prime + 7.25 % interest rate, 10.50 % floor, 7.00 % EOT payment) [(2)] | 3/31/2022 | 7,000 | 6,912 | 6,868 | 9/30/2025 |
| | | | 24,500 | 24,653 | 24,520 | |
| Trendly, Inc. | Growth Capital Loan (Prime + 7.75 % interest rate, 11.00 % floor, 8.50 % EOT payment) | 5/27/2021 | 19,500 | 19,869 | 19,731 | 11/30/2024 |
| | Growth Capital Loan (Prime + 7.75 % interest rate, 11.00 % floor, 8.50 % EOT payment) [(2)] | 6/7/2022 | 3,000 | 2,951 | 2,921 | 12/31/2025 |
| | Growth Capital Loan (Prime + 7.75 % interest rate, 11.00 % floor, 8.50 % EOT payment) [(2)] | 6/7/2022 | 5,500 | 5,504 | 5,448 | 12/31/2025 |
| | | | 28,000 | 28,324 | 28,100 | |
| **Total E-Commerce - Clothing and Accessories - 30.49 %*** | | | 129,497 | 131,804 | 128,137 | |
| **E-Commerce - Personal Goods** | | | | | | |
| Merama Inc. | Growth Capital Loan ( 10.00 % interest rate, 7.50 % EOT payment) | 5/17/2021 | 4,168 | 4,242 | 4,191 | 6/30/2024 |
| | Growth Capital Loan ( 10.00 % interest rate, 7.50 % EOT payment) | 6/30/2021 | 1,951 | 1,982 | 1,958 | 6/30/2024 |
| | Growth Capital Loan ( 10.00 % interest rate, 7.50 % EOT payment) | 8/4/2021 | 4,163 | 4,209 | 4,154 | 8/31/2024 |
| **Total E-Commerce - Personal Goods - 2.45 %*** | | | 10,282 | 10,433 | 10,303 | |

86

**TRIPLEPOINT VENTURE GROWTH BDC CORP. AND SUBSIDIARIES**
**CONSOLIDATED SCHEDULE OF INVESTMENTS**
**(dollars in thousands)**
**As of December 31, 2022**

| Portfolio Company | Type of Investment | Acquisition Date [12] | Outstanding Principal | Cost [6] | Fair Value | Maturity Date |
|---|---|---|---|---|---|---|
| **Entertainment** | | | | | | |
| Luminary Roli Limited [1][3][7] | Growth Capital Loan [2] | 8/31/2021 | $ 35,492 | $ 29,530 | $ 9,110 | 8/31/2026 |
| Mind Candy Limited [1][3] | Growth Capital Loan ( 12.00 % PIK interest) [2] | 6/25/2014 | 18,244 | 18,243 | 16,672 | 10/31/2022 |
| | Growth Capital Loan ( 9.00 % PIK interest) [2] | 3/17/2020 | 1,289 | 1,289 | 1,234 | 3/31/2023 |
| | Growth Capital Loan ( 9.00 % PIK interest) [2] | 12/21/2020 | 1,203 | 1,203 | 1,151 | 12/31/2023 |
| | | | 20,736 | 20,735 | 19,057 | |
| **Total Entertainment - 6.70 %*** | | | 56,228 | 50,265 | 28,167 | |
| | | | | | | |
| **Financial Institution and Services** | | | | | | |
| Prodigy Investments Limited [1][3] | Growth Capital Loan ( 8.00 % interest rate) [2] | 12/31/2020 | 32,349 | 31,877 | 31,565 | 12/31/2025 |
| **Total Financial Institution and Services - 7.51 %*** | | | 32,349 | 31,877 | 31,565 | |
| | | | | | | |
| **Financial Software** | | | | | | |
| Synapse Financial Technologies, Inc. | Growth Capital Loan (Prime + 5.75 % interest rate, 9.75 % floor, 4.00 % EOT payment) [2] | 7/29/2022 | 1,000 | 980 | 974 | 7/31/2025 |
| **Total Financial Software - 0.23 %*** | | | 1,000 | 980 | 974 | |
| | | | | | | |
| **Food & Drug** | | | | | | |
| Capsule Corporation | Growth Capital Loan (Prime + 7.75 % interest rate, 13.00 % floor, 13.00 % EOT payment) | 12/30/2020 | 15,000 | 15,553 | 15,553 | 12/31/2024 |
| **Total Food & Drug - 3.70 %*** | | | 15,000 | 15,553 | 15,553 | |
| | | | | | | |
| **Healthcare Services** | | | | | | |
| Hey Favor, Inc (f/k/a The Pill Club Holdings, Inc.) | Growth Capital Loan (Prime + 6.75 % interest rate, 10.00 % floor, 5.25 % EOT payment) [2] | 8/5/2022 | 20,000 | 19,934 | 19,934 | 8/31/2024 |
| **Total Healthcare Services - 4.74 %*** | | | 20,000 | 19,934 | 19,934 | |
| | | | | | | |
| **Healthcare Technology Systems** | | | | | | |
| Medly Health Inc. | Growth Capital Loan (Prime + 9.00% interest rate, 16.00% floor, 3.00% EOT payment) [2][13] | 12/14/2022 | 321 | 317 | 317 | 2/11/2023 |
| | Growth Capital Loan (Prime + 9.00% interest rate, 16.00% floor, 3.00% EOT payment) [2][13] | 12/21/2022 | 1,071 | 1,052 | 1,052 | 2/11/2023 |
| | | | 1,392 | 1,369 | 1,369 | |
| Thirty Madison, Inc. | Growth Capital Loan (Prime + 4.75% interest rate, 11.00% floor, 6.00% EOT payment) [2] | 12/30/2022 | 20,000 | 19,628 | 19,628 | 12/31/2025 |
| **Total Healthcare Technology Systems - 5.00 %*** | | | 21,392 | 20,997 | 20,997 | |
| | | | | | | |
| **Multimedia and Design Software** | | | | | | |
| Hover Inc. | Growth Capital Loan (Prime + 4.75 % interest rate, 9.50 % floor, 5.50 % EOT payment) [2] | 9/30/2022 | 20,000 | 19,604 | 19,604 | 3/31/2027 |
| **Total Multimedia and Design Software - 4.67 %*** | | | 20,000 | 19,604 | 19,604 | |
| | | | | | | |
| **Other Financial Services** | | | | | | |
| Jerry Services, Inc. | Growth Capital Loan ( 10.00 % interest rate, 8.25 % EOT payment) [2] | 6/13/2022 | 10,000 | 9,974 | 9,716 | 9/30/2025 |
| Monzo Bank Limited [1][3] | Growth Capital Loan ( 12.00 % interest rate) [2] | 3/8/2021 | 7,035 | 6,871 | 5,702 | 3/8/2031 |
| **Total Other Financial Services - 3.67 %*** | | | 17,035 | 16,845 | 15,418 | |

87

**TRIPLEPOINT VENTURE GROWTH BDC CORP. AND SUBSIDIARIES**
**CONSOLIDATED SCHEDULE OF INVESTMENTS**
**(dollars in thousands)**
**As of December 31, 2022**

| Portfolio Company | Type of Investment | Acquisition Date [12] | Outstanding Principal | Cost [6] | Fair Value | Maturity Date |
|---|---|---|---|---|---|---|
| **Real Estate Services** | | | | | | |
| Demain ES (d/b/a Luko) [1][3] | Growth Capital Loan (Prime + 6.75 % interest rate, 10.00 % floor, 6.00 % EOT payment) [2] | 12/28/2021 | $ 4,535 | $ 4,526 | $ 4,221 | 12/28/2024 |
| | Growth Capital Loan (Prime + 6.75 % interest rate, 10.00 % floor, 6.00 % EOT payment) [2] | 12/28/2021 | 5,669 | 5,657 | 5,277 | 12/28/2024 |
| | Growth Capital Loan (Prime + 7.75 % interest rate, 11.00 % floor, 6.00 % EOT payment) [2] | 8/4/2022 | 7,178 | 7,074 | 7,264 | 7/31/2025 |
| | | | 17,382 | 17,257 | 16,762 | |
| Homeward, Inc. | Growth Capital Loan (Prime + 5.25 % interest rate, 8.50 % floor, 9.75 % EOT payment) [2] | 12/30/2021 | 10,000 | 10,177 | 10,118 | 6/30/2024 |
| | Growth Capital Loan (Prime + 6.25% interest rate, 9.50% floor, 2.25% EOT payment) [2] | 12/30/2022 | 5,000 | 4,924 | 4,897 | 12/31/2024 |
| | | | 15,000 | 15,101 | 15,015 | |
| Mynd Management, Inc. | Growth Capital Loan (Prime + 6.00 % interest rate, 9.50 % floor, 6.00 % EOT payment) [2] | 5/25/2022 | 6,000 | 6,103 | 6,103 | 5/31/2024 |
| | Growth Capital Loan (Prime + 6.00% interest rate, 9.50% floor, 6.00% EOT payment) [2] | 12/27/2022 | 4,000 | 3,956 | 3,956 | 12/31/2024 |
| | | | 10,000 | 10,059 | 10,059 | |
| McN Investments Ltd. [1][3] | Growth Capital Loan (Prime + 3.38 % interest rate, 6.63 % floor, 1.25 % EOT payment) [2] | 8/9/2022 | 6,000 | 6,007 | 6,007 | 2/28/2023 |
| | Growth Capital Loan (Prime + 3.38 % interest rate, 6.63 % floor, 1.25 % EOT payment) [2] | 8/24/2022 | 6,000 | 6,001 | 6,001 | 2/28/2023 |
| | | | 12,000 | 12,008 | 12,008 | |
| True Footage Inc. | Growth Capital Loan ( 11.00 % interest rate, 7.00 % EOT payment) | 12/3/2021 | 250 | 250 | 245 | 12/31/2024 |
| | Growth Capital Loan ( 11.00 % interest rate, 6.00 % EOT payment) | 12/3/2021 | 800 | 799 | 781 | 12/31/2024 |
| | Growth Capital Loan ( 11.00 % interest rate, 7.00 % EOT payment) | 12/3/2021 | 220 | 220 | 215 | 12/31/2024 |
| | Growth Capital Loan ( 11.00 % interest rate, 8.00 % EOT payment) | 12/13/2021 | 105 | 105 | 103 | 12/31/2024 |
| | Growth Capital Loan ( 11.00 % interest rate, 7.00 % EOT payment) | 12/13/2021 | 440 | 441 | 431 | 12/31/2024 |
| | Growth Capital Loan ( 11.00 % interest rate, 7.00 % EOT payment) | 12/15/2021 | 208 | 208 | 204 | 12/31/2024 |
| | Growth Capital Loan ( 11.00 % interest rate, 8.00 % EOT payment) | 12/15/2021 | 150 | 151 | 147 | 12/31/2024 |
| | Growth Capital Loan ( 11.00 % interest rate, 6.00 % EOT payment) | 12/15/2021 | 1,372 | 1,370 | 1,338 | 12/31/2024 |
| | Growth Capital Loan ( 11.00 % interest rate, 6.00 % EOT payment) | 12/21/2021 | 760 | 759 | 741 | 12/31/2024 |
| | Growth Capital Loan ( 11.00 % interest rate, 7.00 % EOT payment) | 1/31/2022 | 170 | 170 | 166 | 1/31/2025 |
| | Growth Capital Loan ( 11.00 % interest rate, 8.00 % EOT payment) | 2/25/2022 | 115 | 115 | 112 | 2/28/2025 |
| | Growth Capital Loan ( 11.00 % interest rate, 7.00 % EOT payment) | 3/15/2022 | 300 | 298 | 291 | 3/31/2025 |
| | Growth Capital Loan ( 11.00 % interest rate, 7.00 % EOT payment) | 4/22/2022 | 1,110 | 1,100 | 1,071 | 4/30/2025 |
| | Growth Capital Loan ( 11.00 % interest rate, 7.00 % EOT payment) | 4/22/2022 | 991 | 978 | 952 | 4/30/2025 |
| | Growth Capital Loan ( 11.00 % interest rate, 8.00 % EOT payment) | 5/23/2022 | 216 | 213 | 207 | 5/31/2025 |
| | Growth Capital Loan ( 11.00 % interest rate, 6.00 % EOT payment) | 7/19/2022 | 200 | 196 | 190 | 7/31/2025 |
| | Growth Capital Loan ( 11.00 % interest rate, 7.00 % EOT payment) | 7/19/2022 | 100 | 98 | 95 | 7/31/2025 |
| | Growth Capital Loan (11.00% interest rate, 7.00% EOT payment) [2] | 12/5/2022 | 150 | 145 | 141 | 12/31/2025 |
| | Growth Capital Loan (11.00% interest rate, 7.00% EOT payment) [2] | 12/5/2022 | 361 | 350 | 339 | 12/31/2025 |
| | Growth Capital Loan (11.00% interest rate, 6.00% EOT payment) [2] | 12/5/2022 | 565 | 548 | 530 | 12/31/2025 |
| | | | 8,583 | 8,514 | 8,299 | |
| **Total Real Estate Services - 14.79 %*** | | | 62,965 | 62,939 | 62,143 | |

**TRIPLEPOINT VENTURE GROWTH BDC CORP. AND SUBSIDIARIES**
**CONSOLIDATED SCHEDULE OF INVESTMENTS**
**(dollars in thousands)**
**As of December 31, 2022**

| Portfolio Company | Type of Investment | Acquisition Date [12] | Outstanding Principal | Cost [6] | Fair Value | Maturity Date |
|---|---|---|---|---|---|---|
| **Security Services** | | | | | | |
| ForgeRock, Inc. | Growth Capital Loan ( 8.00 % interest rate, 10.00 % EOT payment) | 3/27/2019 | $ 10,000 | $ 10,500 | $ 10,620 | 9/30/2025 |
| | Growth Capital Loan ( 8.00 % interest rate, 10.00 % EOT payment) | 9/30/2019 | 10,000 | 10,407 | 10,535 | 12/31/2025 |
| | Growth Capital Loan ( 8.00 % interest rate, 10.00 % EOT payment) | 12/23/2019 | 10,000 | 10,374 | 10,502 | 12/31/2025 |
| **Total Security Services - 7.53 %*** | | | 30,000 | 31,281 | 31,657 | |
| | | | | | | |
| **Shopping Facilitators** | | | | | | |
| Moda Operandi, Inc. | Growth Capital Loan (Prime + 8.75 % interest rate, 12.00 % floor, 7.00 % EOT payment) | 12/30/2021 | 27,500 | 28,103 | 28,103 | 6/30/2024 |
| **Total Shopping Facilitators - 6.69 %*** | | | 27,500 | 28,103 | 28,103 | |
| | | | | | | |
| **Travel & Leisure** | | | | | | |
| GoEuro Corp. [1][3] | Growth Capital Loan ( 11.00 % interest rate, 8.50 % EOT payment) | 10/30/2019 | 20,000 | 20,959 | 20,605 | 10/31/2024 |
| | Growth Capital Loan ( 11.00 % interest rate, 8.50 % EOT payment) | 3/27/2020 | 10,000 | 10,404 | 10,229 | 10/31/2024 |
| **Total Travel & Leisure - 7.34 %*** | | | 30,000 | 31,363 | 30,834 | |
| | | | | | | |
| **Total Debt Investments - 202.98 %*** | | | $ 890,431 | $ 888,586 | $ 852,951 | |

89

**TRIPLEPOINT VENTURE GROWTH BDC CORP. AND SUBSIDIARIES**
**CONSOLIDATED SCHEDULE OF INVESTMENTS**
**(dollars in thousands)**
**As of December 31, 2022**

| Portfolio Company | Type of Warrant | Acquisition Date (12) | Shares | Cost (6) | Fair Value |
|---|---|---|---|---|---|
| **Warrant Investments (8)** | | | | | |
| | | | | | |
| **Advertising / Marketing** | | | | | |
| InMobi Pte Ltd. (1)(3) | Ordinary Shares (2) | 12/13/2013 | 48,500 | $ 35 | $ 13 |
| **Total Advertising / Marketing - 0.00 %*** | | | | 35 | 13 |
| | | | | | |
| **Aerospace and Defense** | | | | | |
| Loft Orbital Solutions Inc. | Common Stock (2) | 7/15/2022 | 22,488 | 192 | 192 |
| **Total Aerospace and Defense - 0.05 %*** | | | | 192 | 192 |
| | | | | | |
| **Application Software** | | | | | |
| Flo Health, Inc. (1)(3) | Preferred Stock (2) | 5/10/2022 | 14,536 | 123 | 114 |
| **Total Application Software - 0.03 %*** | | | | 123 | 114 |
| | | | | | |
| **Building Materials/Construction Machinery** | | | | | |
| View, Inc. | Common Stock (2) | 6/13/2017 | 105,682 | 500 | — |
| **Total Building Materials/Construction Machinery - 0.00 %*** | | | | 500 | — |
| | | | | | |
| **Business Applications Software** | | | | | |
| Arcadia Power, Inc. | Preferred Stock | 12/10/2021 | 55,458 | 138 | 486 |
| | Preferred Stock (2) | 6/29/2022 | 27,714 | 164 | 164 |
| | | | | 302 | 650 |
| DialPad, Inc. | Preferred Stock (2) | 8/3/2020 | 28,980 | 102 | 117 |
| Envoy, Inc. | Preferred Stock (2) | 5/8/2020 | 35,893 | 82 | 401 |
| Farmer's Business Network, Inc. | Preferred Stock (2) | 1/3/2020 | 37,666 | 33 | 1,086 |
| Filevine, Inc. | Preferred Stock (2) | 4/20/2021 | 186,160 | 38 | 294 |
| FinancialForce.com, Inc. | Preferred Stock (2) | 6/20/2016 | 547,440 | 1,540 | 2,480 |
| FlashParking, Inc. | Preferred Stock | 6/15/2021 | 210,977 | 810 | 1,293 |
| Hi.Q, Inc. | Preferred Stock | 12/17/2018 | 606,952 | 196 | — |
| | Preferred Stock | 12/31/2020 | 114,319 | 125 | — |
| | | | | 321 | — |
| Narvar, Inc. | Preferred Stock (2) | 8/28/2020 | 87,160 | 102 | 102 |
| NewStore Inc. | Preferred Stock (2) | 11/16/2022 | 48,941 | 18 | 18 |
| OneSource Virtual, Inc. | Preferred Stock | 6/25/2018 | 70,773 | 161 | 457 |
| Passport Labs, Inc. | Preferred Stock (2) | 9/28/2018 | 21,929 | 303 | 590 |
| Quantcast Corporation | Cash Exit Fee (2)(5) | 8/9/2018 | | 213 | 161 |
| Uniphore Technologies Inc. | Common Stock (2) | 12/22/2021 | 35,000 | 34 | 187 |
| **Total Business Applications Software - 1.86 %*** | | | | 4,059 | 7,836 |
| | | | | | |
| **Business Products and Services** | | | | | |
| Cart.com, Inc. | Common Stock | 12/30/2021 | 32,731 | 477 | 375 |
| | Common Stock (2) | 3/31/2022 | 4,532 | 25 | 25 |
| | | | | 502 | 400 |
| LeoLabs, Inc. | Preferred Stock (2) | 1/20/2022 | 218,512 | 197 | 197 |
| Quick Commerce Ltd (1)(3) | Preferred Stock (2) | 5/4/2022 | 1,464,990 | 311 | 120 |
| RenoRun Inc. (1)(3) | Preferred Stock (2) | 12/30/2021 | 15,906 | 348 | 348 |
| Substack Inc. | Preferred Stock (2) | 7/13/2022 | 1,141 | 6 | 6 |
| **Total Business Products and Services - 0.25 %*** | | | | 1,364 | 1,071 |
| | | | | | |
| **Business/Productivity Software** | | | | | |
| Forum Brands Holdings, Inc. | Preferred Stock | 7/6/2021 | 9,457 | 556 | 160 |
| Metropolis Technologies, Inc. | Common Stock (2) | 3/30/2022 | 87,385 | 87 | 478 |
| **Total Business/Productivity Software - 0.15 %*** | | | | 643 | 638 |
| | | | | | |
| **Business to Business Marketplace** | | | | | |
| Optoro, Inc. | Preferred Stock (2) | 7/13/2015 | 10,346 | 40 | 67 |
| RetailNext, Inc. | Preferred Stock (2) | 11/16/2017 | 123,420 | 80 | 111 |
| **Total Business to Business Marketplace - 0.04 %*** | | | | 120 | 178 |

90

**TRIPLEPOINT VENTURE GROWTH BDC CORP. AND SUBSIDIARIES**
**CONSOLIDATED SCHEDULE OF INVESTMENTS**
**(dollars in thousands)**
**As of December 31, 2022**

| Portfolio Company | Type of Warrant | Acquisition Date [12] | Shares | Cost [6] | Fair Value |
|---|---|---|---|---|---|
| **Commercial Services** | | | | | |
| Transfix, Inc. | Preferred Stock [2] | 5/31/2019 | 133,502 | $ 188 | $ 188 |
| **Total Commercial Services - 0.04 %*** | | | | 188 | 188 |
| | | | | | |
| **Computer Hardware** | | | | | |
| Grey Orange International Inc. | Preferred Stock [2] | 3/16/2021 | 27,878 | 183 | 116 |
| **Total Computer Hardware - 0.03 %*** | | | | 183 | 116 |
| | | | | | |
| **Consumer Finance** | | | | | |
| Activehours, Inc. (d/b/a Earnin) | Preferred Stock | 10/8/2020 | 108,468 | 346 | 588 |
| The Aligned Company (f/k/a Thingy Thing Inc.) | Preferred Stock | 10/21/2021 | 5,855 | 17 | 257 |
| | Preferred Stock [2] | 9/30/2022 | 163 | 2 | 2 |
| | | | | 19 | 259 |
| **Total Consumer Finance - 0.20 %*** | | | | 365 | 847 |
| | | | | | |
| **Consumer Non-Durables** | | | | | |
| Alyk, Inc. | Preferred Stock | 6/16/2021 | 61,096 | 21 | 8 |
| Athletic Greens International, Inc. | Ordinary Shares [2] | 6/3/2022 | 2,262 | 85 | 84 |
| Don't Run Out, Inc. | Preferred Stock [2] | 12/30/2021 | 42,929 | 30 | 27 |
| Hims & Hers Health, Inc. (f/k/a Hims, Inc.) | Preferred Stock [2] | 11/27/2019 | 98,723 | 73 | 260 |
| **Total Consumer Non-Durables - 0.09 %*** | | | | 209 | 379 |
| | | | | | |
| **Consumer Products and Services** | | | | | |
| AvantStay, Inc. | Common Stock [2] | 12/12/2022 | 24,495 | 151 | 151 |
| Baby Generation, Inc. | Common Stock [2] | 1/26/2022 | 25,766 | 19 | 19 |
| Clutter Inc. | Preferred Stock [2] | 10/18/2018 | 77,434 | 363 | 567 |
| | Preferred Stock [2] | 9/30/2020 | 29,473 | 169 | 169 |
| | | | | 532 | 736 |
| everdrop GmbH [1][3] | Preferred Stock [2] | 3/16/2022 | 14 | 25 | 24 |
| Flink SE [1][3] | Preferred Stock [2] | 4/13/2022 | 178 | 339 | 233 |
| Foodology Inc. [1][3] | Preferred Stock [2] | 3/25/2022 | 22,948 | 100 | 100 |
| Frubana Inc. [1][3] | Preferred Stock [2] | 9/30/2022 | 15,987 | 334 | 334 |
| Good Eggs, Inc. | Preferred Stock [2] | 8/12/2021 | 1,072,903 | 401 | 32 |
| Hydrow, Inc. | Common Stock [2] | 2/9/2021 | 103,267 | 143 | 293 |
| | Preferred Stock [2] | 8/6/2021 | 53,903 | 89 | 89 |
| | | | | 232 | 382 |
| JOKR S.à r.l. [1][3] | Preferred Stock | 10/14/2021 | 10,663 | 273 | 247 |
| | Preferred Stock [2] | 8/10/2022 | 746 | 3 | 8 |
| | | | | 276 | 255 |
| Lower Holding Company | Preferred Stock [2] | 12/28/2022 | 146,431 | 189 | 189 |
| Mystery Tackle Box, Inc. (d/b/a Catch Co.) | Preferred Stock | 4/29/2022 | 321,429 | 69 | 109 |
| Nakdcom One World AB [1][3] | Preferred Stock [2] | 6/2/2022 | 147,091 | 208 | 47 |
| Outdoor Voices, Inc. | Common Stock | 2/26/2019 | 732,387 | 369 | 15 |
| Pair Eyewear, Inc. | Common Stock [2] | 7/12/2022 | 2,288 | 5 | 5 |
| Project 1920, Inc. | Preferred Stock [2] | 3/25/2022 | 41,140 | 23 | 23 |
| Quip NYC, Inc. | Preferred Stock [2] | 11/26/2018 | 41,272 | 455 | 1,020 |
| Tempo Interactive Inc. | Preferred Stock | 3/31/2021 | 14,709 | 93 | 14 |
| The Black Tux, Inc. | Preferred Stock | 11/5/2021 | 142,939 | 139 | 395 |
| Untitled Labs, Inc. | Common Stock | 6/23/2022 | 227,273 | 171 | 234 |
| VanMoof Global Holding B.V. [1][3] | Preferred Stock [2] | 2/1/2021 | 704,689 | 145 | 181 |
| | Preferred Stock [2] | 10/31/2022 | 82,514 | 10 | 10 |
| | | | | 155 | 191 |
| **Total Consumer Products and Services - 1.07 %*** | | | | 4,285 | 4,508 |

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this Annual Report on Form 10-K to be signed on its behalf by the undersigned, thereunto duly authorized.

TriplePoint Venture Growth BDC Corp.

Date: March 1, 2023    By: /s/ JAMES P. LABE

James P. Labe
Chief Executive Officer and Chairman

In accordance with the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the following capacities on March 1, 2023.

| Signatures | Title | Date |
|---|---|---|
| By: /s/ JAMES P. LABE<br>James P. Labe | Chief Executive Officer and Chairman of the Board (Principal Executive Officer) | March 1, 2023 |
| By: /s/ CHRISTOPHER M. MATHIEU<br>Christopher M. Mathieu | Chief Financial Officer (Principal Financial and Accounting Officer) | March 1, 2023 |
| By: /s/ SAJAL K. SRIVASTAVA<br>Sajal K. Srivastava | Chief Investment Officer, President, Secretary, Treasurer and Director | March 1, 2023 |
| By: /s/ GILBERT E. AHYE<br>Gilbert E. Ahye | Director | March 1, 2023 |
| By: /s/ STEVEN P. BIRD<br>Steven P. Bird | Director | March 1, 2023 |
| By: /s/ STEPHEN A. CASSANI<br>Stephen A. Cassani | Director | March 1, 2023 |
| By: /s/ CYNTHIA M. FORNELLI<br>Cynthia M. Fornelli | Director | March 1, 2023 |
| By: /s/ KATHERINE J. PARK<br>Katherine J. Park | Director | March 1, 2023 |
| By: /s/ KIMBERLEY H. VOGEL<br>Kimberley H. Vogel | Director | March 1, 2023 |

145