**Pages 1 - 51**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Trina L Thompson, Judge

DEREK PETERSEN,                    )
                                   )
          Plaintiff,               )
                                   )
  VS.                              )     **NO. 3:23-CV-02980-TLT**
                                   )
TRIPLEPOINT VENTURE GROWTH BDC )
CORPORATION, et al.,               )
                                   )
          Defendants.              )
_____      )

                              San Francisco, California
                              Tuesday, February 20, 2024

                    **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                    SCOTT & SCOTT, LLP
                    The Helmsley Building
                    230 Park Avenue, 17t Floor
                    New York, NY 10169
              BY:   **WILLIAM C. FREDERICKS**
                    **ATTORNEY AT LAW**

                    MCNAMARA SMITH, LLP
                    655 West Broadway, Suite 900
                    San Diego, CA 92101
              BY:   **CORNELIA J.B. GORDON**
                    **ATTORNEY AT LAW**

For Defendants:
                    FRESHFIELDS, BRUCKHAUS, DERINGER, LLP
                    855 Main Street
                    Redwood City, CA 94063
              BY:   **BORIS FELDMAN, ATTORNEY AT LAW**

REPORTED REMOTELY BY:  Stephen W. Franklin, RMR, CRR, CPE
                       Official United States Reporter

**Tuesday - February 20, 2024**                              **1:27 p.m.**

                         P R O C E E D I N G S

                              ---o0o---

THE COURT:  Good afternoon.  You may be seated unless you're presenting.  And if you're presenting, I invite you to the podium.

MR. FELDMAN:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

All right.  One moment.  Place it on the record.

THE COURTROOM DEPUTY:  Now calling case 23-CV-02980, Petersen versus TriplePoint Venture Growth BDC Corporation, et al.  If counsel could please come forward to the podiums and state your appearances beginning with the plaintiffs.

MR. FREDERICKS:  Good morning, Your Honor.  William C. Fredericks, counsel for lead plaintiffs, from the law firm of Scott & Scott, Attorneys at Law, LLP.  And with me is my colleague, Cornelia Gordon, from our San Diego office.

THE COURT:  Good afternoon.

And you'll probably want to bring your items to the podium, because I'm -- we're tight on time, so that everybody can make their flights in this inclement weather.

MR. FELDMAN:  Good afternoon, Your Honor.  Boris Feldman of Freshfields from Redwood City for the defendants.

THE COURT:  Good afternoon.  All right.  Thank you.

All right.  Counsel, each of you will have a half an hour

to address the issues in each other's briefing.  Counsel for the defense has generated a very detailed reply brief, but I do have some questions initially for plaintiff that I'd like answered, and then I'm going to ask plaintiff to address the issues that were brought up in the reply brief.  All right?

So one of the questions I have is when I took a look at the first complaint, I noticed that the class period was March 4th, 2020, and I believe through May 3rd, 2023.  However, the amended complaint changed the dates to April 4th, 2022 to May 3rd, 2023, inclusive.  Can you share with me why there was a change in the class period?

MR. FREDERICKS:  Well, I think actually the class period now begins May 4, 2022, if I'm not mistaken.

THE COURT:  I'm sorry.  All right.

MR. FREDERICKS:  Your Honor, after lead plaintiff's motions are determined and lead counsel are selected, if we are involved we always go back and do a further hard look at all the allegations.

THE COURT:  Uh-huh.

MR. FREDERICKS:  Often the allegations are expanded; sometimes they're contracted.

And in this case, we made the professional judgment that it would be more appropriate to focus the case and the Court's attention on the latter part of the originally alleged class period, and that it would have been problematic to find

problems going back to 2021 and 2020 that should have been disclosed.  Of course, if the case goes through to discovery, we'll see.  But, you know, we're trying to focus the Court's attention on the claims which we think are well founded or best founded.

THE COURT:  All right.  And the reason why I'm asking is that I'm focused on *Merck*, M-e-r-c-k, *& Company, Incorporated, versus Reynolds*, 559 U.S. 633, decided in 2010 in terms of the time constraints for a 10(b) action.

The second question I have is I want to confirm that the plaintiff, the named plaintiff, Derek Petersen, purchased his 200 shares on or about August 3rd, 2022; is that correct?

MR. FREDERICKS:  I don't believe we have Mr. Petersen's sales in the record on this motion.  Mr. Solotruk is now the lead plaintiff.

THE COURT:  Uh-huh.

MR. FREDERICKS:  And I will just -- it's alleged at paragraph 25 that he purchased shares during the class period.

THE COURT:  All right.  All right.  One moment.

All right.  Now, then --

MR. FELDMAN:  Your Honor.

THE COURT:  Yes, sir?

MR. FELDMAN:  If I could?

THE COURT:  You'll have an opportunity to respond.  I -- that's fine.  Hold on to it and then share it with me at

the appropriate time.  I'd like to allow counsel to go uninterrupted so that he can address the things that were in the reply briefing.

And this is the reason I'm going in this order.  A 12(b) motion, failure to state a claim under which relief can be granted, of course, the Court is looking at the nonmoving party's complaint and accepting the contents as true.

Rule 8(a) is very liberal and requires only a short and plain statement of the claim showing that the pleader is entitled to relief.  But when we have an SEC claim where plaintiff alleges that there is fraud, Rule 9 requires plaintiff to state with particularity the circumstances constituting the fraud, and that burden is placed upon the plaintiff.

And under PSLRA, the plaintiff must specify each statement alleged to have been misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall, with particularity, state all facts on which the belief is formed.  And that's 15 U.S.C., Section 78u-4(b)(1).

So I am taking really close attention to the class period and the ebb and flow of that class period, where the stocks were going up and down during that period, was there a rise and then a fall, was there a fall and then a continual rise.  I'm also looking at scienter.  We all differ on how to pronounce

that, but whether the scheme claim is such that it is alleged with particularity and the responsibility of Mr. Mathieu, M-a-t-h-i-e-u.  And then I need to go back to standing in terms of the lead plaintiff and named plaintiffs, whether the injury has been alleged in order to support Article III standing for my purposes.

So the reply brief really goes through quite a few areas in which they feel that even with the opposition briefing, that plaintiff has fallen short.  And I wanted to give you an opportunity to address all of those issues that came up.  Those that may get overlooked I'll bring your attention to them, because I'm sure you're prepared for today, and I don't want to interrupt the method in which you've prepared.  But I did ask some of my most compelling questions, and then I'll ask quite a few more in terms of things that I need to understand to make sure that I'm making an informed decision.

**MR. FREDERICKS:**  Thank you, Your Honor.

Let me try to address the questions that you raised right off the top.

**THE COURT:**  Okay.

**MR. FREDERICKS:**  With respect to stock price movement, traditionally in these cases there is a requirement to allege loss causation and as *Dura* and its progeny make clear, that has to be pled with a plausibility standard.  I think it was Justice Breyer who wrote that the burden shouldn't

really be too burdensome, you just give -- need to give the defendant some idea of your theory.

And loss causation is typically measured at the back end, where you see stock price response that's a decline.  And here we've alleged basically three declines cumulatively of about 18.6 percent over the last three days of the class period. That's really in response to two separate disclosures, the Bear Cave report and the company's own first quarter 10-Q for 2023. So for the first quarter of 2023.

So our allegation is that the change in price, the approximately 20 percent decline, roughly two dollars here, measures the, or is a plausible measure of damages for purposes of pleading.  Of course, if the case goes forward, these things tend to be the subject of rather complex expert testimony.

But that, I hope, addresses your question as to the adequacy of the stock price movement.  Obviously stock prices go up and go down for various reasons, market forces, interest rates, whatever.  But whereas here, we believe we have adequately tied disclosure of corrective information to a stock drop, we're entitled to the -- we're entitled to the presumption at the pleading stage that we've adequately alleged loss causation under the statute.

**THE COURT:**  All right.  And about how many people do you think make up the class?

**MR. FREDERICKS:**  Your Honor, today basically every

investor holds what's known as street name.  So if you were to ask the company for its list of stockholders, they'd tell you, we have 60 stockholders, they could all be brokers, who in turn are holding for other people.

You know, the company last I looked at a market cap of around 350 million, and its shares were trading at about $10 a share.  So if my math is correct, there are about 35 million shares, Mr. Feldman may correct me, but I don't think there's a question as to numerosity of the class.  But typically that's something that nobody really knows until the end of the case when you have a claims administration process.

With respect to particularity, I did want to try to clarify something for the Court.  Of course, we are subject to Rule 9(b) and the PSLRA's pleading requirements as to particularity.  I'll deal with scienter separately in a moment. But particularity in the PSLRA context, as in the 9(b) context generally, is -- you know, there's a famous case that sorta says it's like pleading the first paragraph of a (sic) newspaper stories, the who, what, where, when and why.

And here I think we only have a dispute as to the have we alleged sufficiently the why statements are false.  We've alleged in the complaint specifically each statement we alleged to be false.  We have a paragraph in the complaint accompanying each of those statements as to why we allege it was false or misleading.  So we've alleged -- and we've alleged who made the

statement, where the statement appears.

Was it a statement by the company, or Mr. Labe or Mr. Srivastava.

So we've alleged the who, alleged the where, where it appeared, a 10-K or an analyst. We've alleged the date of the statement. So the particularity analysis really comes down to the why or how is it false, misleading. And for reasons we'll get into, we think we've adequately alleged actionably false misstatements.

And with respect to Mr. Mathieu -- I apologize if I got his name wrong -- defendants do have a point. We have not raised any particularity arguments as to Mr. Mathieu, and at this point we would not dispute having him dismissed without prejudice. Qualitatively, Mr. Labe and Mr. Srivastava's role in this case is -- we have a lot more to run on with respect to those two gentlemen than with respect to Mr. Mathieu. So we don't want to trouble the Court unduly with Mr. Mathieu.

THE COURT: And actually, that brings me to a point that I should have started with. Are there any areas in which you and defense counsel agree, or areas in which you at this stage would like to concede based upon the briefing and the reply brief?

MR. FREDERICKS: I had the pleasure of first dealing with Mr. Feldman 26 years ago or so. And so I have the one concession for Mr. Feldman with respect to Mr. Mathieu. I'm

afraid I don't think I have anything else that's as neat and tidy.

THE COURT:  All right.

MR. FREDERICKS:  So if I may, Your Honor, I'd like to try to address the falsity and scienter issues.  And if I can sort of summarize my argument, I'll try to address defendants' rebuttal arguments in the course of presenting my own affirmative.

THE COURT:  All right.  And you're satisfied with your Article III standing?

MR. FREDERICKS:  Yes, Your Honor.  I'll confess I haven't specifically prepared for it, but I would be very surprised if there was an issue, and I'll let you know if I find one overnight.

THE COURT:  All right.  Thank you.

MR. FREDERICKS:  This case is rather sui generis, because there are a number of precedents involving cases against bank lenders.  Like, you know, Countrywide.  We all remember Countrywide and cases from the loan crisis, and there are other cases involving companies that have a credit portfolio.

But this case, although it involves a lender and borrowers, it's very different context, because TriplePoint provides venture capital lending.  It doesn't make loans to tens or hundreds of thousands of people like Countrywide.  I'm

sure the gentleman who ran Countrywide probably never looked at a single loan file anywhere in his bank, because, you know, it's such a large bank and so many tens of thousands, if not more, loans.

This company made loans to a very select group of companies, never more than, you know, 50, 55 plus or minus. And we know from the defendants' own 10-Qs and 10-Ks, that Mr. Labe and Mr. Srivastava were involved in approving every one of these loans when they were made, because they were the sole members of the investment committee, an entity called TPA, the investment adviser for TPBG, and they were the people who were also in the driver's seat in terms of monitoring the performance of those loans after.

So here we have a case where you have two individuals who I think it's pretty undisputed has their fingerprints all over each of these loans at the beginning, and if you are to believe their prospectus, they have their fingerprints all over loans in terms of monitoring them thereafter.  So it's not a case of, you know, Jamie Dimon and JPMorgan not knowing what's in a homeowner loan or on my credit card statement.  These folks were very hands-on with a very specific and small group of loans.

And defendants, you know, first cited our argument, I think.  I should back up by saying a number of cases point out that falsity and scienter are also -- are often sort of hand

and glove.  The issues relevant to falsity are also relevant to scienter.  So I won't try to break them out too specifically.  But perhaps actually let me start first with falsity, because it's kind of customary to discuss first, well, is the statement alleged to be false, and then you get to the issue of was it false with scienter.

So let me back up a second.

As I understand defendants' arguments with respect to falsity, they say, well, most of the statements here are either about loan value, or did they fairly categorize the portfolio as high quality, and then there's also issues as to whether they should have been put on credit watch.

With respect to loan value, they say, well, loan value's really sort of a forward-looking statement because the value of a loan, so it depends on future performance.  But, Your Honor, fair value of a line, like of any asset, is as of a particular date.  And we do allege that as of particular dates, these loans were sufficiently problematic that they were over valid.  They complain, well, we don't allege an alternative value, but they also don't cite any case law that says we have to plead an alternative value.  The alternative value, again, would be subject of expert testimony dealing with all of the facts.

What I think we need to do, Your Honor, is establish that there was a material overvaluation, and then we'll sort out the details through discovery.  And I think if you look at what we

have pled with respect to each of the transactions, we have done so, but --

THE COURT: Can I ask a question?

When you say that the alternative value is not something you need to plead, but is it your position that the defendants knew facts in the portfolios of these companies, and, if so, which facts, that would lead them to believe or would put them in a position where they knew or should have known that these companies were problematic? Which facts are you resting that on?

MR. FREDERICKS: Well, Your Honor, we go through I believe it's a dozen or more individual transactions to show specific problems with each one of them.

THE COURT: Okay.

MR. FREDERICKS: But if I can just finish up one other thought and then circle back at this point?

THE COURT: Okay. That's fine.

MR. FREDERICKS: All right. Because I'm trying to group the three categories of misstatements.

The other category of misstatement is that they constantly were telling the market that we have high-quality loans, exceptional companies. We only invest in the most compelling stories. So they say, well, that's just sort of puffery. That's sort of like where the used car salesman comes in and says, you know, I've got the best, you know, used Audi in

California here.

And so they say it's inactionable puffery.

But I would respectfully suggest, Your Honor, that the better reasoned case -- and there are cases that go on both sides of this -- is that on the facts of this case, where the company, where TriplePoint's entire business is loans, that's all they do basically, and it's only like 50 companies, when they're making representations about, we're lending only to the most compelling companies, the highest quality, exceptional companies, that in that context, that means a lot more to an investor than the guy who's on the used car lot talking to a used car salesman.  You almost expect the used car salesman to say this is the best car.  Very different here.  So we've alleged that they're actionable.

The third category of statements are credit risk category statements.  Because at the end of each quarter, they would put companies in different credit risk buckets on a scale of one to five.  And, Your Honor, in this regard, the argument that there is a lack of specific criteria to show what quality means or what is meant I think is a very difficult argument for defendants to come up with -- and, in fact, they didn't even make it in their opening brief -- because as we cited in our opposition brief, they're very -- there is narrative as to what it means to be in these particular categories.

One is performing above expectations; two is performing at

expectations; three is when a company is performing below expectations; four is below expectations with, you know, even higher degree of concern; and red is basically you're, in layman's terms, about to lose your shirt or at risk of losing your shirt.

And here, although there are three different categories of misstatements, I think, Your Honor, we would say that the statements that relate to the failure to put the market on notice that certain companies rated as white or clear, the top two quality components, that far more of those companies needed to be written down at least to yellow, if not to orange, if not to red much sooner.  And that's not based on, oh, this is, you know, high quality, this is medium quality, this is low quality.  This is based on their own stated criteria in their credit watch list as to having some concerns, or concerns related to financing, concerns relating to assets.

And I think, again, if you read through what we've alleged with respect to specific companies, I think that we have shown that companies were falling into these lower-tier credit risks well before the company itself admitted that.

THE COURT:  How many companies, and what percentage would you attribute to that?  About 9 percent?

MR. FREDERICKS:  We have a paragraph in our complaint, I believe it's around 224, where we sum up that there are about $226 million in loans.  It's 225, Your Honor.

**THE COURT:** But I'm concerned about the ones that would fall in the category of, let's say, orange and red.

**MR. FREDERICKS:** Those would be, looking at my math here, close to 200. There's a $20 million loan to an entity called The Pill Club, which they ended up not having to write off because they were able to transfer the debt on that to an affiliated company, which --

**THE COURT:** That covered the loan, correct?

**MR. FREDERICKS:** Yes. They got another one of their portfolio companies that they lent money to to take it over so they didn't have to, you know, write that down. So we think that's a highly suspicious red flag with that one. But I still think we're talking in the neighborhood of around 175 million covering the period. And, again, I think that's paragraph 225 of the complaint where we try to sum it up.

**THE COURT:** So percentage-wise in terms of the overall portfolio would be?

**MR. FREDERICKS:** The overall portfolio during this period ranged between around 900 to close to a billion. So say 900 to 950 as a rough range. So we're talking 20 percent rough ballpark of the portfolio. Of course, those are only the ones that we've been able to identify without any discovery, and which is rather frustrating because we don't have discovery. These are all privately held companies. It's very difficult to get information.

So I think that we've alleged why the statements are false. Now, let me try to address scienter. And I may not hit all their arguments on falsity. I'll come back to them if I have time, but I want to address scienter.

**THE COURT:** All right. Thank you. Because you have about eight minutes.

**MR. FREDERICKS:** Their concern -- first of all, they say, well, you know, how do we know that, you know, Mr. Labe, Mr. Srivastava even got any of this information that showed that these loans were in trouble? Well, as I alluded to at the beginning, we know that the company was generally -- was entitled to monthly financial statements, copies of all board packages, reports on material contingencies. They discuss how management, TPVG, would remain in regularly -- in regular contact with these borrowers. Again, there are only 50 companies they had invested in at any given time. They would be in contact with its other lenders, with its venture capitalist funders.

And my question for the Court ultimately is defendants' position largely comes down to why is it that they always seem to be the last ones to know? It's like, oh, this company went bankrupt in, you know, in June. Well, we couldn't have known they would actually go bankrupt until actually filed. Well, if you're following the company's monthly performance and finances, if you're getting board packages, companies don't

just blow up overnight.  You know, these are subjects --
companies go bankrupt when they run into a period of decline.

And we know from the company's own statements that they endeavor to invest at the beginning only in the best companies.  So presumably they aren't investing in any companies with the understanding that they're sort of on track for bankruptcy.

**THE COURT:**  Well, one of the -- now, I have two questions.

One of the reasons why I asked about the change in the time period was there was this phenomena that happened in 2020 that had some impact on the market, and then there's -- you indicated there's 50 companies.  How many of these companies went bankrupt of the 50?

**MR. FREDERICKS:**  Your Honor, I think it's only -- well, first of all, the company hasn't reported any additional information since as of September 30 of last year.  It has its 10-K, which I believe is due to be filed in March.  So we'll probably get some more information.

**THE COURT:**  Uh-huh.

**MR. FREDERICKS:**  I think that we're probably talking only about a half dozen or so companies that ultimately went bankrupt.  But other companies, the loans have been written off.  You know, once you write them off, I'm not sure you have any obligation to report the company as having gone bankrupt.  I mean, the loan's no longer on your books.  You know, why do

you need to report?

And in other cases you take a breakdown, and in other cases the company has essentially refinanced a loan to sort of refresh it, so that it may have put off, you know, a day of reckoning. But nonetheless, all of these factors, whether a company goes bankrupt or not, they're still indicative of the company -- of the portfolio as a whole not being that highest quality exceptional caliber portfolio. And even if some of their loans are secured -- and I don't doubt that any number of their loans have performed well, performed up to expectations. We aren't claiming everything. But we're claiming that to a material degree, the defendants were overstating the quality of their portfolio, and that as the market got information about this in May of 2023, the market reacted negatively, falling about 20 percent. So that alleges the causal aspect.

But again, with respect to scienter, you know, maybe it's possible that they just missed the facts on one of these companies, maybe on two of these companies, but these guys are either, you know, the gang that couldn't shoot straight, or they had more information on a lot more of these companies. Why is it that, you know, in a dozen instances or more that we've been able to find private companies without discovery, that we found these problems? And then defendant said, well, this information was in the newspapers. Well, why is it that UTPVG, if you're talking to the board directors, if you're

getting board packages, if you're getting monthly financials, all of this confidential information, why is it somehow a good defense that, oh, well, when I read about it in the papers I disclosed things?  They should have known months and quarters before that the portfolio was in a state of decline and deteriorating.

Ultimately, as things happen in these situations, the facts caught up with them and they had to disclose, but investors during the class period were buying at inflated prices because they should have come cleaner earlier.

So again, I think this is a very interesting case where we have two defendants who are very involved in these particular companies.  Maybe in discovery they'll have a good story, and, you know, they'll say, yeah, we just happened, you know, to invest in a dozen companies, all of which concealed all of this information from us.  But when weighing the plausibility -- when weighing the strong inference standard, Your Honor, on scienter -- let me circle back to that last question that you asked:  What's the heightened pleading standard.  The law is you don't need to have a smoking gun to establish defendants' scienter or recklessness.  You don't have to even show that it is more likely than not that it was a situation of fraud.  You just have to show at least that the inferences are evenly balanced.

And we think that based on this record, the inferences

certainly weigh more strongly towards us of a fraudulent intent.  You know, and again, sometimes the road to perdition is paved with good intentions, and they thought, well, maybe all these situations would resolve themselves.  But when you're a public company, you have an obligation to tell the truth and not to make misleading statements or to omit facts necessary not to make a statement misleading, and that's what we have here.

I'll just briefly touch on motive.  As Your Honor I'm sure is aware, the best motive cases are cases where you have the insider defendants having sold 75 percent of their stock just before the stock crashes and they announce horrible news.  That's not this case.  That would be a better motive case.

**THE COURT:**  Now, in this case I believe only one person purchased, but no one sold from what I could tell.

**MR. FREDERICKS:**  I think Mr. Mathieu may have gotten stock options and then cash at his normal rate.  But the only point I want to make on motive is, is that the two main defendants did have a motive to keep the value of the stock high, because they're getting paid asset management fees on it.  Their own prospectus says there can be conflicts amongst different groups, because they tout their relationship with other venture capitals, and they have relationships with other TriplePoint entities.  And so if I'm doing a deal with some leading venture capital companies, and they make a big point of

their prospectus about how important that is to build relationships with their friends in the venture capital industry, and I may also have my own interest in other TriplePoint entities, am I really going to pull the plug and squeeze a particular portfolio company until I really need to? As their own prospectus points out, there may be times where there may be conflicts of interest.

So I'm not saying that this is the strongest motive case, but there were certainly motives for the company to do this. And one argument that defense do make --

**THE COURT:** Okay.  I'm going to interrupt you, because I'm going to let the kind gentleman have his time.  But while you're waiting to respond in your last 15 minutes, I do want you to think about what evidence there is of injury in terms of scienter, motive and opportunity to commit the alleged fraud, or a strong circumstantial inference or strong circumstantial evidence of conscious misbehavior and recklessness.

When I'm looking at 50 companies and maybe six that may have filed bankruptcy, and it appears that the company was able to make good on all of those loans and recovered from all of those loans, that's something else I'm looking at.

Your definition of "speculative short seller," what is your definition of that; and why your care operation argument is persuasive and the Court should follow that; and the access

to information allegation.  That's why I was trying to tease out what it is that these two individuals actually knew or should have known based on their access, when they have to rely on the company to provide them with information.

And you did go through the fact that they do get monthly statements.  I don't know if you said P&L reports, but you did go through the various reports that they do get.

And finally, there was a reply.  There was a reply by the defendant with regards to judicial notice of SEC filings and their requests that the Court incorporate by reference exhibits 1 through 31, particularly focused on exhibit 2 and the supplemental exhibit.

So those are the remaining things that I have questions about.

And then finally, whether there's any kind of statute of limitations challenge, and whether some of this wording is what I call risk wording, where it's kind of, you know, you made the comment about puffery, but whether any of this -- the wording that was used really kinda flagged people that, okay, you're taking a risk here, but this is how we're going to deal with that risk.  I mean, I'm looking at this.  When I look at these cases, I figure there's this side and there's that side, and somewhere around the rim of this coin is the information that brings it all together.

So I'm really trying to make sure I'm reading all of this

information in your complaint, which was quite lengthy and had some information that gave me background, but I'm trying to get to the meat of what I need in order to make an informed decision.

**MR. FREDERICKS:** My friends on the defense bar always complain that there's either too little or too much. It's never the Goldilocks complaint.

I understand Your Honor wants me to address that after Mr. Feldman?

**THE COURT:** Yes. And I wanted to give you the liberty of knowing what were some of my remaining questions.

**MR. FREDERICKS:** Thank you, Your Honor.

**THE COURT:** All right. Counsel for the defense.

**MR. FELDMAN:** Thank you, Your Honor.

May it please the Court, Boris Feldman for the defendants.

This is an accounting fraud case. It's one thing to talk about Goldilocks and were they trying to have cushy jobs. They allege accounting fraud. And there's a lot of law in your circuit, Your Honor, about accounting fraud.

Lest there be any doubt, please look at paragraph 19 of the complaint, which alleges the defendants, quote, "overstated the quarter end value of TPVG's investment portfolio, the amount of TPVG's actual orderly net unrealized gains on investments, and the amount of TPVG's actual quarterly net increase in net assets resulting from operations," closed

quote.

So the case is about an accounting fraud, which, by the way, he just dropped the CFO from, Mr. Mathieu.  He's now not a defendant, even though it's an accounting fraud case.  But there are none of the indicia here, Your Honor, of a financial fraud.

Number one, there was no restatement of any prior financials.  And I suspect that through Your Honor's prior career, typically when you have a big financial fraud, people are going to jail, the company has to restate the financials, because somebody found out they were phony.  No restatements here.

Second, no SEC or DOJ criminal investigations or charges against anyone.

Third, no enforcement proceeding by the banking regulators.  And certainly during the time of the Bear Cave short seller report, when Silicon Valley Bank was shut down, First Republic was shut down, there was a national, if not global, crisis in lenders, there is no enforcement proceeding by the bank regulators against TPVG.  And above all, as Your Honor has noted, there were no individual sales of stock during the class period, and actually the CFO bought -- one needs to be careful in listening to assertions during argument that are not in the complaint.  My friend said, oh, yeah, Mathieu may have bought once or twice, but they just gave him the stock, it

was a stock option thing.  Not at all.  There are two Form 4s in the exhibits that show that he spent his own cash money to buy those shares.

The lawsuit was triggered -- counsel keeps talking about they fessed up in May.  The lawsuit was not triggered by any bad news from the company.  It was triggered by a short seller, Bear Cave, out to make a quick buck.

And Your Honor picked up on something that I missed, and thank you for that.  The complaint here ended on May 1 as Mr. Petersen filed it.  The Bear Cave report was on May 2.  So it's curious that the litigation began at -- I guess it didn't want to blame it on the Bear Cave Report, but in the end, when you look at the amended consolidated complaint that counsel's defending today, it's built on the Bear Cave report.  That's what triggered this.

Unlike the usual securities fraud case where a company puts out a bad news announcement and a shareholder says, oh, I wish we'd known that before, we would have paid less, there was no bad news announcement by the company.  The day before, they put out their earnings results for the quarter, which exceeded the street expectations.

Your Honor had asked two questions.  They're not part of my argument, but I do want to address them.  You asked when Mr. Petersen bought his stock, and I think counsel said it isn't in the record.  It is in the record.  It's in the

Stephen W. Franklin, RMR, CRR, CPE
United States Court Reporter
stephen_franklin@cand.uscourts.gov (561)313-8439

original complaint in the docket.  At the end of the complaint, Mr. Petersen bought his whopping 200 shares on August 3rd, 2022.

And Your Honor asked about stock prices, and that's in the record, as well.  That is contained in exhibit 25.  And if the Court looks at exhibit 25, you see that in late April --

(Reporter clarification.)

**MR. FELDMAN:**  I'm sorry.  My apologies.

If the Court looks at exhibit 25, it shows the trading price each day.  In late April, the stock had been trading in the mid to high 11s.  May 1, which is when Petersen's class period ended, it was at 11.92.  May 2, before the Bear Cave report came out -- it came out that day -- 10.97.  It dropped a little over the next few days.  And then later that month it had exceeded that price again.  It was up to 11.72, 12.22.

So this notion that when TPVG, when TriplePoint put out the news, investors had a 20 percent loss because the stock got tanked, the numbers don't reflect that.  But I just wanted to make clear to the Court that that information is in the record.

**THE COURT:**  All right.  And I wanted to ask another question.  This might be beyond the pleadings, but the time period when the banks closed, when Silicon Valley Bank closed, First Republic and Signature Bank, that was during March through May of 2023?

**MR. FELDMAN:**  If I can type fast, Your Honor, I'm

going to get the answer for you.  March 2023.  You're exactly right.  Silicon Valley Bank was shut down in March 2023 by the California Department of Financial Protection.  So it was after that.  It was in the two months after that, TriplePoint put out its results for the March quarter in which it beat earnings expectations.  Beat, not fell short.  And at the same time, Bear Cave put out a report saying, oh, they have lousy business, and that triggered a short-term slight drop in the stock.

THE COURT:  And can you give me your definition of "speculative short seller"?

MR. FELDMAN:  Yes; Bear Cave.  It's someone who purports to be an analyst in the way that you might look at TD Ameritrade or Goldman Sachs publishing about a company, and then you make an informed decision about, do I want to put part of my 401k in that stock.

A short seller's goal is to drive down the stock price by coming up with all the garbage they can about a company.  Sometimes they try to get people inside to give them news.  What made the Bear Cave report especially disturbing is it purported to have no inside information.  The author of the Bear Cave report said this is based entirely on publicly available information.  And since the Bear Cave report is the foundation stone of this lawsuit, it makes one wonder where was the disclosure violation if the report that triggered this was

based entirely on public information.

That ties to -- and I'm going to get for a second to the *CareDX* decision Your Honor wrote. It ties to the absence of CWs. Fortunately for Your Honor, because you haven't been on the bench here for so long, you haven't had dozens of these as your colleagues have. But I think as you saw it even in *CareDX*, the way to get past the reform act barriers is with inside information on what happened. In *CareDX* you had eight FEs. Sometimes they called them CWs, because they want to make it look like an indictment; confidential witnesses. Other times they say FEs, former employees. You had eight FEs in *CareDX*, and some of them were pretty high up and purported to know a lot about what the individual defendants knew.

Here we have the big doughnut of CWs. There are none. There are no inside documents. There's nothing where somebody leaked it to the SEC saying, oh, on this date there was a meeting of the loan valuation committee and such and such happened. It's a lawsuit devoid of that.

So it's not sometimes -- my colleague tried to make this, you know, we'll get discovery, and then we might find stuff, we might not. It doesn't work under the reform act. Unlike virtually every type, every other type of civil lawsuit in federal court, where there are pretty lenient pleading standards, the reform act imposed its own world, especially on scienter.

So we discussed three independent bases for dismissing the complaint, but I'd like to only talk about one.  I am available at Your Honor's pleasure to talk about falsity and loss causation.  I think you've highlighted on both very valid points, but I think the shortest distance to a dismissal is over scienter, and so I'd like to focus on that.

As Your Honor knows from *CareDX* and recited clearly there, the scienter standards are different.  This isn't -- it's not enough -- like in a normal lawsuit, if there's an element of intent and the complaint says, we allege that she acted with intent, that's enough at the pleading stage.  But here Congress said, no, you need a lot more than that.  It has to be strong inference.

So here's why the complaint fails to allege scienter:

First, no CWs or internal documents, unlike virtually every shareholder class action that survives a motion to dismiss, based entirely on the Bear Cave short seller report.

Many of your brothers and sisters on the bench, Your Honor, have thrown out lawsuits recently in the last few years -- we cite them -- based on short seller reports.  But this short -- not all short seller reports are equal.  This one's at the bottom of the barrel, because it did not purport to have any inside information, anything that wasn't already known to the market.

Again, *CareDX* is a good example.  Eight FEs there; none

here.

When you look at the scienter theories, they're really two.  They do them as three, but I think that they're really two.  One is motive and opportunity, and the other is access to information slash poor operations.  And I'd like to address them in that order, please.

Motive and opportunity, even using that as a basis to plead scienter under the reform act is a stretch.  There's a lot of language and Ninth Circuit decisions that say motive and opportunity isn't enough.  But the absence of motive and opportunity is often fatal.  Here, the motive and opportunity allegations are remarkably weak.  No sales of stock by the individuals.  The CEO -- I'm sorry, CFO actually bought stock twice.

There was no use of the allegedly inflated stock to buy up other companies.  So in some cases the plaintiffs can establish scienter by saying they were about to close an M&A transaction, so they needed the price to stay high enough for a month so that they could do that.  There's nothing like that here.

There is no plausible reason -- not just -- this isn't balancing 51-49.  There's no plausible reason why the defendants would knowingly lie about the value of their loan portfolio for a few months, knowing that news about the borrowers would eventually come out.

And I try not to burden you with a lot of citations, but

there's one case that's actually right on point, Your Honor. It's the Second Circuit decision in *Shields* against *Citytrust*, 225 F.3d, at 1130.  It was Second Circuit in 1994.  So it was just before the reform act, so it's much more lenient standards than Your Honor has.  And it affirmed the dismissal of a shareholder class action about loan valuations.  And here's what the Court said, and I won't read too much of it.  Quote: "It is hard to see what benefits accrue from a short respite from an inevitable day of reckoning.  There is no claim here that false statements were made in an effort to sell off shares held by management or to delay a criminal prosecution.  For related reasons, the complaint fails to allege a sufficient opportunity to derive a benefit from the alleged misstatements and nondisclosures.  The ordinary course of bank business would lead to the review of the loan portfolios, as it did," closed quote.  And that is our case in spades.

The process that counsel -- again, that there's a little poetic license about these guys were powerful, and they had conflicts, and they could do whatever they wanted.  Well, not really.

Here is the process.  And this is set forth in great detail, and there's nothing in the opposition or the complaint to challenge it.  This is all in the record.

There is an elaborate redundant valuation process for the loans.  There is a valuation committee of the board of

directors.  It recommends the valuation to the board.  Neither of the two defendants is on that committee.  They cannot be. It is formed entirely of independent directors.  So even if those two had a conflict and wanted to be good to their venture capital buddies, doesn't matter.  A committee of independent directors makes the recommended valuation.  At the same time, there are outside independent valuation firms that recommend a value range for every major loan.  That is above one percent of TriplePoint's assets.  So you have independent directors recommending valuation, and then you have outside valuation experts recommending it.  That then goes to the board of directors of TriplePoint, and it determines the fair value of each loan.  There are eight directors; six of them are independent.

This is not -- this is not just some whim.  That's the Investment Company Act of 1940 that establishes what these boards have to do, and the fair value estimates for each loan are revisited every quarter.

So when Mr. Fredericks says, you know, they should have done it earlier, well, if something changes during a quarter with a particular borrower, you wait 'til the process -- you don't rush out every day.  There is a process for going through it.

But wait, there's more.

The company has outside auditors as a public company,

Deloitte & Touche.  They then review these fair value estimates.  In the most recent 10-K, the annual report, Deloitte certified that it had reviewed, quote:  "The valuation techniques and unobservable inputs used by management to estimate the fair value," closed quote, of TriplePoint's loans and concluded that TriplePoint, quote:  "Presented fairly in all material respects its financial position," closed quote.

So there's just nothing in the complaint other than a wish and a prayer to suggest that even if the two executives had larceny in their heart, they could circumvent all that and somehow override the independent directors, the outside valuation group, the independent board as a group, Deloitte & Touche, that they could overwrite them -- override them all to have phony numbers on the books, which would eventually come out anyway if the loans deteriorated.  It just doesn't make any sense, Your Honor.

In the end, what the complaint boils down to is this. During a very turbulent time in our economy -- COVID, Ukraine, interest rates going up, venture funds drying up -- some of the loans that TriplePoint had made deteriorated because the borrowers experienced difficulties.  Some of the borrowers went bankrupt, although there's actually no allegation in the complaint that TriplePoint was injured materially by that given its security interests.

For example, of the 18 portfolio companies cited in the

complaint, plaintiff alleges that TriplePoint fully wrote off its loans to only two of them.  That's in paragraph 76 and 107 of the complaint.

Also, as we note in our papers, Your Honor -- and this is super complicated -- TriplePoint is a BDC.  It's a business development company.  It's a strange creature that Congress established to make it easier for growth companies to get loans.  And as a result, unlike typical tech companies that don't give dividends, BDCs do give dividends.  And fortunately for us, in the record we have the dividends.  It's from our 10-Q.  It's exhibit number 10, which is about a 10-page exhibit.  This is -- at the bottom of exhibit 10 it has number 53.  At the top of it, it says page 9 of 11.  And that has all of the company's dividends that it paid out to shareholders from the time it launched in 2014.

And if you -- it's the farthest right column in that.  I probably should have printed this out.  I'm sorry, Your Honor. But exhibit 10, at page 9.  And if you look at the dividends going back to Petersen's class period beginning in '20, 36 cents a share, a lot of quarters whether it's 36 cents.  At the end of December it went up to 37 cents, and then March and June and September of 2023, it went up to 40 cents.

So this notion that the wheels were coming off the bus but the insiders hid it for as long as they could, the allegations in the complaint do not support that.

Thank you, Your Honor. I'm happy to answer any questions you have.

**THE COURT:** Thank you. I think you've answered pretty much most of them. Thank you.

**MR. FELDMAN:** Thank you.

**THE COURT:** All right. Counsel?

**MR. FREDERICKS:** Your Honor, first of all, my friend, Mr. Feldman, kept talking about Mr. Petersen. Mr. Petersen was not our client. We did not file the complaint on his behalf. He was represented by a different law firm. I take no responsibility for what the Pomerantz firm or what Mr. Petersen thought, and I resent the notion that somehow this Court should somehow be looking at what Mr. Petersen did, when the Court, in its wisdom, has appointed Mr. Solotruk the lead plaintiff. So I object strenuously to that line of attack.

I also object strenuously to the characterization of the Bear Cave as a short seller report. There's nothing in the record that indicates it's a short seller. In fact, as we pointed out in our reply papers, our opposition brief, the Bear Cave is written by -- is simply alleged to be a widely read stock newsletter, and the author of that report expressly disclaims having a position in any stock. And yet Mr. Feldman, as he did in his papers, has gotten up repeatedly and said he's the short seller, he's the short seller, he's the short seller. You know, it's -- there's nothing in the record to say he's a

short seller.

And Your Honor, I will just direct the Court's attention to the *In Re: BFI Holding* case, 977 F.3d 9' -- I'm sorry, 977 F.3d 781, a 2020 Ninth Circuit case, which goes into very great detail about how, in fact, short seller reports, even if it was a short seller, short seller reports can be the basis for loss causation allegations where the short seller, analyst, newspaper writer, whatever, has pulled together strains of information that would not normally be apparent to an investor.

Now, admittedly under the fraud on the market doctrine, if the company issues a public statement on a Form 8-K, the market's going to be presumed to understand that. But here, what happened with Bear Cave and what we've tried to elaborate in our own research, is putting together strands of information about VanMoof, about Medley, about the Pill Cloud, about RenoRun, privately held companies for which there's only very, very limited information, if any, that's available. And what Mr. Dorsey, the author of the Bear Cave newsletter did, was pull that together.

Now, Mr. Feldman says, huh, the market, of course, couldn't have paid any attention to this, and look at the market prices from March and from December and from I don't know when. First of all, he cites no case law or authority suggesting that the Court has some kind of free rein to start looking at prices over months or years and inferring its own

conclusions as to what that means.  The Court doesn't have that latitude.  You know, the Court is confined basically by the complaint.

But let me ask Your Honor a question.  If the Bear Cave's report and information were so outrageous and so baseless, oh, this is just some slander, and that all serious market participants dismissed it, well, the company then went out and filed its 10-Q the following day.  And Mr. Feldman, with all his discussion about dividends and whatnot, Mr. Feldman sort of makes it sound as if, oh, the stock price immediately recovered.

What did the stock price do after the company made its own separate disclosures, two separate disclosures, Bear Cave and the company?  The stock price went down another 10 percent. And if you look at the analyst commentary -- and we cite some of it in our complaint, so it's not only of -- you know, in the record, it's in the complaint -- you'll see that what -- that the market was concerned.  The market was concerned that TPVG was overrepresenting the credit quality of its portfolio.

Now, it wasn't expressly concerned that the house -- there was a house of cards all about to collapse, but it was material.  It was a 20 percent decline.  Analysts talk about it.  You know, you have the company itself admitted belated downgrades.  So, you know, the notion that there's no loss causation here, that no one was hurt, no one suffered a loss,

Mr. Petersen, who my firm has no relationship with, has no relationship --

THE COURT:  Well, actually, let me go to Mr. Solotruk.

MR. FREDERICKS:  Yep.

THE COURT:  When he acquired his stock, it's in your complaint that it was artificially inflated during the class period, and he was damaged thereby.  What do you mean when you say it was artificially inflated by whom when he acquired it, and does it matter that it was artificially inflated if it's not attributable to the defendants?

MR. FREDERICKS:  Yes.

THE COURT:  And then what is the period of time during which the damages are sought?  Is it for one week?  For a year, when the period of -- when the stocks dropped from 12 to $10?

What are your specific dates for that plaintiff?

MR. FREDERICKS:  Your Honor, I can provide the information with respect to the specific plaintiff.  For standing purposes, the plaintiff only needs to have purchased within the class period, because obviously there are people who purchased throughout the entire class period at different times.

Depending on when they bought and sold, they will have --

**THE COURT:** Well, we've got to figure out this injury, but go ahead.

**MR. FREDERICKS:** Yeah, I will be happy to provide just a, you know, two-page letter to Your Honor which gives you those details, because I can't give you those details right now.

**THE COURT:** And they're not in the complaint?

**MR. FREDERICKS:** I don't believe they are in the complaint, because all we need to allege a prima facie basis is that the plaintiff purchased during the class period, and we have alleged --

**THE COURT:** But he suffered a loss.

**MR. FREDERICKS:** If he purchased in the class period, he, like all other class members, Your Honor, would have suffered a loss through the presumption of the fraud on the market reliance principle. All people who purchased in the market during the period of time when the stock price was artificially inflated would be damaged.

**THE COURT:** All right. And artificially inflated by the defendants.

**MR. FREDERICKS:** Because what the defendants' statements were saying, high quality, exceptional companies, only invest in the best, you know, here's our credit watch, you know. But our contention is that the company overstated the quality and understated the portfolio risk, and consistent with

what is our minimal pleading burden, or plausibility pleading burden under loss causation, we have shown that inflation in the stock came out in May, and that is the presumptive measure of inflation, presumptive measure of damages.

It's more complicated than that, but for pleading purposes I think that should be sufficient.

THE COURT:  All right.

MR. FREDERICKS:  I just want --

THE COURT:  And one last question.  I hate to interrupt you, but what effect do you think that the closure of the banks in that period of March to May had on this stock?

MR. FREDERICKS:  Your Honor, two points.

THE COURT:  Uh-huh.

MR. FREDERICKS:  First of all, it's entirely outside the record.

THE COURT:  Okay.

MR. FREDERICKS:  We try not to burden the courts unnecessarily.  We will respectfully request that Your Honor read the *Coja* (phonetic) case as to the limits on judicial notice and --

THE COURT:  And incorporation?

MR. FREDERICKS:  And incorporation by reference.

And obviously, you know, just because we incorporated by reference, or just because some things are in a document that says X, like a 10-K, that doesn't -- and we cite to stuff in

the 10-K to show, for example, that the defendants got monthly P&Ls, they got monthly board packages, they got all this inside information from the portfolio, just because we cited to that doesn't mean that we, you know, cite it for the truth of the loan values.

THE COURT:  No, I understand.

That's why I asked you to be sure to address the judicial notice and incorporation by reference cited in the reply brief of the defendant.

MR. FREDERICKS:  So I think *Coja* does it better than I could.  I think Your Honor knows what the limits are, so I'm not going to presume too much.

THE COURT:  All right.

MR. FREDERICKS:  But with respect to other activity in the market, you know, as *Coja* says, defendants just have this narrative, oh, you know, Silicone Valley Bank and the market and other things.  That's all outside of the record. And, in fact, the only thing that's inside the record is if you look at some of the stock -- some of the analyst commentary that we do cite in our complaint, it actually talks about how the decline of Silicon Valley Bank should actually be good for TriplePoint.

But, again, Mr. Feldman says, oh, it's bad for everybody. No, a lot of analysts thought this was actually going to be good, which is frankly why the Ninth Circuit says, you know,

the Court should be covered by what's in the complaint.  We aren't afraid to address it.  Silicon Bank happened in March. These declines happened in May.

So again, I think I tried to touch upon -- Mr. Feldman actually said something that was -- again, I hate to flag it for saying something incorrect, but paragraph 246 he made the comment that, oh, well, there's no allegation you have in a lot of cases where the defendants benefited from inflated stock price because they were doing an offering or a merger, and they were using inflated stock shares as currency.  In fact, at paragraph 246 of the complaint we allege that the company raised $47 million at that inflated stock price.  And so that's a further benefit that I'm glad that Mr. Feldman reminded me of, because I'd forgot it before.

And again, he, you know, talked about, well, there's no restatement, no SEC charges, no enforcement proceedings.  The vast majority of securities fraud cases that are brought do not involve restatements or SEC charges or enforcement proceedings. That's why the Supreme Court constantly talks about the importance of private securities actions as a vital supplement to government enforcement actions.

And starting at the beginning of Mr. Feldman's comments that this is an accounting fraud case, with respect to loan values that can be construed as accounting fraud.  But with respect to the statements touting the company's investments as

only in high-quality companies or their credit watch allegations, those are not accounting fraud allegations. Mr. Feldman would simply have the Court ignore them. The Court should not.

There are three categories of statements, and they should be reviewed separately.

The one final thing I want to address is Mr. Feldman's comments about, oh, all these valuations are reviewed as irrational for anyone to have made these investments or delayed in writing them off. There are plenty of reasons in fraud cases, it happens all the time that people start saying, well, let me just get away with it for this month or next month, and things will come back and I won't be caught out. You know, situations do change sometimes, but, you know, here, these third-party reviewers, there's no allegation that they had access to all the monthly financials or board packages.

And his comment that, oh, the valuation committee was completely independent. Well, Your Honor, again, I think Your Honor's entitled to apply some common sense. Mr. Labe and Mr. Srivastava were the investment committee of TPA, the adviser. TPVG is basically a shell, and they invest the way TPA advises them.

Now, I don't deny that the TPVG board members may get a package, you know, once a month that sorta says here are our valuations, but they are not the people doing the detailed

valuations.  That's clear.  That's clear from the 10-K.  That's being done by the investment committee which is Mr. Labe and Mr. Srivastava.  They're the people who have the access to the information.  The accountants, they come in maybe once a year. These outside evaluators, maybe they come in for certain investments once a year, not every quarter.  Mr. Labe and Mr. Srivastava, they have their fingers on the pulse.  They know these companies.  You know, that's the whole reason why people invest with TPVG, because of their expertise and involvement.

And again, I just ask the Court to ponder the question that I posed originally, which is either they were just the unluckiest business folks in the world that somehow, oh, our borrowers always lied to us in the board packages we got, always lied to us in the monthly financials.  You know, yeah, we just saw stuff, what we read in the paper and disclosed it as quickly as possible.  Why were they always the last to learn, you know, allegedly or they had to read in the papers? Aren't they meant to be getting this stuff first?  They're the ones that have access to the inside information.

So, Your Honor, I suspect that I have gone over my time limit.

**THE COURT:**  Actually, you haven't.  You have five more minutes, and I have one last question.

**MR. FREDERICKS:**  All right.  I will try my best, Your

Honor.

**THE COURT:**  All right.  The difference between what plaintiff paid and the security mean trading price over 90 days after the corrective measure is usually the limitation placed on damages under a loss causation analysis.

**MR. FREDERICKS:**  Yes.

**THE COURT:**  What was the difference between what plaintiff paid for his shares of stock and the mean trading price over 90 days after the Bear Cave report, if you know?

**MR. FREDERICKS:**  Uh, Your Honor, I don't know because that hasn't been calculated, because to my knowledge there is no case that requires that to be calculated at the pleading stage.

**THE COURT:**  Okay.  All right.  I'm just looking at the statute, and that was a question that just kind of stood out for me.

All right.  Thank you.

**MR. FREDERICKS:**  Your Honor, if I may just have one quick minute just to see whether there's anything else I missed.

I didn't realize I still had some time.

Again, you know, the allegation here is not that these defendants went out and deliberately invested in poor companies.  That is not the allegation.  The allegation is they invested in companies, and they deteriorated and decayed,

unfortunately. I'm sure nobody wishes that that had happened. But when that happens, the securities laws embody a principle of full and fair disclosure, not misleading a reasonable investor. And it's our contention that after a certain point when things decay, you have to come clean. Under their credit ratings, when they say there's some problems and you're no longer performing at expectations, you have to come clean. It has nothing to do with what was said at the beginning.

And you did, Your Honor, have a question about risk warnings. And I will grant you that in this case there is risk disclosure in the prospectus that warns investors that, you know, the stocks -- you know, there's no guarantee of a return, no guarantee of a dividend, no guarantee against default. But it is ironclad, as the cases in our brief point out, that while, to quote one famous court, while it may be prudent to warn that the untoward may occur, it is fraud to represent something as a risk, as merely a risk, when the risk has already come to pass. And that is just hornbook law. And while I concede that is an argument that defendants often make, the case law says it's a stringent standard to prevail on that basis, because it basically is an argument that you've rebutted materiality as a matter of law because your risk disclosures were so clear.

But I can warn you all day long that I may default next month, but if I'm already in default and I'm just telling Your

Honor I might default next month, I am misleading Your Honor.

I will endeavor to address what I think is Your Honor's question about standing.  Is there a particular form you would like it?

**THE COURT:**  No, I've asked the questions.  Anything else that you'd like to share, please do in the final word that you have.

**MR. FREDERICKS:**  Your Honor, it is nice to have COVID over, even though it's a long flight from New York.  It's always a pleasure to actually be back in federal court again, and I thank the Court for its time.

Thank you.

**THE COURT:**  Thank you.

Thank you for the travel in this weather.  I appreciate it.

Counsel?

**MR. FELDMAN:**  May it please the Court?

I guess the fact that Mr. Fredericks and I have known each other for 20 years didn't keep him from mischaracterizing what I said to the Court when he said that I had represented to Your Honor that during the class period, TriplePoint didn't sell any stock or do any M&A.  That is not what I said, and I trust that the court reporter will bear me out on that.  What I said is none of the individual defendants sold a share.  The CFO, whom they dropped today, sort of like a battlefield promotion, it

was a brevet dismissal.  He bought stock, and I said that the company did not do any M&A activity.  I know that there was a secondary offering that they did, a modest one a year before the bad news, but I -- one shouldn't accuse someone of misleading the Court when one didn't say that.

Counsel talked with a supplemental submission.  I don't feel a need for one.  The information you asked him about is in the record.  In fact, he filed it.  With the lead plaintiff papers there is a document that shows all of Ronald Solotruk's trades.  It lays out the date they happened and the amount.  They ended by December of 2022, long before the Bear Cave report, and they ranged in prices from 10.90 a share up to 17.05 a share.

So that's all in the record already, and for our part we don't feel the need for more briefing here.  We've burdened the Court with a lot of paper.

Finally we found the emergence of a CW, CW 1, William Fredericks, who represents to the Court that, yeah, there may have been a majority of independent directors, but everybody knows that the two big guys dominated them, and there was no way they could stand up.  And if he had actually gotten someone in a position with personal knowledge to say, notwithstanding the statutory structures required by the Investment Company Act of 1940, it was all a sham, the six independent directors didn't really follow the procedures they were required to, then

that would be a tough motion for me, Your Honor. But for him to say that as if he were in the room where it happened doesn't satisfy the reform act.

At the end of the day, what we have is a highly turbulent time in the American financial markets, and at the end of each quarter, TriplePoint updated its ratings of the different loans. That doesn't make it securities fraud.

I'm happy to answer any questions Your Honor has.

THE COURT: No questions.

MR. FELDMAN: Thank you, Your Honor, very much.

THE COURT: Thank you.

MR. FREDERICKS: Your Honor, I would just say if my client's trading records are in the record, and they should be on the lead plaintiff, I would agree with Mr. Feldman that unless your court has a question, hopefully the record is sufficient. But like Mr. Feldman, I'm sure both sides stand ready to respond to any further requests for information you may have.

So with that caveat, unless there's something specific you want from me --

THE COURT: No further.

MR. FREDERICKS: -- I'll just thank you again.

THE COURT: Thank you.

Thank you both for being just so well prepared and tolerating my questions and providing me with some additional

education.

I appreciate it.  Thank you.

(Proceedings concluded at 2:46 p.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:  Thursday, April 20, 2024

_____

Stephen W. Franklin, RMR, CRR, CPE
Official Reporter, U.S. District Court